No. 26-1527

# United States Court of Appeals
# for the Federal Circuit

**ABC IP LLC, RARE BREED TRIGGERS INC.,**

*Plaintiffs-Appellants,*

*v.*

**PEAK TACTICAL LLC, dba Partisan Triggers, NICHOLAS NORTON,**

*Defendants-Appellees.*

APPEAL FROM UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING, IN NO. 2:26-CV-00018-KHR, JUDGE KELLY H. RANKIN

## PLAINTIFFS-APPELLANTS OPENING BRIEF

John W. Thornburgh
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
thornburgh@fr.com

Carl E. Bruce
Matthew A. Colvin
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
Tel: (214) 747-5070

Benjamin J. Christoff
Elizabeth DeToro
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W., Suite 1000
Washington, DC 2024
Tel: (202) 783-5070

Jory M. Hoffman
FISH & RICHARDSON P.C.
150 N. Riverside Plaza, Suite 2820
Chicago, IL 60606
Tel: (212) 278-2700

Glenn D. Bellamy
WOOD HERRON & EVANS, LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: (513) 707-0243

April 13, 2026

*Attorneys for Plaintiffs-Appellants*
*ABC IP LLC, Rare Breed Triggers, Inc.*

# EXEMPLAR CLAIMS AT ISSUE ON APPEAL

## Claim 4 of U.S. Patent No. 10,514,223 B1 (Appx53-62)

4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

## Claim 4 of U.S. Patent No. 11,724,003 B2 (Appx63-92)

4. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**Claim 3 of U.S. Patent No. 12,036,336 B2 (Appx93-1 22)**

3. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said

disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**Claim 1 of U.S. Patent No. 12,274,807 B2 (Appx123-149)**

1. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer hook and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during

forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants ABC IP LLC and Rare Breed Triggers, Inc. certifies the following:

1.  Provide the full names of all entities represented by undersigned counsel in this case.

    **Rare Breed Triggers, Inc.**
    **ABC IP, LLC**

2.  Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

    **Kevin Maxwell**

3.  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    **LAD, LLC**
    **Leleux LLC**
    **1861 LLC**

4.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

    **Fish & Richardson P.C.:** **Jory M. Hoffman**
    **Koch Law P.C.:** **Nathan A. Nicholas; Travis W. Koch**

5.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

    **Yes (*see* Notice of Related Case Information at Dkt. 7).**

6.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

    **None/Not Applicable.**

Dated:  April 13, 2026

/s/ John W. Thornburgh
John W. Thornburgh

# TABLE OF CONTENTS

EXEMPLAR CLAIMS AT ISSUE ON APPEAL ..................................................... i

CERTIFICATE OF INTEREST ..................................................................... i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... v

STATEMENT OF RELATED CASES ............................................................. viii

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES..................................................................... 1

INTRODUCTION ......................................................................................... 3

STATEMENT OF THE CASE......................................................................... 5

I.      Rare Breed Creates a New Market for FRTs by Investing in
        R&D and Legal Precedent.................................................................5

        A.      Forced Reset Triggers ................................................................5

        B.      The Patents-at-Issue ...................................................................6

                1.      Exemplary Figures Illustrating Forced Reset Mode.................. 8

                2.      Exemplary Figures Illustrating Standard Semi-
                        Automatic Mode ......................................................... 11

                3.      Representative Claims ................................................. 12

        C.      Rare Breed Wins the Right to Market Its Patented FRT
                Products Under Certain Conditions .......................................14

II.     In Late 2025, Partisan Deliberately Floods the Market with
        Cheap Copies of Rare Breed's FRT Products ...............................15

III.    Rare Breed Shows Its Entitlement to Preliminary Injunctive
        Relief 20

        A.      Overview of Relevant District Court Proceedings...........................20

B.   Rare Breed Satisfies the Four-Factor Test for Preliminary
     Injunctive Relief .................................................................23

          1.   Rare Breed Is Likely to Succeed on the Merits ...................... 23

               a.   Infringement .................................................... 23

               b.   Validity and Enforceability ........................................ 27

               c.   False Advertising .................................................. 29

          2.   Rare Breed Bears Significant Risk of Irreparable
               Harm ................................................................... 34

          3.   The Balance of Equities Favors Preliminary
               Injunctive Relief ...................................................... 38

          4.   The Public Interest Favors Preliminary Injunctive
               Relief ................................................................. 39

IV.  The District Court Denies Rare Breed's Requested Relief ...........................40

     A.   The District Court Denies Preliminary Injunctive Relief ..................40

     B.   The District Court Denies Rare Breed's Follow-Up
          Motion for Tailored Expedited Discovery .........................................43

SUMMARY OF THE ARGUMENT ........................................................ 45

STANDARD OF REVIEW ................................................................ 49

ARGUMENT ............................................................................. 50

I.   The District Court Erroneously Found the Likelihood of
     Success Factor Weighs Against Rare Breed .................................................51

     A.   Rare Breed Amply Demonstrated Its Likelihood of
          Success on Patent Infringement .........................................................51

          1.   The District Court Incorrectly Found a Claim
               Construction Dispute Precludes a Determination of
               Likely Infringement ................................................... 51

iii

2. The District Court Incorrectly Found Partisan Raised a Substantial Question of Invalidity ............................. 55

B. The Record Confirms Rare Breed's Likelihood of Success in Proving False Advertising, and the District Court's Finding Otherwise Is Incorrect ............................... 58

II. The District Court Erroneously Found the Irreparable Harm Factor Weighs Against Rare Breed ............................... 59

III. The District Court Erroneously Found the Balance of Equities Factor Weighs Against Rare Breed ............................... 63

IV. The District Court Erroneously Found the Public Interest Factor Weighs Against Rare Breed ............................... 64

ADDENDUM ............................... 68

CERTIFICATE OF SERVICE AND FILING ............................... i

CERTIFICATE OF COMPLIANCE ............................... ii

iv

**Page(s)**

**Cases**

*ABC IP, LLC et al. v. Hoffman et al.*,
No. 1:25-cv-00389-CLC-CHS (E.D. Tenn.) ...................................22, 43, 65, 66

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015) ...................................................................39

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996) ..............................................................35, 61

*BlephEx, LLC v. Myco Indus., Inc.*,
24 F.4th 1391 (Fed. Cir. 2022) ...................................................50, 56, 57, 58

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*,
100 F.4th 1251 (10th Cir. 2024) ................................................................61

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) .............................................................49, 63

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013) ..................................................................62

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ..................................................................53

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
156 F.4th 1259 (Fed. Cir. 2025) .................................................................52

*Garland v. Cargill*,
602 U.S. 406 (2024)................................................................................14

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
376 F.3d 1339 (Fed. Cir. 2004) ..................................................................56

*Greater Yellowstone Coal. v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) .............................................................50, 61

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)................................................................................27

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ...........................................................................54

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
   848 F.3d 1358 (Fed. Cir. 2017) .........................................................65

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
   741 F. Supp. 3d 568 (N.D. Tex. 2024) .......................................14, 18

*Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*,
   25 F.4th 998 (Fed. Cir. 2022) ............................................................50

*Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008) .........................................................57

*Payless Shoesource, Inc. v. Reebok Int'l Ltd.*,
   998 F.2d 985 (Fed. Cir. 1993) .................................................*passim*

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .............................................24, 52, 54

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) .........................................................52

*Polymer Techs., Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996) .....................................................35, 61

*Procter & Gamble Co. v. Kraft Foods Glob., Inc.*,
   549 F.3d 842 (Fed. Cir. 2008) ...........................................................51

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
   237 F.3d 1359 (Fed. Cir. 2001) ...................................................35, 60

*In re: Rare Breed Triggers Pat. Litig.*,
   MDL No. 3176, Dkt. 44 (J.P.M.L. Apr. 2, 2026) .............................23

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) .........................................................62

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) .............................................49, 54, 61, 63

*Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*,
320 F.3d 1081 (10th Cir. 2003) ...............................................................40

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ......................................................52, 53, 55

*Titan Tire Corp. v. Case New Holland, Inc.*,
566 F.3d 1372 (Fed. Cir. 2009) ......................................................27, 55, 58

*Unwired Planet L.L.C. v. Google, Inc.*,
660 F. App'x 974 (Fed. Cir. 2016) .............................................................50

*Windsurfing Int'l v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986) ..............................................................39, 64

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................................................49

**Statutes**

15 U.S.C. § 1125(a)(1)(B) ...............................................................58, 59

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a)(2), Rare Breed states that no appeal in or from the same proceeding was previously before this or any other appellate court, and that the following are cases that may directly affect or be directly affected by the Court's decision in this appeal:

- *Rare Breed Triggers, Inc., et al. v. DNT d/b/a Deez Nutz Tactical, et al.*, No. 4:25-cv-00298 (D. Idaho)

- *Rare Breed Triggers, Inc., et al. v. Harrison Gunworks LLC, et al.*, No. 4:25-cv-00299 (D. Idaho)

- *Rare Breed Triggers, Inc., et al. v. 80Mills LLC, et al.*, No. 1:25-cv-01262 (N.D. Ohio)

- *Rare Breed Triggers, Inc., et al. v. Z3 Productions LLC d/b/a Z3 PRO*, No. 5:25-cv-00695 (W.D. Okla.)

- *Rare Breed Triggers, Inc., et al. v. Steven Thanh Nguyen, et al.*, No. 4:25-cv-02961 (S.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Hanes Tactical LLC, et al.*, No. 3:25-cv-00201 (W.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Dairyland Defense Solutions, LLC, et al.*, No. 2:25-cv-00852 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Jesse T. Kline*, No. 3:25-cv-00454 (S.D. Miss.)

- *Rare Breed Triggers, Inc., et al. v. AR-TT, LLC, et al.*, No. 2:26-cv-00014 (E.D. Wash.)

- *Rare Breed Triggers, Inc., et al. v. Christopher Cope*, No. 2:26-cv-00033 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. MaRs Trigger, LLC, et al.*, No. 2:26-cv-00030 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. WebCorp, Inc., et al.*,
  No. 4:26-cv-00018 (E.D. Mo.)

- *Rare Breed Triggers, Inc., et al. v. SGC, LLC, et al.*,
  No. 2:26-cv-00085 (D. Ariz.)

- *Rare Breed Triggers, Inc., et al. v. Hawkphin Sales, LLC, et al.*,
  No. 4:26-cv-00015 (S.D. Iowa)

- *Rare Breed Triggers, Inc., et al. v. Cloak Industries, Inc., et al.*,
  No. 1:26-cv-00001 (D. Idaho)

- *Rare Breed Triggers, Inc., et al. v. AS Designs, LLC, et al.*,
  No. 1:25-cv-01192 (M.D.N.C.)

- *Rare Breed Triggers, Inc., et al. v. Firearm Systems LLC, et al.*,
  No. 2:25-cv-04938 (D. Ariz.)

- *Rare Breed Triggers, Inc., et al. v. Hoffman Tactical, LLC, et al.*,
  No. 1:25-cv-00389 (E.D. Tenn.)

- *Rare Breed Triggers, Inc., et al. v. PistolCap Limited Company, et al.*,
  No. 2:26-cv-00053 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Hush Distribution, LLC*,
  No. 2:26-cv-00054 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. ProSource Firearms, LLC*,
  No. 2:26-cv-00055 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Mister Guns, LLC, et al.*,
  No. 2:26-cv-00056 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Superior Firearms of Texas, LLC*,
  No. 2:26-cv-00058 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Optics Planet, Inc., d/b/a, OpticsPlanet*,
  No. 1:26-cv-01072 (N.D. Ill.)

- *Rare Breed Triggers, Inc., et al. v. HK Parts Inc.*,
  No. 2:26-cv-00090 (D. Utah)

- *Rare Breed Triggers, Inc., et al. v. Orion Arms Corp, d/b/a Orion Wholesale*,
  No. 4:26-cv-00032 (S.D. Ind.)

- *Rare Breed Triggers, Inc., et al. v. TRG Ventures, LLC, et al.*,
  No. 2:26-cv-00201 (E.D. Tex.)

- *Rare Breed Triggers, Inc., et al. v. Canuck Tactical, LLC, et al.*,
  No. 2:26-cv-00576 (E.D. LA.)

- *Atrius Development Group Corp., Inc. v. Rare Breed Triggers, Inc., et al.*,
  No. 7:26-cv-00057 (W.D. Tex.)

- *In re: Rare Breed Triggers Patent Litigations*,
  No. MDL-3176 (J.P.M.L.)

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) and 1292(c)(1) over this appeal from the district court's order denying Plaintiff-Appellants ABC IP LLC and Rare Breed Triggers Inc. (collectively, "Rare Breed") motion for a preliminary injunction against Defendant-Appellees Peak Tactical LLC, dba Partisan Triggers, and Nicholas Norton (collectively "Partisan").

On February 13, 2026, the district court entered an order denying Rare Breed's motion for a preliminary injunction. Appx1-35. Rare Breed timely filed a notice of appeal on March 12, 2026. Appx3543-3546; 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court reversibly erred in finding that the likelihood of success factor weighs against preliminarily enjoining Partisan from further Disruptor-related infringement and false advertising until trial;

2.     Whether the district court reversibly erred in finding that the irreparable harm factor weighs against preliminarily enjoining Partisan from further Disruptor-related infringement and false advertising until trial;

3.     Whether the district court reversibly erred in finding that the balance of equities factor weighs against preliminarily enjoining Partisan from further Disruptor-related infringement and false advertising until trial; and

4.      Whether the district court reversibly erred in finding that the public interest factor weighs against preliminarily enjoining Partisan from further Disruptor-related infringement and false advertising until trial.

## **INTRODUCTION**

This case involves two competitors in the forced reset trigger (FRT) market, one of which (Partisan) brazenly copied and significantly underpriced the other (Rare Breed), as well as falsely advertised its infringing product. Even so, the district court found that ***all four*** injunction factors weigh ***against*** preliminarily enjoining Partisan until trial. To reach that outcome, the district court plainly misapplied the law and made clearly erroneous fact findings at every factor.

In 2020, Rare Breed finished developing its first FRT product. Rare Breed created the FRT, coined the term, and brought the first product of its kind to market. Rare Breed litigated with the federal government for the next several years over the legality of FRTs, thus investing heavily not only in the technology but in the legal right to market FRTs. The litigation culminated in a settlement in mid-2025, which was reached on "condition" that Rare Breed enforce its patents and promote the safe use of FRTs.

The individuals involved with Partisan knew about Rare Breed for years and followed its litigation with the government. When the settlement was reached, they formed Partisan and used the next seven months to manufacture a nearly identical copy of Rare Breed's FRT-15L3 product (which Partisan called the Disruptor)—which Partisan released in mid-December 2025. Partisan undercut Rare Breed's $450 price by 33% to $299, below Rare Breed's profit per product,

so that Partisan is incapable of paying back Rare Breed's lost profits.  Partisan told the public that the Disruptor practiced Partisan's own '067 Patent, and that the product was an "assisted reset" trigger (a preexisting type of trigger that does not fully reset) rather than an FRT.  Partisan also publicly criticized Rare Breed as greedy bullies going after a monopoly, and shockingly compared Rare Breed to someone who "chain[s] . . . women and children up in his basement and rape[s] them."  Partisan assuaged its customers' and distributors' concerns by informing them that Partisan had already prepared for patent litigation with Rare Breed and so had purchased two $5 million patent liability insurance policies.  Then, in early January 2026, Partisan posted on the popular AR15.com forum to tell the world "[t]his week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end."

Within days, Rare Breed filed suit and moved for a preliminary injunction to preserve the status quo until trial.  The district court's denial rests upon clear legal and factual errors at every factor.  Because the record supports only the conclusion that Rare Breed's motion should be granted, the Court should reverse and remand for entry of the preliminary injunction.

<u>**STATEMENT OF THE CASE**</u>

**I.      Rare Breed Creates a New Market for FRTs by Investing in R&D and Legal Precedent**

**A.      Forced Reset Triggers**

This case involves forced reset triggers ("FRTs") that can be retrofitted into existing semi-automatic rifles.  Appx1482-1485 (¶¶8-18).  In simple terms, an FRT is a trigger that is forcibly reset by the action of a firearm.  Appx2204 (16:17-19).  The federal government has previously regulated and closely monitors FRTs because they are designed to allow rifle users to take faster follow-up shots without manually releasing pressure on the trigger.  Appx1410; Appx1485 (¶¶16-19).

FRTs are distinct from other types of firearm triggers.  First, standard semi-automatic triggers are different in that they require the user to manually release the trigger so it can reset before taking a follow-up shot.  *See infra* § I.B.1-2; Appx1389-1394.  Second, fully automatic trigger mechanisms are different in that they let a user to fire repeatedly without resetting the trigger between each shot. *See* Appx1389-1390.  Third, although Partisan contended below that there are similarities between FRTs and assisted reset triggers, its witness[1] Michael Stakes admitted that they ***are functionally different***.  Appx2249-2250 (61:20-62:3); Appx1418.  Mr. Stakes also acknowledged that the ATF has treated the two types

---

[1] Although Partisan's website refers to Mr. Stakes as a "Group Engineer," Appx1418, the record does not show that he has an engineering degree or license.

of triggers differently by more strictly regulating FRTs, and that some customers have consequently favored assisted reset triggers to "settle the[ir] fears" associated with buying FRTs.  Appx2248-2249 (60:15-61:19).

Rare Breed was the first to commercialize FRTs and began developing FRT technology in the years leading up to 2020, when Rare Breed released its original FRT product (called the FRT-15) into the market.  Appx2205-2206 (17:9-18:19). Rare Breed's Asserted Patents (summarized below) arose from Rare Breed's R&D efforts to design a trigger having FRT functionality while avoiding being categorized as a "machine gun" for regulatory purposes.  Appx2207 (19:17-23). Rare Breed worked with experts to achieve that, and its development efforts required significant research, prototyping, testing, and investment before any product was ever brought to market.  *See* Appx2205 (17:9-19).

The FRT market is now sizable.  As one indicator, Partisan—just one of multiple infringing FRT manufacturers now in existence—estimates that it alone expects to sell 1.68 million FRTs in the next three years.  Appx2208 (20:10-19); Appx2283 (95:7-9); Appx1873-1876 (¶¶20-35).

## B.    The Patents-at-Issue

Rare Breed asserts four patents that cover its FRT products: U.S. Patent Nos. 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents").  Appx

1872-1873.  ABC owns the Asserted Patents, and RBT holds an exclusive license to them.  Appx1396-1401; Appx1403-04.

The Asserted Patents are in two patent families: (1) the '223 Patent; and (2) the '003, '336, and '807 Patents.[2]  The '223 Patent is the earliest Asserted Patent, filed in 2018 and issued in 2019.  Appx53.  The '003, '336, and '807 Patents were filed and issued between 2022 and 2025, and they all share a common specification given that the '336 and '807 Patents are continuations of the '003 Patent.  Appx63; Appx93; Appx123.

All four Asserted Patents generally describe and cover similar subject matter: FRTs that can be retrofitted into existing rifles.  All four are titled "Firearm Trigger Mechanism."  Appx53; Appx63; Appx93; Appx123.  The relevant asserted claims here—claim 4 of the '223 Patent, claim 4 of the '003 Patent, claim 3 of the '336 Patent, and claim 1 of the '807 Patent (collectively, "Asserted Claims")—are all directed to a firearm trigger mechanism.  Appx1364 (identifying asserted claims); Appx61 (6:56-7:13 ('223 Patent, cl. 4)); Appx89 (11:64-12:61 ('003 Patent, cl. 4)); Appx119 (12:61 ('336 Patent, cl. 3)); Appx149 (10:64-12:14, 12:23-25 ('807 Patent, cl. 1)).

---

[2] For convenience, at certain locations this brief cites the '807 Patent for disclosures common to the '003, '336, and '807 Patents.

The two families of Asserted Patents are similar.  As relevant here, the '223 Patent discloses and claims a semi-automatic rifle trigger mechanism involving a hammer, a trigger member, and a locking bar.  Appx53 (Abstract); Appx61-62 (6:56-7:13 (cl. 4)).  The '003, '336, and '807 Patents describe and claim a device like that of the '223 Patent, but with the added feature of "a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." *See, e.g.*, Appx144 (2:39-42); Appx146 (6:50-7:5); Appx135 (Fig. 7 (safe)); Appx136-139 (Figs. 8A-8D (standard semi-automatic)); Appx140-143 (Figs. 9A-9D (forced reset semi-automatic)).

### 1.    Exemplary Figures Illustrating Forced Reset Mode

The Asserted Patents' figures—such as Figures 3-5 of the '223 Patent and Figures 9A-9D of the '336, '003, and '807 Patents—when viewed sequentially, illustrate the basic workings of an FRT, such as how it uses the action of the rifle to forcibly reset the trigger.  Appx2204 (16:17-19).

Using the '223 Patent's figures for simplicity, Figure 3 shows the FRT "in a cocked a ready to fire status with the bolt and bolt carrier [52] in an in-battery position."  Appx59 (2:59-62).  As shown below, "[t]he sear 48 engages the sear catch 46 of the hammer 18," thereby preventing discharge of the rifle until the trigger is pulled.  Appx60 (4:49-50).



FWD

Appx56 (Fig. 3).

Figure 4 shows "a similar view in which the trigger [26] has been pulled and the hammer [18] has fallen against the firing pin [72]," causing discharge. Appx59 (2:63-64).



Appx57 (Fig. 4).

Figure 5 is another "similar view showing the bolt carrier [52] in a retracted position, forcing the hammer [18] and trigger [26] into a reset status." Appx59 (2: 65-67).

10



Appx58 (Fig. 5).

### 2. Exemplary Figures Illustrating Standard Semi-Automatic Mode

In contrast, the operation of a standard semi-automatic trigger mechanism is shown for example in Figures 8A-8D of the '336, '003, and '807 Patents. Figure 8D in particular (below) shows that, once (i) the bolt carrier has cycled to the rear, (ii) the hammer has pivoted downward, and (iii) the bolt carrier is traveling back to its in-battery position, the hammer hook (53) of the hammer (36) is caught by a disconnector hook (64). Appx146 (6:55-63); Appx148 (9:40-67). "At this point rearward finger pressure on the trigger blade 54 ***must be released***" for the trigger to return to its set position. Appx148 (9:62-66).

11



Appx139 (Fig. 8D).

Thus, whereas a standard semi-automatic trigger mechanism requires a user to manually release rearward pressure so that the trigger can be reset, an FRT does not. In an FRT, even if the user applies rearward pressure on the trigger, the action of the rifle will forcibly reset the trigger in preparation for a follow-up shot. Appx2204 (16:17-19).

### 3. Representative Claims

Claim 1 of the '807 Patent is representative for purposes of this appeal and recites the following (with disputed language emphasized):

1. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse

12

hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer hook and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi-automatic, and forced reset semi-automatic positions,

***whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm***, and

13

*whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.*

Appx148-149 (10:64-12:13); *see also* Appx1667; Appx2288.

## C. Rare Breed Wins the Right to Market Its Patented FRT Products Under Certain Conditions

Rare Breed created today's FRT market by fighting and winning a years-long battle over the products' legality. Shortly after Rare Breed launched the FRT-15, the ATF took the position (later determined to be unlawful) that it was a machine gun component. Appx2197-2198 (9:23-10:15). As a result, Rare Breed had to litigate in several districts and its officers even faced the threat of criminal prosecution. The DOJ eventually obtained a civil preliminary injunction that shut down Rare Breed's operations. Appx2198 (10:3-7); Appx2214 (26:21-24).

These litigations began to resolve in 2024. The Supreme Court held that the federal government had exceeded its authority in regulating bump stocks. *See generally Garland v. Cargill*, 602 U.S. 406 (2024). Soon after, the Northern District of Texas ruled that Rare Breed's FRTs were not machine gun components, but lawful semi-automatic triggers. *See Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp. 3d 568 (N.D. Tex. 2024). In May 2025, while the DOJ's appeal in the Fifth Circuit was still pending, Rare Breed and the DOJ settled. Apppx1410.

14

Under the settlement, the government withdrew its appeal and opposition to Rare Breed selling its FRTs under certain conditions enhancing public safety: Rare Breed would not make FRTs for handguns; Rare Breed would enforce its patent rights; and Rare Breed would promote the safe and responsible use of FRTs. Appx2207 (19:2-8); Appx1410.

## II. In Late 2025, Partisan Deliberately Floods the Market with Cheap Copies of Rare Breed's FRT Products

Peak Tactical LLC, doing business as Partisan Triggers ("Partisan"), formed in mid-2025—just as Rare Breed was settling with the DOJ to confirm the legality of FRTs. Appx1410; Appx1425. Partisan's sole purpose is manufacturing and marketing a virtually identical copy of Rare Breed's FRT-15L3, which it calls the Partisan Disruptor. Appx231 (123:23 ("These triggers are [Partisan's] entire business.")).

The graphic below shows the essential identicality between Rare Breed's FRT-15L3 and Partisan's Disruptor, using CAD images. Appx2266-2268 (78:19-80:18). Partisan witness Michael Stakes admitted that the below CAD drawing of Rare Breed's FRT-15L3 (below, middle) is correct, and that, apart from minor shaping differences in the areas depicted below with pen, the CAD drawing of the Disruptor (below, right) is accurate. Appx2266-2268 (78:19-80:18). Mr. Stakes agreed that there is "***no difference***" in how Rare Breed's FRT-15L3 and Partisan's Disruptor operate. Appx2268 (80:14-17).



Appx2069; Appx2061; Appx2266-2268 (78:19-80:18). On adverse direct

examination, Mr. Stakes agreed that the Disruptor *is* a copy, and volunteered

reasons why—namely that "it uses the energy of the bolt carrier to reset the

trigger" and it has an "out-of-battery safety" or "locking bar." Appx2245-2246

(57:14-58:25).

The individuals who set up Partisan and collaborated to make the Partisan

Disruptor were all well-aware of Rare Breed when they did so. Appx2279 (91:18-

22). Mr. Stakes testified he knew of Rare Breed since 2020, spoke with Rare

Breed's president Lawrence DeMonico in 2021, and was "very aware" of Rare

Breed's litigation with the ATF and DOJ as it was ongoing. Appx2243 (55:9-

56:22). Partisan was also intimately familiar with Rare Breed's Asserted Patents,

even posting two of them (the '223 and '336 Patents) on ***Partisan's own webpage***

called "FRT Legal Library." Appx1421. It was therefore hardly an accident that

Partisan began creating its clone product right when Rare Breed settled its dispute with the government over the legality of FRTs.

Starting in mid-2025, Partisan spent a grand total of $1.5 million dollars to bring the Disruptor to market within about seven months. Appx2322 (123:23-24). Partisan did a "soft release" of the Disruptor on Black Friday 2025 at a gun show in Montana, and fully launched the product on December 15, 2025. Appx2278-2279 (90:3-91:1). Partisan priced its Disruptor $299, far below Rare Breed's $450 FRT-L3 price, and lined up multiple dealers to distribute the Disruptor. Appx1477; Appx1472; Appx1469.

In the months leading up to the Disruptor's release, Partisan also sought the advice of IP attorneys about potential infringement and obtained two $5 million-insurance policies for patent infringement liability. Appx1428; Appx1438-1441; Appx2275 (87:9-24); Appx2280-2282 (92:21-94:2). Partisan actively planned for litigation with Rare Breed over its infringement of Rare Breed's patents. Appx2280 (92:2-5).

In September 2025, Partisan wrote a blog post on AR15.com describing these activities for purposes of announcing its forthcoming trigger product, while keeping secret that Rare Breed was the target of its infringement. It stated, among other things: Partisan "was shown a new trigger design" months ago; Partisan was planning to bring that design to market; Partisan expected someone else to allege

17

that the "design falls within [its] IP rights"; Partisan had undergone "several long months of intensive work with IP attorneys and insurance companies"; Partisan was now "ready to rumble" and interested observers should "[g]et plenty of popcorn ready"; Partisan planned to release its trigger product by the holidays of 2025; and "every part of this project has been preplanned." Appx237-239; Appx369-371; Appx942. However, Partisan did not release enough detail for Rare Breed to know it planned to infringe Rare Breed's patents or how the upcoming product operated. Partisan stated "[f]or reasons that should be obvious, we can't speak publicly yet as to all our plans and intrigues." Appx339. It also quoted Sun Tzu: "Let your plans be dark and impenetrable as the night, and when you move, fall like a thunderbolt." *Id.*

Partisan posted again on January 7, 2026, this time revealing Rare Breed as the target of its infringement campaign, and that it had begun distributing massive numbers of infringing Disruptors into the market. Appx1240-1241; Appx1438-1441. Partisan stated, for example: "we've shipped thousands of triggers to dealers, with thousands more going out by week's end"; Partisan had made "preparations for the inevitable lawsuit from Rare Breed"; Partisan "oppose[]s" public/private partnerships that exist only to [customers'] detriment"; Rare Breed "excels at bullying small companies"; Partisan "won't be bullied or back down";

and Disruptor dealers would be "indemnified under our substantial patent insurance policy." Appx1240-1241; Appx1438-1441.

Partisan's corporate structure and assets are shrouded with secrecy—apparently by design. Partisan described its *modus operandi* in its public online postings before this case ever began: "***Shroud with deception everything you do***." Appx942. Ben Woods is Partisan's supposed spokesperson who controls Partisan's AR15.com account, where Partisan wrote those words. Appx1417; Appx2275 (87:9-88:1). According to Mr. Woods, Partisan is made up of not only Peak but also operates together with two other entities: (i) Dark Flame Innovations, LLC ("Dark Flame"), of which Mr. Woods is the owner and sole manager, and (ii) QOX Consulting, LLC, which is owned by someone named Richard Seddon. Appx1869 (¶2); Appx1870-1871 (¶¶8-15); Appx2273-2274 (85:13-86:15). Either hiding the ball or lacking knowledge about his own business, Mr. Woods testified he does not even know how much money Dark Flame has or how much its assets are worth. Appx2282 (94:3-9). He nonetheless admitted that any damages Rare Breed may obtain would have to come out of the Partisan's two insurance policies rather than the Partisan entities' assets. Appx2280-2282 (92:21-94:21).

Mr. Stakes' role at Partisan is similarly unclear. Although Partisan identifies Mr. Stakes as its "Group Engineer" on its website, Appx1418, Mr. Stakes made clear he works only as consultant or independent contractor with Partisan, not an

19

employee, Appx2240 (52:10-22).  Mr. Stakes oddly does not know if Mr. Woods works at Partisan.  Appx2241 (53:4-7).

**III.**   **Rare Breed Shows Its Entitlement to Preliminary Injunctive Relief**

   **A.**   **Overview of Relevant District Court Proceedings**

On January 15, 2026, eight days after Partisan publicly identified Rare Breed as its infringement target and disclosed its plan to ship thousands of units a week, Rare Breed filed this action.  Appx160-253.  The next day, Rare Breed moved for temporary restraining order and preliminary injunction to preserve the status quo until trial.  Appx1350-1352.  Together with its motion, Rare Breed submitted 27 exhibits (A-AA), including declarations by Rare Breed's technical expert Brian Luettke and its economic expert Dr. Samir Warty.  Appx1356-1386; Appx1480-1529; Appx1622-1650.

On January 20, 2026, the district court issued an order addressing Rare Breed's motion for injunctive relief, setting (1) a response deadline of January 30, 2026, and (2) a hearing for February 4, 2026.  Appx1651.  The district court's order did not set any deadline for Rare Breed to file a reply, nor did it provide guidance on the length of the hearing, whether it would include witness testimony, or whether it would address only TRO relief or also preliminary injunction relief.  Appx1651.  The district court stated, "Counsel will appear in person and should be prepared to present any evidence or argument they may have."  Appx1651.

On January 23, 2026, the district court emailed the parties asking them to "confer as to the time required to present each respective argument during the February 4, 2026, Motion Hearing, and the overall time allotment required." Appx3550. On January 26, 2026, after conferring with Partisan, Rare Breed contacted the Court indicating that the parties "believe that three hours (90 minutes per side) will be sufficient for argument," and asking "if the Court would like to hear from witnesses" because if so "then we need to revisit our time allotment." Appx3549-3550. On January 27, 2026, the district court responded telling the parties simply that "the Court will allot 90 minutes per side for the parties to utilize how they deem appropriate." Appx3549.

Partisan filed its opposition brief on Friday, January 30, 2026. Partisan's submission totaled 357 pages, and included a 129-page declaration by its expert John Nixon on non-infringement and validity, and declarations by Mr. Stakes and Mr. Woods. Appx157; Appx1653-1654; Appx1709; Appx1857; Appx1869. Mr. Nixon's declaration alluded to claim charts detailing invalidity, *see* Appx1743, but Partisan's submissions *did not include* any such claim charts, and Partisan to this day has not provided them (if they exist) to either Rare Breed or the district court.

Rare Breed had no opportunity to reply to Partisan's response. Five days later on February 4, 2026, the district court held a hearing lasting about three-and-

a-half hours on record.  Appx2010.  Partisan called no witnesses.  Partisan did not even bring its technical expert Mr. Nixon or economic expert Scott Cragun to the hearing, and so Rare Breed had no opportunity to cross-examine them.  Appx2192-2193 (4:16-5:13).  Two of Partisan's declarants—Messrs. Stakes and Woods—did attend and so Rare Breed called them adversely.  *See* Appx2238-2255; Appx2265-2268; Appx2273-2284.

For its part, Rare Breed presented all its declarants for testimony and subjected them to cross-examination.  Appx2204-2209; Appx2217-2223; Appx2234-2236; Appx2286-2287.  Those witnesses were Rare Breed president Mr. DeMonico; technical expert Mr. Luettke; and economic expert Dr. Warty.  Appx2209; Appx2217; Appx2286.  Partisan never disputed that Mr. Luettke and Dr. Warty are experts in the subject matter on which they testified.  Appx2221; Appx2286-2287.

The following week, on February 22, 2026, in a separate case, *ABC IP, LLC et al. v. Hoffman et al.*, No. 1:25-cv-00389-CLC-CHS (E.D. Tenn.) ("*Hoffman*"), which involved different defendants, different Rare Breed FRT patents, and a different type of FRT called a "Super Safety," the district granted Rare Breed's motion for a preliminary injunction on a fulsome record after conducting a three-day hearing.  *See generally Hoffman*, Dkt. 45.

In another recent development, on April 2, 2026, the Judicial Panel on Multidistrict Litigation ("JPML") issued an order transferring certain cases to the Eastern District of Texas in a consolidated multidistrict litigation. *In re: Rare Breed Triggers Pat. Litig.*, MDL No. 3176, Dkt. 44 (J.P.M.L. Apr. 2, 2026) ("*MDL*"). The next day, April 3, 2026, the JPML issued a conditional transfer order transferring this case to the same *MDL*. *MDL*, Dkt. 45.

## B. Rare Breed Satisfies the Four-Factor Test for Preliminary Injunctive Relief

In its motion and at the hearing, Rare Breed presented its meritorious case for preliminary injunctive relief. The backdrop of Rare Breed's preliminary injunction case was that Partisan carefully "preplanned," "shrouded," and executed a campaign to copy Rare Breed's $450 FRT-15L3 product and flood the market with its cheaper $299 clone Disruptor product. *See supra* § II. As shown below, Rare Breed presented detailed evidence meeting every preliminary injunction factor, and Partisan's response arguments lacked substance—despite Partisan's self-described advance preparation for litigation.

### 1. Rare Breed Is Likely to Succeed on the Merits

#### a. Infringement

At the outset, Rare Breed showed that it has standing to sue Partisan for patent infringement. *See* Appx1563-1576 (assignments showing ABC's ownership of the Asserted Patents); Appx1395-1404 (ABC's exclusive license to Rare

23

Breed); Appx1377 (Rare Breed's motion presenting these materials to the district court).  Partisan did not dispute Rare Breed's standing.

On the merits of infringement, Rare Breed presented the declaration and testimony of Mr. Luettke, an undisputed expert with over 25 years in the firearms field and over 20 years' experience working at the ATF.  Appx2217-2220 (29:23-32:9); Appx1480-1529.  Mr. Luettke has testified as an expert on firearms 40 times.  Appx2220 (32:14-20).  Mr. Luettke's declaration presents detailed claim charts showing how the accused Disruptor meets each limitation of every Asserted Claim using CAD drawings.  *See* Appx1481-1524.  These facts combined with Partisan's own admissions about its deliberate copying, *see supra* § II, amply showed a likelihood of infringement—and even beyond that, willful infringement.

Rare Breed showed no claim construction was needed, and the Asserted Claims' plain meaning should govern.  Mr. Luettke applied that plain meaning in his analysis, opining that "[t]he Asserted Patents sufficiently describe the limitations of the claims such that their meanings are clear."  Appx1486.  Rare Breed argued—consistent with Mr. Luettke's opinion—that the Asserted Claims do not need construction because (1) claim language is ordinarily given its ordinary and customary meaning under *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc), (2) the Asserted Patents here do not show any clear lexicography or disavowal that would justify departing from the Asserted

Claims' plain meaning, and (3) the Asserted Claims here "use language in its ordinary, rather than technical, sense," applying "the widely accepted meaning of commonly understood words." Appx1379.

Partisan responded with two non-infringement arguments. Rather than brook any material dispute about how Disruptor is designed or works, both of Partisan's non-infringement arguments involved adding timing requirements to the claims.

The first dealt with the "catch" requirement relevant to the '003, '336, and '807 Patents. Here, Partisan added a timing limitation that the disconnector hook must catch the hammer hook—in Partisan's words—"***during***" or "***at th[e] time***" of "the hammer's rearward pivot." Appx1667-1669. But the relevant claim language is plainly broader, reciting ***causation*** of events leading to catching and never explicitly requiring that the catching taking place at any particular time: "whereupon in said standard semi-automatic position, rearward movement of the bolt carrier ***causes*** rearward pivoting of said hammer ***such that*** said disconnector hook catches said hammer hook." Appx119 (12:43-51); *see also* Appx89 (12:35-43); Appx149 (11:38-12:4).

Partisan's second argument was similar. It relates to all four Asserted Patents, and in particular the term "set position." Partisan added another timing limitation that the trigger must arrive back in the set position ***at the moment*** the

bolt carrier is driving the hammer rearward. According to Partisan, the claims require the trigger to be in set position "***at the claimed time*** of the forced reset impulse," or in other words, "***when*** the hammer's rearward movement imparts the forced reset impulse." Appx1669-1671. But again, the relevant language is plainly broader, reciting causation of events leading to the trigger member being put back into the set position, and never defining when that must occur: "whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier ***causes*** rearward pivoting of said hammer ***causing*** said trigger member to be forced to said set position . . . ." Appx149 (12:5-13); *see also* Appx89 (12:44-52); Appx119 (12:52-60).

Partisan also argued that the district court should deny Rare Breed's motion because the Asserted Claims allegedly require claim construction. For support, Partisan argued that the term "substantially in-battery" could conceivably have two meanings—a narrow one ("essentially at the in-battery condition") and a broader one ("a broader band of near-battery positions during forward travel"). Appx1746; Appx1666-1667. However, Partisan nowhere even alleged that the specification contains any clear disavowal or lexicography on this point, such that the claims could be given a narrower scope than their plain meaning.

### b. Validity and Enforceability

The Asserted Patents are presumed valid, even at the preliminary injunction stage. Partisan bore the burden to show that it is more likely than not that Partisan would be able to prove invalidity by clear and convincing evidence at trial. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376-79 (Fed. Cir. 2009).[3]

Partisan presented no anticipation case and never submitted claim charts showing how Partisan's identified prior art references correspond, if at all, to the Asserted Claims' limitations. Partisan counsel confirmed its invalidity case was one of obviousness under *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). Appx2298-2299 (110:16-111:3) ("*KSR* . . . is the seminal Supreme Court case that is directly applicable here . . . ."). Without claim charts, neither the parties nor the district court understood Partisan's invalidity theories, such as (1) which limitations are met and not met by Partisan's identified art, (2) which gaps in the references' teachings might be able to be filled by other of Partisan's references, and (3) whether a POSITA might have had any motivation for combining those teachings to fill those gaps. Partisan's invalidity case therefore was hardly discernible such that it could be evaluated for its strength.

For prior art, Partisan relied primarily on Mr. Stakes' '067 Patent and its allegedly implementing product, the Tac-Con 3MR, as well as a reference called

---

[3] Partisan has not challenged the enforceability of any Asserted Patent.

Bonner.  Appx1663; Appx2300.  The examiner considered both references in allowing the '003, '336, and '807 Patents.  Appx2127-2128.

Partisan's invalidity case was a mishmash of disparate teachings from its identified references, with no cohesive explanation of how those teachings relate to each other or the Asserted Claims.  *See* Appx1663-1666.  In contrast to Partisan's nitpicky, timing-focused non-infringement arguments, Partisan painted with broad brush strokes on invalidity: Although all the Asserted Claims are lengthy and detailed (those of the '003, '336, and '807 Patents are approximately a column long), Partisan reduced limitations to a single word and largely ignored how they interact with each other.  *See, e.g.*, Appx1664 ("The '067 Patent depicts and describes the standard AR hammer/trigger/disconnector architecture . . ., the three-position selector . . ., and the assisted reset mode in which the hammer's rearward movement during cycling actuates the reset lever to drive the trigger back to set.  In addition, decades-old references disclosed the 'locking member" gating function . . . .").

At the hearing, Partisan sought to simplify invalidity for the district court, arguing that the Asserted Patents

> are the exact same as Mr. Stakes' '067 Patent with two exceptions.  One is instead of the reset lever that Mr. Stakes had built in, they made the trigger bigger so they eliminated the reset lever so it is now a one-piece trigger. . . . The second difference is they added . . . the out-of-battery safety . . . .

Appx2300 (112:3-10).  But Mr. Stakes testified otherwise, admitting that there are additional differences beyond just those two.  Appx2244-2245 (there are "other differences").  Partisan's simplistic framing of validity was also belied by Partisan's lead counsel's own rhetoric elsewhere about the "surprising" complexity of the trigger technology in question:

> I will also say, Your Honor, this is complicated stuff.  These triggers are surprisingly complicated.  It took me almost a week of looking at these every day to finally figure out what is actually going on here and how do all of these things interconnect.

Appx2305 (117:18-22).  Partisan failed to spell out—for example, in claim charts—how its identified references related to the Asserted Claims on a limitation-by-limitation basis.  Partisan also focused heavily on the fact that the prosecution histories of the '003, '336, and '807 Patents contain 147 references, ignoring that the examiner specifically indicated that he considered the '067 Patent and Bonner.  Appx2128.

Lastly, Partisan never attempted to reconcile its '067 Patent-based invalidity theory with its own commercial behavior: If Partisan's own '067 Patent (and its alleged implementing 3MR product) already contained Rare Breed's technology, Partisan never needed to release a copy of Rare Breed's product.

### c.  False Advertising

Rare Breed showed that Partisan falsely markets its Disruptor in at least two ways: (1) incorrectly stating that the Disruptor practices its own '067 Patent; and

(2) incorrectly stating that the Disruptor is an "assisted reset trigger" rather than a "forced reset trigger." Appx1380-1381; Appx1482-1485 (¶¶8-18); Appx1524-1529 (¶¶40-47); Appx1413; Appx1462; Appx1465; Appx1469.

Regarding the first, Rare Breed showed with Mr. Luettke's analysis that the Disruptor does not practice any of the '067 Patent's claims. *See* Appx1381; Appx1524-29 (¶¶40-47). Partisan's own witnesses only confirmed Rare Breed's position, and Partisan's only response was facially deficient, relating to ***only a portion*** of one claim (claim 19) of the '067 Patent.

Mr. Luettke specifically opined that the Disruptor does not practice claims 1-18 of the '067 Patent because those claims all require a "reset lever," and the Disruptor has no such feature. Partisan and its expert Mr. Nixon never disputed that, Appx1671-1673; Appx1759-1763 (¶¶115-125), and Partisan's witnesses confirmed that Rare Breed's FRT-15L3 and its Disruptor clone have no "reset lever" as claims 1-18 of the '067 Patent require. Appx2244 (56:16-21); Appx2069; Appx2061; Appx2266-Appx2268 (78:19-80:18).

Partisan argued that the Disruptor practices claim 19 of the '067 Patent (the only remaining claim), but it failed to proffer any theory about how the Disruptor meets all the claim's language. Partisan and Mr. Nixon never set out any limitation-by-limitation analysis, and Partisan's own witnesses' testimony confirmed the Disruptor does not implement claim 19. Specifically, Claim 19

requires that, in both recited modes (which correspond to the Disruptor's (1) forced reset mode and (2) standard-semiautomatic mode, since only those two modes—not safe mode—allow the trigger to be in a "fired position" as recited), "***the movement of the trigger body is arrested by the tail contacting the . . . stop***." Appx1562:41-65. Mr. Stakes testified—vociferously and seemingly unaware of the consequences—that this does not occur in the Disruptor:

> Q. Okay. Did you consider, though, that the trigger is actually stopped ***not by the tail***, indicating that -- by the tail impacting the selector, ***but, instead, by the nose*** of the trigger impacting the housing?
>
> A. I was aware of that . . . .
>
> Q. . . . [I]t is ***actually the nose of the trigger*** impacting the housing when the trigger is pulled that stops the rotation and movement of the trigger, correct?
>
> A. Only ***in semi-automatic***.
>
> Q. And you can tell that by the CAD?
>
> A. ***I can tell by the CAD. I also have a cut-away housing and a cut-away lower receiver that I use for analysis like this.***
>
> Q. Is that right?
>
> A. ***That is right***.
>
> Q. Did you do the same thing for the Rare Breed trigger?
>
> A. ***We sure did***.

Appx2253 (65:21-25). Mr. Stakes' testimony alone forecloses the possibility that the Disruptor practices claim 19.

Partisan's stated reason why the Disruptor practices claim 19 is facially deficient because it corresponds to only *part* of the claim language—i.e., the requirement that the trigger travel distance must be different in each of the two pertinent operating modes. Appx1562 (22:41-65); Appx1672; Appx1759-1763 (¶¶15-25). Partisan's argument was deficient also because it lacked adequate support, resting on unverified evidence that Partisan inexplicably withheld from Rare Breed and the district court. Specifically, Mr. Stakes testified that he measured two different trigger travel distances, but Mr. Stakes and Partisan never disclosed the details of any such measurement. *See* Appx1672; Appx1759-1763 (¶¶15-25). Mr. Stakes admitted those details were missing from his declaration, Appx2250 (62:19-21), and that he "provided them to counsel" but was "not sure if they were included" in Partisan's submission to the district court. Appx2250 (62:22-25); *see also* Appx2251 (63:1-4). In turn, Mr. Nixon relied entirely on Mr. Stakes' unverified measurement testimony to opine that the Disruptor meets the two-distance requirement. Appx1763 (¶¶122-123). The record thus only confirms that Partisan falsely markets its Disruptor as practicing the '067 Patent.

As for Partisan's second falsehood that the Disruptor is an "assisted reset trigger," Partisan's labeling of the Disruptor is contradicted by its own statements, as well as those of its distributors, that the Disruptor is a forced reset trigger. *See, e.g.*, Appx1344 (video titled "Partisan Triggers – The Disruptor – Forced Reset

Trigger"); Appx1472 (distributor website stating "Forced Reset Trigger"); Appx1477 (same). Mr. Luettke (who spent his career at the ATF) opined without qualification that the industry understands "assisted reset triggers" and "forced reset triggers" as categorically different. Appx2232 (44:4-6 ("Very much so.")); *see also* Appx1482-1485 (¶¶8-18).

Partisan responded that its description of the Disruptor as an "assisted reset trigger" is appropriate, allegedly because there is no difference between "assisted reset triggers" and "forced reset triggers." Appx1755-1759 (¶¶105-114); Appx1671 (alleging the two phrases are "interchangeable"). But Partisan's own evidence says otherwise. To start, Mr. Stakes agreed that "there's a difference between an assisted reset trigger and a forced reset trigger in the market" in terms of "their overall general function" and "their functionality." Appx2249 (61:20-62:3). Consistent with Mr. Luettke's testimony, Mr. Stakes testified that his former company, Delta V, advertised that its 3MR is an "ATF-approved *assisted reset not an FRT*" "to settle the fears of some customers that didn't want to purchase FRT triggers" given the ATF's strict regulatory stance at the time towards FRTs. Appx2248-2249 (60:20-61:19). Even in Partisan's and Mr. Nixon's response papers, they walked back their strong statements about the sameness of FRTs and assisted reset triggers—qualifying that the two phrases merely relate to "the same underlying [or fundamental] phenomenon," Appx1756

33

(¶¶106-107), and that the two terms have merely "overlapping" meanings in the industry, Appx1759 (¶114). But they did not refute Rare Breed's evidence that customers and the federal government consider FRTs and assisted-reset triggers different. Partisan's story also makes no sense: Why would a design from 2015 excite the market in 2026? It would not. Rare Breed's product is different. Viewing all the above evidence together shows the likelihood that Partisan misled its customers about the nature of its Disruptor product.

### 2. Rare Breed Bears Significant Risk of Irreparable Harm

Rare Breed also showed that Partisan's deliberate copying spree is likely to irreparably harm Rare Breed in forms that this Court has held support preliminary injunctive relief—lost sales and business opportunities, price erosion, and reputational harm. *See* Appx1381-1383; Appx1622-1650. Preliminarily, Rare Breed's economic expert Dr. Warty characterized the relevant market as a "differentiated niche market" rather than a "commodity market," meaning that "a competing product can rapidly displace an incumbent supplier and, in doing so, permanently alter the competitive landscape." Appx1626 (¶4).

Rare Breed and its economic expert Dr. Warty articulated the documented economic mechanisms for irreparable harm in cases like this, namely, lost sales and business opportunities, price erosion, and reputational harm and loss of goodwill—all of which this Court has held support irreparable harm. *See*

34

Appx1381-1383; Appx1628-1637 (¶¶8-27); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (loss of revenue and goodwill); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (loss of market opportunities that cannot be adequately compensated). When combined, as here, these harms more firmly establish the likelihood of their irreparability.

First, Rare Breed showed it is likely to suffer irreparable lost sales and business opportunities. In Partisan counsel's words, "The sales have been strong." Appx2311 (123:24-25). Partisan predicts it will sell 1.68 million Disruptors in its first three years. Appx2284-2285 (96:23-97:1); Appx1873-1876 (¶¶20-35). Because FRT products are undisputedly durable, all of Partisan's infringing Disruptor sales translate into lost sales opportunities for Rare Breed with little to no opportunity to regain customers, like Rare Breed would have in a commodity market. Appx1381-1382; Appx1626 (¶4); Appx1628-1631 (¶¶8-15).

Second, on price erosion, Rare Breed showed such harm is likely given Partisan's large sales projections (discussed above) combined with Partisan's steep 33% discount in comparison to Rare Breed's FRT-15L3. Appx1382; Appx1631-1633 (¶¶16-19). Dr. Warty explained for example that, according to economic research, "when prices fall in a competitive setting, they often persist at or near the

lower level even after competitive conditions change, because buyers adjust their expectations and renegotiate future purchases around the new reference point." Appx1631-1632 (¶16).

Third, Rare Breed shows that Partisan harms Rare Breed's reputation and goodwill by (1) undercutting Rare Breed's pricing and thereby suggesting to the public that its pricing is uncompetitive or unmerited, and (2) publicly calling Rare Breed a "bully" for its patent enforcement efforts and, shockingly, comparing Rare Breed to someone who "chain[s] women and children up in his basement and rape[s] them until someone stops him." Appx1382; Appx1634-1637 (¶¶22-27); *see also* Appx1284 ("Ben" stating "[t]here is a lot more going on here than any of you are aware of. We look forward to providing further details in court.")); Appx220 (12:14-18).

In response to Rare Breed's irreparable harm showing, Partisan argued that Rare Breed "delayed" "months" and prioritized suing six other entities before Partisan. Appx1673-1676; Appx2308 (120:2-8). But as Rare Breed explained at the hearing, Rare Breed sued Partisan Triggers as a "John Doe" defendant and Mr. Stakes in its first lawsuit against the Disruptor product, just ***eight days*** after Partisan's public launch on December 15, 2025. Appx2321 (133:11-19); Appx2308. Rare Breed then filed this lawsuit on January 15, 2026, once it

uncovered which entities to name as defendants.  Appx160; Appx2321 (133:11-19).

Partisan also ignored that it was not until its January 7, 2026 AR15.com post that Partisan publicly announced that it was ***currently*** in the process of distributing "thousands" upon "thousands" of infringing Disruptors—the first time Rare Breed could have understood the magnitude of Partisan's infringement campaign and the concomitant high likelihood of irreparable harm.  *See* Appx1438.

Partisan's allegation of a "months"-long delay was based on starting the clock with Partisan's September 2025 AR15.com post—yet Partisan did not explain how Rare Breed could have known Partisan planned to infringe the Asserted Patents based on that post.  Appx1673; Appx1428.  In fact, Partisan did not reveal how its product worked at that time or its plan to copy Rare Breed, explaining "[f]or reasons that should be obvious, we can't speak publicly yet as to all our plans and intrigues."  Appx339.

Separately, Partisan argued that Rare Breed's harm would be redressable by money damages, emphasizing that Rare Breed's damages would be calculable.  Appx1676-1679.  Partisan did not meaningfully grapple, however, with the question of ***recoverability***, which the hearing only confirmed is unlikely.  *See* Appx1679.  Mr. DeMonico testified that Rare Breed's profit per trigger amounts to $425 or $350, depending on the model.  Appx2213 (25:1-10).  Assuming the lower

$350 figure and Partisan's 1.68 million-unit predicted sales over three years, Rare Breed's lost profits would undisputedly exceed $500 million. Appx2283 (95:1-14). Yet, when asked how Partisan would pay for that, Mr. Woods said he had "[n]o idea," Appx2283-2284 (95:20-96:1), or guessed that the money would come from Partisan's two $5 million insurance policies, Appx2282 (94:18-21). Perhaps even more troubling, Mr. Woods testified that he did not know how much money or assets his company has. Appx2282 (94:3-17). Regardless, because Rare Breed's $350- and $425-per-product profits *exceed* Partisan's steeply discounted price of $299, there is no possibility that Partisan could make enough money to cover Rare Breed's lost profits. Appx2213 (25:1-10). Appx1472; Appx1477; Appx1367; Appx1407-1408. Partisan's lack of financial history as a new company and its *modus operandi* of secrecy and evasiveness, *see* Appx942 ("Shroud with deception everything you do."), also illustrate the unlikelihood of Rare Breed's recovery absent preliminary injunctive relief.

### 3. The Balance of Equities Favors Preliminary Injunctive Relief

Rare Breed showed that the irreparable harm it is likely to incur absent preliminary injunctive relief, *see supra* § III.B.3, far outweighs any cognizable harm Partisan would incur. Appx1383-1384. Partisan responded that an injunction would harm Partisan's business, Appx1679, citing this Court's precedent that "[o]ne who elects to build a business on a product found to infringe

cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)).

### 4. The Public Interest Favors Preliminary Injunctive Relief

Rare Breed also showed that the public interest favors preliminary injunctive relief. From the outset, the public interest strongly favors protection of patent rights, especially when a patent owner like Rare Breed practices its own patents. Appx1384 (citing *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015)). Even more, the DOJ's statements confirm that the public interest favors preliminary injunctive relief here. The DOJ settled litigation with Rare Breed on "condition" that Rare Breed enforce its patents in furtherance of the government's public safety goals, Appx1410; Appx2357; Appx2207 (19:2-23), and since then the DOJ has submitted a statement of interest in favor of Rare Breed in a separate litigation involving a different type of infringing FRT, stating: "in evaluating the four factors for a preliminary injunction, public interest should be weighted heavily in plaintiffs' favor." Appx2357. Partisan's response did not meaningfully grapple with any of these considerations, but merely reiterated that it would incur harm from choosing to enter into an infringing business and complained generically that patents can permit their owners to charge higher prices. Appx1680.

## IV. The District Court Denies Rare Breed's Requested Relief

### A. The District Court Denies Preliminary Injunctive Relief

The district court denied Rare Breed's motion, finding that all four preliminary injunction factors weigh against Rare Breed. Appx8.

The district court began with irreparable harm. First, on lost business opportunities, the district court found that "a demonstration of loss business opportunities is insufficient to independently establish irreparable harm." Appx10-11. Second, on price erosion, it counted against Rare Breed that it had not already dropped its prices, and found that Rare Breed's damages would be "compensable by money damages." Appx12-14. Third, on loss of market share, the district court stated that "[f]or the loss of market share to be irreparable, it must be both difficult to quantify and difficult to repair," Appx14 (citing *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003)), and counted against Rare Breed that it did not show it has "an established dealer network," Appx15. Fourth, on reputational harm, the district court stated that "the moving party must offer evidence of a reputational loss stemming from the underlying tort—altering how customers perceive the product and making the resulting harm persistent and difficult to quantify." Appx16 (citation omitted). The district court reasoned that Rare Breed's evidence of defamatory statements by Partisan "is irrelevant to th[e] consideration [of reputational harm] without demonstrating this reputational harm

40

flows from the underlying torts alleged," i.e., patent infringement and false advertising. Appx17. The district court acknowledged that Partisan's cheap price "could present a basis for reputational harm as [Rare Breed] suggests," but faulted Rare Breed for "include[ing] no evidence indicating their reputation has been, or will imminently be, damaged." Appx17.

The district court also found that Rare Breed had not shown likelihood of success on the merits. On patent infringement, the district court found that a dispute between the parties on whether the claim term "substantially in-battery" needed construction precluded any determination about the likelihood of Rare Breed's success in proving infringement. Appx20-25. The district court credited the declaration of Partisan's expert, Mr. Nixon, even though Partisan did not bring him to the hearing and thus Rare Breed never had the opportunity to cross-examine him. *See* Appx24-25; Appx28. The district court faulted Rare Breed for not "attempting an express definition of 'substantially in-battery position,'" Appx25, and not providing a fulsome enough "direct rebuttal" to Defendants' argument that claim construction was needed, Appx25. Addressing validity, the district court found that Defendants met their burden of "rais[ing] a substantial question of validity" based on the '067 Patent and Tac-Con 3MR product, Appx27, and that the prosecution history only showed "limited consideration by the Patent office of this prior art," Appx28. The district court further found that Partisan's failure to

present any limitation-by-limitation analysis on invalidity and the Patent Office's express consideration of the '067 Patent and its implementing 3MR "call into question" invalidity but nevertheless "fail to demonstrate the Defendants['] validity challenges lack substantial merit." Appx28 (citation and quotations omitted).

On false advertising, the district court credited Partisan's allegation that "the Disruptor is in exact compliance with claim 19 of the '067" based on Mr. Stakes' alleged measurement of trigger travel distances and Mr. Nixon's reliance on that alleged measurement. Appx30. In doing so, the district court again credited Mr. Nixon's declaration even though he did not appear for the hearing and, thus, could not be cross-examined. The district court also credited Partisan's argument that "assisted" and "forced reset" "are used synonymously to describe the same class of mechanisms." Appx30. The district court further reasoned that, because Rare Breed had not shown facial falsity of Partisan's statements, Rare Breed also carried the burden of proving "actual influence of [Partisan's] representations on consumers." Appx30.

The district court also found "the balance of hardships favors [Partisan]." Appx31. It reasoned that "the requested remedy is extreme" and found an "absence of evidence demonstrating irreparable harm" to Rare Breed, "shifting the balance of favor of [Partisan]." Appx32.

Lastly, on public interest, the district court framed the inquiry as "whether there exists some critical public interest that would be injured by the ***grant*** of preliminary [injunctive] relief," Appx32 (citation and quotation marks omitted), but it never identified any such critical public interest, *see* Appx32-34.  The district court instead found that *Hoffman*—where the DOJ filed a statement of interest in Rare Breed's favor—"is factually distinguishable from the present case," Appx33-34, and reiterated its finding that Rare Breed had not adequately "raised . . . patent infringement concerns" or "demonstrated irreparable harm."  Appx34.

### B.     The District Court Denies Rare Breed's Follow-Up Motion for Tailored Expedited Discovery

The next week, Rare Breed moved for targeted, expedited discovery to confirm whether the district court's stated reasons for denying preliminary injunctive relief were sound.  First, Rare Breed sought to get to the bottom of whether Partisan would be able to satisfy a judgment if its infringement continued until trial—an assumption that underlay the district court's denial of preliminary injunctive relief.  Appx3409-3418.  Rare Breed observed that the district court had "credited Partisan's representation that two insurance policies totaling $10 million could help satisfy any eventual judgment," even though (1) Rare Breed's predicted damages would exceed $500 million, (2) Partisan had yet to produce its two insurance policies, (3) Mr. Woods could not say whether the policies cover willful infringement damages or attorneys' fees, (4) Mr. Woods could not say the value of

Partisan's assets, and (5) Mr. Woods stated he had "no idea" how Partisan would be able to satisfy a judgment. Appx3414-3415. Rare Breed argued the facts should be further developed on this critical irreparable harm issue. Appx3413-3415.

Rare Breed also requested narrow discovery to confirm the district court's bases for denial—including to obtain Partisan's expert's invalidity claim charts, CAD files, and trigger travel measurement data that had never been produced yet were part of Partisan's opposition to preliminary injunctive relief. Appx3416-3417. Rare Breed showed that its requested discovery was appropriate, posing no undue burden to Partisan, being narrow in scope, and having a neutral impact on the case schedule. Appx3416-3418.

The district court denied Rare Breed's motion for expedited discovery. It stated that Rare Breed's requested discovery would be "futile," since Rare Breed's motion "focus[ed] on hypothetical irreparable harm the Court found unpersuasive." Appx47. It reasoned that the district court's denial of preliminary injunctive relief itself, and the consequent lack of any pending injunction motion in this case, weighed against Rare Breed's discovery request. Appx43. It also counted against Rare Breed the alleged lack of "an intervening change in controlling law or the need to correct clear error or prevent manifest injustice." Appx44. The district court also reasoned that Rare Breed "did not act with due diligence in bringing [its]

original motion" for preliminary injunctive relief, overlooking Rare Breed's explanation that Rare Breed never sat on its rights but rather (i) sued Partisan in its first Disruptor case just eight days after its December 15, 2025 release, and (ii) filed the instant case separately in Wyoming the next month after uncovering the correct entities to sue. *See supra* III.B.2; Appx2321; Appx44-45. The district court also faulted Rare Breed for not explicitly requesting a continuance to cross-examine Partisan's absent expert witnesses, despite Rare Breed telling the district court in closing it had hoped and planned to cross-examine them and had not had the opportunity to submit a rebuttal paper to their analyses. Appx2317-2318; Appx2321; Appx45. The district court also faulted Rare Breed for "cho[osing] the timing of [its] emergency motion on an exceptionally incomplete record." Appx49. On the issue of recoverability of damages, the district court acknowledged that Partisan's "financial condition must be assessed before money damages may be considered in place of injunctive relief," Appx49, but reasoned that Rare Breed "must *first* show irreparable harm requiring compensation." Appx49-50.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in denying Rare Breed's motion for preliminary injunction that would enjoin Partisan from further infringement with its Disruptor product until trial. For each applicable factor, the district court

misapplied the law, made clearly erroneous factual findings, or both.  Because the record only supports the conclusion that each factor weighs in favor of preliminarily enjoining Partisan's infringing conduct, the Court should reverse and remand for entry of a preliminary injunction enjoining Partisan from its Disruptor-related infringing conduct and false advertising until trial.

On likelihood of success on the merits, Rare Breed showed the likelihood of success in proving infringement.  The district court, however, accepted Partisan's argument that the term "substantially in-battery" could have two possible meanings (a narrow one and a broad one), that the term needed construction, and that the need for construction precluded the district court from determining likelihood of success of the merits.  As a legal matter, however, plain language is generally entitled to the full scope of its plain meaning, and that is true here since Partisan never alleged, and the district court never found, any clear evidence of disavowal or lexicography exists that could support any construction other than the plain meaning.

Rare Breed also amply showed likelihood of success on false advertising. Partisan never rebutted, and its witnesses confirmed, that the Disruptor does not practice any claim of the '067 Patent—yet Partisan markets the Disruptor as practicing it.  Although Partisan argued that the Disruptor meets one claim (claim

19), it only showed that it meets part of the claim and its witness confirmed the Disruptor does not practice another part of it.

Partisan plainly failed to show any substantial question of invalidity. It submitted an indiscernible invalidity case, devoid of any limitation-by-limitation analysis, any showing of how references could fit together, and any evidence-based motivation to combine amounting to more than attorney argument. At bottom, Partisan's invalidity case consisting of a collection of high-level concepts Partisan alleged that loosely correspond to the Asserted Patents and the prior art. The district court's finding of a substantial question of invalidity under these circumstances was clear error.

On irreparable harm, the district court failed to apply the governing "significant risk" test, instead requiring proof that Rare Breed's irreparable harm had already fully come to fruition only days after Partisan began shipping thousands of units per week. The district court overlooked critical facts showing Rare Breed's significant risk of irreparable harm, including that it would be *impossible* for Partisan to pay back Rare Breed's lost profits totaling at least $500 million over the next three years since Rare Breed's $350- and $425-per-product profits exceed Partisan's discounted $299 price, and that Partisan shockingly called Rare Breed rapists in a widely-read firearm forum called AR15.com. The district court also overlooked that Partisan deliberately copied Rare Breed's FRT-15L3

product and predicted millions of sales over three years, and that Partisan's witnesses testified they have "no idea" how they would pay Rare Breed's damages or whether its insurance covered willful infringement or attorney fees.

In balancing the harms, the district court incorporated its above errors into its balancing. It also erroneously found that, somehow, Partisan's two unverified $5 million patent insurance policies, which would cover only a small fraction of Rare Breed's damages, ameliorated concerns that Partisan would be unable to satisfy a judgment.

On public interest, the district court never identified any "critical public interest that would be injured by the grant of injunctive relief" (the relevant question) yet still found the public interest weighs against Rare Breed. The district court focused largely on distinguishing another Rare Breed case where the DOJ advocated that the public interest weighs heavily in Rare Breed's favor. But the district court's distinguishing factors are immaterial and have nothing to do with the reasons why the DOJ submitted its statement of interest. The DOJ's position stems from its settlement with Rare Breed—which opened the FRT market—on "condition" that Rare Breed enforce its patents and promote the safe use of FRTs. That condition applies equally here.

Because the record only supports preliminarily enjoining Partisan from further infringement and false advertising until trial, the Court should reverse and remand for entry of the preliminary injunction.

## **STANDARD OF REVIEW**

The Court reviews procedural matters and substantive legal issues over which this Court does not have exclusive subject matter jurisdiction under the law of the regional circuit in which the district court sits, here the Tenth Circuit. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 987 (Fed. Cir. 1993). The Court applies its own law to substantive issues within its exclusive appellate jurisdiction, including patent law. *Id.* at 988.

The Tenth Circuit "reviews the grant of a preliminary injunction for abuse of discretion." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1153 (10th Cir. 2001). "A district court abuses its discretion if it commits an error of law, or is clearly erroneous in its preliminary factual findings." *Id.*

To obtain a preliminary injunction in the Tenth Circuit, a movant must show "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). "Because a

preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003) (citation omitted).

The Court "review[s] a district court's claim construction based solely on intrinsic evidence de novo," and "review[s] subsidiary factual findings regarding extrinsic evidence for clear error." *Unwired Planet L.L.C. v. Google, Inc.*, 660 F. App'x 974, 977 (Fed. Cir. 2016).

## ARGUMENT

The record supports only the conclusion that each preliminary injunction factor favors granting Rare Breed's motion. The district court abused its discretion—misapplying the law or making clearly erroneous factual findings—in finding that all four applicable factors weigh against preliminarily enjoining further infringement by Partisan until trial. *See* Appx1351; Appx8. For these reasons, set forth fully below, the Court should reverse the district court's denial of the preliminary injunction, and thereby prevent further infringement and false advertisement pending trial. *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, 25 F.4th 998, 1009 (Fed. Cir. 2022); *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1404 (Fed. Cir. 2022).

**I. The District Court Erroneously Found the Likelihood of Success Factor Weighs Against Rare Breed**

**A. Rare Breed Amply Demonstrated Its Likelihood of Success on Patent Infringement**

The record shows that the Disruptor likely infringes the Asserted Claims. *See supra* Statement of the Case ("SOC") §§ II, III.B.1.a-b. Not only does the record establish that Partisan carefully planned and launched a willful infringement campaign using a clone of Rare Breed's FRT-15L3, which implements its Asserted Claims, *see supra* SOC § II, Rare Breed submitted Mr. Luettke's declaration and claim charts showing specifically how the Disruptor meets every limitation of the Asserted Claims, *supra* SOC § III.B.1.a. The record also lacks any substantial question of invalidity. *See supra* SOC § III.B.1.b.

**1. The District Court Incorrectly Found a Claim Construction Dispute Precludes a Determination of Likely Infringement**

The district court abused its discretion in finding that Partisan's supposed dispute about the meaning of "substantially in-battery" precluded it from determining likelihood of infringement. Appx19-25. Partisan's contention that the mere possibility that "substantially in-battery" might have two meanings (a narrow one and a broad one)—which the district court accepted—is legally erroneous and factually unsupported. Appx1666-1667; Appx19-25; *Payless*, 998 F.2d at 991 (legal error qualifies as abuse of discretion). Claim construction is a question of law that the district court should have resolved if it was required. *E.g.*, *Procter &*

*Gamble Co. v. Kraft Foods Glob., Inc.*, 549 F.3d 842, 847-48 (Fed. Cir. 2008) (remanding for consideration of preliminary injunction including necessary claim construction).

But here the district court also should have applied ordinary meaning. It is settled law that there is a "'heavy presumption' that claim terms carry their ***full*** ordinary and customary meaning." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1273 (Fed. Cir. 2025); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) (citation omitted); *see also Phillips*, 415 F.3d at 1312 ("We have frequently stated that the words of a claim "are generally given their ordinary and customary meaning."). Thus, "[t]he patentee is free to choose a broad term and expect to obtain the ***full scope*** of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). Here, because Partisan never even alleged that Rare Breed had clearly defined or disclaimed any part of "substantially-in battery," Appx1666-1667, the only correct conclusion was to afford the phrase the full scope of its plain and ordinary meaning.

Partisan seized on the term of degree "substantially" to suggest perhaps the phrase should not receive the full scope of its plain meaning. Appx1666-1667. The district court credited the opinion of Partisan's expert Mr. Nixon on this point,

even though he did not appear at the hearing for cross-examination. Appx23-24. Meanwhile, the district court did not account for the inference of infringement established by the detailed infringement analysis of Mr. Luettke, or even mention him by name, let alone address his credibility or qualifications given his career at the ATF. *See supra* § III.B; Appx19-25.

Terms of degree like "substantially," however, are permissible, and claim terms need not have mathematical precision. *See, e.g.*, *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1345-46 (Fed. Cir. 2018). As for specification evidence, Partisan and its expert Mr. Nixon pointed solely to the '223 Patent's statement that the bolt carrier is "at or near its in-battery position" and the '003, '336, and '807 Patent's statement it "has reached (or nearly reached) its closed, in-battery position." Appx1746-1747; Appx1753-174; Appx1666-1667; Appx61-62 (4:61-5:9, 5:55-65); Appx88 (10:27-42); Appx118 (10:30-45); 10:32-47). Although Mr. Nixon conclusorily opined that these are "not identical[] formulations[,] underscor[ing] . . . [the claim term's] ambiguity," Appx1753, the cited specification language is hardly clear evidence of a disavowal or disclaimer that would require construing "substantially in-battery" away from its full plain meaning. *Thorner*, 669 F.3d at 1367. In any event, Mr. Nixon's opinion here has no value since it merely interprets the intrinsic record, which is the

Court's role. *Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

Moreover, the specification's different formulations are entirely ***consistent*** with each other and phrase "substantially in-battery" itself. Partisan thus did not come close to showing any other meaning apart from the full plain meaning would be appropriate. *RoDa*, 552 F.3d at 1213 (no evidence supporting counterargument to likelihood of success on the merits). Therefore, the district court's finding that a need for claim construction existed precluding a finding of likely infringement was legally incorrect and factually unsupported.

Further, the record does not support any finding other than likely infringement. Partisan raised two non-infringement arguments that the district court did not reach, *see* Appx19-25, but both are a straightforward matter of claim interpretation and do not involve any factual dispute about how the Disruptor operates. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) (Claim construction "is exclusively within the province of the court."). Both of Partisan's arguments are facial attempts to read in unsupported and nonexistent timing limitations into the claims. *See supra* SOC § III.B.1.a. Whereas the Asserted Claims plainly recite language of ***causation*** culminating in certain events—(1) "catching" the hammer, and (2) the trigger arriving in "set position"—Partisan wrongly argued that these events need to happen at particular times not

54

supported by the claims.  *See supra* SOC § III.B.1.a.  Importantly, Partisan never so much as alleged that the Rare Breed had engaged in lexicography or disavowal that could support its new timing requirements, and so its timing requirements cannot be correct.  *See* Appx1667-167; *Thorner*, 669 F.3d at 1367.

For these reasons, the Court should reverse the district court's finding of no likelihood of infringement.

### 2. The District Court Incorrectly Found Partisan Raised a Substantial Question of Invalidity

The district court also abused its discretion in finding that Partisan raised a substantial question of invalidity.  Appx27-28; *See supra* SOC § III.B.1.b.  The district court rested this finding on crediting the incomplete declaration of Partisan's expert, Mr. Nixon, even though he did not attend the hearing to be cross-examined.  Appx27-28.

To start, merely finding that Partisan "raised a substantial question of validity" is not enough to defeat a preliminary injunction.  It merely shifts the burden back to the patentee to present contrary evidence.  *E.g.*, *Titan Tire*, 566 F.3d at 1376-77.  Rare Breed more than carried that burden, demonstrating that Partisan failed to show a motivation to combine, did not provide invalidity claim charts despite its lengthy opposition, and relied on prior art already rejected by the Patent Office, including the '067 Patent that Partisan emphasized.  Appx2318-2319 (130:9-19, 131:6-24).

The district court legally erred in its analysis of the Asserted Patents' prosecution history. It is well-established that a patent challenger's burden becomes "especially difficult" when it rests on art already considered by the Patent Office. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citation omitted). The district court turned this principle on its head, however, reasoning that the examiner's consideration of the asserted prior art supports ***Partisan's invalidity showing*** because the examiner only gave the art "limited consideration." Appx28; Appx2127-2128. In doing so, the district court evaluated Partisan's invalidity case using an incorrect legal standard. *Payless*, 998 F.2d at 991.

The district court's finding is also clearly erroneous in light of the gaps in Partisan's invalidity case, which foreclose any substantial question of invalidity. *See supra* SOC § III.B.1.b. As a contextual point, Partisan's lead counsel voluntarily described the trigger technology in question as "surprisingly" complicated, Appx2305 (117:18-22), and indeed the Asserted Claims of the '003, '336, and '807 Patents occupy an entire column, Appx89 (11:60-12:52); Appx119 (11:63-12:60); Appx148 (10:63-12:14). The complexity here requires more than conclusory arguments. *BlephEx*, 24 F.4th at 1403-04 ("[W]here the level of skill in the art is so high, conclusory attorney argument is not enough."). Partisan was obliged to spell out—for example, in claim charts—how its identified references

56

related to the Asserted Claims on a limitation-by-limitation basis. *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (inadequate expert opinion on obviousness "simply retraced the path of the inventor with hindsight" and "discounted the number and complexity of the alternatives").

Yet, Partisan's invalidity case could scarcely be evaluated for its strength. Partisan pitched its case at the high level of concepts vaguely corresponding to the Asserted Patents and prior art, and presented no showing of (i) how the prior art references corresponds (or not) on a limitation-by-limitation basis, or (ii) how the references might fit together where necessary. *See supra* SOC § III.B.1.b. It also rested primarily on the '067 Patent, which the examiner considered. *See supra*. At the hearing, Partisan oversimplified its theory, arguing there are only two differences between Rare Breed's technology and the prior art, but Partisan's witnesses admitted more differences existed. Appx2300 (112:3-10); Appx2244-2245.

Additionally, and critically, Partisan offered mere attorney argument for a motivation to combine. *See* Appx1663; Appx2299; *BlephEx*, 24 F.4th at 1401 ("[A] substantial question of validity cannot be manufactured through mere supposition about what an artisan with highly advanced skill in the medical field might do."). Absent any discernible theory on how the prior art could render the

Asserted Claims invalid, the district court's finding on a substantial question of invalidity was clearly erroneous. *BlephEx*, 24 F.4th at 1403 ("Myco's conclusory obviousness argument did not pose a substantial question of validity."); *Titan Tire*, 566 F.3d at 1384. The district court's finding of a substantial question of invalidity should be reversed.

### B. The Record Confirms Rare Breed's Likelihood of Success in Proving False Advertising, and the District Court's Finding Otherwise Is Incorrect

Partisan falsely advertises that the Disruptor practices the '067 Patent. Rare Breed showed that the Disruptor does not actually practice any claim of the '067 Patent, and Partisan failed to rebut this showing. The district court thus clearly erred in finding that Partisan "presented adequate counteranalysis" to Rare Breed's showing on likelihood of success on its false advertising claim. Appx30; 15 U.S.C. § 1125(a)(1)(B); *Payless*, 998 F.2d at 991; *see supra* SOC § III.B.1.c.

The '067 Patent has 19 claims, and Partisan only ever alleged the Disruptor practices claim 19. *See supra* SOC § III.B.1.c. In response to Rare Breed and Mr. Luettke identifying language in claim 19 the Disruptor fails to meet, Partisan and Mr. Nixon argued that the Disruptor meets ***only a part*** of that language, namely the limitations requiring different trigger travel distances. *See supra* SOC § III.B.1.c. Meanwhile, Partisan ***never contended*** that the Disruptor meets claim 19's requirement that, in the two recited modes, "the movement of the trigger body

is arrested by the tail contacting the . . . stop." *See supra* SOC § III.B.1.c. Partisan's witness openly admitted that the Disruptor does not meet that language. Appx2253 (65:21-25). The record is therefore clear that Partisan falsely markets its Disruptor as practicing claim 19 of the '067, confirming Rare Breed's likelihood of success on false advertising.

Although a second falsity is not needed, *see* 15 U.S.C. § 1125(a)(1)(B), Partisan's own evidence shows that it also wrongly markets its Disruptor as an "assisted reset trigger" instead of a "forced reset trigger." *See supra* SOC § III.B.1.c. Partisan's counterargument rested on the notion that the two phrases are "synonymous," but Mr. Stakes agreed that there *is* a functional difference between the two product types, and that customers view them differently. Appx2248-2249 (60:20-62:3). For all of the above reasons, the Court should reverse the district court's finding that Rare Breed did not adequately show a likelihood of success on the merits.

## II. The District Court Erroneously Found the Irreparable Harm Factor Weighs Against Rare Breed

This is a case about a direct competitor selling a cloned product at a lower price and taking the patentee's customers. It is thus not surprising that Rare Breed amply demonstrated the significant risk that Partisan's infringement will irreparably harm it. *See supra* SOC §§ II, III.B.2. Rare Breed showed, in summary, that Partisan (i) has deliberately flooded the market (predicted at 1.68

million units over just three years) with copycat Disruptor products at a 33% discount, (ii) has lobbed gratuitous insults at Rare Breed publicly, even stooping so low as to publicly suggest that Rare Breed "chain[s] women and children up in [a] basement and rape[s] them," and (iii) will certainly not be able to compensate for Rare Breed's damages—which, using Partisan's own numbers, will exceed $500 million over three years. *See supra* SOC §§ II, III.B.2. Importantly, Rare Breed's $350- and $425-per-product profits ***exceed*** Partisan's $299 Disruptor price, and so there is no possibility of Partisan fully compensating Rare Breed—even if it is assumed (incorrectly) that Partisan receives the full $299 price and its retailers receive none. *See supra* SOC §§ II, III.B.2. Partisan's witnesses thus testified that they have "no idea" how they would pay the $500 million, Appx2283-2284 (95:20-96:1); that the money would, absurdly, come from two alleged $5 million insurance policies that Partisan never produced, Appx2282 (94:18-21); and that even Partisan's owners did not know how much money or assets Partisan had, Appx2282 (94:3-17); *see also* Appx942 (Partisan publicly stating, "Shroud with deception everything you do."); *see also supra* SOC § II. Rare Breed and its expert Dr. Warty enumerated the established categories of likely irreparable harm as lost sales and business opportunities, price erosion, and reputational harm. *See supra* SOC §§ II, III.B.2; *Purdue*, 237 F.3d at 1368 (price erosion and loss of

market position); *Bio-Technology*, 80 F.3d at 1566 (loss of revenue and goodwill); *Bridwell*, 103 F.3d at 975-76 (loss of market opportunities).

In the Tenth Circuit, "a plaintiff satisfies the irreparable harm requirement by demonstrating a ***significant risk*** that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa*, 552 F.3d at 1210 (citation and quotation marks omitted); *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1267 (10th Cir. 2024) (requiring "a likely threat of irreparable harm to the movant"). In other words, "[a] plaintiff who can show a significant risk of irreparable harm ***has demonstrated*** that the harm is not speculative and will be held to have satisfied his burden." *RoDa*, 552 F.3d at 1210 (citation and quotation marks omitted). "[A]n injury is not speculative simply because it is not certain to occur." *Flowers*, 321 F.3d at 1258-61 (holding district court abused its discretion by, *inter alia*, "appl[ying] the wrong standard in evaluating whether the harm was speculative").

Despite mentioning the "significant risk" standard once, the district court otherwise ignored it. *See* Appx9-17. The district court instead found that the irreparable harm factor "weighs ***against***" Rare Breed merely because some of the established types of harms that Dr. Warty addressed in his analysis had not fully come to pass. *See* Appx1628-1638 (¶¶8-31); Appx1640-1641 (¶¶36-38). For example, on price erosion and lost market share, the district court faulted Rare

Breed for not already dropping its prices and proving its loss of market share, even though Rare Breed filed its motion just days after Partisan started shipping its Disruptor in volume. Appx11-15; *see supra* SOC §§ II, III.B.2.

In the face of the parties being direct competitors, and Partisan taking customers by selling a cloned product at a lower price, the district court applied an unduly strict standard, one that weighs future irreparable harm against the movant. In so doing, the district court contradicted this Court's precedent. Lost market share supports irreparable harm, especially when the accused infringer is a direct competitor. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153-54 (Fed. Cir. 2011). It is "often irreparable" to force a patentee to compete against products that "incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Such is the case here: the parties compete head-to-head in an emerging niche market, and the patented technology is Rare Breed's entire business. Appx2204 (16:15-16), Appx2208 (20:10-19).

The district court also erred in finding that the Rare Breed's damages would be "redressable by monetary damages." Appx13-14. In making that finding, the district court stated Rare Breed's damages would be "calculable," while ignoring all the record evidence show the improbability of Partisan's ability to pay those damages. *See, e.g.*, Appx2283-2284 (95:20-96:1) ("no idea"); Appx2282 (94:18-

21) (two alleged $5 million insurance policies); Appx2282 (94:3-17) (unawareness of Partisan's own assets); Appx1472; Appx1477; Appx1367; Appx1407-1408; Appx3413-3414; Appx13-14; *see supra* SOC § II, III.B.2.  Mere calculability of a damages figure at trial does not answer the recoverability problem.  *Dominion*, 269 F.3d at 1156 ("A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."); *RoDa*, 552 F.3d at 1210 ("significant risk" standard).  And since the record contains no answer to that, Rare Breed's significant risk of irreparable harm remains.  The district court's finding thus misapplies the law and overlooks critical facts, and should be reversed.

## III.    The District Court Erroneously Found the Balance of Equities Factor Weighs Against Rare Breed

The district court's errors on irreparable harm taint its balancing of the equities, which the district court described as "largely entail[ing] inventorying the irreparable harms."  Appx31-32; *Payless*, 998 F.2d at 991.  Indeed, the district court stated that "the absence of evidence demonstrating irreparable harm . . . shift[s] the balance in favor of [Partisan]."  Appx32.  Yet as shown above, irreparable harm obviously exists on the facts of this case.

Beyond that, the district court erred by failing to account for the fact that Partisan opened its doors for the sole reason of deliberate infringement of Rare Breed's Asserted Patents.  *See supra* SOC § II.  Under these circumstances, the law

required the district court to discount the harm that Partisan would incur from its infringing activity being halted. *Windsurfing Int'l*, 782 F.2d at 1003 n.12 ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). The district court thus applied an incorrect legal standard and overlooked facts critical to an appropriate balancing.

The district court also clearly erred in finding that Partisan's two non-produced $5 million insurance policies "lessen any concerns . . . about [Partisan's] ability to pay a prospective damages award." Appx32. The record is undisputed that Rare Breed's damages, using Partisan's own numbers for just the next three years, would exceed $500 million, and that Partisan's full $299 Disruptor price is less than Rare Breed's $350 and $425 profits per product. *See supra* § III.B.2. The insurance policies would cover just a small fraction of Rare Breed's damages over those three years (to say nothing of sales after that), and thus it is counterfactual that the insurance policies could justify Partisan's infringement.

The Court should reverse the district court's finding that the balance of harms weighs against preliminary injunctive relief.

## IV. The District Court Erroneously Found the Public Interest Factor Weighs Against Rare Breed

The district court's errors on likelihood of success and irreparable harm also taint its analysis on the public interest factor. Appx34 (citing its claim

construction, validity, and irreparable harm analyses in the context of its public interest analysis); *Payless*, 998 F.2d at 991. Because of its analyses on those issues, the district court merely "acknowledge[d]" but gave no apparent weight to the established public policy favoring protection of patent rights. *See* Appx34. Thus, for the reasons discussed above on those issues, the Court's analysis on public interest too is erroneous and should be reversed.

The district court also did not apply the applicable legal test, despite correctly reciting it: "whether a critical public interest would be injured by the grant of injunctive relief." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017); Appx32. The district court never addressed whether any such interest exists and weighs against preliminary injunctive relief, yet it weighed the public interest factor against Rare Breed. Appx32-34. While it considered Partisan's arguments that injunctive relief would permit higher prices, Appx33, the Court has repudiated that rationale for denying such relief. *Payless*, 998 F.2d at 991 ("Were that to be a justification for patent infringement, most injunctions would be denied because copiers universally price their products lower than innovators."). The legal test the district court applied therefore could not have been correct.

The district court focused the bulk of its analysis on distinguishing this case from *ABC IP, LLC et al., v. Hoffman et al.*, Case No. 1:25-00389-CLC-CHS. (E.D.

Tenn.), in which the district court granted a preliminary injunction on technologically related FRT patents after a three-day hearing and the DOJ submitted a statement of interest advocating that the public interest should be "weighted heavily" in Rare Breed's favor. Appx33-34; *see also* Appx2357. The DOJ's position plainly flows from the fact that it settled litigation with Rare Breed, thus opening the FRT market, on "***condition***" that, *inter alia*, Rare Breed must enforce its patent rights and promote FRTs' safe use. Appx1410. While it is true that *Hoffman* deals with the additional fact that the defendant published its infringing designs on the Internet, the DOJ's settlement with Rare Breed and its statement of interest were not so restricted. Rare Breed's settlement with the government requires enforcement of its patents against all infringers because the government believes doing so to be in the public interest. Appx2357; Appx1410. The district court's oversight of the critical facts on public interest and its application of the incorrect standard warrant reversal of its finding.

## CONCLUSION

For the above reasons, the Court should reverse the district court's decision and remand for entry of Rare Breed's requested preliminary injunction.

Dated:  April 13, 2026

Respectfully submitted,

 */s/ John W. Thornburgh*
John W. Thornburgh
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

Carl E. Bruce
Matthew A. Colvin
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
Telephone: (214) 747-5070

Benjamin J. Christoff
Elizabeth DeToro
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W., Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

Jory M. Hoffman
FISH & RICHARDSON P.C.
150 N. Riverside Plaza, Suite 2820
Chicago, IL 60606
Telephone: (312) 278-2700

Glenn D. Bellamy
WOOD HERRON & EVANS, LLP
600 Vince Street, Suite 2800
Cincinnati, OH 45202
Telephone: (513) 707-0243

***Attorneys for Plaintiffs-Appellants
ABC IP LLC; RARE BREED TRIGGERS,
INC.***

# ADDENDUM

# ADDENDUM INDEX

*ABC IP LLC, Rare Breed Triggers Inc. v. Peak Tactical LLC, et al.*
No. 26-1527

| Document | Appx No. |
|---|---|
| Order Denying Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [6] | Appx1 |
| Order Denying Plaintiffs' Motion for Expedited Discovery [41] | Appx36 |
| U.S. Patent No. 10,514,223 B1 | Appx53 |
| U.S. Patent No. 11,724,003 B2 | Appx63 |
| U.S. Patent No., 12,036,336 B2 | Appx93 |
| U.S. Patent No. 12,274,807 B2 | Appx123 |



**FILED**

*4:04 pm, 2/13/26*

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

    Plaintiffs,

    vs.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,

    Defendants.

Case No. 26-CV-18-R

---

**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [6]**

---

ABC IP, LLC and Rare Breed Triggers, Inc. ("Plaintiffs") brought this action against Peak Tactical, LLC d/b/a Partisan Triggers, and its owner Nicholas Norton ("Defendants") for patent infringement and false marking and advertising. [ECF No. 1, at 1, 13]. Both parties make and sell firearms triggers. Plaintiffs assert Defendants' trigger design infringes on four of its registered patents. *Id*. at 3. On January 16, 2026, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. [ECF Nos. 6 & 7]. The Court issued an Order requiring Plaintiffs to serve the Complaint and Motion on Defendants by January 23, 2026. [ECF No. 9]. The Order also required Defendants to respond to the Motion by January 30, 2026, and an in-person hearing was held on the

Appx1

Motion on February 4, 2026. *Id*. After careful consideration of the briefing and arguments offered at the hearing, the Court denies Plaintiffs' requested relief.

## BACKGROUND

Plaintiffs ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("RBT") bring claims of patent infringement, false patent marking, and false advertising under the Lanham Act against Defendants Peak Tactical, LLC ("Peak") and Nicholas Norton ("Norton"). [ECF No. 1]. Plaintiffs' claims are based on four patents they hold related to forced reset triggers ("FRTs"). *Id*. at 3. A FRT is an aftermarket firearms trigger that operates by mechanically resetting the trigger after each shot, allowing the user to make faster follow-up shots without manually releasing pressure on the trigger.

ABC owns the four patents generally related to FRTs that can be retrofitted into existing semi-automatic rifles. *Id*. The asserted U.S. Patent numbers are: 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents"). ABC exclusively licenses the Asserted Patents to RBT, who designs, manufactures, and sells aftermarket triggers, including the RBT FRT-15L3 trigger. *Id*. at 4. Plaintiffs allege Defendants have committed willful acts of direct, contributory, and induced patent infringement in violation of 35 U.S.C. § 271.

Defendants manufacture and distribute the Partisan Disrupter, an aftermarket FRT trigger. *Id*. at 6. Except for minor inconsequential cosmetic features in the outer housing Plaintiffs allege, "the Partisan Disruptor is a direct copy of RBT's FRT-15L3 that one of their distributors, Firearm Systems, sells for $299—$150 (or 33%) cheaper than RBT's FRT-15L3." [ECF No. 7, at 7]. Plaintiffs also allege Defendants have falsely advertised

2

Appx2

their Disruptor by incorrectly describing it as an "assisted reset trigger," rather than a FRT. [ECF No. 1, at 71–73]. Plaintiffs further allege Defendants have engaged in false advertising by telling the public the Partisan Disruptor implements and is covered by U.S. Patent No. 9,146,067 ("'067"). *Id*. Patent '067 relates to an assisted reset trigger and was issued to Partisan's employee Michael Stakes before the Asserted Patents were filed.

## I. *Plaintiffs' Motion [ECF Nos. 6 & 7]*

In the instant Motion, Plaintiffs request the entry of a temporary restraining order ("TRO") and preliminary injunction enjoining Defendants' business operations and marketing. FED. R. CIV. P. 65. They ask the Court to enjoin Defendants from: "1. making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product; 2. stating publicly . . . the Partisan Disruptor is an assisted reset trigger" and "3. stating publicly . . . the Partisan Disruptor product practices U.S. Patent No. 9,146,067." [ECF No. 6-1, at 2]. Plaintiffs argue all four applicable factors for a preliminary injunction are satisfied.

First, Plaintiffs argue the patent infringement claims are likely to succeed because it is established that, "ABC owns the asserted patents and RBT is their exclusive licensee, that the accused Disruptor meets all the asserted claims and is a copycat of RBT's FRT-15L3 patent-implementing product, and [] the Defendants have never raised a substantial question of invalidity or unenforceability despite being aware of the asserted patents." [ECF No. 7, at 15–16] (citing *e.g.*, *Abbott Lab'ys v. Andrx Pharms.*, *Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007)). Plaintiffs argue their false advertising claim is likely to succeed on the merits because "the evidence establishes that Partisan willfully makes public false

Appx3

statements about the design and legitimacy of the Disruptor to syphon RBT's would-be FRT-15L3 customers." *Id*. at 16.

Next, Plaintiffs claim they will suffer irreparable harm without the requested injunctive relief because of, "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities." *Id*. at 26. Plaintiffs go on to argue the balance of harms weighs strongly in their favor. In particular, Plaintiffs allege Defendants' actions threaten the long-term viability of their company, while "Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo." *Id*. at 29. Last, Plaintiffs argue "public interest strongly favors enforcement and protection of patent rights." *Id*. at 29 (citing *Syntex (USA) LLC v. Apotex Inc*., Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435, at *3 (N.D. Cal. May 18, 2006)).

## II. Defendants' Response in Opposition [ECF No. 27]

Defendants oppose Plaintiffs' Motion for a TRO and Preliminary Injunction and request it be denied. [ECF No. 27]. Defendants argue their Disruptor trigger does not infringe on the Asserted Patents because its operation does not satisfy several requirements in the asserted claims, and that Plaintiffs' evidence on this issue is conclusory and lacks substance. *Id*. at 6–7. Defendants go on to argue their '067 Patent predates the Asserted Patents. They contend the Disruptor not only practices the '067 Patent, but that Plaintiff's FRT triggers infringe their '067 Patent. *Id*. at 7–8.

In assessing the elements of a TRO and preliminary injunction, Defendants argue Plaintiffs are unlikely to succeed on their patent infringement claim. They argue the

4

Asserted Patents are likely invalid because of the '067 Patent and insist Plaintiffs' patent claims require claim construction. *Id*. at 11–14. Defendants go on to argue Plaintiffs have not shown likely infringement because the Disrupter does not infringe the Asserted Patents and Plaintiffs' allegations are conclusory and lack the necessary element-by-element analysis. *Id*. Defendants also argue Plaintiffs' false advertising claim is without merit because the terms "'assisted reset,' 'forced reset,' and 'positive reset' are interchangeable descriptors for the same underlying, cycling-driven reset phenomenon," and the Disruptor clearly practices claim 19 of the '067 Patent. *Id*. at 19–21.

Defendants argue Plaintiffs have failed to show irreparable harm because they delayed filing the instant suit for months after the Disruptor was available in the market, while filing six other lawsuits against dealers of the Disruptor. *Id*. at 21–24. Defendants also claim Plaintiffs' own expert analysis shows if Plaintiffs are ultimately successful in their claims, money damages would be sufficient to account for any harm. They reason monetary damages can account for lost profits, reasonable royalty, price erosion, and loss of convoyed sales. *Id*. at 24–27. Defendants assert the public interest does not favor injunctions such as the one requested, and the hardship imposed on Defendants if an injunction preventing sales of the Disruptor would be severe and would likely collapse their business while any hardship to Plaintiffs is compensable. *Id*. at 27. Last, Defendants argue the imposition of an injunction would necessitate a substantial bond to account for Defendants' business losses. *Id*. at 28–30.

5

**RELEVANT LAW**

### I. Applicable Law

Patent issues are governed by law of the Federal Circuit and regional circuit law applies to procedural issues—such as the issuance of preliminary injunctive relief. *See Midwest Indus. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) ("In reviewing district court judgments in patent cases, we apply our own law with respect to patent law issues, but with respect to nonpatent issues we generally apply the law of the circuit in which the district court sits."); *All Plastic, Inc. v. SamDan LLC*, Civil Action No. 20-CV-01318-NYW, 2021 U.S. Dist. LEXIS 24080, at *10 (D. Colo. Feb. 8, 2021) ("[T]he United States Court of Appeals for the Federal Circuit . . . has also explained that, in matters of procedure, it 'will apply the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law.'") (citations omitted).

### II. Temporary Restraining Orders and Preliminary Injunctions

"The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citing 13 JAMES WM MOORE, MOORE'S FEDERAL PRACTICE ¶ 65.36 (3d ed. 2014)). TROs chiefly differ from preliminary injunctions in duration and in that they may be granted without notice to the opposing party. *Id.*; FED. R. CIV. P. 65. The initial timeframe for a TRO is limited to fourteen days from the hour it is issued with narrow exceptions for good cause or consent allowing an extension. FED. R. CIV. P. 65(b)(2). When "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must

6

Appx6

conform to the standards applicable to preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86 (1974). Additionally, "[t]emporary restraining orders are not ordinarily appealable, but preliminary injunctions are appealable." *Tooele Cnty. v. United States*, 820 F.3d 1183, 1186 (10th Cir. 2016).

A TRO's *ex parte* nature and short duration represent its purpose to preserve the status quo between the parties by preventing irreparable injury until a court can rule on the merits of a preliminary injunction. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001). "The status quo is defined as the last peaceable uncontested status existing between the parties before the dispute developed." *Miller v. Austin*, 622 F. Supp. 3d 1105, 1108 (D. Wyo. 2022). In contrast, preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In both cases, however, injunctive relief is an extraordinary remedy." *People's Tr. Fed. Credit Union*, 350 F. Supp. 3d at 1138 (quotations omitted). This extraordinary remedy is not awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, courts are required to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *Id.* In doing so, courts utilize a four-prong test to determine if a party is entitled to a TRO or preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019).

## A. Entitlement to Preliminary Injunctive Relief

The moving party must demonstrate, (1) a substantial likelihood of success on the merits, (2) the movant would suffer irreparable harm if the motion is denied, (3) the threatened injury outweighs the opposing party's injury if the injunction is granted, and (4) granting the injunction is not contrary to public interest. *Id*. These four factors are applicable for preliminary injunctions seeking to enjoin patent infringement. *Natera*, *Inc. v. NeoGenomics Lab'ys*, *Inc*., 106 F.4th 1369, 1375 (Fed. Cir. 2024) ("To obtain a preliminary injunction, a party must establish likelihood of success on the merits, likelihood it will suffer irreparable harm absent preliminary relief, the balance of equities tips in its favor, and an injunction is in the public interest."). Public consequences of granting this extraordinary relief are particularly important for the court's consideration. *Winter*, 555 U.S. at 22. These considerations are within a district court's discretion. *Free the Nipple-Fort Collins*, 916 F.3d at 796.

### RULING OF THE COURT

After hearing testimony and reviewing the briefing on each of the four preliminary injunction factors from the parties, the Court finds each factor weighs against the imposition of a preliminary injunction. The Court will address (I) irreparable harm, (II) the likelihood of success on the merits, (III) the balance of equities between the parties, and (IV) public interest. Because TROs and preliminary injunctions are analyzed under the same structure, the Court will analyze both simultaneously.

8

### I. *Irreparable Harm*

"Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) (citing *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986)). The Tenth Circuit has held a demonstration of probable irreparable harm is the single most important factor to consider before issuing a preliminary injunction. *Hunter v. Hirsig*, 614 F. App'x 960, 962 (10th Cir. 2015) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). Consequently, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id*.

The Court will, therefore, begin its analysis by evaluating the potential for irreparable harm to Plaintiffs. To demonstrate irreparable harm, Plaintiffs must show "a significant risk that [they] will experience harm that cannot be compensated after the fact by money damages." *Mabe, LLC v. Wie*, No. 2:25-CV-00319-DBB, 2025 WL 1433910, at *3 (D. Utah May 19, 2025) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)); *see Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). "Erosion of market share, harm to reputation, and loss of business opportunities can constitute irreparable harm." *Mabe, LLC*, No. 2:25-CV-00319-DBB, at *3 (citing *Miche Bag, LLC v. Thirty One Gifts LLC*, No. 2:10-CV-781 TS, 2010 WL 3629686 (D. Utah Sept. 13, 2010)); *see, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (holding likelihood of price erosion and loss of market position are

9

evidence of irreparable harm); *Bio-Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (stating loss of revenue, goodwill, and research and development constitute irreparable harm); *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996) (finding loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm).

Plaintiffs claim to have already suffered, and continue to suffer, irreparable harm from "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities" without the requested preliminary injunction. [ECF No. 7, at 20] (quotations and citations omitted). In examining irreparable harm, the Court will address (A) loss of business opportunities, (B) price erosion, (C) loss of market share, and (D) reputational harm.

### A. Loss of Business Opportunities

Plaintiffs argue their risk of irreparable harm is heightened because of the "durable, long-lasting nature of the products in question" where an individual gun owner "likely only needs to buy one trigger product for the life of his or her rifle—which can survive generations." [ECF No. 7, at 26]. Defendants contend the products' durability underscores the reality "any lost sales would be fully compensable by lost profit monetary damages." [ECF No. 27, at 9]. The Court finds a demonstration of lost business opportunities is insufficient to independently establish irreparable harm.

During the hearing, Plaintiffs argued Defendants' own sales projections demonstrate Plaintiffs' lost business opportunities. Specifically, Defendants' projections anticipate they will sell more than 1.68 million triggers over the next three years. [ECF No.

33, at 95]. Plaintiffs argue each trigger sold by Defendants results in their loss of sales. *See id*. at 122; [ECF No. 7, at 26]. Plaintiffs' Declaration of Samir P. Warty, Ph.D. furthers this argument, claiming, "[i]n markets for durable or semi-durable goods, lost sales caused by substitution are generally permanent rather than deferred. Unlike consumable goods, which may be repurchased frequently, durable goods are typically acquired on a one-time or infrequent basis." [ECF No. 7-27, at 7]. Plaintiffs offered testimony they collect approximately $350 profit on each trigger sold and allege they will lose over $500 million in profits based on Defendants' own projections. [ECF No. 33, at 95].

However, "lost sales standing alone are insufficient to prove irreparable harm." *Automated Merch. Sys*., *Inc*. *v*. *Crane Co*., 357 F. App'x 297, 300 (Fed. Cir. 2009). If lost sales were sufficient, "irreparable harm would be found in every case involving a 'manufacturer/patentee, regardless of circumstances.'" *Id*. at 300–01 (quoting *Abbott Labs*. *v*. *Andrx Pharms*., *Inc*., 452 F.3d 1331, 1348 (Fed.Cir.2006)). Without more, lost sales "are presumed to be compensable through damages, so they do not require injunctive relief." *Id*. at 301. Consequently, no amount of lost revenue alone may support a finding of irreparable harm. *Id*. The Court now considers price erosion as a basis for irreparable harm.

## B. Price Erosion

Price erosion refers to a "theory of lost-profits remedy that measures the difference between what an item could have sold for with patent protection and what it actually sold for while having to compete against an infringing team." *Price-Erosion Theory*, BLACK'S LAW DICTIONARY (12th ed. 2024). Plaintiffs suggest Defendants' entry into the FRT market will lead to price erosion because Defendants' $300 trigger price is 33% less than

11

Appx11

their $450 price point. [ECF No. 7, at 27]. Plaintiffs again look to the Declaration of Dr. Warty who states, "[o]nce buyers internalize a lower reference price, firms may find it difficult to return to prior price levels without losing sales," suggesting price erosion can lead to irreparable harm in a given market. [ECF No. 7-27, at 11]. While Plaintiffs' argument, including Dr. Warty's Declaration, correctly identifies price erosion as a potential source of irreparable harm, Plaintiffs offer only conclusory statements in support of its potential presence here.

Plaintiffs allude to the price discrepancy between the two products at issue but have not offered (1) any evidence they have or will likely be forced to drop their price nor (2) any projections or analysis of how potential price erosion has or will harm their business. Plaintiffs stated the quantifiable loss of sales it will suffer if not granted injunctive relief does not consider the "harm identified by Dr. Warty addressing issues of price erosion." [ECF No. 33, at 135]. The Court has been presented some data regarding Defendants' sales and future sales projections. *See id*. at 95. While Plaintiffs mentioned their current price of $450 being 33% higher than Defendants' price point, they failed to indicate whether this price point has been static or whether it has already suffered from price erosion. Aside from a cursory statement made in the hearing, no assertions have been made evidencing injury suffered from price erosion. *See id*. at 135 (stating, "[o]ur client has had to lower its prices due to market competition."). Moreover, no evidence of Plaintiffs' sales data before or after Defendants' entry into the FRT market has been presented and no future projections have been provided. *See id*. at 121–22.

12

Appx12

Flat assertions of price erosion with no supporting market analysis are insufficient to demonstrate irreparable harm. *See Potato Ventures LLC v. P'ship & Unincorporated Ass'n Identified on Schedule A*, No. 25-2312-DDC-RES, 2025 WL 2256204, at *9 (D. Kan. Aug. 7, 2025) (declining to find irreparable harm where the plaintiff failed to present any sales data or market share before or after the infringing defendant entered the market); *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (stating, "Courts require more than unsupported factual conclusions to support" a finding of irreparable harm); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) (requiring causal nexus between infringement and harm); *Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (explaining declaration insufficient to show irreparable harm in patent case where declarant assumed without support that defendant's prices "were solely responsible for [plaintiff's] price erosion").

Further, Plaintiffs have not adequately rebutted Defendants' assertion price erosion is calculable and redressable by monetary damages. *See Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013) ("Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages.") (citations omitted). Defendants argue if Plaintiffs are successful at trial, then economic harm from price erosion can be addressed, "by applying Plaintiffs' pre-litigation market price to the lost units to account for market price erosion, thus making Plaintiffs whole for the lost sales and price erosion resulting from the alleged infringement and other wrongful acts." [ECF No. 27-1, at 11] (footnote omitted). The Court finds any alleged harm to Plaintiffs' consumer perception due to

13

Appx13

potential price fluctuation is best addressed under reputational harm below. The Court finds this consideration does not demonstrate irreparable harm because Plaintiffs have not offered evidence indicating harm from price erosion nor shown any damages are not compensable by money damages.

### C. Loss of Market Share

Plaintiffs next argue, "[p]ermanent market displacement in a market like this cannot be resolved after the fact." [ECF No. 33, at 13]. Their expert asserts, "market share influences dealer attention, customer awareness, and expectations about which products are likely to remain available and supported. When substitution persists over time, these secondary effects can reshape the incumbent's competitive position in ways that are not reversed simply by a later change in legal outcome." [ECF No. 7-27, at 8]. Defendants counter, "in the event Plaintiff prevails at trial and obtains a permanent injunction, according to their own expert's description of the market, Plaintiffs will be able to quickly recapture all sales going forward." [ECF No. 27, at 25]. The Court finds consideration of loss of market share weighs against granting the requested relief.

The Court acknowledges, "the right to exclude others from a specific market, no matter how large or small that market, is an essential element of the patent right." *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262–63 (D. Kan. 2009) (citing *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996)) ("[T]he principal value of patent is its statutory right to exclude, so nature of patent weighs against holding that monetary damages will always suffice to make patentee whole."). For the loss of market share to be irreparable, it must be both difficult to quantify and difficult to repair. *See Salt Lake Trib.*

14

Appx14

*Pub. Co., LLC*, 320 F.3d at 1105. "There is an inverse relationship between the potential for price erosion and loss of market share." *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755 n.27 (Fed. Cir. 2014). If the company claiming infringement lowers its prices in response to competition, price erosion will be higher, but it will maintain its share of the market—decreasing market share losses. *See id.*

In discussing market displacement, Plaintiffs rely on their expert's contention, "[d]istribution networks are not merely conduits for price transmission but are central to a supplier's competitive position. . . . Once either level of the distribution chain has invested in these product-specific capabilities, those investments may not readily transfer back to the original supplier's product even if the competing product is later enjoined." [ECF No. 7-27, at 10]. This sub-factor again suffers from a fatal flaw in Plaintiffs' allegations. While Plaintiffs include some evidence of Defendants' dealer network, Plaintiffs include no evidence they too have an established dealer network. *See* [ECF No. 33, at 21–23]. Without evidence of an established dealer network, the concept of market position through distribution networks being difficult to "repair" is somewhat misplaced. This omission makes Plaintiffs' claims of displacement appear increasingly attenuated where no evidence of Plaintiffs' sales statistics have been presented and no evidence of shifting dealer loyalty can be produced. The Court finds Plaintiffs' allegations of loss of market share is inadequate support for irreparable harm.

### D. Reputational Harm

Plaintiffs claim, "Defendants' undercutting of RBT's price by itself harms RBT's reputation by incorrectly suggesting to customers that RBT's pricing is uncompetitive."

15

Appx15

[ECF No. 7, at 27]. They also mentioned Defendants' alleged attempts to label RBT as a "greedy bully" in online forums. *See id*. When referring to the apparently quantifiable damages, Plaintiffs argued even when a permanent injunction is issued and price erosion is no longer a factor, the prevailing party still suffers reputational harm. [ECF No. 33, at 135]. Defendants claim any assertion of reputational harm is conclusory and speculative. They argue, "there is no claim that customers will be confused between the two products. If Plaintiffs' products are superior, they will enjoy whatever reputational advantage flows therefrom." [ECF No. 27, at 26]. Defendants conclude Plaintiffs may not base reputational harm on their product simply receiving less favorable market reception than its competitors. *Id*.

In this context proving reputational harm does not require a showing of any elements required to prove defamation. Rather than evidence of false statements and publication to third parties, the moving party must offer evidence of a reputational loss stemming from the underlying tort—altering how customers perceive the product and making the resulting harm persistent and difficult to quantify. *See Snyder v. Am. Kennel Club*, 575 F. Supp. 2d 1236, 1242 (D. Kan. 2008) ("finding loss of reputation not irreparable where plaintiff provided no evidence of risk of loss of prestige, academic reputation, or professional opportunities that could not be remedied by money damages.") (parenthetically citing *Schrier*, 427 F.3d at 1267 (10th Cir. 2005)); *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016). Here, Plaintiffs have presented insufficient evidence of price erosion and loss of market share. While Plaintiffs have provided evidence of the publication of allegedly false statements online, the threshold inquiry for this equitable consideration is whether the

16

harm ultimately stems from the patent infringement or false marking and advertising. *See Limitless Worldwide*, *LLC v. AdvoCare Int'l*, *LP*, 926 F. Supp. 2d 1248, 1254 (D. Utah 2013); *Dominion Video Satellite*, *Inc*. *v. EchoStar Satellite Corp*., 269 F.3d 1149, 1156 (10th Cir. 2001).

Plaintiffs have presented evidence of Defendants' negative online statements about their business and price point. They have presented no evidence of how these statements have impacted public perception of their brand—and more directly, any defamatory damage to Plaintiffs is irrelevant to this consideration without demonstrating this reputational harm flows from the underlying torts alleged. The variation in price points between the two products could present a basis for reputational harm as Plaintiffs suggested, but they have included no evidence indicating their reputation has been, or will imminently be, damaged. Speculative harm is not sufficient. *RoDa Drilling Co*. *v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *see Lovesac Co*. *v. www.lovessac.com*, No. 2:22-CV-00056-JNP, 2022 WL 504192, at *4 (D. Utah Feb. 18, 2022).

Because Plaintiffs have not affirmatively demonstrated a resulting injury which could be tied to their alleged reputational harm, the Court finds this consideration does not support a finding of irreparable harm. Despite this finding, the Court will now address Plaintiffs' likelihood of success on the merits. *Amazon.com*, *Inc*. *v. Barnesandnoble.com*, *Inc*., 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e*., likelihood of success on the merits and irreparable harm.") (emphasis in original).

17

Appx17

## II.  *Likelihood of Success on the Merits*

Plaintiffs include claims for (1) patent infringement and (2) false advertising as the basis for the injunction. In seeking a TRO or preliminary injunction the movant bears the burden of demonstrating a likelihood of success on the merits. *Altana Pharma AG v. Teva Pharms. USA*, *Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). Specifically, as to the first claim, it must be demonstrated, in light of the presumptions and burden that will apply at trial, "(1) the patentee will likely prove the accused infringer infringes the asserted patent; and (2) the patentee's infringement claim will likely withstand the accused infringer's challenges to the validity and enforceability of the patent." *Won-Door Corp. v. Cornell Iron Works*, *Inc.*, 981 F. Supp. 2d 1070, 1074 (D. Utah 2013) (quoting *Sciele Pharma*, *Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012)). A court should not issue a preliminary injunction if the accused infringer raises a "substantial question" as to either infringement or validity of the patent. *Amazon.com*, *Inc.*, 239 F.3d at 1350–51

Second, to demonstrate a reasonable likelihood of success on its false advertising claim under the Lanham Act, Plaintiffs must establish (1) Defendants presented a false or misleading description or representation about a product:

> (2) the misrepresentation is material, in that it is likely to influence consumers' purchasing decisions; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) [Defendants] placed the false or misleading statement in interstate commerce; and (5) [Plaintiffs have] been or [are] likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by lessening of goodwill associated with its products.

*Zoller Lab'ys*, *LLC. v. NBTY*, *Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (alterations added); 15 U.S.C. § 1125(a)(1)(B); *Wyoming Beverages Inc. v. Core-Mark Int'l*, *Inc.*, No.

18

17-CV-116-F, 2018 WL 8221068, at *13 (D. Wyo. Jan. 4, 2018). The Court finds Plaintiffs have not demonstrated they are likely to be successful on the merits on their claims. The Court will first address Plaintiffs' claim of (A) patent infringement then (B) false advertising.

## A. Patent Infringement

"A party establishes infringement in one of two ways: literal infringement of the claim language or infringement under the doctrine of equivalents." *FBA Operating Co. v. ETN Capital, LLC*, No. 5:23-CV-505-D, 2023 U.S. Dist. LEXIS 182297, at *4–5 (E.D.N.C. Oct. 10, 2023) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997)). "Literal infringement occurs where the allegedly infringing device includes 'each and every limitation of the asserted claim(s).'" *Id*. (quoting *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)). "Infringement under the doctrine of equivalents occurs where the allegedly infringing device 'performs substantially the same function in substantially the same way to obtain the same result' as the patented product." *Id*. (citations omitted).

To establish a likelihood of success on a patent infringement claim, Plaintiff must show the accused product likely infringes at least one patent asserted. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). This analysis "entails two steps, the first step is determining the meaning and scope of the patent claims asserted to be infringed, the second step is comparing the properly construed claims to the device accused of infringing." *Id*. Plaintiff fails to meet this burden in two ways: (1) the material claim construction disputes preclude a finding of likely infringement and (2)

19

defendants have raised serious and substantial questions regarding validity. The Court will address (1) claim construction then (2) claim validity.

### 1. Claim Construction

"For claim construction, the court must: (1) analyze 'the text of the patent and its associated public record,' (2) apply 'the established rules of construction,' and (3) 'arrive at the true and consistent scope of the patent owner's rights to be given legal effect.'" *FBA Operating Co*., No. 5:23-CV-505-D, at *4–5 (quoting *Markman*, 52 F.3d at 979). The Federal Circuit has made clear, "the interpretation and construction of patent claims . . . is a matter of law exclusively for the court." *Id*. at 970–71. Thus, where the parties present competing interpretations of claim scope, the Court must resolve any fundamental disputes before proceeding with the infringement analysis. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999) (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). The Court will (i) outline the relevant text of the patents and (ii) apply the established rules of construction.

### i. Text of the Patents

"The '003, '336, and '807 Patents are related and share a common specification, as the '336 and '807 Patents are continuations of the '003 Patent." [ECF No. 7, at 10]. "These patents all describe and claim a device similar to that of the '223 Patent, but with the additional feature that it 'provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." *Id*. at 10–11

20

Appx20

(citations omitted); *see* [ECF No. 1-1, at 10–11] (claim 4 of '223 Patent); [ECF No. 1-2, at 28] (claim 4 of '003 Patent); [ECF No. 1-3, at 28] (claim 3 of '336 Patent); [ECF No. 1-4, at 28] (claim 1 of '807 Patent).

Defendants identify a portion of the respective claims, stating:

[W]hereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

[W]hereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the ***substantially in-battery*** position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

[ECF No. 1-2, at 28] (claim 4 of '003 Patent) (emphasis added); [ECF No. 1-3, at 28] (claim 3 of '336 Patent) (emphasis added); [ECF No. 1-4, at 28] (claim 1 of '807 Patent) (emphasis added); *see also* [ECF No. 27, at 16] (quoting '807 Patent, claim 1, '336 Patent, claim 3, '003 Patent, claim 4).

Defendants state, "[t]he patents themselves define the 'set position' . . . as the state 'wherein said sear and sear catch are in engagement in said set positions of the hammer and trigger member and are out of the engagement in said released positions of said hammer and trigger member." [ECF No. 27, at 17] (quoting '807 Patent, claim 1, '336 Patent, claim 3, '003 Patent, claim 4).

21

Appx21

### ii. Application of Established Rules of Construction

Claim terms are generally given their "ordinary and customary meaning," the meaning they would have to "a person of ordinary skill in the art at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). "We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Schmeisser GmbH v. AC-Unity d.o.o*, No. 21-CV-24-SWS, 2021 WL 7286256, at *5 (D. Wyo. Mar. 19, 2021) (quotations omitted) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)). When analyzing claim construction, courts typically rely on intrinsic evidence including a patent's specifications and prosecution history. Extrinsic evidence such as expert testimony or a dictionary definition may also be considered. *Id.* (quoting *Bushnell, Inc.*, 673 F. Supp. 2d at 1250).

A court will not give the words of a claim their ordinary meaning "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed.Cir.1996)). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (citation omitted). Disavowal of a claim term comes into play, "'[w]here the specification makes clear that the invention does not include a particular feature, [and] that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the

22

Appx22

specification, might be considered broad enough to encompass the feature in question.'"

*Id*. at 366 (alteration added) (quoting *SciMed Life Sys*., *Inc. v. Advanced Cardiovascular Sys*., *Inc*., 242 F.3d 1337, 1341 (Fed.Cir.2001)).

Here, material disputes exist regarding the meaning of claim terms that are central to the infringement analysis. In particular, Defendants dispute the scope of the phrase "substantially in-battery position." [ECF No. 27 at 14–15]; *see* [ECF No. 33, at 74–75]. Defendants claim this phrase "is 'a timing gate' for when a 'locking member' transitions from blocking to permissive," meaning it determines when the mechanism transitions from a blocked state to one in which firing is permitted. [ECF No. 27, at 14]. Defendants argue this phrase has more than one interpretation when applied to the AR pattern operating cycle. *Id*. Plaintiffs, by contrast, treat the phrase as having an obvious and straightforward meaning. [ECF No. 7, at 23–25]. As such, Plaintiffs do not attempt to offer an express definition of the term, nor do they address Defendants' claimed definition of "set position" from the Asserted Patents. *See* [ECF No. 27, at 17]

Drawing on the patents' specifications, Plaintiffs generally state, "when the trigger is pulled, the hammer contacts the firing pin, thereby causing the ammunition cartridge to discharge. . . This discharge causes the bolt carrier (52) to move rearward, and a lower surface of the bolt carrier hammer pushes against the hammer which in turn forces the trigger . . . to return to its reset position." [ECF No. 7, at 10] (citations omitted). After that, "[a] locking bar (62) prevents the trigger member from being pulled again by the user until the bolt carrier (52) has returned to the original or 'in-battery' position." *Id*. (citations omitted).

23



**FIG. 5**

[ECF No. 7, at 10] (citing '233 Patent, Fig. 5 ("showing the bolt carrier 52 forcing the hammer 18 and trigger 26 back into its reset position")).

Defendants' expert argues, "substantially in-battery position" could reasonably be interpreted to include: "(1) a meaning close to fully in battery (i.e., at or essentially at the in-battery condition), versus (2) a meaning that includes a broader band of near-battery positions during forward travel." [ECF No. 27-2, at 38]. He continues, "[t]he phrase also raises a second critical ambiguity: whether the claim requires the bolt carrier contact/unlocking to occur at the moment the carrier 'reaches' that substantially in-battery condition (a narrow dimensional/timing window), or whether unlocking earlier would suffice so long as the carrier later becomes substantially in-battery." *Id*. at 39. Relying in part on the asserted claims' repeated requirement the bolt carrier reach a "substantially in-battery position," he concludes, "the meaning of that phrase is both disputed and potentially outcome-determinative." *Id*.

24

Neither Plaintiffs nor their expert attempt an express definition of "substantially in-battery position." As relevant to the disputed term, Plaintiffs' expert states, "the trigger described in the Asserted Patents and the Rare Breed trigger operate by the trigger being forcibly pushed into the reset position, with the sear engaging the hammer, each time the action cycles (i.e., each time a shot is fired)." [ECF No. 7-17, at 3–4]. He goes on, "[a]nother shot cannot be fired until the bolt returns to the in-battery position and the trigger is pulled again by the user." *Id.*

Plaintiffs essentially refrain from providing a direct rebuttal to the disputed terms and mechanics presented by Defendants. However, depending on how "substantially in-battery" is construed, the timing requirements of the claims change. Because infringement analysis depends on the Court first resolving the disputed claim term ("substantially in-battery position") the Court cannot properly compare the asserted claims to the accused device without first construing the meaning and scope. *See Markman*, 52 F.3d at 976; *O2 Micro*, 521 F.3d at 1362. The Court finds there is insufficient evidence presented to properly make a comparison between the two products. Accordingly, Plaintiffs cannot demonstrate literal infringement or infringement under the doctrine of equivalents, nor a clear likelihood of success on the merits at this stage. *See Markman*, 52 F.3d at 976; *Amazon.com, Inc.*, 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention."). Nonetheless, the Court will proceed to address the validity of Plaintiffs' patents in demonstrating its likelihood of success on its patent infringement claim.

Appx25

### 2. *Validity*

At the preliminary-injunction stage, the Court "does not resolve the validity question," but instead assesses the persuasiveness of the parties' evidence "recognizing that it is doing so without all evidence that may come out at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (quotations omitted) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed. Cir. 1992)). Patents enjoy a statutory presumption of validity. *Id*. If the alleged infringer responds to a preliminary-injunction motion by "launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." *Id*. "The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." *Id*.

Although invalidity ultimately must be proven at trial by clear and convincing evidence, that evidentiary standard does not apply at the preliminary-injunction stage. *Id*. at 1377–79. Thus, if the challenger presents evidence raising a "substantial question" of validity and the patentee cannot demonstrate it "lacks substantial merit," the patentee has not demonstrated a likelihood of success on the merits warranting preliminary relief. *Id*. (quoting *New England Braiding*, 970 F.2d at 883). Here, Plaintiffs have not shown they are likely to withstand Defendants' invalidity challenges. The Court will address (i) Defendants' theory supporting the invalidity of Plaintiffs' patents and (ii) Plaintiffs' burden to overcome that showing.

Appx26

### i.  Defendants' Substantial Question of Validity

Defendants' principal invalidity theory is tied to obviousness under 35 U.S.C. § 103, which provides:

> A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103.

"[A] patent composed of several elements is not proved obvious by demonstrating that each of its elements was, independently, known in the art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, the appropriate inquiry is "whether the subject matter would have been obvious to a person of ordinary skill in the art at the time of the asserted invention." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). Although an incentive to combine prior-art references may be inferred from the nature of the problem to be solved, there must be "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008).

The Court finds Defendants have raised a substantial question of validity. Defendants' validity challenge rests on a multi-layered obviousness theory grounded in, 35 U.S.C. § 103 and *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 415–16 (2007). [ECF No. 27, at 11]. They contend the '067 Patent and the TacCon 3MR long predate the Asserted Patents and disclose the same core forced-reset architecture embodied in the asserted claims. *Id.* at 11–14. They argue longstanding prior art references the claimed locking and

27

gating features, and the Asserted Patents merely combine these familiar elements in predictable ways. *Id.* at 13; *see KSR Int'l Co.*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Defendants contend the prosecution histories also reflect limited consideration by the Patent Office of this prior art, including the TacCon 3MR and the '067 Patent. [ECF No. 27, at 8]. Defendants need to only raise a "substantial question" of invalidity at this stage. *Titan Tire*, 566 F.3d at 1377–79. The Court finds Defendants' evidence of the '067 Patent and their prior-art analysis with added support through expert declaration is sufficient to meet this standard. *Amazon.com, Inc.*, 239 F.3d at 1359 ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.").

### ii.  Plaintiffs' Burden

Once Defendants have raised a substantial question of validity, the burden shifts back to Plaintiffs to demonstrate the asserted validity defenses lack substantial merit. *Id*. Plaintiffs have not carried their burden. Plaintiffs raised numerous contentions in their closing statements—including the nonexistence of Defendants' expert's claim charts and alleged proof the '067 Patent was looked at and considered by the Patent Office. [ECF No. 33, at 130–32]. Although these arguments call into question some of Defendants arguments, they fail to demonstrate the Defendants validity challenges, "lack substantial merit." *See Titan Tire* 566 F.3d at 1377–79. Additionally, contrary to Plaintiffs' arguments the Defendants need only raise a substantial question of invalidity at this stage and do not need to prove their invalidity by clear and convincing evidence. *See id*.; *Amazon.com, Inc.*,

28

Appx28

239 F.3d at 1359 ("The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself."); [ECF No. 33, at 13, 130–31]. Material claim construction disputes preclude a finding of likely infringement, and Defendants have raised substantial questions regarding validity. Collectively, Plaintiffs have failed to meet the burden of demonstrating a likelihood of success on the merits for patent infringement. The Court now turns to Plaintiffs' claim of false advertising.

## B.  False Advertising

Under the Lanham Act, a plaintiff must show the defendant made a false or misleading representation by demonstrating the statement was either facially false or likely to have the effect of misleading consumers. *Zoller Lab'ys*, *LLC.*, 111 F. App'x at 982. "Where the advertisement is literally false, a violation may be established without evidence of consumer deception" and, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Id.* (quotations omitted) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir.2002), and *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare*, *L.P.*, 131 F.3d 430, 434 (4th Cir.1997)). "[F]actfinders usually base literal falsity determinations upon the explicit claims made by an advertisement[.]" *Id.*

Plaintiffs assert two bases for their false advertising claim against Defendants. [ECF No. 7, at 25–26]. First, Plaintiffs state Defendants falsely represent the Partisan Disruptor is an "assisted reset trigger" instead of a forced reset trigger. *Id.* at 25. They assert the labels are mutually exclusive and explain, "the two triggers are designed and operate in different

Appx29

ways: whereas a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger." *Id*. (emphasis in original). Second, Plaintiffs argue, "Partisan incorrectly claims that their Disruptor is covered by the '067, on which Partisan's employee Michael Stakes is a named inventor." *Id*. at 26. They contend this representation is likely to mislead consumers by falsely increasing the perceived legitimacy of the product.

Defendants claim they have not made any false or misleading representations. [ECF No. 27, at 19]. Defendants rely on their expert and Mr. Stakes to assert, "in practice and in the literature, 'assisted reset' and 'forced reset' are used synonymously to describe the same class of mechanisms; the difference is semantics, not mechanics." *Id*. at 20 (citation omitted). Given the context, they conclude no false representation has been made. Defendants rebut Plaintiffs' second contention by stating the Disruptor is in exact compliance with claim 19 of the '067, and claim this conclusion is supported by specific measurements and distances outlined by Mr. Stakes and Mr. Nixon. *Id*. They argue Plaintiffs' expert, "offers only a bare, unsupported assertion to the contrary; he discloses no measurements, photographs, or analysis." *Id*. (citation omitted).

The Court finds Plaintiffs have not demonstrated a likelihood of success on their false advertising claim. The Court holds Defendants have presented adequate counter-analysis to bar an establishment of facial falsity. In considering whether Defendants' representations are misleading, Plaintiffs have not presented any evidence of the actual influence of Defendants' representations on consumers. Such a showing is required absent a demonstration of facial falsity. *Zoller Lab'ys, LLC*, 111 F. App'x at 982; *Wyoming*

30

*Beverages*, *Inc*., No. 17-CV-116-F, at *13. Accordingly, the Court finds Plaintiffs have not sufficiently demonstrated a likelihood of success on the merits as to false advertising.

### III.    *Balancing of Harms*

The balancing of harms element largely entails inventorying the irreparable harms as outlined above. Plaintiffs argue because Defendants' actions in selling an allegedly infringing product are contrary to law, they could not suffer any legally cognizable harm from the requested relief. [ECF No. 7, at 29]. Plaintiffs also assert, "because Partisan Triggers has procured patent insurance, the Defendants are at minimal risk if any of harm from the preliminary injunction." *Id*. (citations omitted). They conclude, "[t]he balance of equities favors injunctive relief." *Id*.

Defendants contend the injunction would force their company out of business. [ECF No. 27, at 27]. They claim, "[a]n injunction would put dozens of employees out of work, and create consequential havoc to the various people who are working in Defendants' business. Even with a sizable bond . . . the damage to Defendants would indeed be extreme and irreparable." *Id*. Conversely, Defendants assert, "in the event Plaintiffs prevail in their claims at trial, they can be made whole by monetary damages. And if Plaintiffs do not prevail at trial, the only hardship to Plaintiffs is *lawful* competition in the marketplace." *Id*. (emphasis in original).

The Court finds the balance of hardships favors Defendants. The Court acknowledges, "[a] record showing that the infringer will be put out of business is a factor . . . but does not control the balance of hardships factor." *Aria Diagnostics*, *Inc*. *v*. *Sequenom*, *Inc*., 726 F.3d 1296, 1305 (Fed. Cir. 2013) (citing *Intel Corp*. *v*. *ULSI Sys*.

31

Appx31

*Tech., Inc.*, 995 F.2d 1566, 1568, 1570 (Fed.Cir.1993), and *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997)). Despite this, because the requested remedy is extreme the Court finds the absence of evidence demonstrating irreparable harm lightens Plaintiffs' proverbial scale—shifting the balance in favor of Defendants. The Court additionally notes Plaintiffs' claim related to Defendants' patent insurance could potentially lessen any concerns it has about Defendants' ability to pay a prospective damages award. *See* [ECF No. 33, at 133].

### IV. Public Interest

The public interest factor, "requires the court to focus on whether 'there exists some critical public interest that would be injured by the grant of preliminary relief.'" *In re BRCA1-, BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 3 F. Supp. 3d 1213, 1275 (D. Utah), *aff'd and remanded sub nom. In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755 (Fed. Cir. 2014) (quoting *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc.*, 849 F.2d at 1458 (footnotes omitted).

Plaintiffs argue, "permitting the Defendants to flood the market with the accused 3-position forced reset triggers at severely reduced prices serves no legitimate public interest, and only contradicts the public interest." [ECF No. 7, at 30]. They state, "the DOJ under President Trump has permitted RBT to market its triggers on condition that RBT (1)

32

Appx32

'enforce its patents to prevent infringement that could threaten public safety,' and (2) 'promote the safe and responsible use of its products.'" [ECF No. 7, at 30]; *see* [ECF No. 33, at 14]. Defendants counter, due to the lack of competition in the FRT market, "Plaintiffs have been able to charge the public monopolistic prices for their triggers, and essentially use the additional profits to continue fueling their litigation campaigns." [ECF No. 27, at 28]. They conclude, "[t]he public interest is not served by such tactics and above-market prices but, instead, would be better served by competition." *Id*.

After the hearing, Plaintiffs filed a Supplement to their request attaching the Eastern District of Tennessee's Order granting a preliminary injunction in *ABC IP*, *LLC et al*., *v. Hoffman et al*., Case No. 1:25-00389-CKC-CHS. (Dkt. Nos. 45, 46) (E.D. Tenn. Feb. 11, 2026); [ECF No. 37]. The *Hoffman* case involved ABC's Patent No. 12,038,247 (the "'247 Patent"), ABC's Patent No. 12,031,784 (the "'784 Patent"), and ABC's now-expired Patent No. 7,398,723 (the "'723 Patent"). [ECF No. 37-2, at 3]. There, the defendants were accused of infringing the three patents listed, and digitally releasing free firearm-related designs and 3D print files for public download. *Id*. The government filed a statement of interest in the case. *Id*. at 5.

*Hoffman* is factually distinguishable from the present facts. Here, Defendants note the DOJ entered a statement of interest in the *Hoffman* case, but not in the current litigation. [ECF No. 33, at 24]. The *Hoffman* Court also found "Defendants' unrestricted distribution of Super Safety Files resulted in and would continue to result in widespread copying, third-party manufacturing, and uncontrolled downstream infringement." [ECF No. 37-2, at 11]. But, as mentioned, *Hoffman* Defendants posted allegedly infringing firearm designs online

Appx33

for free public access. *Id*. at 3. Because they freely distributed infringing designs—rather than charging consumers for an allegedly infringing product—this act had the effect of potentially syphoning Plaintiffs' business and also expanding the infringement to potentially countless individuals. The Court correctly concluded the underlying facts presented potentially irreparable public safety and patent infringement concerns. *Id*.

Here, Plaintiffs have failed to demonstrate the current facts present the same public safety and patent infringement concerns. In this case, different patents are at issue, and Defendants have raised a substantial question of validity. *Cf. id*. at 8. Plaintiffs failed to directly and adequately address Defendants' validity and claim construction challenges and Defendants' claims any damages could be resolved through compensatory damages. The Court finds the public interest will not be highly impacted if an injunction is not granted against Defendants. The Court acknowledges the public interest favoring enforcement and protection of patent rights. *See Pfizer*, *Inc*. *v*. *Teva Pharms*. *USA*, *Inc*., 429 F.3d 1364, 1382 (Fed. Cir. 2005); *Syntex (USA) LLC*, No. C 01-02214 MJJ, at \*3, *aff'd sub nom*. *Syntex (U.S.A.) LLC*, 221 F. App'x 1002. But Plaintiffs have not demonstrated irreparable harm will result if the requested relief is not granted. Overall, the Court finds the public interest does not weigh in favor of granting injunctive relief.

## CONCLUSION

The Court finds Plaintiffs have failed to carry the burden of showing irreparable harm in the absence of the requested preliminary injunction. The parties shall proceed under the status quo while the case proceeds on the merits. The findings and conclusions

34

35

set forth herein do not constitute a determination on the merits but are findings made in light of the requested preliminary injunction order.

**NOW, THEREFORE, IT IS ORDERED** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 6] is **DENIED**.

Dated this 13th day of February, 2026.

Kelly H. Rankin
United States District Judge

Appx35

**FILED**



**3:57 pm, 3/11/26**

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

    Plaintiffs,

    vs.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,

    Defendants.

Case No. 26-CV-18-R

---

**ORDER DENYING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY
[41]**

---

ABC IP, LLC, together with Rare Breed Triggers, Inc. ("Plaintiffs") and Peak Tactical, LLC d/b/a Partisan Triggers, and its owner Nicholas Norton ("Defendants") are in the firearms triggers market. [ECF No. 1, at 1, 13]. In January 2026, Plaintiffs sued Defendants asserting patent infringement and false marking and advertising. *Id*. at 3–4. The next day Plaintiffs filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"). [ECF Nos. 6, 7]. The Court denied the Motion. [ECF No. 39]. Plaintiffs now motion the Court for expedited discovery intending to gather relevant evidence to renew their PI request. [ECF Nos. 41, 42]. Defendants oppose the Motion. They claim Plaintiffs have shown neither good cause for expedited discovery nor proper

Appx36

grounds for reconsideration. [ECF No. 43]. After careful consideration of the briefing and being otherwise fully informed on the matter, the Court denies Plaintiffs' request.

**BACKGROUND**

## I. General Background

Plaintiffs sued Defendants for patent infringement, false patent marking, and false advertising under the Lanham Act. [ECF No. 1]. Plaintiffs' claims are based on patents they hold related to forced reset triggers ("FRTs"). *Id.* at 3. An FRT is an aftermarket firearms trigger that operates by mechanically resetting the trigger after each shot, allowing the user to make faster follow-up shots without manually releasing pressure on the trigger. ABC owns four patents generally related to FRTs which can be retrofitted into existing semi-automatic rifles. *Id.* The asserted U.S. Patent numbers are: 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents"). ABC exclusively licenses the Asserted Patents to Rare Breed Triggers, who designs, manufactures, and sells aftermarket triggers, including the RBT FRT-15L3 trigger. *Id.* at 4. Plaintiffs allege Defendants have committed willful acts of direct, contributory, and induced patent infringement in violation of 35 U.S.C. § 271.

Defendants manufacture and distribute the Partisan Disrupter, an aftermarket FRT trigger. *Id.* at 6. Except for minor inconsequential cosmetic features in the outer housing Plaintiffs allege, "the Partisan Disruptor is a direct copy of RBT's FRT-15L3 that one of their distributors, Firearm Systems, sells for $299—***$150 (or 33%) cheaper*** than RBT's FRT-15L3." [ECF No. 7, at 13] (emphasis in original). Plaintiffs assert Defendants have

falsely advertised their Disruptor by incorrectly describing it as an "assisted reset trigger." [ECF No. 1, at 71–73]. Plaintiffs maintain Defendants have also falsely advertised their product by telling the public the Disruptor implements and is covered by U.S. Patent No. 9,146,067 ("'067"). *Id*. Patent '067 relates to an assisted reset trigger and was issued to Partisan's employee Michael Stakes before the Asserted Patents were filed.

## II. Plaintiffs' Motion for TRO and PI [6 & 7]

In January 2026, Plaintiffs requested a TRO and PI enjoining Defendants' business operations and marketing. [ECF Nos. 6, 7]; FED. R. CIV. P. 65. They asked the Court to enjoin Defendants from: "1. making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product; 2. stating publicly . . . the Partisan Disruptor is an assisted reset trigger" and "3. stating publicly . . . the Partisan Disruptor product practices U.S. Patent No. 9,146,067." [ECF No. 6-1, at 2]. Plaintiffs argued all four TRO and PI factors were satisfied.

On February 4, 2026, the Court conducted a hearing on the Motion. Plaintiffs called three witnesses: their corporate representative Lawrence DeMonico, their technical expert Brian Luettke, and their economist Samir Warty. [ECF No. 33, at 4]. Defendants called their employee Michael Stakes, Partisan's spokesperson Ben Woods, and advised at the outset of the hearing their technical expert John Nixon was not present. *Id*. at 5, 12.

After the hearing, the Court denied Plaintiffs' Motion. [ECF No. 39]. In its Order, the Court found all four factors weighed against granting the requested relief. For irreparable harm, the Court found Plaintiffs presented insufficient evidence of price erosion, loss of market share, and reputational damage. *Id*. at 10–17. Specifically, the Court

3

Appx38

noted Plaintiffs did not present evidence of their prices before and after Defendants entered the market, existence of their established dealer networks, or losses demonstrating reputational harm. *Id*. at 12–13, 15, 17.

Second, the Court addressed Plaintiffs' likelihood of success for (1) patent infringement and (2) false advertising. First, for patent infringement, the Court began with claim construction. It found material disputes existed about the meaning of claim terms— "substantially in-battery position"—central to the infringement analysis. *Id*. at 23. The Court noted neither Plaintiffs nor their expert attempted to provide a direct interpretation of the disputed terms and mechanics. *Id*. at 25. The Court also found Defendants raised a substantial question rebutting the statutory presumption of validity. *Id*. at 27–28. Plaintiffs failed to demonstrate this challenge lacked substantial merit. *Id*. at 28–29. As to false advertising, the Court established Plaintiffs presented no evidence of the advertisements' consumer impact. Thus, they failed to show facial falsity under the Lanham Act. *Id*. at 30.

Third, the Court found the balance of hardships weighed in Defendants' favor because the requested remedy is extreme and Plaintiffs did not show irreparable harm. *Id*. at 31–32. Fourth, the Court acknowledged public interests favoring protecting patent rights, but again noted Plaintiffs failed to demonstrate irreparable harm or a likelihood of success on the merits. *Id*. at 34.

### III.    *Plaintiffs' Motion for Expedited Discovery [41 & 42]*

Plaintiffs now motion the Court for expedited discovery to renew their PI request. [ECF No. 42, at 3]. They argue, "[t]argetted discovery would allow a renewed preliminary injunction motion to be decided on a complete record." *Id*. at 9. Plaintiffs claim they had

insufficient time to respond to Defendants' arguments, neither of Defendants' experts attended the hearing, and Defendants' technical expert never produced the charts he relied on. *Id*. at 4–5, 9–10. They argue granting their request for expedited discovery and allowing reconsideration is consistent with Tenth Circuit precedent. *Id*. at 2, 5–6.

### IV. *Defendants' Opposition to Expedited Discovery [43]*

Defendants contend, "Plaintiffs['] motion for expedited discovery is best understood for what it is: an attempted reconsideration-by-discovery." [ECF No. 43, at 3, 5–8]. They maintain courts treat attempts to renew interlocutory injunctive rulings with caution. *Id*. (citing *Schmeisser GmbH v. AC-Unity d.o.o*., 2021 U.S. Dist. LEXIS 255447, at *8–9 (D. Wyo. Aug. 23, 2021)). And they routinely deny such requests when there is no evidence of a meaningful change in circumstances, evidence, or law. *Id*. at 4 (citing *SEC v. Young*, 121 F.4th 70, 78 (10th Cir. 2024)). They claim even if expedited discovery is permitted "[t]he Court's order was not driven by a lack of information uniquely in Defendants' possession; it was driven by Plaintiffs' failure to carry their burden with their own evidence and arguments." *Id*. at 4, 8–11.

### RELEVANT LAW

### I. *Expedited Discovery*

Federal Rule of Civil Procedure 26(d) mandates the typical timing and sequence of discovery. But the court has broad discretion to "alter the timing, sequence and volume of discovery." *Qwest Commc'ns Int'l*, *Inc. v. WorldQuest Networks*, *Inc*., 213 F.R.D. 418, 419 (D. Colo. 2003) (citing FED. R. CIV. P. 26(b)(2) and 26(d)); *Washington v. Correia*, 546 F. App'x 786, 787 (10th Cir. 2013) ("It was well within the court's discretion to decline

5

to authorize expedited discovery."). "However, a party seeking expedited discovery in advance of a Rule 26(f) conference has the burden of showing good cause for the requested departure from usual discovery procedures." *Qwest Commc'ns Int'l, Inc.*, 213 F.R.D. at 419 (citing *Pod–Ners, LLC v. N. Feed & Bean of Lucerne, Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002), and *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 614 (D. Ariz. 2001)).

In some cases, "good cause" may be shown where a PI is sought, "or where the moving party has asserted claims of infringement and unfair competition." *Id.* (citations omitted). Still, "early discovery in preliminary injunction circumstances is often limited to jurisdictional issues." *PPEX, LLC v. Buttonwood, Inc.*, No. 21-CV-53-F, 2021 WL 7210184, at *2 (D. Wyo. July 28, 2021) (citing *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, No. 20-2109-HLT, 2020 WL 1659858, at *1 (D. Kan. Apr. 3, 2020)).

## II. Reconsideration

"In reviewing an interlocutory motion to reconsider, 'the court may look to the standard used to review a motion made pursuant to Federal Rule of Civil Procedure 59(e).'" *Schmeisser GmbH*, 2021 U.S. Dist. LEXIS 255447, at *3 (quoting *Ankeney v. Zavaras*, 524 Fed. App'x 454, 458 (10th Cir. 2013)). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servante of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995)).

6

Appx41

**RULING OF THE COURT**

## I. *Expedited Discovery*

The Court denies Plaintiffs' request for expedited discovery. When ruling on a motion for expedited discovery, courts generally consider "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Smagin v. Yegiazaryan*, No. CV 14-9764-R, 2015 WL 12762270, at *2 (C.D. Cal. Sept. 18, 2015) (citing *Qwest Commc'ns Int'l*, *Inc*., 213 F.R.D. at 419).

### A. Factor Test

The Court finds each factor weighs against granting expedited discovery and the appropriateness of reconsideration is on a similar, downward slant. The Court finds (1) no PI is pending; (2) Plaintiffs' purpose underlying expedited discovery is to renew their PI motion; (3) the breadth of discovery and burden on Defendants is weighty given the context; and (4) the comparison of expedited and typical discovery timelines favors denial. The Court will address each finding in detail.

#### 1. *Whether a Preliminary Injunction is Pending*

A pending PI may support granting an expedited discovery request. *Qwest Commc'ns Int'l*, *Inc*., 213 F.R.D. at 419. But the Court typically considers whether a PI is pending—not whether one has been ruled on or may be reconsidered. *See id*.; *Am. Equip. Sys.*, *LLC v. Chester*, No. 223CV00680DBBDBP, 2023 WL 8261427, at *3 (D. Utah Nov. 29, 2023). Plaintiffs concede no PI motion is pending but state their intent to renew the

7

Appx42

request following expedited discovery. [ECF Nos. 42, 44]. They contend "[t]he absence of a currently pending PI motion is not dispositive []—the inquiry is whether a PI is 'at issue.'" [ECF No. 44, at 6] (citation omitted). Defendants argue there is no PI pending and the request for expedited discovery should have been made before the hearing, if at all. [ECF No. 43, at 11]. The Court finds this factor weighs against granting expedited discovery.

Plaintiffs cite *Am. Equip. Sys.* to suggest a PI need only be "at issue." [ECF No. 44, at 6] (citing *Am. Equip. Sys.*, *LLC*, 2023 WL 8261427, at *3). While the court used the words "at issue" when discussing a PI, it also referred to this factor as "whether a preliminary injunction *is pending*." *Am. Equip. Sys.*, *LLC*, 2023 WL 8261427, at *2–3 (emphasis added). More directly, the court found this factor weighed in favor of expedited discovery where the issuance of a PI had been briefed but no hearing had been set, and no order had been issued. *Id.*

Because a PI motion is not currently pending, the Court finds this factor weighs against granting expedited discovery. *See Qwest Commc'ns Int'l, Inc.*, 213 F.R.D. at 419. As reconsideration is central to Plaintiffs' request, the Court will next address whether Plaintiffs' intent to renew their motion is proper.

### 2. *Purpose for Requesting Expedited Discovery*

Plaintiffs primarily bring this Motion to renew their PI request. Yet they ask the Court to consider this Motion solely as one requesting expedited discovery. [ECF No. 44, at 2–3]. They simply hope the expedited discovery will uncover relevant grounds to renew their motion. *Id.* at 4 ("[T]he discovery Rare Breed requests focuses on information the

Appx43

Court identified as in dispute and could change the Court's analysis, *depending on what the discovery reveals*.") (emphasis added). This circular reasoning is not proper justification for expedited discovery.

As stated, "[g]rounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servante of Paraclete*, 204 F.3d at 1012 (citing *Brumark Corp.*, 57 F.3d at 948). Plaintiffs do not allege any recognized basis for bringing the renewed motion. The Court will address Plaintiffs' (1) lack of basis, (2) lack of due diligence, and (3) lack of supporting law.

First, because Plaintiffs presented no evidence of an intervening change in controlling law or the need to correct clear error or prevent manifest injustice, their future reconsideration hinges on new, previously unavailable evidence. *See id*. Plaintiffs hope expedited discovery will uncover evidence supporting a compelling PI request. Even so, despite the urgency, Plaintiffs had other procedural options for timing their initial motion. So simply because Plaintiffs did not request expedited discovery earlier does not mean the evidence was "previously unavailable" in the relevant meaning of the phrase. *See United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015) (stating a motion to reconsider should not be used to "advance arguments that could have been raised earlier") (quoting *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014)).

Second, Plaintiffs did not act with due diligence in bringing their original motion. Plaintiffs contend:

9

Appx44

> Defendants filed their opposition five days before the hearing, supported by four declarations, including two from retained experts—totaling 325 pages. Plaintiffs had no reply brief, no depositions, no document discovery, and not even an opportunity to cross-examine Partisan's technical and damages experts whose opinions the Court considered. Neither expert appeared at the hearing.

[ECF No. 42, at 3].

Plaintiffs do not acknowledge they initiated the escalated timeline, and Defendants were under a similar resulting burden. Plaintiffs' Complaint, filed January 15, 2026, contained 1,217 pages of attachments. [ECF No. 1]. Their TRO and PI Motion filed the next day included 263 pages of attachments. [ECF Nos. 6, 7]; *see* [ECF No. 42, at 11 n.2]. Altogether, Defendants reviewed 1,480 pages of attachments before filing their response two weeks later. *See* [ECF Nos. 1, 6, 7, 27] (comparing rate-of-review ratios, Plaintiffs proportionately reviewed 65 pages daily for five days while Defendants reviewed around 105 pages daily for two weeks). Regardless, Plaintiffs did not request Defendants' expert witnesses attend the hearing. *See* [ECF No. 43, at 2]. They also did not request a continuance when the witnesses were not present at the hearing. *Id*.; [ECF No. 33, at 5]. Plaintiffs also do not acknowledge the omissions in their evidence and arguments as asserted by the Court and Defendants. Their briefing failures carry greater weight than any discovery issues cited, and increasingly bare on their due diligence omissions. *PPEX*, *LLC*, 2021 WL 7210184, at *2 ("If Plaintiff needed this discovery to support their Motion for Preliminary Injunction, it should have waited to file that motion until after discovery opened.").

10

Third, Plaintiffs fail to provide relevant law supporting their renewal. The cases they cite are distinguishable from the current facts. *See* [ECF No. 42, at 8–9] (citing *CLEAR Clinic v. Noem*, No. 25-cv-01906, 2025 WL 3033800, at *2 (D. Or. Oct. 29, 2025); *Equity Bank v. McGregor*, No. 22-1081-DDC-GEB, 2022 WL 1102640, at *8 (D. Kan. Apr. 13, 2022); *Phibro Biodigester v. Murphy-Brown, LLC*, No. 4:22-CV-00050-RJS-PK, 2022 WL 17243727, at *3 (D. Utah Nov. 23, 2022), *aff'd sub nom. Phibro Biodigester* No. 22-4117, 2024 WL 4541530 (10th Cir. Oct. 22, 2024)).

Plaintiffs claim, "[w]hen the evidentiary record at the TRO or early PI stage is in dispute on key elements, the court has discretion to allow the movant to develop 'a more robust record to litigate the preliminary injunction.'" [ECF No. 42, at 8]. Plaintiffs cite *CLEAR Clinic v. Noem*, stating the court allowed the parties two weeks to brief additional arguments raised at the hearing, and allowed submission of a renewed PI motion. *Id*. (citing *CLEAR Clinic*, 2025 WL 3033800, at *2). There the court noted the plaintiff moved for a mandatory injunction (requiring a party to act) and the parties presented competing evidence. *CLEAR Clinic*, 2025 WL 3033800, at *2. The court explained mandatory injunctions are particularly disfavored, require a clear showing of favorable facts and law, and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Id*. (citations omitted).

Here, Plaintiffs moved for a prohibitory injunction (maintaining the status quo) which requires a less concrete showing than a mandatory injunction. *Id*. ("A mandatory injunction "'goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored.'") (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir.

11

1994)). Yet they failed to carry their initial burden, and rebuttal, as to each of the four TRO and PI factors. [ECF No. 39].

Plaintiffs also cite two cases to support the notion "[c]ourts in this Circuit have also denied TROs, but then granted expedited discovery to develop the record before a preliminary injunction." [ECF No. 42, at 8] (citing *Equity Bank*, 2022 WL 1102640, at *8, and *Phibro Biodigester*, *LLC*, 2022 WL 17243727, at *3).

Both cases cited differ from the current facts. In *Equity Bank*, the plaintiffs filed a single motion in which they requested (1) a TRO, (2) a PI, and (3) expedited discovery to aid their PI request. *Equity Bank*, 2022 WL 1102640, at *8. The court denied the TRO request, "[b]ut, given that plaintiffs [] indicated their desire to proceed with their request for a preliminary injunction" the court allowed expedited discovery related to the PI. *Id*. Like *CLEAR Clinic*, the parties in *Phibro Biodigester* requested a mandatory injunction. *Phibro Biodigester*, *LLC*, 2022 WL 17243727, at *4. After a hearing and an oral ruling specific to the TRO, the court allowed expedited discovery related to the PI. *Id*. at *3. Presently, Plaintiffs failed to demonstrate any TRO or PI factors weighed in their favor under the lesser standard required for a prohibitory injunction and did not request expedited discovery before this ruling. [ECF No. 39].

Overall Plaintiffs ignore the recognized bases supporting reconsideration. They underscore the urgency of renewal by focusing on hypothetical irreparable harm the Court found unpersuasive. [ECF No. 42, at 6–8]. Plaintiffs again fail to acknowledge their briefing deficiencies independent of the requested discovery. This omission indicates— even if it were permitted—any reconsideration may be futile. *See Schmeisser GmbH*, 2021

12

U.S. Dist. LEXIS 255447, at *3 (stating reconsideration "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.") (quotations omitted) (quoting *Servante of Paraclete*, 204 F.3d at 1012).

### 3. Breadth of Discovery Requests and Burden on Defendants

The Court will jointly consider the breadth of discovery requests and the burden on Defendants to comply. Plaintiffs contend the expedited discovery does not pose an undue burden because the requested scope is limited, Defendants had notice of the underlying claims, and this information would be produced in the normal course of litigation. [ECF No. 42, at 10]. Defendants claim if granted, the request would impose an undue burden because they will undergo another round of front-loaded expedited proceedings and argue the same issues could have been addressed earlier. [ECF No. 43, at 11].

Plaintiffs request "six interrogatories, six requests for production, and five depositions—each targeting issues Partisan itself placed before the Court." [ECF No. 42, at 3]; *see* [ECF Nos. 42-1, 42-2] (detailing proposed discovery requests). Defendants claim the requested discovery is overly broad and Plaintiffs "do not and cannot show [expedited discovery] will alter the multiple independent grounds for denial that the Court identified in its order." [ECF No. 43, at 11] (alteration added). The Court finds the breadth and burden of Plaintiffs' discovery requests favors denial.

The issue with Plaintiffs' proposal is contextual. It seems part of the burden anticipated by Defendants stems from the reconsideration trailing behind Plaintiffs' expedited discovery. [ECF No. 43, at 11]. Reconsideration would necessarily be followed by additional briefing, proceedings, and argument. There would be additional cost in the

13

Appx48

preparation and attendance of all parties—including the preparation and attendance of expert and fact witnesses. Plaintiffs chose the timing of their emergency motion on an exceptionally incomplete record. *See* [ECF Nos. 6, 7]. Many issues raised by Plaintiffs could have been addressed before, or during the hearing if proper arrangements were made.

Purportedly related to irreparable harm, Plaintiffs propose taking three depositions. [ECF No. 42-1, at 2] (proposing to depose Ben Woods, Scott Cragun, and Rule 30(b)(6) Designee). Plaintiffs plan to depose Mr. Woods related to Partisan's sales projections, insurance coverage, dealer networks, and pricing strategies. Similarly, they seek to question Defendants' damages expert Mr. Cragun about "[p]rice erosion methodology and calculations; compensability of damages; lost profits analysis; [and] opinions on irreparable harm." *Id*. (alteration added). And they intend to question the Rule 30(b)(6) Designee about insurance coverage, Partisan's financial condition, overall corporate structure, and ability to satisfy a damages judgment. *Id*. Nine of the twelve discovery requests relate to irreparable harm. [ECF No. 42-2, at 2–3]. Five of their discovery requests relate to Defendants' ability to pay a hypothetical judgment. *Id*. at 2.

Defendants argue Plaintiffs' emphasis on collectability "puts the cart before the horse." [ECF No. 43, at 8]; *see* [ECF No. 44, at 4]. Yet Plaintiffs argue Defendants' financial condition must be assessed before money damages may be considered in place of injunctive relief. [ECF No. 44, at 4] (citing *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1155–56 (Fed. Cir. 2011)).

While this may be true, Plaintiffs do not acknowledge the crux of the analysis— they must first show irreparable harm requiring compensation. *See Robert Bosch LLC*, 659

14

F.3d at 1156 ("While competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so."). Plaintiffs failed to provide specific information about how their business operations and reputation have been impacted after Defendants entered the market. [ECF No. 39, at 10–17]. Their current request contains similar flaws. For example, within their collectability argument they present purely hypothetical damages based on Defendants' sales projections for Partisan. [ECF No. 44, at 4 n.2] (stating at their $350 price point, Plaintiffs would yield approximately $86 million more than Defendants "on those same units" projected for Partisan).

Related to likelihood of success, Plaintiffs intend to focus their deposition of John Nixon, Defendant's technical expert, on his "[i]nfringement analysis; claim construction of 'substantially in-battery position'; obviousness theory and prior art analysis; missing claim charts . . .; [and] opinions on '067 Patent and Asserted Patents." [ECF No. 42-1, at 2] (alteration added). Four of their discovery requests relate to the likelihood of success factor. [ECF No. 42-2, at 2]. They argue they should not be required to demonstrate Defendants' validity challenge "lacked substantial merit" "without seeing the charts and questioning the expert who created them." [ECF No. 44, at 6].

At this stage, determining likelihood of success based on an incomplete record poses a predictable challenge. *See*, *e.g.*, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) ("[T]his court recognizes the difficulty imposed on a trial court to construe claim terms based upon a preliminary 'likelihood' record."); *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (recognizing the need for

15

"rolling claim construction . . . particularly [] where issues involved are complex, either due to the nature of the technology or because the meaning of the claims is unclear. . . . These difficulties may be even more acute in the preliminary injunction context[.]") (citations omitted).

The Court finds because Plaintiffs selected the timing for filing their suit and emergency motion, granting their request for expedited discovery in support of reconsideration—with no support for the forthcoming reconsideration—would unduly burden Defendants. The Court will now compare the timelines between typical and expedited discovery.

### 4. *Comparison Between Typical and Expedited Discovery Timeframes*

Plaintiffs argue this factor is neutral. [ECF No. 42, at 10–11]. They contend, "the need for the requested discovery crystallized only after the Response . . . and hearing revealed what Defendants would rely on and what the Court found unresolved." [ECF No. 44, at 6]. Defendants do not specifically address this point but argue, as stated above, the requested discovery is front-loaded and would present an undue burden because it could have been addressed earlier. [ECF No. 43, at 11]. The Court finds because Plaintiffs have ultimately chosen the timeline of the emergency motions to this point—and because the discovery is only requested in aid of an unsupported reconsideration—this factor weighs against granting expedited discovery.

### B. Factor Test Conclusion

The listed factors, while non-exhaustive, each weigh against the existence of good cause for Plaintiffs' expedited discovery request. Importantly, Plaintiffs request the

expedited discovery to renew their PI motion. They have no recognized basis for this reconsideration. Thus, the Court finds there is no good cause supporting the request and denies the same.

### CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** Plaintiffs' Motion for Expedited Discovery [ECF No. 41] is **DENIED**.


Dated this 11th day of March, 2026.

Kelly H. Rankin
United States District Judge

17



US010514223B1

(12) **United States Patent**
Rounds

(10) **Patent No.:** **US 10,514,223 B1**
(45) **Date of Patent:** **Dec. 24, 2019**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **Wolf Tactical LLC**, Buda, TX (US)

(72) Inventor: **Jeffrey Cooper Rounds**, Buda, TX (US)

(73) Assignee: **Wolf Tactical LLC**, Buda, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/143,624**

(22) Filed: **Sep. 27, 2018**

**Related U.S. Application Data**

(60) Provisional application No. 62/565,247, filed on Sep. 29, 2017.

(51) **Int. Cl.**
| | |
|---|---|
| *F41A 19/43* | (2006.01) |
| *F41A 19/14* | (2006.01) |
| *F41A 19/10* | (2006.01) |
| *F41A 19/12* | (2006.01) |
| F41A 17/82 | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *F41A 19/43* (2013.01); *F41A 19/10* (2013.01); *F41A 19/12* (2013.01); *F41A 19/14* (2013.01); *F41A 17/82* (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/10; F41A 19/12; F41A 19/14; F41A 19/43; F41A 17/82
USPC ............. 89/136, 139; 42/69.01, 69.02, 69.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,704,153 A * 1/1998 Kaminski ............. F41A 17/063
42/117

| | | | |
|---|---|---|---|
| 6,101,918 A | 8/2000 | Akins | |
| 6,722,072 B1 | 4/2004 | McCormick | |
| 7,162,824 B1 | 1/2007 | McCormick | |
| 7,213,359 B2 | 5/2007 | Beretta | |
| 7,293,385 B2 | 11/2007 | McCormick | |
| 7,398,723 B1 | 7/2008 | Blakley | |

(Continued)

FOREIGN PATENT DOCUMENTS

TW 409847 U 10/2000

*Primary Examiner* — Bret Hayes
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism for use in a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. The trigger mechanism includes a hammer, a trigger member, and a locking bar. The hammer has a sear notch and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. The trigger member has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions. The trigger member has a surface positioned to be contacted by hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position. The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the release position, and is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**7 Claims, 4 Drawing Sheets**



Appx53

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,127,658 | B1 | 3/2012 | Cottle | |
| 8,820,211 | B1 | 9/2014 | Hawbaker | |
| 9,021,732 | B2 | 5/2015 | Johnson | |
| 9,513,076 | B2 * | 12/2016 | Kolev | F41A 3/12 |
| 9,568,264 | B2 | 2/2017 | Graves | |
| 9,816,772 | B2 | 11/2017 | Graves | |
| 9,939,221 | B2 | 4/2018 | Graves | |
| 2007/0199435 | A1 * | 8/2007 | Hochstrate | F41A 3/66 |
| | | | | 89/191.02 |
| 2016/0010933 | A1 | 1/2016 | Bonner | |
| 2016/0102933 | A1 | 4/2016 | Graves | |
| 2017/0219307 | A1 * | 8/2017 | Foster | F41A 19/06 |
| 2018/0066911 | A1 | 3/2018 | Graves | |
| 2018/0087860 | A1 * | 3/2018 | Sullivan | F41A 17/46 |

* cited by examiner



**FIG. 1**



**FIG. 2**

Appx55



**FIG. 3**



**FIG. 4**

FWD



FIG. 5

FWD

Appx58

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 62/565,247 filed Sep. 29, 2017, and incorporates the same herein by reference.

## TECHNICAL FIELD

This invention relates to a firearm trigger mechanism. More particularly, it relates to a semiautomatic trigger that is mechanically reset by movement of the hammer when it is reset by the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunitions propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Other devices have been offered that facilitate the bump fire process. One is shown in U.S. Pat. No. 6,101,918, issued Aug. 15, 2000, to William Akins for a Method and Apparatus for Accelerating the Cyclic Firing Rate of a Semiautomatic Firearm. This device, sold for some time as the Akins Accelerator™, allowed the receiver and action of the firearm to move longitudinally relative to the butt stock and used a spring to assist forward return movement. Other devices, such as that shown in U.S. Pat. No. 8,127,658, issued Mar. 6, 2012, and other patents owned by Slide Fire Solutions provide a replacement stock and handgrip assembly that facilitates bump firing, but without spring assistance.

Other solutions to increase the rate of semiautomatic fire include pull/release trigger mechanisms. These devices cause one round to be fired when the trigger is pulled and a second round to be fired when the trigger is released. Such a device is shown in U.S. Pat. No. 8,820,211, issued Sep. 2, 2014, entitled Selectable Dual Mode Trigger for Semiautomatic Firearms. A device like this is offered by FosTecH Outdoors, LLC as the ECHO TRIGGER™. Another device, offered by Digital Trigger Technologies, LLC under the name DigiTrigger™, provides a dual mode trigger in which the pull/release operating function is achieved electronically.

The above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. This invention, however, does not provide a "drop-in" solution for existing popular firearm platforms, like the AR15, AK47 variants, or the Ruger 10/22™. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to be forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures; wherein;

FIG. 1 is an isometric view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention;

FIG. 2 is a partially cut-away view thereof;

FIG. 3 is a longitudinal section view showing the module of the embodiment installed in a typical AR15-pattern lower receiver in a cocked and ready to fire status with the bolt and bolt carrier in an in-battery position;

FIG. 4 is a similar view in which the trigger has been pulled and the hammer has fallen against a firing pin; and

FIG. 5 is a similar view showing the bolt carrier in a retracted position, forcing the hammer and trigger into a reset status.

**3**

### DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments.

Referring first to FIGS. **1** and **2**, therein is shown at **10** a "drop-in" trigger module adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatics firearm platforms, such as the Ruger 10/22™ or AK-pattern variants.

The module **10** includes a frame or housing **12** that may be sized and shaped to fit within the internal fire control mechanism pocket of an AR-pattern lower receiver. It includes first and second pairs of aligned openings **14**, **16** that are located to receive transverse pins (**40**, **36**, respectively, shown in FIGS. **3-5**) used in a standard AR-pattern trigger mechanism as pivot axes for the hammer and trigger member, respectively. The housing **12** includes left and right sidewalls **20**, **22**, which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **20**, **22** may be interconnected at the bottom of the housing **12** at the front by a crossmember **24**.

A hammer **18** of ordinary (MIL-SPEC) AR-pattern shape and construction may be used. The illustrated hammer **18** may be standard in all respects and biased by a typical AR-pattern hammer spring (not shown).

A modified trigger member **26** may be sized to fit between the sidewalls **20**, **22** of the housing **12** and may include a trigger blade portion **28** that extends downwardly. The trigger blade portion **28** is the part of the trigger member **26** contacted by a user's finger to actuate the trigger mechanism. The trigger blade portion **28** may be curved (shown) or straight, as desired. The trigger member **26** may pivot on a transverse pin **36** (not shown in FIGS. **1** and **2**) that extends through aligned openings **16** in the sidewalls **20**, **22** of the housing **12**. The same pin **36** is aligned and positioned within aligned openings **47** of a lower receiver **50** to assemble the module **10** into a fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**, for example. The modified trigger member **26** may have integral first and second contact surfaces **30**, **32**. Some part of the trigger member **26** includes contact surfaces for interaction with the hammer **18** and locking bar **62**. For

**4**

example, the trigger member **26** can include first and second upwardly extended rear contact surfaces **30**, **32**. The first contact surface **30** is positioned to interact, for example, with a tail portion **44** of the hammer **18** that extends rearwardly from a head part **42** of the hammer **18**. The second contact surface **32** is positioned to interact with a locking bar **62**. The contact surfaces may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin **36**, with no lost motion between the parts.

The hammer **18** may include bosses **34** coaxial with a transverse pivot pin opening **38** that receives an assembly/pivot pin **40** (not shown in FIGS. **1** and **2**) through the first set of aligned openings **14** in the housing **12** (and through openings **51** in the firearm receiver, to position the trigger module **10** within the fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**). The bosses **34** may fit between the sidewalls **20**, **22** of the housing **12** to laterally position the hammer **18**, or can be received in the openings **14** (if enlarged) so that the hammer **18** stays assembled with the module **10** when the hammer's pivot pin is removed and/or when the module **10** is not installed in a firearm receiver. The hammer **18** includes a head portion **42** and a tail portion **44**. The hammer **18** also includes a sear catch **46** that engages the sear **48** on the trigger member **26**, when cocked. The trigger and hammer pins **36**, **40** provide pivot axes at locations (openings **47**, **51**, shown in FIGS. **3-5**, for example) standard for an AR-pattern fire control mechanism. Although FIGS. **3-5** are a longitudinal section view and only show one of the aligned openings **47**, **51**, it is understood that a typical AR15-pattern lower receiver **50** includes second, corresponding and aligned openings **47**, **51** in the half of the receiver **50** not shown).

Referring now also to FIG. **3**, the trigger module **10** is shown installed in the fire control mechanism pocket **49** of an AR-pattern lower receiver **50**. Other lower receiver parts not important to the present invention are well-known in the art and are omitted from all figures for clarity. As is well-known in the art, the bolt carrier assembly **52** (or blow-back bolt) would be carried by an upper receiver (not shown) and engage the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The hammer **18** is shown in a cocked position and a bolt carrier assembly **52** is shown in an in-battery position. The sear **48** engages the sear catch **46** of the hammer **18**.

The bolt carrier assembly **52** used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface **54** in a tail portion **56** of the bolt carrier body **58**. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible. The semi-automatic AR-pattern safety selector switch **60** may also be standard (MIL-SPEC) in all respects.

The trigger module of the present invention includes a trigger locking bar **62** carried on a frame **66** for pivotal movement on a transverse pivot pin **68**. The frame **66** may be part of the module housing **12**, if configured as a "drop-in" unit. An upper end of the locking bar **62** extends above the upper edge of the housing **12** and lower receiver **50** to be engaged by the engagement surface **54** of the bolt

carrier body **58** when the bolt carrier assembly **52** is at or near its in-battery position (as shown in FIG. **3**). Contact between the engagement surface **54** and upper end of the locking bar **62** causes the locking bar **62** to pivot into a first position (FIG. **3**) against a biasing spring **70** and allows pivotal movement of the trigger member **26**. If desired, the locking bar **62** may include a rearward extension **64** that serves as a means to limit the extent to which it can pivot toward the blocking position.

Referring now also to FIG. **4**, when the safety selector **60** is in the "fire" position (as shown in all figures), finger pressure pulling rearward against the trigger blade portion **28** causes the trigger member **26** to rotate on the pivot pin **36**, as indicated by arrows. This rotation causes the sear **48** to disengage from the sear catch **46** of the hammer **18**. This release allows the hammer **18** to rotate by spring force (hammer spring omitted for clarity) into contact with the firing pin **72**. Any contact between the rear portion of the trigger member **26** and front surface of the locking bar **62** will simply cause the locking bar **62** to rotate out of the way, as illustrated in FIG. **4**.

Referring now to FIG. **5**, discharging an ammunition cartridge (not shown) causes the action to cycle by moving the bolt carrier assembly **52** rearwardly, as illustrated. The same effect occurs when the action is cycled manually. As in an ordinary AR15-pattern configuration, a lower surface **76** of the bolt carrier body **58** pushes rearwardly against the head portion **42** of the hammer **18**, forcing it to pivot on the hammer pivot/assembly pin **40** against its spring (not shown) toward a reset position. As the rearward movement of the bolt carrier body **58** and pivotal movement of the hammer **18** continues, mechanical interference or contact between a rear surface **74** of the hammer **18** (such as on the tail portion **44**) and a contact surface **30** of the trigger member **26** forces the trigger to pivot (arrows in FIG. **5**) toward and to its reset position. At the same time, as the trigger member **26** is reset, the biasing spring **70** moves the lower end of the locking bar **62** into a second position (FIG. **5**) in which it blocks pivotal movement of the trigger **26**, including by finger pressure applied (or reapplied) to the trigger blade **28**. Thus, as the bolt carrier assembly **52** returns forward, the trigger member **26** is held in its reset position by the locking bar **62** where the hammer sear catch **46** will engage with the sear **48** carried on the trigger member **26** to reset the fire control mechanism. The trigger member **26** cannot be pulled to release the sear/hammer engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **52** and firing pin **72** as the bolt carrier assembly **52** is returning to battery. A trigger return spring (not shown) of the type used in a standard AR-pattern trigger mechanism may be unnecessary in this case, because the trigger member **26** is forced to return by the hammer **18**, but may be used, if desired.

When the bolt carrier assembly **52** has reached (or nearly reached) its closed, in-battery position (shown in FIG. **3**), the engagement surface **54** of the bolt carrier tail portion **56** contacts and forwardly displaces the upper end of the locking bar **62**, disengaging the second contact surface **32** of the trigger member **26**, allowing the trigger **26** to be pulled a second time. The distance of travel during which there is no interference between the locking bar **62** and second contact surface **32** of the trigger member **26**, allowing the trigger member **26** to be manually displaced, may be about from about 0.10 to 0.31 inch. This prevents early release of the hammer **18** and contact of the hammer against the firing pin **72** before the bolt is completely locked and in-battery.

Force applied by the user's trigger finger against the trigger blade portion **28** is incapable of overcoming the mechanical interference and force of the hammer **18** against the contact surface **30** of the trigger member **26**. However, the trigger can immediately be pulled again—only by application of an external force—as soon as the locking bar **62** has been rotated against the spring **70** and out of blocking engagement with the trigger member **26**, as the bolt carrier assembly **52** approaches or reaches its in-battery position. This allows the highest possible standard rate of fire, without risk of hammer-follow, for the semiautomatic action of the firearm.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. For a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a hammer having a sear notch and mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions;

a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in a frame and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**2**. The trigger mechanism of claim **1**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**3**. The trigger mechanism of claim **1**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

**4**. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and

released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

5. The trigger mechanism of claim **4**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

6. The trigger mechanism of claim **4**, wherein the housing's transversely aligned pairs of openings for receiving hammer and trigger assembly pins are aligned with the assembly pin openings in the fire control mechanism pocket of the receiver.

7. The trigger mechanism of claim **4**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

* * * * *



US011724003B2

# (12) United States Patent
## Strbac

(10) **Patent No.:** **US 11,724,003 B2**
(45) **Date of Patent:** **Aug. 15, 2023**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/048,572**

(22) Filed: **Oct. 21, 2022**

(65) **Prior Publication Data**

US 2023/0221087 A1 Jul. 13, 2023

### Related U.S. Application Data

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**
*F41A 19/24* (2006.01)
*F41A 19/10* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *F41A 19/10* (2013.01); *F41A 17/48* (2013.01); *F41A 19/15* (2013.01); *F41A 19/24* (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,765,562 A 10/1956 Rober et al.
3,045,555 A 7/1962 Stoner
(Continued)

FOREIGN PATENT DOCUMENTS

DE 582963 C 8/1933
DE 4008351 A1 9/1991
(Continued)

OTHER PUBLICATIONS

Statutory Invention Registration No. H107, Inventor: Bauer, Published Aug. 5, 1986 (8 pages).

*Primary Examiner* — J. Woodrow Eldred
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt
(Continued)



carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**14 Claims, 18 Drawing Sheets**

(51) **Int. Cl.**
**F41A 17/48** (2006.01)
**F41A 19/15** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,292,492 A | 12/1966 | Sturtevant | |
| 3,301,133 A | 1/1967 | Sturtevant | |
| 3,670,442 A | 6/1972 | Kennedy et al. | |
| 4,023,465 A | 5/1977 | Inskip | |
| 4,057,003 A | 11/1977 | Atchisson | |
| 4,151,670 A | 5/1979 | Rath | |
| 4,276,808 A | 7/1981 | York | |
| 4,433,610 A | 2/1984 | Tatro | |
| 4,463,654 A | 8/1984 | Barnes et al. | |
| 4,516,466 A | 5/1985 | Jennie | |
| 4,580,484 A | 4/1986 | Moore | |
| 4,656,993 A | 4/1987 | Yuzawa et al. | |
| 4,658,702 A | 4/1987 | Tatro | |
| 4,693,170 A | 9/1987 | Atchisson | |
| 4,697,495 A | 10/1987 | Beretta | |
| 4,787,288 A | 11/1988 | Miller | |
| 4,937,964 A | 7/1990 | Crandall | |
| 5,149,898 A | 9/1992 | Chesnut et al. | |
| 5,183,959 A | 2/1993 | McCoan et al. | |
| 5,223,649 A | 6/1993 | Claridge | |
| 5,339,721 A | 8/1994 | Beretta | |
| 5,517,897 A | 5/1996 | Perrine | |
| 5,614,691 A | 3/1997 | Taylor | |
| 5,623,114 A | 4/1997 | Soper | |
| 5,682,699 A | 11/1997 | Gentry | |
| 5,701,698 A | 12/1997 | Wesp et al. | |
| 5,704,153 A | 1/1998 | Kaminski et al. | |
| 5,760,328 A | 6/1998 | Robbins | |
| 5,770,814 A | 6/1998 | Ealovega | |
| 6,101,918 A | 8/2000 | Akins | |
| 6,360,467 B1 | 3/2002 | Knight | |
| 6,601,331 B2 | 8/2003 | Salvitti | |
| 6,718,680 B2 | 4/2004 | Roca et al. | |
| 6,722,072 B1 | 4/2004 | McCormick | |
| 6,851,346 B1 | 2/2005 | Herring | |
| 6,889,459 B1 | 5/2005 | Salvitti | |
| 6,976,416 B2 | 12/2005 | Ealovega | |
| 7,051,638 B2 | 5/2006 | Thomele | |
| 7,162,824 B1 | 1/2007 | McCormick | |
| 7,213,359 B2 | 5/2007 | Beretta | |
| 7,293,385 B2 | 11/2007 | McCormick | |
| 7,337,574 B2 | 3/2008 | Crandall et al. | |
| 7,347,021 B1 | 3/2008 | Jones | |
| 7,398,723 B1 | 7/2008 | Blakley | |
| 7,421,937 B1 | 9/2008 | Gangl | |
| 7,634,959 B2 | 12/2009 | Frickey | |
| 7,661,220 B2 | 2/2010 | Crandall et al. | |
| 7,806,039 B1 | 10/2010 | Gomez | |
| 8,037,805 B1 | 10/2011 | Neroni | |
| 8,112,928 B2 | 2/2012 | Keough | |
| 8,127,658 B1 | 3/2012 | Cottle | |
| 8,156,854 B2 | 4/2012 | Brown | |
| 8,443,537 B2 | 5/2013 | Curry | |
| 8,464,454 B2 | 6/2013 | Martin et al. | |
| 8,490,309 B2 | 7/2013 | Zukowski | |
| 8,667,881 B1 | 3/2014 | Hawbaker | |
| 8,695,477 B2 | 4/2014 | Esch | |
| 8,720,096 B2 | 5/2014 | Siddle | |
| 8,820,211 B1 | 9/2014 | Hawbaker | |
| 8,893,607 B2 | 11/2014 | Audibert et al. | |
| 8,925,234 B1 | 1/2015 | Barrett | |
| 8,985,006 B1 | 3/2015 | Christensen et al. | |
| 9,016,187 B2 | 4/2015 | Findlay | |
| 9,021,732 B2 | 5/2015 | Johnson | |
| 9,021,733 B1 | 5/2015 | DiChario | |
| 9,052,150 B2 | 6/2015 | Talasco | |
| 9,121,661 B2 | 9/2015 | Calvete | |
| 9,146,066 B1 | 9/2015 | Cason | |
| 9,146,067 B2 | 9/2015 | Stakes | |
| 9,182,189 B2 | 11/2015 | Seigler | |
| 9,228,786 B2 | 1/2016 | Sullivan et al. | |
| 9,310,150 B1 | 4/2016 | Geissele | |
| 9,347,726 B1 | 5/2016 | Thomas | |
| 9,448,023 B2 | 9/2016 | Sheets, Jr. et al. | |
| 9,476,660 B2 | 10/2016 | Potter et al. | |
| 9,513,076 B2 | 12/2016 | Kolev et al. | |
| 9,568,264 B2 | 2/2017 | Graves | |
| 9,618,288 B2 | 4/2017 | Wilson | |
| 9,618,289 B1 | 4/2017 | Geissele | |
| 9,625,231 B1 | 4/2017 | Hass | |
| 9,631,886 B2 | 4/2017 | Findlay | |
| 9,651,329 B2 | 5/2017 | Hittmann | |
| 9,658,007 B2 | 5/2017 | Withey | |
| 9,683,800 B2 | 6/2017 | Sewell, Jr. et al. | |
| 9,733,031 B1 | 8/2017 | Sylvester et al. | |
| 9,759,504 B2 | 9/2017 | Geissele | |
| 9,777,980 B2 | 10/2017 | Heizer | |
| 9,810,493 B2 | 11/2017 | Fluhr et al. | |
| 9,810,496 B2 | 11/2017 | Kolev et al. | |
| 9,816,772 B2 | 11/2017 | Graves | |
| 9,829,263 B2 | 11/2017 | Bonner | |
| 9,835,398 B2 | 12/2017 | Biegel | |
| 9,863,730 B2 | 1/2018 | Elftmann | |
| 9,869,522 B2 | 1/2018 | Larson, Jr. et al. | |
| 9,874,417 B2 | 1/2018 | Zajk et al. | |
| 9,927,197 B1 | 3/2018 | Geissele | |
| 9,939,221 B2 | 4/2018 | Graves | |
| 10,002,500 B2 | 6/2018 | Hall et al. | |
| 10,006,734 B1 | 6/2018 | Findlay | |
| 10,030,924 B1 | 7/2018 | Smith | |
| 10,077,960 B2 | 9/2018 | Geissele | |
| 10,107,580 B2 | 10/2018 | Fellows et al. | |
| 10,254,067 B2 | 4/2019 | Foster | |
| 10,267,584 B2 | 4/2019 | Kasanjian-King | |
| 10,330,413 B2 | 6/2019 | Williams et al. | |
| 10,488,136 B2 | 11/2019 | Sullivan et al. | |
| 10,502,511 B2 | 12/2019 | Graves | |
| 10,514,223 B1 | 12/2019 | Rounds | |
| 10,584,932 B2 | 3/2020 | Foster | |
| 10,816,297 B1 * | 10/2020 | Williams | F41A 19/46 |
| 11,287,205 B2 | 3/2022 | Biegel | |
| 11,293,715 B1 | 4/2022 | Newsome et al. | |
| 11,346,627 B1 | 5/2022 | DeMonico | |
| 2006/0048426 A1 | 3/2006 | Crandall | |
| 2006/0101695 A1 | 5/2006 | Longueira | |
| 2007/0051236 A1 | 3/2007 | Groves et al. | |
| 2007/0199435 A1 | 8/2007 | Hochstrate et al. | |
| 2009/0151213 A1 | 6/2009 | Bell | |
| 2009/0188145 A1 | 7/2009 | Fluhr et al. | |
| 2011/0209607 A1 | 9/2011 | St. George | |
| 2013/0118343 A1 | 5/2013 | Hirt | |
| 2014/0311004 A1 | 10/2014 | Barrett | |
| 2016/0010933 A1 | 1/2016 | Bonner | |
| 2016/0102933 A1 | 4/2016 | Graves | |
| 2016/0161202 A1 | 6/2016 | Larue | |
| 2017/0176124 A1 | 6/2017 | Wilson | |
| 2017/0219307 A1 | 8/2017 | Foster | |
| 2017/0276447 A1 | 9/2017 | Foster | |
| 2017/0284761 A1 | 10/2017 | Lewis et al. | |
| 2017/0299309 A1 | 10/2017 | Fellows et al. | |
| 2017/0328663 A1 | 11/2017 | Fellows et al. | |
| 2018/0066911 A1 | 3/2018 | Graves | |
| 2018/0087860 A1 | 3/2018 | Sullivan et al. | |
| 2018/0112944 A1 | 4/2018 | Underwood et al. | |
| 2018/0195823 A1 | 7/2018 | Schafer et al. | |
| 2018/0202740 A1 | 7/2018 | Elftmann, Jr. | |
| 2018/0231342 A1 | 8/2018 | Martinez | |
| 2020/0191513 A1 * | 6/2020 | Foster | F41A 19/16 |
| 2021/0222974 A1 | 7/2021 | Graves | |
| 2022/0364812 A1 * | 11/2022 | Fellows | F41A 19/24 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

FOREIGN PATENT DOCUMENTS

| EP | 1678458 | B1 | 2/2012 |
| EP | 2950033 | B1 | 11/2016 |
| TW | 409847 | U | 10/2000 |
| WO | 2016/028337 | A1 | 2/2016 |
| WO | 2018/058174 | A1 | 4/2018 |

* cited by examiner



## FIG. 1





## FIG. 2



**FIG. 3**

Appx68



FIG. 4A



FIG. 4B



FIG. 5A

Appx71



**FIG. 5B**



FIG. 6A



FIG. 6B



FIG. 7



FIG. 8A



FIG. 8B



FIG. 8C



FIG. 8D



**FIG. 9A**



FIG. 9B



FIG. 9C



FIG. 9D

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application claims the priority benefit of US Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, which is hereby incorporated by reference herein as if fully set forth in its entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627, which are hereby incorporated by reference herein as if fully set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semiautomatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward

movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced

reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position

the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. **1** is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. **2** is a top rear right perspective view thereof.

FIG. **3** is a top rear right exploded perspective view thereof.

FIG. **4A** is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **4B** is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **5A** is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **5B** is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6A** is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6B** is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **7** is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. **8A** is a view similar to FIG. **7** but with the safety selector in the standard semi-automatic position.

FIG. **8B** is a view similar to FIG. **8A** but after the trigger has been pulled to drop the hammer.

FIG. **8C** is a view similar to FIG. **8B** but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **8D** is a view similar to FIG. **8C** but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. **9A** is a view similar to FIG. **7** but with the safety selector in the forced reset semi-automatic position.

FIG. **9B** is a view similar to FIG. **9A** but after the trigger has been pulled to drop the hammer.

FIG. **9C** is a view similar to FIG. **9B** but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **9D** is a view similar to FIG. **9C** but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

7

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. 1-6B, there is illustrated a "drop-in" trigger module 10 adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module 10 includes a frame or housing 12 sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver 14. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing 12 includes forward left and right sidewalls 16, 18 which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls 16, 18 may be interconnected by a floor 20. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls 21, 22 extend rearward from forward sidewalls 16, 18 and are interconnected by a rear end wall 23. The sidewalls 16, 18 include first and second pairs of aligned openings 24, 26 for receiving hollow transverse pins 30, 32 upon which a hammer 36 and trigger member 38 pivot. The openings 24, 26 are located coaxially with openings 42, 44 in the lower receiver 14. Standard AR-pattern hammer and trigger pins 46, 48 pass through the openings 42, 44 in the lower receiver 14 and through the hollow transverse pins 30, 32 to assemble the housing 12 into the lower receiver 14. Thus, the pins 30, 32 retain the hammer 36 and trigger member 38 in the housing 12 in modular fashion, whereas the pins 46, 48 retain the trigger module 10 in the lower receiver 14.

8

The hammer 36 has a hammer head 50, a sear catch 52, a hammer hook 53, and a concave contact surface 51. The hammer 36 is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member 38 has a trigger blade 54 that extends downwardly. The trigger blade 54 is the part of the trigger member 38 contacted by a user's finger to actuate the trigger mechanism. The trigger blade 54 may be curved (as shown) or straight, as desired. The trigger member 38 has a sear 56. When the sear 56 and the sear catch 52 are engaged, the hammer 36 and trigger member 38 are in their set positions. When the sear 56 and sear catch 52 are not engaged, the hammer 36 and trigger member 38 are in their released positions. The trigger member 38 has a convex contact surface 58 that interacts with concave surface 51 on hammer 36 in a manner described below. The trigger member 38 also has a contact surface 69. The trigger member 38 is spring biased by a compression spring 59 positioned between a forward end of the trigger member 38 and the floor 20 of the housing 12 so that the trigger blade 54 is spring biased towards a forward position.

A disconnector 60 is pivoted on the hollow transverse pin 32 upon which the trigger member 38 pivots. The disconnector 60 has a disconnector hook 64 and a tail 66. The tail 66 of the disconnector 60 is spring biased upwardly away from a tail 68 of the trigger member 38 by a compression spring 67.

A locking or blocking member 72 is movably mounted to the housing 12. For example, the locking/blocking member 72 can be pivoted on a locking/blocking member pin or screw 74 that is installed in aligned openings 76 in the sidewalls 21, 22 of the housing 12. The locking member 72 has a first contact surface 78 that interacts with an engagement surface 94 in a rear portion 96 of a bolt carrier body 98 of a bolt carrier assembly 92, in a manner to be described below. The locking member 72 has a second contact surface 80 that interacts with surface 69 of trigger member 38 in a manner to be described below. The locking member 72 is spring biased by a torsion spring 82 acting between a pin 84 in the sidewalls 21, 22 and a lower portion of the locking member 72 such that surface 78 is biased rearward and surface 80 is biased forward. Alternatively, the locking/blocking member 72 can be slidably mounted to the housing 12 and spring biased forward by a compression spring.

An upper receiver 90 houses a bolt carrier assembly 92. As is well-known in the art, the bolt carrier assembly 92 (or blow-back bolt) slidably reciprocates in the upper receiver 90 and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly 92 used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member 72, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly 92 has an engagement surface 94 in a rear portion 96 of the bolt carrier body 98. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly 92 a lower surface 102 in a forward portion 104 of the bolt carrier body 98 contacts the face of the hammer head 50 causing the hammer 36 to pivot rearward. Rearward travel of bolt carrier assembly 92 also moves engagement surface 94 rearward and away from surface 78 of locking member 72. The action of spring 82 causes locking member 72 to pivot in a first direction from

a first position wherein surface **80** of locking member **72** does not impede upward movement of surface **69** of trigger member **38** to a second position wherein surface **80** of locking member **72** does impede upward movement of surface **69** of trigger member **38** thus preventing the trigger blade **54** from being pulled by the user. During forward travel of the bolt carrier assembly **92** the engagement surface **94** of the bolt carrier body **98** contacts the surface **78** of the locking member **72** to pivot the locking member **72** in a second opposite direction from the second position to the first position.

A three position safety selector **110** has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator **111** pointing forward), a wide semi-circular portion **112** of the safety selector **110** prevents the trigger blade **54** from being pulled (FIGS. 4A, 4B, and 7). When in the standard semi-automatic position (safety selector indicator **111** pointing upward), a flat portion **114** of the safety selector **110** permits the trigger blade **54** to be pulled. The disconnector **60** can pivot with the trigger member **38** and the disconnector hook **64** can catch the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. 5A and 5B). When in the forced reset semi-automatic position (safety selector indicator **111** pointing rearward), a narrow semi-circular portion **116** permits the trigger blade **54** to be pulled but prevents the disconnector **60** from pivoting with the trigger member **38** thus preventing the disconnector hook **64** from catching the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. 6A and 6B). In other words, in the forced reset semi-automatic position, the disconnector **60** is "disabled" in that the disconnector hook **64** is unable to catch the hammer hook **53** during cycling of the bolt carrier assembly **92**.

Referring now to FIGS. 8A-8D, with the safety selector **110** set in the standard semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. Also during pivoting travel of the hammer **36** the disconnector hook **64** catches the hammer hook **53**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise moving surface **80** out of the blocking position. At this point rearward finger pressure on the trigger blade **54** must be released to allow the sear **56** to engage the sear catch **52**, returning the hammer **36** and trigger member **38** to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade **54** to fire another round.

Referring now to FIGS. 9A-9D, with the safety selector **110** set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. The narrow semi-circular portion **116** of the safety selector **110** prevents the discon-

nector **60** from rotating with the trigger member **38**, thus "disabling" the disconnector **60**, preventing the disconnector hook **64** from catching the hammer hook **53**. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. The bolt carrier assembly **92** thereby forces the hammer **36** and trigger member **38** to their set positions wherein the sear **56** engages the sear catch **52**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise. At this point the user can reapply rearward finger pressure on the trigger blade **54** to fire another round, without first manually releasing rear finger pressure on the trigger blade **54**.

Thus, as the bolt carrier assembly **92** returns forward, the trigger member **38** is held in its set position by the locking member **72**. The trigger member **38** cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **92** and firing pin **99** as the bolt carrier assembly **92** is returning to battery. When the bolt carrier assembly **92** has reached (or nearly reached) its closed, in-battery position, the engagement surface **94** contacts and forwardly displaces the contact surface **78** of the locking member **72**, disengaging the contact surface **80** of the locking member **72** from the contact surface **69** of the trigger member **38**, allowing the trigger blade **54** to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

1. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a

transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

2. The trigger mechanism of claim 1, wherein said safety selector has a protuberance thereon which, when said safety selector is in said forced reset semi-automatic position, contacts said disconnector preventing said disconnector hook from catching said hammer hook.

3. The trigger mechanism of claim 1 further including a spring which biases said trigger member towards said set position.

4. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions,

said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

5. The trigger mechanism of claim 4, wherein said safety selector has a protuberance thereon which, when said safety selector is in said forced reset semi-automatic position, contacts said disconnector preventing said disconnector hook from catching said hammer hook.

6. The trigger mechanism of claim 4, wherein said first and second pairs of openings in said housing are adapted to be aligned with first and second pairs of transversely aligned assembly pin openings in the fire control mechanism pocket.

7. The trigger mechanism of claim 4 further including a spring which biases said trigger member towards said set position.

8. The trigger mechanism of claim 7 wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**9**. A firearm comprising:

a receiver having a fire control mechanism pocket therein,

a reciprocating bolt carrier,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, said hammer pivoted rearward by rearward movement of said bolt carrier,

a trigger member having a sear and mounted in said fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member mounted in said fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and moved against said spring bias to said second position by contact from said bolt carrier during forward movement of said bolt carrier as said bolt carrier reaches a substantially in-battery position, and

a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when said bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**10**. The firearm of claim **9** further comprising:

a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough,

said hammer mounted on said hammer pin, said trigger member and disconnector mounted on said trigger member pin.

**11**. The firearm of claim **10** further comprising:

said receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings,

said housing first pair of openings coaxial with said receiver first pair of openings and said housing second pair of openings coaxial with said receiver second pair of openings,

a first assembly pin passing through said receiver first pair of openings and through said housing first pair of openings, and

a second assembly pin passing through said receiver second pair of openings and through said housing second pair of openings.

**12**. The firearm of claim **10** further including a spring which biases said trigger member towards said set position.

**13**. The firearm of claim **12** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**14**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer

and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

* * * * *

# CERTIFICATE OF CORRECTION

PATENT NO.        : 11,724,003 B2                           Page 1 of 1
APPLICATION NO.    : 18/048572
DATED             : August 15, 2023
INVENTOR(S)       : Mladen Thomas Strbac

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 4, Line 52, delete:
"… and a safety selector adapted mounted in the fire control …";
Insert:
--… and a safety selector adapted to be mounted in the fire control …--.

In the Claims

Column 13, Lines 38-39, Claim 9, delete:
"… a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard …";
Insert:
--… a safety selector adapted to be mounted in said fire control mechanism pocket to pivot between safe, standard …--.

Signed and Sealed this
Fifth Day of December, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*



US012036336B2

(12) **United States Patent**

Strbac

(10) **Patent No.: US 12,036,336 B2**
(45) **Date of Patent: Jul. 16, 2024**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/346,423**

(22) Filed: **Jul. 3, 2023**

(65) **Prior Publication Data**

US 2023/0355830 A1 Nov. 9, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 18/048,572, filed on Oct. 21, 2022, now Pat. No. 11,724,003.

(Continued)

(51) **Int. Cl.**
*F41A 19/24* (2006.01)
*A61L 24/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *A61L 24/0036* (2013.01); *A61L 24/0015* (2013.01); *A61L 24/043* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,765,562 A 10/1956 Roper et al.
3,045,555 A 7/1962 Stoner
(Continued)

FOREIGN PATENT DOCUMENTS

DE 582963 C 8/1933
DE 4008351 A1 9/1991
(Continued)

*Primary Examiner* — J. Woodrow Eldred
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**12 Claims, 18 Drawing Sheets**



Appx93

## Related U.S. Application Data

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**

| | |
|---|---|
| *A61L 24/04* | (2006.01) |
| *F41A 17/48* | (2006.01) |
| *F41A 19/10* | (2006.01) |
| *F41A 19/15* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *F41A 17/48* (2013.01); *F41A 19/10* (2013.01); *F41A 19/15* (2013.01); *F41A 19/24* (2013.01); *A61L 2300/252* (2013.01); *A61L 2300/418* (2013.01); *A61L 2400/04* (2013.01); *A61L 2430/36* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,292,492 | A | 12/1966 | Sturtevant |
| 3,301,133 | A | 1/1967 | Sturtevant |
| 3,670,442 | A | 6/1972 | Kennedy et al. |
| 4,023,465 | A | 5/1977 | Inskip |
| 4,057,003 | A | 11/1977 | Atchisson |
| 4,151,670 | A | 5/1979 | Rath |
| 4,276,808 | A | 7/1981 | York |
| 4,433,610 | A | 2/1984 | Tatro |
| 4,463,654 | A | 8/1984 | Barnes et al. |
| 4,516,466 | A | 5/1985 | Jennie |
| 4,580,484 | A | 4/1986 | Moore |
| H107 | H | 8/1986 | Bauer |
| 4,656,993 | A | 4/1987 | Yuzawa et al. |
| 4,658,702 | A | 4/1987 | Tatro |
| 4,693,170 | A | 9/1987 | Atchisson |
| 4,697,495 | A | 10/1987 | Beretta |
| 4,787,288 | A | 11/1988 | Miller |
| 4,937,964 | A | 7/1990 | Crandall |
| 5,149,898 | A | 9/1992 | Chesnut et al. |
| 5,183,959 | A | 2/1993 | McCoan et al. |
| 5,223,649 | A | 6/1993 | Claridge |
| 5,339,721 | A | 8/1994 | Beretta |
| 5,517,897 | A | 5/1996 | Perrine |
| 5,614,691 | A | 3/1997 | Taylor |
| 5,623,114 | A | 4/1997 | Soper |
| 5,682,699 | A | 11/1997 | Gentry |
| 5,701,698 | A | 12/1997 | Wesp et al. |
| 5,704,153 | A | 1/1998 | Kaminski et al. |
| 5,760,328 | A | 6/1998 | Robbins |
| 5,770,814 | A | 6/1998 | Ealovega |
| 6,101,918 | A | 8/2000 | Akins |
| 6,360,467 | B1 | 3/2002 | Knight |
| 6,601,331 | B2 | 8/2003 | Salvitti |
| 6,718,680 | B2 | 4/2004 | Roca et al. |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 6,851,346 | B1 | 2/2005 | Herring |
| 6,889,459 | B1 | 5/2005 | Salvitti |
| 6,976,416 | B2 | 12/2005 | Ealovega |
| 7,051,638 | B2 | 5/2006 | Thomele |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,337,574 | B2 | 3/2008 | Crandall et al. |
| 7,347,021 | B1 | 3/2008 | Jones |
| 7,398,723 | B1 | 7/2008 | Blakley |
| 7,421,937 | B1 | 9/2008 | Gangl |
| 7,634,959 | B2 | 12/2009 | Frickey |
| 7,661,220 | B2 | 2/2010 | Crandall et al. |
| 7,806,039 | B1 | 10/2010 | Gomez |
| 8,037,805 | B1 | 10/2011 | Neroni |
| 8,112,928 | B2 | 2/2012 | Keough |
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,156,854 | B2 | 4/2012 | Brown |
| 8,443,537 | B2 | 5/2013 | Curry |
| 8,464,454 | B2 | 6/2013 | Martin et al. |
| 8,490,309 | B2 | 7/2013 | Zukowski |
| 8,667,881 | B1 | 3/2014 | Hawbaker |
| 8,695,477 | B2 | 4/2014 | Esch |
| 8,720,096 | B2 | 5/2014 | Siddle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 8,893,607 | B2 | 11/2014 | Audibert et al. |
| 8,925,234 | B1 | 1/2015 | Barrett |
| 8,985,006 | B1 | 3/2015 | Christensen et al. |
| 9,016,187 | B2 | 4/2015 | Findlay |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,021,733 | B1 | 5/2015 | DiChario |
| 9,052,150 | B2 | 6/2015 | Talasco |
| 9,121,661 | B2 | 9/2015 | Calvete |
| 9,146,066 | B1 | 9/2015 | Cason |
| 9,146,067 | B2 | 9/2015 | Stakes |
| 9,182,189 | B2 | 11/2015 | Seigler |
| 9,228,786 | B2 | 1/2016 | Sullivan et al. |
| 9,310,150 | B1 | 4/2016 | Geissele |
| 9,347,726 | B1 | 5/2016 | Thomas |
| 9,448,023 | B2 | 9/2016 | Sheets, Jr. et al. |
| 9,476,660 | B2 | 10/2016 | Potter et al. |
| 9,513,076 | B2 | 12/2016 | Kolev et al. |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,618,288 | B2 | 4/2017 | Wilson |
| 9,618,289 | B1 | 4/2017 | Geissele |
| 9,625,231 | B1 | 4/2017 | Hass |
| 9,631,886 | B2 | 4/2017 | Findlay |
| 9,651,329 | B2 | 5/2017 | Hittmann |
| 9,658,007 | B2 | 5/2017 | Withey |
| 9,683,800 | B2 | 6/2017 | Sewell, Jr. et al. |
| 9,733,031 | B1 | 8/2017 | Sylvester et al. |
| 9,759,504 | B2 | 9/2017 | Geissele |
| 9,777,980 | B2 | 10/2017 | Heizer |
| 9,810,493 | B2 | 11/2017 | Fluhr et al. |
| 9,810,496 | B2 | 11/2017 | Kolev et al. |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,829,263 | B2 | 11/2017 | Bonner |
| 9,835,398 | B2 | 12/2017 | Biegel |
| 9,863,730 | B2 | 1/2018 | Elftmann |
| 9,869,522 | B2 | 1/2018 | Larson, Jr. et al. |
| 9,874,417 | B2 | 1/2018 | Zajk et al. |
| 9,927,197 | B1 | 3/2018 | Geissele |
| 9,939,221 | B2 | 4/2018 | Graves |
| 10,002,500 | B2 | 6/2018 | Hall et al. |
| 10,006,734 | B1 | 6/2018 | Findlay |
| 10,030,924 | B1 | 7/2018 | Smith |
| 10,077,960 | B2 | 9/2018 | Geissele |
| 10,107,580 | B2 | 10/2018 | Fellows et al. |
| 10,254,067 | B2 | 4/2019 | Foster |
| 10,267,584 | B2 | 4/2019 | Kasanjian-King |
| 10,330,413 | B2 | 6/2019 | Williams et al. |
| 10,488,136 | B2 | 11/2019 | Sullivan et al. |
| 10,502,511 | B2 | 12/2019 | Graves |
| 10,514,223 | B1 | 12/2019 | Rounds |
| 10,584,932 | B2 | 3/2020 | Foster |
| 10,816,297 | B1 | 10/2020 | Williams et al. |
| 11,287,205 | B2 | 3/2022 | Biegel |
| 11,293,715 | B1 | 4/2022 | Newsome et al. |
| 11,346,627 | B1 | 5/2022 | DeMonico |
| 11,724,003 | B2 | 8/2023 | Strbac |
| 2006/0048426 | A1 | 3/2006 | Crandall |
| 2006/0101695 | A1 | 5/2006 | Longueira |
| 2007/0051236 | A1 | 3/2007 | Groves et al. |
| 2007/0199435 | A1 | 8/2007 | Hochstrate et al. |
| 2009/0151213 | A1 | 6/2009 | Bell |
| 2009/0188145 | A1 | 7/2009 | Fluhr et al. |
| 2011/0209607 | A1 | 9/2011 | St. George |
| 2013/0118343 | A1 | 5/2013 | Hirt |
| 2014/0311004 | A1 | 10/2014 | Barrett |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2016/0161202 | A1 | 6/2016 | Larue |
| 2017/0176124 | A1 | 6/2017 | Wilson |
| 2017/0219307 | A1 | 8/2017 | Foster |
| 2017/0276447 | A1 | 9/2017 | Foster |
| 2017/0284761 | A1 | 10/2017 | Lewis et al. |
| 2017/0299309 | A1 | 10/2017 | Fellows et al. |
| 2017/0328663 | A1 | 11/2017 | Fellows et al. |
| 2018/0066911 | A1 | 3/2018 | Graves |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0087860 A1 | 3/2018 | Sullivan et al. | |
| 2018/0112944 A1 | 4/2018 | Underwood et al. | |
| 2018/0195823 A1 | 7/2018 | Schafer et al. | |
| 2018/0202740 A1 | 7/2018 | Elftmann, Jr. | |
| 2018/0231342 A1 | 8/2018 | Martinez | |
| 2020/0191513 A1 | 6/2020 | Foster | |
| 2021/0222974 A1 | 7/2021 | Graves | |
| 2022/0364812 A1 | 11/2022 | Fellows | |
| 2023/0097725 A1* | 3/2023 | Davis | F41A 17/46 |
| | | | 42/69.01 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1678458 B1 | 2/2012 |
| EP | 2950033 B1 | 11/2016 |
| TW | 409847 U | 10/2000 |
| WO | 2016/028337 A1 | 2/2016 |
| WO | 2018/058174 A1 | 4/2018 |

* cited by examiner



FIG. 1

Appx96



FIG. 2



**FIG. 3**

Appx98



FIG. 4A



FIG. 4B



FIG. 5A



**FIG. 5B**

Appx102



FIG. 6A



FIG. 6B



FIG. 7



FIG. 8A



FIG. 8B



FIG. 8C



FIG. 8D



FIG. 9A



FIG. 9B



**FIG. 9C**



**FIG. 9D**

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 18/048,572 filed Oct. 21, 2022, which claims the priority benefit of U.S. Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, both of which are hereby incorporated by reference herein as if fully set forth in their entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627, which are hereby incorporated by reference herein as if fully set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second

position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user

can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when

the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting

of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. **1** is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. **2** is a top rear right perspective view thereof.

FIG. **3** is a top rear right exploded perspective view thereof.

FIG. **4A** is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **4B** is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **5A** is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **5B** is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6A** is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6B** is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **7** is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. **8A** is a view similar to FIG. **7** but with the safety selector in the standard semi-automatic position.

FIG. **8B** is a view similar to FIG. **8A** but after the trigger has been pulled to drop the hammer.

FIG. **8C** is a view similar to FIG. **8B** but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **8D** is a view similar to FIG. **8C** but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. **9A** is a view similar to FIG. **7** but with the safety selector in the forced reset semi-automatic position.

FIG. **9B** is a view similar to FIG. **9A** but after the trigger has been pulled to drop the hammer.

FIG. **9C** is a view similar to FIG. **9B** but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. 9D is a view similar to FIG. 9C but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. 1-6B, there is illustrated a "drop-in" trigger module 10 adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module 10 includes a frame or housing 12 sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver 14. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing 12 includes forward left and right sidewalls 16, 18 which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls 16, 18 may be interconnected by a floor 20. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls 21, 22 extend rearward from forward sidewalls 16, 18 and are interconnected by a rear end wall 23. The sidewalls 16, 18 include first and second pairs of aligned openings 24, 26 for receiving hollow transverse pins 30, 32 upon which a hammer 36 and trigger member 38 pivot. The openings 24, 26 are located coaxially with openings 42, 44 in the lower receiver 14. Standard AR-pattern hammer and trigger pins 46, 48 pass through the openings 42, 44 in the lower receiver 14 and through the hollow transverse pins 30, 32 to assemble the housing 12 into the lower receiver 14. Thus, the pins 30, 32 retain the hammer 36 and trigger

member 38 in the housing 12 in modular fashion, whereas the pins 46, 48 retain the trigger module 10 in the lower receiver 14.

The hammer 36 has a hammer head 50, a sear catch 52, a hammer hook 53, and a concave contact surface 51. The hammer 36 is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member 38 has a trigger blade 54 that extends downwardly. The trigger blade 54 is the part of the trigger member 38 contacted by a user's finger to actuate the trigger mechanism. The trigger blade 54 may be curved (as shown) or straight, as desired. The trigger member 38 has a sear 56. When the sear 56 and the sear catch 52 are engaged, the hammer 36 and trigger member 38 are in their set positions. When the sear 56 and sear catch 52 are not engaged, the hammer 36 and trigger member 38 are in their released positions. The trigger member 38 has a convex contact surface 58 that interacts with concave surface 51 on hammer 36 in a manner described below. The trigger member 38 also has a contact surface 69. The trigger member 38 is spring biased by a compression spring 59 positioned between a forward end of the trigger member 38 and the floor 20 of the housing 12 so that the trigger blade 54 is spring biased towards a forward position.

A disconnector 60 is pivoted on the hollow transverse pin 32 upon which the trigger member 38 pivots. The disconnector 60 has a disconnector hook 64 and a tail 66. The tail 66 of the disconnector 60 is spring biased upwardly away from a tail 68 of the trigger member 38 by a compression spring 67.

A locking or blocking member 72 is movably mounted to the housing 12. For example, the locking/blocking member 72 can be pivoted on a locking/blocking member pin or screw 74 that is installed in aligned openings 76 in the sidewalls 21, 22 of the housing 12. The locking member 72 has a first contact surface 78 that interacts with an engagement surface 94 in a rear portion 96 of a bolt carrier body 98 of a bolt carrier assembly 92, in a manner to be described below. The locking member 72 has a second contact surface 80 that interacts with surface 69 of trigger member 38 in a manner to be described below. The locking member 72 is spring biased by a torsion spring 82 acting between a pin 84 in the sidewalls 21, 22 and a lower portion of the locking member 72 such that surface 78 is biased rearward and surface 80 is biased forward. Alternatively, the locking/blocking member 72 can be slidably mounted to the housing 12 and spring biased forward by a compression spring.

An upper receiver 90 houses a bolt carrier assembly 92. As is well-known in the art, the bolt carrier assembly 92 (or blow-back bolt) slidably reciprocates in the upper receiver 90 and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly 92 used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member 72, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly 92 has an engagement surface 94 in a rear portion 96 of the bolt carrier body 98. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly 92 a lower surface 102 in a forward portion 104 of the bolt carrier body 98 contacts the face of the hammer head 50 causing the hammer 36 to pivot rearward. Rearward travel of bolt carrier assembly 92 also

moves engagement surface 94 rearward and away from surface 78 of locking member 72. The action of spring 82 causes locking member 72 to pivot in a first direction from a first position wherein surface 80 of locking member 72 does not impede upward movement of surface 69 of trigger member 38 to a second position wherein surface 80 of locking member 72 does impede upward movement of surface 69 of trigger member 38 thus preventing the trigger blade 54 from being pulled by the user. During forward travel of the bolt carrier assembly 92 the engagement surface 94 of the bolt carrier body 98 contacts the surface 78 of the locking member 72 to pivot the locking member 72 in a second opposite direction from the second position to the first position.

A three position safety selector 110 has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator 111 pointing forward), a wide semi-circular portion 112 of the safety selector 110 prevents the trigger blade 54 from being pulled (FIGS. 4A, 4B, and 7). When in the standard semi-automatic position (safety selector indicator 111 pointing upward), a flat portion 114 of the safety selector 110 permits the trigger blade 54 to be pulled. The disconnector 60 can pivot with the trigger member 38 and the disconnector hook 64 can catch the hammer hook 53 during rearward pivoting travel of the hammer head 50. (FIGS. 5A and 5B). When in the forced reset semi-automatic position (safety selector indicator 111 pointing rearward), a narrow semi-circular portion 116 permits the trigger blade 54 to be pulled but prevents the disconnector 60 from pivoting with the trigger member 38 thus preventing the disconnector hook 64 from catching the hammer hook 53 during rearward pivoting travel of the hammer head 50. (FIGS. 6A and 6B). In other words, in the forced reset semi-automatic position, the disconnector 60 is "disabled" in that the disconnector hook 64 is unable to catch the hammer hook 53 during cycling of the bolt carrier assembly 92.

Referring now to FIGS. 8A-8D, with the safety selector 110 set in the standard semi-automatic position, rearward finger pressure on the trigger blade 54 causes the trigger member 38 to rotate clockwise. Rotation of the trigger member 38 causes the sear 56 to disengage from the sear catch 52 of the hammer 36. This allows the hammer 36 to drop by spring force onto the firing pin 99 of the bolt carrier assembly 92, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly 92 rearward. Rearward travel of the bolt carrier assembly 92 frees the locking member 72 to pivot such that surface 80 is moved into a blocking position. Rearward travel of the bolt carrier assembly 92 also causes the lower surface 102 to contact the face of the hammer head 50 and pivot the hammer 36 counter-clockwise. During pivoting travel of the hammer 36 surface 51 contacts surface 58 of trigger member 38 forcing trigger member 38 to pivot counter-clockwise. Also during pivoting travel of the hammer 36 the disconnector hook 64 catches the hammer hook 53. Forward travel of the bolt carrier assembly 92 returning to battery causes the surface 94 to contact the surface 78 of the locking member 72 to pivot the locking member 72 clockwise moving surface 80 out of the blocking position. At this point rearward finger pressure on the trigger blade 54 must be released to allow the sear 56 to engage the sear catch 52, returning the hammer 36 and trigger member 38 to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade 54 to fire another round.

Referring now to FIGS. 9A-9D, with the safety selector 110 set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade 54 causes the trigger member 38 to rotate clockwise. The narrow semi-circular portion 116 of the safety selector 110 prevents the disconnector 60 from rotating with the trigger member 38, thus "disabling" the disconnector 60, preventing the disconnector hook 64 from catching the hammer hook 53. Rotation of the trigger member 38 causes the sear 56 to disengage from the sear catch 52 of the hammer 36. This allows the hammer 36 to drop by spring force onto the firing pin 99 of the bolt carrier assembly 92, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly 92 rearward. Rearward travel of the bolt carrier assembly 92 frees the locking member 72 to pivot such that surface 80 is moved into a blocking position. Rearward travel of the bolt carrier assembly 92 also causes the lower surface 102 to contact the face of the hammer head 50 and pivot the hammer 36 counter-clockwise. During pivoting travel of the hammer 36 surface 51 contacts surface 58 of trigger member 38 forcing trigger member 38 to pivot counter-clockwise. The bolt carrier assembly 92 thereby forces the hammer 36 and trigger member 38 to their set positions wherein the sear 56 engages the sear catch 52. Forward travel of the bolt carrier assembly 92 returning to battery causes the surface 94 to contact the surface 78 of the locking member 72 to pivot the locking member 72 clockwise. At this point the user can reapply rearward finger pressure on the trigger blade 54 to fire another round, without first manually releasing rear finger pressure on the trigger blade 54.

Thus, as the bolt carrier assembly 92 returns forward, the trigger member 38 is held in its set position by the locking member 72. The trigger member 38 cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly 92 and firing pin 99 as the bolt carrier assembly 92 is returning to battery. When the bolt carrier assembly 92 has reached (or nearly reached) its closed, in-battery position, the engagement surface 94 contacts and forwardly displaces the contact surface 78 of the locking member 72, disengaging the contact surface 80 of the locking member 72 from the contact surface 69 of the trigger member 38, allowing the trigger blade 54 to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:
1. A firearm trigger mechanism comprising:
a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released

positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

2. The trigger mechanism of claim **1** further including a spring which biases said trigger member towards said set position.

3. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

4. The trigger mechanism of claim **3**, wherein said first and second pairs of openings in said housing are adapted to be aligned with first and second pairs of transversely aligned assembly pin openings in the fire control mechanism pocket.

5. The trigger mechanism of claim **3** further including a spring which biases said trigger member towards said set position.

13

**6**. The trigger mechanism of claim **5** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**7**. A firearm comprising:

a receiver having a fire control mechanism pocket therein,

a reciprocating bolt carrier,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, said hammer pivoted rearward by rearward movement of said bolt carrier,

a trigger member having a sear and mounted in said fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member mounted in said fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and moved against said spring bias to said second position by contact from said bolt carrier during forward movement of said bolt carrier as said bolt carrier reaches a substantially in-battery position, and

a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when said bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

14

**8**. The firearm of claim **7** further comprising:

a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough,

said hammer mounted on said hammer pin, said trigger member and disconnector mounted on said trigger member pin.

**9**. The firearm of claim **8** further comprising:

said receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings,

said housing first pair of openings coaxial with said receiver first pair of openings and said housing second pair of openings coaxial with said receiver second pair of openings,

a first assembly pin passing through said receiver first pair of openings and through said housing first pair of openings, and

a second assembly pin passing through said receiver second pair of openings and through said housing second pair of openings.

**10**. The firearm of claim **7** further including a spring which biases said trigger member towards said set position.

**11**. The firearm of claim **10** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**12**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic posi-

tions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 12,036,336 B2       Page 1 of 1
APPLICATION NO. : 18/346423
DATED : July 16, 2024
INVENTOR(S) : Mladen Thomas Strbac

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 4, Line 53, delete:
"... and a safety selector adapted mounted in the fire control ....";
Insert:
--... and a safety selector adapted to be mounted in the fire control ....--.

In the Claims

Column 13, Line 41 or Claim 7, Line 38, delete:
"... a safety selector adapted mounted in said fire control ....";
Insert:
--... a safety selector adapted to be mounted in said fire control ....--.

Signed and Sealed this
Seventeenth Day of September, 2024

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

Appx122


US012274807B2

## (12) United States Patent
### Strbac

(10) **Patent No.:** **US 12,274,807 B2**
(45) **Date of Patent:** *Apr. 15, 2025

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/665,926**

(22) Filed: **May 16, 2024**

(65) **Prior Publication Data**

US 2024/0299616 A1 Sep. 12, 2024

**Related U.S. Application Data**

(63) Continuation of application No. 18/346,423, filed on Jul. 3, 2023, now Pat. No. 12,036,336, which is a
(Continued)

(51) **Int. Cl.**
*F41A 19/15* (2006.01)
*A61L 24/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *A61L 24/0036* (2013.01); *A61L 24/0015* (2013.01); *A61L 24/043* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,765,562 A | 10/1956 | Roper et al. | |
| 3,045,555 A | 7/1962 | Stoner | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 582963 C | 8/1933 | |
| DE | 4008351 A1 | 9/1991 | |

(Continued)

OTHER PUBLICATIONS

Statutory Invention Registration No. H107, Inventor: Bauer, Published Aug. 5, 1986 (8 pages).

*Primary Examiner* — J. Woodrow Eldred
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger
(Continued)



Appx123

member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**8 Claims, 18 Drawing Sheets**

## Related U.S. Application Data

continuation of application No. 18/048,572, filed on Oct. 21, 2022, now Pat. No. 11,724,003.

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**
| | |
|---|---|
| *A61L 24/04* | (2006.01) |
| *F41A 17/48* | (2006.01) |
| *F41A 19/10* | (2006.01) |
| *F41A 19/24* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *F41A 17/48* (2013.01); *F41A 19/10* (2013.01); *F41A 19/15* (2013.01); *F41A 19/24* (2013.01); *A61L 2300/252* (2013.01); *A61L 2300/418* (2013.01); *A61L 2400/04* (2013.01); *A61L 2430/36* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,292,492 A | 12/1966 | Sturtevant |
| 3,301,133 A | 1/1967 | Sturtevant |
| 3,670,442 A | 6/1972 | Kennedy et al. |
| 4,023,465 A | 5/1977 | Inskip |
| 4,057,003 A | 11/1977 | Atchisson |
| 4,151,670 A | 5/1979 | Rath |
| 4,276,808 A | 7/1981 | York |
| 4,433,610 A | 2/1984 | Tatro |
| 4,463,654 A | 8/1984 | Barnes et al. |
| 4,516,466 A | 5/1985 | Jennie |
| 4,580,484 A | 4/1986 | Moore |
| 4,656,993 A | 4/1987 | Yuzawa et al. |
| 4,658,702 A | 4/1987 | Tatro |
| 4,693,170 A | 9/1987 | Atchisson |
| 4,697,495 A | 10/1987 | Beretta |
| 4,787,288 A | 11/1988 | Miller |
| 4,937,964 A | 7/1990 | Crandall |
| 5,149,898 A | 9/1992 | Chesnut et al. |
| 5,183,959 A | 2/1993 | McCoan et al. |
| 5,223,649 A | 6/1993 | Claridge |
| 5,339,721 A | 8/1994 | Beretta |
| 5,517,897 A | 5/1996 | Perrine |
| 5,614,691 A | 3/1997 | Taylor |
| 5,623,114 A | 4/1997 | Soper |
| 5,682,699 A | 11/1997 | Gentry |
| 5,701,698 A | 12/1997 | Wesp et al. |
| 5,704,153 A | 1/1998 | Kaminski et al. |
| 5,760,328 A | 6/1998 | Robbins |
| 5,770,814 A | 6/1998 | Ealovega |
| 6,101,918 A | 8/2000 | Akins |
| 6,360,467 B1 | 3/2002 | Knight |
| 6,601,331 B2 | 8/2003 | Salvitti |
| 6,718,680 B2 | 4/2004 | Roca et al. |
| 6,722,072 B1 | 4/2004 | McCormick |
| 6,851,346 B1 | 2/2005 | Herring |
| 6,889,459 B1 | 5/2005 | Salvitti |

| | | | |
|---|---|---|---|
| 6,976,416 B2 | 12/2005 | Ealovega |
| 7,051,638 B2 | 5/2006 | Thomele |
| 7,162,824 B1 | 1/2007 | McCormick |
| 7,213,359 B2 | 5/2007 | Beretta |
| 7,293,385 B2 | 11/2007 | McCormick |
| 7,337,574 B2 | 3/2008 | Crandall et al. |
| 7,347,021 B1 | 3/2008 | Jones |
| 7,398,723 B1 | 7/2008 | Blakley |
| 7,421,937 B1 | 9/2008 | Gangl |
| 7,634,959 B2 | 12/2009 | Frickey |
| 7,661,220 B2 | 2/2010 | Crandall et al. |
| 7,806,039 B1 | 10/2010 | Gomez |
| 8,037,805 B1 | 10/2011 | Neroni |
| 8,112,928 B2 | 2/2012 | Keough |
| 8,127,658 B1 | 3/2012 | Cottle |
| 8,156,854 B2 | 4/2012 | Brown |
| 8,443,537 B2 | 5/2013 | Curry |
| 8,464,454 B2 | 6/2013 | Martin et al. |
| 8,490,309 B2 | 7/2013 | Zukowski |
| 8,667,881 B1 | 3/2014 | Hawbaker |
| 8,695,477 B2 | 4/2014 | Esch |
| 8,720,096 B2 | 5/2014 | Siddle |
| 8,820,211 B1 | 9/2014 | Hawbaker |
| 8,893,607 B2 | 11/2014 | Audibert et al. |
| 8,925,234 B1 | 1/2015 | Barrett |
| 8,985,006 B1 | 3/2015 | Christensen et al. |
| 9,016,187 B2 | 4/2015 | Findlay |
| 9,021,732 B2 | 5/2015 | Johnson |
| 9,021,733 B1 | 5/2015 | DiChario |
| 9,052,150 B2 | 6/2015 | Talasco |
| 9,121,661 B2 | 9/2015 | Calvete |
| 9,146,066 B1 | 9/2015 | Cason |
| 9,146,067 B2 | 9/2015 | Stakes |
| 9,182,189 B2 | 11/2015 | Seigler |
| 9,228,786 B2 | 1/2016 | Sullivan et al. |
| 9,310,150 B1 | 4/2016 | Geissele |
| 9,347,726 B1 | 5/2016 | Thomas |
| 9,448,023 B2 | 9/2016 | Sheets, Jr. et al. |
| 9,476,660 B2 | 10/2016 | Potter et al. |
| 9,513,076 B2 | 12/2016 | Kolev et al. |
| 9,568,264 B2 | 2/2017 | Graves |
| 9,618,288 B2 | 4/2017 | Wilson |
| 9,618,289 B1 | 4/2017 | Geissele |
| 9,625,231 B1 | 4/2017 | Hass |
| 9,631,886 B2 | 4/2017 | Findlay |
| 9,651,329 B2 | 5/2017 | Hittmann |
| 9,658,007 B2 | 5/2017 | Withey |
| 9,683,800 B2 | 6/2017 | Sewell, Jr. et al. |
| 9,733,031 B1 | 8/2017 | Sylvester et al. |
| 9,759,504 B2 | 9/2017 | Geissele |
| 9,777,980 B2 | 10/2017 | Heizer |
| 9,810,493 B2 | 11/2017 | Fluhr et al. |
| 9,810,496 B2 | 11/2017 | Kolev et al. |
| 9,816,772 B2 | 11/2017 | Graves |
| 9,829,263 B2 | 11/2017 | Bonner |
| 9,835,398 B2 | 12/2017 | Biegel |
| 9,863,730 B2 | 1/2018 | Elftmann |
| 9,869,522 B2 | 1/2018 | Larson, Jr. et al. |
| 9,874,417 B2 | 1/2018 | Zajk et al. |
| 9,927,197 B1 | 3/2018 | Geissele |
| 9,939,221 B2 | 4/2018 | Graves |
| 10,002,500 B2 | 6/2018 | Hall et al. |
| 10,006,734 B1 | 6/2018 | Findlay |
| 10,030,924 B1 | 7/2018 | Smith |
| 10,077,960 B2 | 9/2018 | Geissele |
| 10,107,580 B2 | 10/2018 | Fellows et al. |
| 10,254,067 B2 | 4/2019 | Foster |
| 10,267,584 B2 | 4/2019 | Kasanjian-King |
| 10,330,413 B2 | 6/2019 | Williams et al. |
| 10,488,136 B2 | 11/2019 | Sullivan et al. |
| 10,502,511 B2 | 12/2019 | Graves |
| 10,514,223 B1 | 12/2019 | Rounds |
| 10,584,932 B2 | 3/2020 | Foster |
| 10,816,297 B1 | 10/2020 | Williams et al. |
| 11,287,205 B2 | 3/2022 | Biegel |
| 11,293,715 B1 | 4/2022 | Newsome et al. |
| 11,346,627 B1 | 5/2022 | DeMonico |
| 11,724,003 B2 * | 8/2023 | Strbac ................. A61L 24/0036 |
| | | 42/69.01 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 12,031,784 B1 * | 7/2024 | DeMonico | F41A 17/46 |
| 12,036,336 B2 * | 7/2024 | Strbac | A61L 24/0036 |
| 2006/0048426 A1 | 3/2006 | Crandall | |
| 2006/0101695 A1 | 5/2006 | Longueira | |
| 2007/0051236 A1 | 3/2007 | Groves et al. | |
| 2007/0199435 A1 | 8/2007 | Hochstrate et al. | |
| 2009/0151213 A1 | 6/2009 | Bell | |
| 2009/0188145 A1 | 7/2009 | Fluhr et al. | |
| 2011/0209607 A1 | 9/2011 | St. George | |
| 2013/0118343 A1 | 5/2013 | Hirt | |
| 2014/0311004 A1 | 10/2014 | Barrett | |
| 2016/0010933 A1 | 1/2016 | Bonner | |
| 2016/0102933 A1 | 4/2016 | Graves | |
| 2016/0161202 A1 | 6/2016 | Larue | |
| 2017/0176124 A1 | 6/2017 | Wilson | |
| 2017/0219307 A1 | 8/2017 | Foster | |
| 2017/0276447 A1 | 9/2017 | Foster | |
| 2017/0284761 A1 | 10/2017 | Lewis et al. | |
| 2017/0299309 A1 | 10/2017 | Fellows et al. | |
| 2017/0328663 A1 | 11/2017 | Fellows et al. | |
| 2018/0066911 A1 | 3/2018 | Graves | |
| 2018/0087860 A1 | 3/2018 | Sullivan et al. | |
| 2018/0112944 A1 | 4/2018 | Underwood et al. | |
| 2018/0195823 A1 | 7/2018 | Schafer et al. | |
| 2018/0202740 A1 | 7/2018 | Elftmann, Jr. | |
| 2018/0231342 A1 | 8/2018 | Martinez | |
| 2020/0191513 A1 | 6/2020 | Foster | |
| 2021/0222974 A1 | 7/2021 | Graves | |
| 2022/0364812 A1 | 11/2022 | Fellows | |
| 2023/0097725 A1 | 3/2023 | Davis et al. | |
| 2024/0085136 A1 * | 3/2024 | Blakley | F41A 19/45 |

FOREIGN PATENT DOCUMENTS

| EP | 1678458 B1 | 2/2012 |
| EP | 2950033 B1 | 11/2016 |
| TW | 409847 U | 10/2000 |
| WO | 2016/028337 A1 | 2/2016 |
| WO | 2018/058174 A1 | 4/2018 |

* cited by examiner



FIG. 1



FIG. 2



**FIG. 3**



FIG. 4A



FIG. 4B



FIG. 5A



**FIG. 5B**



FIG. 6A



FIG. 6B



FIG. 7



FIG. 8A



FIG. 8B



FIG. 8C



FIG. 8D



FIG. 9A



FIG. 9B



FIG. 9C



FIG. 9D

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 18/346,423 filed Jul. 3, 2023, now U.S. Pat. No. 12,036,336 issued Jul. 16, 2024, which is a continuation of U.S. patent application Ser. No. 18/048,572 filed Oct. 21, 2022, now U.S. Pat. No. 11,724,003 issued Aug. 15, 2023, which claims the priority benefit of U.S. Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, all of which are hereby incorporated by reference herein as if fully set forth in their entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern

firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627, which are hereby incorporated by reference herein as if fully set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member

does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the

disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rear-

ward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. 1 is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. 2 is a top rear right perspective view thereof.

FIG. 3 is a top rear right exploded perspective view thereof.

FIG. 4A is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. 4B is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. 5A is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. 5B is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. 6A is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. 6B is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. 7 is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. 8A is a view similar to FIG. 7 but with the safety selector in the standard semi-automatic position.

FIG. 8B is a view similar to FIG. 8A but after the trigger has been pulled to drop the hammer.

FIG. 8C is a view similar to FIG. 8B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. 8D is a view similar to FIG. 8C but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. 9A is a view similar to FIG. 7 but with the safety selector in the forced reset semi-automatic position.

FIG. 9B is a view similar to FIG. 9A but after the trigger has been pulled to drop the hammer.

FIG. **9C** is a view similar to FIG. **9B** but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **9D** is a view similar to FIG. **9C** but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. **1-6B**, there is illustrated a "drop-in" trigger module **10** adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module **10** includes a frame or housing **12** sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver **14**. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing **12** includes forward left and right sidewalls **16**, **18** which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **16**, **18** may be interconnected by a floor **20**. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls **21**, **22** extend rearward from forward sidewalls **16**, **18** and are interconnected by a rear end wall **23**. The sidewalls **16**, **18** include first and second pairs of aligned openings **24**, **26** for receiving hollow transverse pins **30**, **32** upon which a hammer **36** and trigger member **38** pivot. The openings **24**, **26** are located coaxially with openings **42**, **44** in the lower receiver **14**. Standard AR-pattern hammer and trigger pins **46**, **48** pass through the openings **42**, **44** in the lower receiver **14** and through the hollow transverse pins **30**,

**32** to assemble the housing **12** into the lower receiver **14**. Thus, the pins **30**, **32** retain the hammer **36** and trigger member **38** in the housing **12** in modular fashion, whereas the pins **46**, **48** retain the trigger module **10** in the lower receiver **14**.

The hammer **36** has a hammer head **50**, a sear catch **52**, a hammer hook **53**, and a concave contact surface **51**. The hammer **36** is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member **38** has a trigger blade **54** that extends downwardly. The trigger blade **54** is the part of the trigger member **38** contacted by a user's finger to actuate the trigger mechanism. The trigger blade **54** may be curved (as shown) or straight, as desired. The trigger member **38** has a sear **56**. When the sear **56** and the sear catch **52** are engaged, the hammer **36** and trigger member **38** are in their set positions. When the sear **56** and sear catch **52** are not engaged, the hammer **36** and trigger member **38** are in their released positions. The trigger member **38** has a convex contact surface **58** that interacts with concave surface **51** on hammer **36** in a manner described below. The trigger member **38** also has a contact surface **69**. The trigger member **38** is spring biased by a compression spring **59** positioned between a forward end of the trigger member **38** and the floor **20** of the housing **12** so that the trigger blade **54** is spring biased towards a forward position.

A disconnector **60** is pivoted on the hollow transverse pin **32** upon which the trigger member **38** pivots. The disconnector **60** has a disconnector hook **64** and a tail **66**. The tail **66** of the disconnector **60** is spring biased upwardly away from a tail **68** of the trigger member **38** by a compression spring **67**.

A locking or blocking member **72** is movably mounted to the housing **12**. For example, the locking/blocking member **72** can be pivoted on a locking/blocking member pin or screw **74** that is installed in aligned openings **76** in the sidewalls **21**, **22** of the housing **12**. The locking member **72** has a first contact surface **78** that interacts with an engagement surface **94** in a rear portion **96** of a bolt carrier body **98** of a bolt carrier assembly **92**, in a manner to be described below. The locking member **72** has a second contact surface **80** that interacts with surface **69** of trigger member **38** in a manner to be described below. The locking member **72** is spring biased by a torsion spring **82** acting between a pin **84** in the sidewalls **21**, **22** and a lower portion of the locking member **72** such that surface **78** is biased rearward and surface **80** is biased forward. Alternatively, the locking/blocking member **72** can be slidably mounted to the housing **12** and spring biased forward by a compression spring.

An upper receiver **90** houses a bolt carrier assembly **92**. As is well-known in the art, the bolt carrier assembly **92** (or blow-back bolt) slidably reciprocates in the upper receiver **90** and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly **92** used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member **72**, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly **92** has an engagement surface **94** in a rear portion **96** of the bolt carrier body **98**. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly **92** a lower surface **102** in a forward portion **104** of the bolt carrier body **98** contacts the face of

US 12,274,807 B2

9

the hammer head **50** causing the hammer **36** to pivot rearward. Rearward travel of bolt carrier assembly **92** also moves engagement surface **94** rearward and away from surface **78** of locking member **72**. The action of spring **82** causes locking member **72** to pivot in a first direction from a first position wherein surface **80** of locking member **72** does not impede upward movement of surface **69** of trigger member **38** to a second position wherein surface **80** of locking member **72** does impede upward movement of surface **69** of trigger member **38** thus preventing the trigger blade **54** from being pulled by the user. During forward travel of the bolt carrier assembly **92** the engagement surface **94** of the bolt carrier body **98** contacts the surface **78** of the locking member **72** to pivot the locking member **72** in a second opposite direction from the second position to the first position.

A three position safety selector **110** has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator **111** pointing forward), a wide semi-circular portion **112** of the safety selector **110** prevents the trigger blade **54** from being pulled (FIGS. 4A, 4B, and 7). When in the standard semi-automatic position (safety selector indicator **111** pointing upward), a flat portion **114** of the safety selector **110** permits the trigger blade **54** to be pulled. The disconnector **60** can pivot with the trigger member **38** and the disconnector hook **64** can catch the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. 5A and 5B). When in the forced reset semi-automatic position (safety selector indicator **111** pointing rearward), a narrow semi-circular portion **116** permits the trigger blade **54** to be pulled but prevents the disconnector **60** from pivoting with the trigger member **38** thus preventing the disconnector hook **64** from catching the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. 6A and 6B). In other words, in the forced reset semi-automatic position, the disconnector **60** is "disabled" in that the disconnector hook **64** is unable to catch the hammer hook **53** during cycling of the bolt carrier assembly **92**.

Referring now to FIGS. 8A-8D, with the safety selector **110** set in the standard semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. Also during pivoting travel of the hammer **36** the disconnector hook **64** catches the hammer hook **53**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise moving surface **80** out of the blocking position. At this point rearward finger pressure on the trigger blade **54** must be released to allow the sear **56** to engage the sear catch **52**, returning the hammer **36** and trigger member **38** to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade **54** to fire another round.

10

Referring now to FIGS. 9A-9D, with the safety selector **110** set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. The narrow semi-circular portion **116** of the safety selector **110** prevents the disconnector **60** from rotating with the trigger member **38**, thus "disabling" the disconnector **60**, preventing the disconnector hook **64** from catching the hammer hook **53**. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. The bolt carrier assembly **92** thereby forces the hammer **36** and trigger member **38** to their set positions wherein the sear **56** engages the sear catch **52**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise. At this point the user can reapply rearward finger pressure on the trigger blade **54** to fire another round, without first manually releasing rear finger pressure on the trigger blade **54**.

Thus, as the bolt carrier assembly **92** returns forward, the trigger member **38** is held in its set position by the locking member **72**. The trigger member **38** cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **92** and firing pin **99** as the bolt carrier assembly **92** is returning to battery. When the bolt carrier assembly **92** has reached (or nearly reached) its closed, in-battery position, the engagement surface **94** contacts and forwardly displaces the contact surface **78** of the locking member **72**, disengaging the contact surface **80** of the locking member **72** from the contact surface **69** of the trigger member **38**, allowing the trigger blade **54** to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

1. A firearm trigger mechanism comprising:
a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis

between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer hook and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said

hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

2. The trigger mechanism of claim 1, wherein said safety selector is configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector contacts said disconnector preventing said disconnector hook from catching said hammer hook.

3. The trigger mechanism of claim 1, further comprising a spring which biases said trigger member towards said set position.

4. The trigger mechanism of claim 1, wherein said trigger member pivot axis and said disconnector pivot axis are the same axis.

5. The trigger mechanism of claim 1, wherein said safety selector is adapted to be pivotably mounted in the fire control mechanism pocket to pivot on a transverse safety selector pivot axis.

6. The trigger mechanism of claim 1, wherein said locking member is adapted to be pivotably mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis.

7. The trigger mechanism of claim 1, further comprising a housing having a first pair of transversely aligned openings for receiving a hammer pivot pin and a second pair of transversely aligned openings for receiving a trigger member pivot pin.

8. The trigger mechanism of claim 7, wherein said housing has a third pair of transversely aligned openings for receiving a locking member pivot pin or screw.

* * * * *

# CERTIFICATE OF SERVICE AND FILING

I certify that on April 13, 2026, I electronically filed the foregoing

**OPENING BRIEF** of Plaintiffs-Appellants using the Court's CM/ECF filing

system.  Counsel for Defendants-Appellees were electronically served by and

through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R.

25(e).

*/s/ John W. Thornburgh*
John W. Thornburgh

# CERTIFICATE OF COMPLIANCE

The **OPENING BRIEF** of Plaintiffs Appellants is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The brief contains 13,851 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 in Times New Roman, 14 Point.

Dated: April 13, 2026                    */s/ John W. Thornburgh*
                                          John W. Thornburgh