**VOLUME I OF II**
**(Appx1-Appx3407)**

**No. 26-1527**

# United States Court of Appeals for the Federal Circuit

**ABC IP LLC, RARE BREED TRIGGERS INC.,**

***Plaintiffs-Appellants,***

***v.***

**PEAK TACTICAL LLC, dba Partisan Triggers, NICHOLAS NORTON,**

***Defendants-Appellees.***

APPEAL FROM UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING, IN NO. 2:26-CV-00018-KHR, JUDGE KELLY H. RANKIN

## JOINT APPENDIX

John W. Thornburgh
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
thornburgh@fr.com

Carl E. Bruce
Matthew A. Colvin
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201

Benjamin J. Christoff
Elizabeth DeToro
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W., Suite 1000
Washington, DC 20024

*(continued on inside cover)*

Timothy P. Getzoff
J. Randy Roeser
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Tel: (303) 473-2700
tgetzoff@hollandhart.com

Paul D. Swanson
Christopher M. Jackson
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Tel: (303) 295-8000

*Attorneys for Defendants-Appellees Peak Tactical LLC, dba Partisan Triggers, Nicholas Norton*

Jory M. Hoffman
FISH & RICHARDSON P.C.
150 N. Riverside Plaza, Suite 2820
Chicago, IL 60606

Glenn D. Bellamy
WOOD HERRON & EVANS, LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: (513) 707-0243

*Attorneys for Plaintiffs-Appellants*
*ABC IP LLC, Rare Breed Triggers, Inc.*

June 12, 2026

ABC IP LLC v. Peak Tactical LLC
CAFC No. 26-1527

**Joint Appendix Index**


| Date | Dkt. | Document | Beg. Page No. |
|---|---|---|---|
| 02/13/26 | 39 | Order Denying Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (D6) | Appx1 |
| 03/11/26 | 45 | Order Denying Plaintiffs' Motion for Expedited Discovery (D41) | Appx36 |
| 01/15/26 | 1-1 | U.S. Patent No. 10,514,223 | Appx53 |
| 01/15/26 | 1-2 | U.S. Patent No. 11,724,003 | Appx63 |
| 01/15/26 | 1-3 | U.S. Patent No. 12,036,336 | Appx93 |
| 01/15/26 | 1-4 | U.S. Patent No. 12,274,807 | Appx123 |
| 03/26/26 | 47 | Preliminary Record of Appeal from US District Court for the District of Wyoming | Appx150 |
| **Record before U.S. District Court for the District of Wyoming in No. 2:26-cv-00018-KHR** | | | |
| 01/15/26 | 1 | Plaintiffs' Complaint for Patent Infringement, False Patent Marking, and False Advertising | Appx160 |
| 01/16/26 | 6 | Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Proposed Order | Appx1350 |
| 01/16/26 | 7 | Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction and Exhibits | Appx1356 |
| 01/20/26 | 9 | Order Setting Hearing and Briefing Schedule | Appx1651 |
| 01/30/26 | 27 | Defendants' Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Exhibits | Appx1653 |

| **Date** | **Dkt.** | **Document** | **Beg. Page No.** |
|---|---|---|---|
| 02/04/26 | 31 | Civil Minute Sheet - Motion Hearing held 2/4/26 with Exhibits 1-3 | Appx2010 |
| 02/04/26 | N/A[1] | Plaintiffs' Demonstratives presented during Motion Hearing | Appx2063 |
| 02/06/26 | 33 | Official Transcript of Hearing before Judge Rankin - Plaintiffs' Motion for TRO and Preliminary Injunction | Appx2189 |
| 02/11/26 | 37 | Plaintiffs' Notice of Supplemental Authority re Order Granting Preliminary Injunction re Case 1:25-cv-00389-CKC-CHS, *ABC IP, LLC et al v. Hoffman* | Appx2337 |
| 02/20/26 | 41 | Plaintiffs' Motion for Expedited Discovery and Proposed Order | Appx3401 |
| 02/20/26 | 42 | Plaintiffs' Memorandum in Support of Motion for Expedited Discovery | Appx3408 |
| 02/27/26 | 43 | Defendants' Response in Opposition to Plaintiffs' Motion for Expedited Discovery | Appx3502 |
| 03/12/26 | 46 | Plaintiffs' Notice of Appeal of D39 Order Denying Motion for Temporary Restraining Order and Preliminary Injunction, D45 Order Denying Motion for Expedited Discovery | Appx3543 |
| 01/27/26 | N/A[2] | Correspondence between Hon. Kelly Rankin (D. Wyo.) chambers staff and parties' counsel regarding Motion Hearing on Feb. 4, 2026 | Appx3549 |

[1] Plaintiff's Demonstratives were presented to but not filed with the U.S. District Court for the District of Wyoming, and were therefore not assigned an ECF docket designation (Fed. Cir. R. 30(a)(6)).

[2] Correspondence sent directly by Parties' counsel, Judge Rankin, and chambers staff rather than by submission to the Court via ECF, and therefore was not assigned an ECF designation. *Id.*

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

4:04 pm, 2/13/26

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

Plaintiffs,

vs.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,

Defendants.

Case No. 26-CV-18-R

**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [6]**

ABC IP, LLC and Rare Breed Triggers, Inc. ("Plaintiffs") brought this action against Peak Tactical, LLC d/b/a Partisan Triggers, and its owner Nicholas Norton ("Defendants") for patent infringement and false marking and advertising. [ECF No. 1, at 1, 13]. Both parties make and sell firearms triggers. Plaintiffs assert Defendants' trigger design infringes on four of its registered patents. *Id.* at 3. On January 16, 2026, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. [ECF Nos. 6 & 7]. The Court issued an Order requiring Plaintiffs to serve the Complaint and Motion on Defendants by January 23, 2026. [ECF No. 9]. The Order also required Defendants to respond to the Motion by January 30, 2026, and an in-person hearing was held on the

Motion on February 4, 2026. *Id*. After careful consideration of the briefing and arguments offered at the hearing, the Court denies Plaintiffs' requested relief.

## BACKGROUND

Plaintiffs ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("RBT") bring claims of patent infringement, false patent marking, and false advertising under the Lanham Act against Defendants Peak Tactical, LLC ("Peak") and Nicholas Norton ("Norton"). [ECF No. 1]. Plaintiffs' claims are based on four patents they hold related to forced reset triggers ("FRTs"). *Id*. at 3. A FRT is an aftermarket firearms trigger that operates by mechanically resetting the trigger after each shot, allowing the user to make faster follow-up shots without manually releasing pressure on the trigger.

ABC owns the four patents generally related to FRTs that can be retrofitted into existing semi-automatic rifles. *Id*. The asserted U.S. Patent numbers are: 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents"). ABC exclusively licenses the Asserted Patents to RBT, who designs, manufactures, and sells aftermarket triggers, including the RBT FRT-15L3 trigger. *Id*. at 4. Plaintiffs allege Defendants have committed willful acts of direct, contributory, and induced patent infringement in violation of 35 U.S.C. § 271.

Defendants manufacture and distribute the Partisan Disrupter, an aftermarket FRT trigger. *Id*. at 6. Except for minor inconsequential cosmetic features in the outer housing Plaintiffs allege, "the Partisan Disruptor is a direct copy of RBT's FRT-15L3 that one of their distributors, Firearm Systems, sells for $299—$150 (or 33%) cheaper than RBT's FRT-15L3." [ECF No. 7, at 7]. Plaintiffs also allege Defendants have falsely advertised

their Disruptor by incorrectly describing it as an "assisted reset trigger," rather than a FRT. [ECF No. 1, at 71–73]. Plaintiffs further allege Defendants have engaged in false advertising by telling the public the Partisan Disruptor implements and is covered by U.S. Patent No. 9,146,067 ("'067"). *Id*. Patent '067 relates to an assisted reset trigger and was issued to Partisan's employee Michael Stakes before the Asserted Patents were filed.

### *I. Plaintiffs' Motion [ECF Nos. 6 & 7]*

In the instant Motion, Plaintiffs request the entry of a temporary restraining order ("TRO") and preliminary injunction enjoining Defendants' business operations and marketing. FED. R. CIV. P. 65. They ask the Court to enjoin Defendants from: "1. making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product; 2. stating publicly . . . the Partisan Disruptor is an assisted reset trigger" and "3. stating publicly . . . the Partisan Disruptor product practices U.S. Patent No. 9,146,067." [ECF No. 6-1, at 2]. Plaintiffs argue all four applicable factors for a preliminary injunction are satisfied.

First, Plaintiffs argue the patent infringement claims are likely to succeed because it is established that, "ABC owns the asserted patents and RBT is their exclusive licensee, that the accused Disruptor meets all the asserted claims and is a copycat of RBT's FRT-15L3 patent-implementing product, and [] the Defendants have never raised a substantial question of invalidity or unenforceability despite being aware of the asserted patents." [ECF No. 7, at 15–16] (citing *e.g.*, *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007)). Plaintiffs argue their false advertising claim is likely to succeed on the merits because "the evidence establishes that Partisan willfully makes public false

statements about the design and legitimacy of the Disruptor to syphon RBT's would-be FRT-15L3 customers." *Id*. at 16.

Next, Plaintiffs claim they will suffer irreparable harm without the requested injunctive relief because of, "price erosion, loss of market share, harm to its reputation, and a loss of business opportunities." *Id*. at 26. Plaintiffs go on to argue the balance of harms weighs strongly in their favor. In particular, Plaintiffs allege Defendants' actions threaten the long-term viability of their company, while "Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo." *Id*. at 29. Last, Plaintiffs argue "public interest strongly favors enforcement and protection of patent rights." *Id*. at 29 (citing *Syntex (USA) LLC v. Apotex Inc*., Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435, at *3 (N.D. Cal. May 18, 2006)).

***II. Defendants' Response in Opposition [ECF No. 27]***

Defendants oppose Plaintiffs' Motion for a TRO and Preliminary Injunction and request it be denied. [ECF No. 27]. Defendants argue their Disruptor trigger does not infringe on the Asserted Patents because its operation does not satisfy several requirements in the asserted claims, and that Plaintiffs' evidence on this issue is conclusory and lacks substance. *Id*. at 6–7. Defendants go on to argue their '067 Patent predates the Asserted Patents. They contend the Disruptor not only practices the '067 Patent, but that Plaintiff's FRT triggers infringe their '067 Patent. *Id*. at 7–8.

In assessing the elements of a TRO and preliminary injunction, Defendants argue Plaintiffs are unlikely to succeed on their patent infringement claim. They argue the

Asserted Patents are likely invalid because of the ’067 Patent and insist Plaintiffs’ patent claims require claim construction. *Id*. at 11–14. Defendants go on to argue Plaintiffs have not shown likely infringement because the Disrupter does not infringe the Asserted Patents and Plaintiffs’ allegations are conclusory and lack the necessary element-by-element analysis. *Id*. Defendants also argue Plaintiffs’ false advertising claim is without merit because the terms “‘assisted reset,’ ‘forced reset,’ and ‘positive reset’ are interchangeable descriptors for the same underlying, cycling-driven reset phenomenon,” and the Disruptor clearly practices claim 19 of the ’067 Patent. *Id*. at 19–21.

Defendants argue Plaintiffs have failed to show irreparable harm because they delayed filing the instant suit for months after the Disruptor was available in the market, while filing six other lawsuits against dealers of the Disruptor. *Id*. at 21–24. Defendants also claim Plaintiffs’ own expert analysis shows if Plaintiffs are ultimately successful in their claims, money damages would be sufficient to account for any harm. They reason monetary damages can account for lost profits, reasonable royalty, price erosion, and loss of convoyed sales. *Id*. at 24–27. Defendants assert the public interest does not favor injunctions such as the one requested, and the hardship imposed on Defendants if an injunction preventing sales of the Disruptor would be severe and would likely collapse their business while any hardship to Plaintiffs is compensable. *Id*. at 27. Last, Defendants argue the imposition of an injunction would necessitate a substantial bond to account for Defendants’ business losses. *Id*. at 28–30.

## RELEVANT LAW

### *I. Applicable Law*

Patent issues are governed by law of the Federal Circuit and regional circuit law applies to procedural issues—such as the issuance of preliminary injunctive relief. *See Midwest Indus. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) ("In reviewing district court judgments in patent cases, we apply our own law with respect to patent law issues, but with respect to nonpatent issues we generally apply the law of the circuit in which the district court sits."); *All Plastic, Inc. v. SamDan LLC*, Civil Action No. 20-CV-01318-NYW, 2021 U.S. Dist. LEXIS 24080, at *10 (D. Colo. Feb. 8, 2021) ("[T]he United States Court of Appeals for the Federal Circuit . . . has also explained that, in matters of procedure, it 'will apply the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law.'") (citations omitted).

### *II. Temporary Restraining Orders and Preliminary Injunctions*

"The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citing 13 JAMES WM MOORE, MOORE'S FEDERAL PRACTICE ¶ 65.36 (3d ed. 2014)). TROs chiefly differ from preliminary injunctions in duration and in that they may be granted without notice to the opposing party. *Id.*; FED. R. CIV. P. 65. The initial timeframe for a TRO is limited to fourteen days from the hour it is issued with narrow exceptions for good cause or consent allowing an extension. FED. R. CIV. P. 65(b)(2). When "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must

conform to the standards applicable to preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86 (1974). Additionally, "[t]emporary restraining orders are not ordinarily appealable, but preliminary injunctions are appealable." *Tooele Cnty. v. United States*, 820 F.3d 1183, 1186 (10th Cir. 2016).

A TRO's *ex parte* nature and short duration represent its purpose to preserve the status quo between the parties by preventing irreparable injury until a court can rule on the merits of a preliminary injunction. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001). "The status quo is defined as the last peaceable uncontested status existing between the parties before the dispute developed." *Miller v. Austin*, 622 F. Supp. 3d 1105, 1108 (D. Wyo. 2022). In contrast, preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In both cases, however, injunctive relief is an extraordinary remedy." *People's Tr. Fed. Credit Union*, 350 F. Supp. 3d at 1138 (quotations omitted). This extraordinary remedy is not awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, courts are required to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *Id.* In doing so, courts utilize a four-prong test to determine if a party is entitled to a TRO or preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019).

**A. Entitlement to Preliminary Injunctive Relief**

The moving party must demonstrate, (1) a substantial likelihood of success on the merits, (2) the movant would suffer irreparable harm if the motion is denied, (3) the threatened injury outweighs the opposing party's injury if the injunction is granted, and (4) granting the injunction is not contrary to public interest. *Id*. These four factors are applicable for preliminary injunctions seeking to enjoin patent infringement. *Natera*, *Inc*. *v*. *NeoGenomics Lab'ys*, *Inc*., 106 F.4th 1369, 1375 (Fed. Cir. 2024) ("To obtain a preliminary injunction, a party must establish likelihood of success on the merits, likelihood it will suffer irreparable harm absent preliminary relief, the balance of equities tips in its favor, and an injunction is in the public interest."). Public consequences of granting this extraordinary relief are particularly important for the court's consideration. *Winter*, 555 U.S. at 22. These considerations are within a district court's discretion. *Free the Nipple-Fort Collins*, 916 F.3d at 796.

**RULING OF THE COURT**

After hearing testimony and reviewing the briefing on each of the four preliminary injunction factors from the parties, the Court finds each factor weighs against the imposition of a preliminary injunction. The Court will address (I) irreparable harm, (II) the likelihood of success on the merits, (III) the balance of equities between the parties, and (IV) public interest. Because TROs and preliminary injunctions are analyzed under the same structure, the Court will analyze both simultaneously.

### *I. Irreparable Harm*

"Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) (citing *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986)). The Tenth Circuit has held a demonstration of probable irreparable harm is the single most important factor to consider before issuing a preliminary injunction. *Hunter v. Hirsig*, 614 F. App'x 960, 962 (10th Cir. 2015) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). Consequently, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.*

The Court will, therefore, begin its analysis by evaluating the potential for irreparable harm to Plaintiffs. To demonstrate irreparable harm, Plaintiffs must show "a significant risk that [they] will experience harm that cannot be compensated after the fact by money damages." *Mabe, LLC v. Wie*, No. 2:25-CV-00319-DBB, 2025 WL 1433910, at *3 (D. Utah May 19, 2025) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)); *see Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). "Erosion of market share, harm to reputation, and loss of business opportunities can constitute irreparable harm." *Mabe, LLC*, No. 2:25-CV-00319-DBB, at *3 (citing *Miche Bag, LLC v. Thirty One Gifts LLC*, No. 2:10-CV-781 TS, 2010 WL 3629686 (D. Utah Sept. 13, 2010)); *see, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (holding likelihood of price erosion and loss of market position are

evidence of irreparable harm); *Bio-Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (stating loss of revenue, goodwill, and research and development constitute irreparable harm); *Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996) (finding loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm).

Plaintiffs claim to have already suffered, and continue to suffer, irreparable harm from “price erosion, loss of market share, harm to its reputation, and a loss of business opportunities” without the requested preliminary injunction. [ECF No. 7, at 20] (quotations and citations omitted). In examining irreparable harm, the Court will address (A) loss of business opportunities, (B) price erosion, (C) loss of market share, and (D) reputational harm.

**A. Loss of Business Opportunities**

Plaintiffs argue their risk of irreparable harm is heightened because of the “durable, long-lasting nature of the products in question” where an individual gun owner “likely only needs to buy one trigger product for the life of his or her rifle—which can survive generations.” [ECF No. 7, at 26]. Defendants contend the products’ durability underscores the reality “any lost sales would be fully compensable by lost profit monetary damages.” [ECF No. 27, at 9]. The Court finds a demonstration of lost business opportunities is insufficient to independently establish irreparable harm.

During the hearing, Plaintiffs argued Defendants’ own sales projections demonstrate Plaintiffs’ lost business opportunities. Specifically, Defendants’ projections anticipate they will sell more than 1.68 million triggers over the next three years. [ECF No.

33, at 95]. Plaintiffs argue each trigger sold by Defendants results in their loss of sales. *See id*. at 122; [ECF No. 7, at 26]. Plaintiffs' Declaration of Samir P. Warty, Ph.D. furthers this argument, claiming, "[i]n markets for durable or semi-durable goods, lost sales caused by substitution are generally permanent rather than deferred. Unlike consumable goods, which may be repurchased frequently, durable goods are typically acquired on a one-time or infrequent basis." [ECF No. 7-27, at 7]. Plaintiffs offered testimony they collect approximately $350 profit on each trigger sold and allege they will lose over $500 million in profits based on Defendants' own projections. [ECF No. 33, at 95].

However, "lost sales standing alone are insufficient to prove irreparable harm." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300 (Fed. Cir. 2009). If lost sales were sufficient, "irreparable harm would be found in every case involving a 'manufacturer/patentee, regardless of circumstances.'" *Id*. at 300–01 (quoting *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed.Cir.2006)). Without more, lost sales "are presumed to be compensable through damages, so they do not require injunctive relief." *Id*. at 301. Consequently, no amount of lost revenue alone may support a finding of irreparable harm. *Id*. The Court now considers price erosion as a basis for irreparable harm.

**B. Price Erosion**

Price erosion refers to a "theory of lost-profits remedy that measures the difference between what an item could have sold for with patent protection and what it actually sold for while having to compete against an infringing team." *Price-Erosion Theory*, BLACK'S LAW DICTIONARY (12th ed. 2024). Plaintiffs suggest Defendants' entry into the FRT market will lead to price erosion because Defendants' $300 trigger price is 33% less than

their $450 price point. [ECF No. 7, at 27]. Plaintiffs again look to the Declaration of Dr. Warty who states, "[o]nce buyers internalize a lower reference price, firms may find it difficult to return to prior price levels without losing sales," suggesting price erosion can lead to irreparable harm in a given market. [ECF No. 7-27, at 11]. While Plaintiffs' argument, including Dr. Warty's Declaration, correctly identifies price erosion as a potential source of irreparable harm, Plaintiffs offer only conclusory statements in support of its potential presence here.

Plaintiffs allude to the price discrepancy between the two products at issue but have not offered (1) any evidence they have or will likely be forced to drop their price nor (2) any projections or analysis of how potential price erosion has or will harm their business. Plaintiffs stated the quantifiable loss of sales it will suffer if not granted injunctive relief does not consider the "harm identified by Dr. Warty addressing issues of price erosion." [ECF No. 33, at 135]. The Court has been presented some data regarding Defendants' sales and future sales projections. *See id*. at 95. While Plaintiffs mentioned their current price of $450 being 33% higher than Defendants' price point, they failed to indicate whether this price point has been static or whether it has already suffered from price erosion. Aside from a cursory statement made in the hearing, no assertions have been made evidencing injury suffered from price erosion. *See id*. at 135 (stating, "[o]ur client has had to lower its prices due to market competition."). Moreover, no evidence of Plaintiffs' sales data before or after Defendants' entry into the FRT market has been presented and no future projections have been provided. *See id*. at 121–22.

Flat assertions of price erosion with no supporting market analysis are insufficient to demonstrate irreparable harm. *See Potato Ventures LLC v. P'ship & Unincorporated Ass'n Identified on Schedule A*, No. 25-2312-DDC-RES, 2025 WL 2256204, at *9 (D. Kan. Aug. 7, 2025) (declining to find irreparable harm where the plaintiff failed to present any sales data or market share before or after the infringing defendant entered the market); *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (stating, "Courts require more than unsupported factual conclusions to support" a finding of irreparable harm); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) (requiring causal nexus between infringement and harm); *Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (explaining declaration insufficient to show irreparable harm in patent case where declarant assumed without support that defendant's prices "were solely responsible for [plaintiff's] price erosion").

Further, Plaintiffs have not adequately rebutted Defendants' assertion price erosion is calculable and redressable by monetary damages. *See Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013) ("Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages.") (citations omitted). Defendants argue if Plaintiffs are successful at trial, then economic harm from price erosion can be addressed, "by applying Plaintiffs' pre-litigation market price to the lost units to account for market price erosion, thus making Plaintiffs whole for the lost sales and price erosion resulting from the alleged infringement and other wrongful acts." [ECF No. 27-1, at 11] (footnote omitted). The Court finds any alleged harm to Plaintiffs' consumer perception due to

potential price fluctuation is best addressed under reputational harm below. The Court finds this consideration does not demonstrate irreparable harm because Plaintiffs have not offered evidence indicating harm from price erosion nor shown any damages are not compensable by money damages.

**C. Loss of Market Share**

Plaintiffs next argue, "[p]ermanent market displacement in a market like this cannot be resolved after the fact." [ECF No. 33, at 13]. Their expert asserts, "market share influences dealer attention, customer awareness, and expectations about which products are likely to remain available and supported. When substitution persists over time, these secondary effects can reshape the incumbent's competitive position in ways that are not reversed simply by a later change in legal outcome." [ECF No. 7-27, at 8]. Defendants counter, "in the event Plaintiff prevails at trial and obtains a permanent injunction, according to their own expert's description of the market, Plaintiffs will be able to quickly recapture all sales going forward." [ECF No. 27, at 25]. The Court finds consideration of loss of market share weighs against granting the requested relief.

The Court acknowledges, "the right to exclude others from a specific market, no matter how large or small that market, is an essential element of the patent right." *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262–63 (D. Kan. 2009) (citing *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996)) ("[T]he principal value of patent is its statutory right to exclude, so nature of patent weighs against holding that monetary damages will always suffice to make patentee whole."). For the loss of market share to be irreparable, it must be both difficult to quantify and difficult to repair. *See Salt Lake Trib.*

*Pub. Co., LLC*, 320 F.3d at 1105. "There is an inverse relationship between the potential for price erosion and loss of market share." *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755 n.27 (Fed. Cir. 2014). If the company claiming infringement lowers its prices in response to competition, price erosion will be higher, but it will maintain its share of the market—decreasing market share losses. *See id.*

In discussing market displacement, Plaintiffs rely on their expert's contention, "[d]istribution networks are not merely conduits for price transmission but are central to a supplier's competitive position. . . . Once either level of the distribution chain has invested in these product-specific capabilities, those investments may not readily transfer back to the original supplier's product even if the competing product is later enjoined." [ECF No. 7-27, at 10]. This sub-factor again suffers from a fatal flaw in Plaintiffs' allegations. While Plaintiffs include some evidence of Defendants' dealer network, Plaintiffs include no evidence they too have an established dealer network. *See* [ECF No. 33, at 21–23]. Without evidence of an established dealer network, the concept of market position through distribution networks being difficult to "repair" is somewhat misplaced. This omission makes Plaintiffs' claims of displacement appear increasingly attenuated where no evidence of Plaintiffs' sales statistics have been presented and no evidence of shifting dealer loyalty can be produced. The Court finds Plaintiffs' allegations of loss of market share is inadequate support for irreparable harm.

**D. Reputational Harm**

Plaintiffs claim, "Defendants' undercutting of RBT's price by itself harms RBT's reputation by incorrectly suggesting to customers that RBT's pricing is uncompetitive."

[ECF No. 7, at 27]. They also mentioned Defendants' alleged attempts to label RBT as a "greedy bully" in online forums. *See id*. When referring to the apparently quantifiable damages, Plaintiffs argued even when a permanent injunction is issued and price erosion is no longer a factor, the prevailing party still suffers reputational harm. [ECF No. 33, at 135]. Defendants claim any assertion of reputational harm is conclusory and speculative. They argue, "there is no claim that customers will be confused between the two products. If Plaintiffs' products are superior, they will enjoy whatever reputational advantage flows therefrom." [ECF No. 27, at 26]. Defendants conclude Plaintiffs may not base reputational harm on their product simply receiving less favorable market reception than its competitors. *Id*.

In this context proving reputational harm does not require a showing of any elements required to prove defamation. Rather than evidence of false statements and publication to third parties, the moving party must offer evidence of a reputational loss stemming from the underlying tort—altering how customers perceive the product and making the resulting harm persistent and difficult to quantify. *See Snyder v. Am. Kennel Club*, 575 F. Supp. 2d 1236, 1242 (D. Kan. 2008) ("finding loss of reputation not irreparable where plaintiff provided no evidence of risk of loss of prestige, academic reputation, or professional opportunities that could not be remedied by money damages.") (parenthetically citing *Schrier*, 427 F.3d at 1267 (10th Cir. 2005)); *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016). Here, Plaintiffs have presented insufficient evidence of price erosion and loss of market share. While Plaintiffs have provided evidence of the publication of allegedly false statements online, the threshold inquiry for this equitable consideration is whether the

harm ultimately stems from the patent infringement or false marking and advertising. *See Limitless Worldwide, LLC v. AdvoCare Int'l, LP*, 926 F. Supp. 2d 1248, 1254 (D. Utah 2013); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

Plaintiffs have presented evidence of Defendants' negative online statements about their business and price point. They have presented no evidence of how these statements have impacted public perception of their brand—and more directly, any defamatory damage to Plaintiffs is irrelevant to this consideration without demonstrating this reputational harm flows from the underlying torts alleged. The variation in price points between the two products could present a basis for reputational harm as Plaintiffs suggested, but they have included no evidence indicating their reputation has been, or will imminently be, damaged. Speculative harm is not sufficient. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *see Lovesac Co. v. www.lovessac.com*, No. 2:22-CV-00056-JNP, 2022 WL 504192, at *4 (D. Utah Feb. 18, 2022).

Because Plaintiffs have not affirmatively demonstrated a resulting injury which could be tied to their alleged reputational harm, the Court finds this consideration does not support a finding of irreparable harm. Despite this finding, the Court will now address Plaintiffs' likelihood of success on the merits. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original).

### *II. Likelihood of Success on the Merits*

Plaintiffs include claims for (1) patent infringement and (2) false advertising as the basis for the injunction. In seeking a TRO or preliminary injunction the movant bears the burden of demonstrating a likelihood of success on the merits. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). Specifically, as to the first claim, it must be demonstrated, in light of the presumptions and burden that will apply at trial, "(1) the patentee will likely prove the accused infringer infringes the asserted patent; and (2) the patentee's infringement claim will likely withstand the accused infringer's challenges to the validity and enforceability of the patent." *Won-Door Corp. v. Cornell Iron Works, Inc.*, 981 F. Supp. 2d 1070, 1074 (D. Utah 2013) (quoting *Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012)). A court should not issue a preliminary injunction if the accused infringer raises a "substantial question" as to either infringement or validity of the patent. *Amazon.com, Inc.*, 239 F.3d at 1350–51

Second, to demonstrate a reasonable likelihood of success on its false advertising claim under the Lanham Act, Plaintiffs must establish (1) Defendants presented a false or misleading description or representation about a product:

> (2) the misrepresentation is material, in that it is likely to influence consumers' purchasing decisions; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) [Defendants] placed the false or misleading statement in interstate commerce; and (5) [Plaintiffs have] been or [are] likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by lessening of goodwill associated with its products.

*Zoller Lab'ys, LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (alterations added); 15 U.S.C. § 1125(a)(1)(B); *Wyoming Beverages Inc. v. Core-Mark Int'l, Inc.*, No.

17-CV-116-F, 2018 WL 8221068, at *13 (D. Wyo. Jan. 4, 2018). The Court finds Plaintiffs have not demonstrated they are likely to be successful on the merits on their claims. The Court will first address Plaintiffs' claim of (A) patent infringement then (B) false advertising.

**A. Patent Infringement**

"A party establishes infringement in one of two ways: literal infringement of the claim language or infringement under the doctrine of equivalents." *FBA Operating Co. v. ETN Capital, LLC*, No. 5:23-CV-505-D, 2023 U.S. Dist. LEXIS 182297, at *4–5 (E.D.N.C. Oct. 10, 2023) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997)). "Literal infringement occurs where the allegedly infringing device includes 'each and every limitation of the asserted claim(s).'" *Id.* (quoting *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)). "Infringement under the doctrine of equivalents occurs where the allegedly infringing device 'performs substantially the same function in substantially the same way to obtain the same result' as the patented product." *Id.* (citations omitted).

To establish a likelihood of success on a patent infringement claim, Plaintiff must show the accused product likely infringes at least one patent asserted. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). This analysis "entails two steps, the first step is determining the meaning and scope of the patent claims asserted to be infringed, the second step is comparing the properly construed claims to the device accused of infringing." *Id.* Plaintiff fails to meet this burden in two ways: (1) the material claim construction disputes preclude a finding of likely infringement and (2)

defendants have raised serious and substantial questions regarding validity. The Court will address (1) claim construction then (2) claim validity.

***1. Claim Construction***

"For claim construction, the court must: (1) analyze 'the text of the patent and its associated public record,' (2) apply 'the established rules of construction,' and (3) 'arrive at the true and consistent scope of the patent owner's rights to be given legal effect.'" *FBA Operating Co.*, No. 5:23-CV-505-D, at *4–5 (quoting *Markman*, 52 F.3d at 979). The Federal Circuit has made clear, "the interpretation and construction of patent claims . . . is a matter of law exclusively for the court." *Id.* at 970–71. Thus, where the parties present competing interpretations of claim scope, the Court must resolve any fundamental disputes before proceeding with the infringement analysis. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). The Court will (i) outline the relevant text of the patents and (ii) apply the established rules of construction.

**i. Text of the Patents**

"The '003, '336, and '807 Patents are related and share a common specification, as the '336 and '807 Patents are continuations of the '003 Patent." [ECF No. 7, at 10]. "These patents all describe and claim a device similar to that of the '223 Patent, but with the additional feature that it 'provides a 'three position' trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions." *Id.* at 10–11

(citations omitted); *see* [ECF No. 1-1, at 10–11] (claim 4 of ’223 Patent); [ECF No. 1-2, at 28] (claim 4 of ’003 Patent); [ECF No. 1-3, at 28] (claim 3 of ’336 Patent); [ECF No. 1-4, at 28] (claim 1 of ’807 Patent).

Defendants identify a portion of the respective claims, stating:

> [W]hereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and
>
> [W]hereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the ***substantially in-battery*** position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

[ECF No. 1-2, at 28] (claim 4 of ’003 Patent) (emphasis added); [ECF No. 1-3, at 28] (claim 3 of ’336 Patent) (emphasis added); [ECF No. 1-4, at 28] (claim 1 of ’807 Patent) (emphasis added); *see also* [ECF No. 27, at 16] (quoting ’807 Patent, claim 1, ’336 Patent, claim 3, ’003 Patent, claim 4).

Defendants state, “[t]he patents themselves define the ‘set position’ . . . as the state ‘wherein said sear and sear catch are in engagement in said set positions of the hammer and trigger member and are out of the engagement in said released positions of said hammer and trigger member.” [ECF No. 27, at 17] (quoting ’807 Patent, claim 1, ’336 Patent, claim 3, ’003 Patent, claim 4).

**ii. Application of Established Rules of Construction**

Claim terms are generally given their "ordinary and customary meaning," the meaning they would have to "a person of ordinary skill in the art at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). "We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Schmeisser GmbH v. AC-Unity d.o.o*, No. 21-CV-24-SWS, 2021 WL 7286256, at *5 (D. Wyo. Mar. 19, 2021) (quotations omitted) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)). When analyzing claim construction, courts typically rely on intrinsic evidence including a patent's specifications and prosecution history. Extrinsic evidence such as expert testimony or a dictionary definition may also be considered. *Id.* (quoting *Bushnell, Inc.*, 673 F. Supp. 2d at 1250).

A court will not give the words of a claim their ordinary meaning "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed.Cir.1996)). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (citation omitted). Disavowal of a claim term comes into play, "'[w]here the specification makes clear that the invention does not include a particular feature, [and] that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in question.'" *Id*. at 366 (alteration added) (quoting *SciMed Life Sys*., *Inc. v. Advanced Cardiovascular Sys*., *Inc*., 242 F.3d 1337, 1341 (Fed.Cir.2001)).

Here, material disputes exist regarding the meaning of claim terms that are central to the infringement analysis. In particular, Defendants dispute the scope of the phrase "substantially in-battery position." [ECF No. 27 at 14–15]; *see* [ECF No. 33, at 74–75]. Defendants claim this phrase "is 'a timing gate' for when a 'locking member' transitions from blocking to permissive," meaning it determines when the mechanism transitions from a blocked state to one in which firing is permitted. [ECF No. 27, at 14]. Defendants argue this phrase has more than one interpretation when applied to the AR pattern operating cycle. *Id*. Plaintiffs, by contrast, treat the phrase as having an obvious and straightforward meaning. [ECF No. 7, at 23–25]. As such, Plaintiffs do not attempt to offer an express definition of the term, nor do they address Defendants' claimed definition of "set position" from the Asserted Patents. *See* [ECF No. 27, at 17]

Drawing on the patents' specifications, Plaintiffs generally state, "when the trigger is pulled, the hammer contacts the firing pin, thereby causing the ammunition cartridge to discharge. . . This discharge causes the bolt carrier (52) to move rearward, and a lower surface of the bolt carrier hammer pushes against the hammer which in turn forces the trigger . . . to return to its reset position." [ECF No. 7, at 10] (citations omitted). After that, "[a] locking bar (62) prevents the trigger member from being pulled again by the user until the bolt carrier (52) has returned to the original or 'in-battery' position." *Id*. (citations omitted).




FIG. 5

[ECF No. 7, at 10] (citing '233 Patent, Fig. 5 ("showing the bolt carrier 52 forcing the hammer 18 and trigger 26 back into its reset position")).

Defendants' expert argues, "substantially in-battery position" could reasonably be interpreted to include: "(1) a meaning close to fully in battery (i.e., at or essentially at the in-battery condition), versus (2) a meaning that includes a broader band of near-battery positions during forward travel." [ECF No. 27-2, at 38]. He continues, "[t]he phrase also raises a second critical ambiguity: whether the claim requires the bolt carrier contact/unlocking to occur at the moment the carrier 'reaches' that substantially in-battery condition (a narrow dimensional/timing window), or whether unlocking earlier would suffice so long as the carrier later becomes substantially in-battery." *Id.* at 39. Relying in part on the asserted claims' repeated requirement the bolt carrier reach a "substantially in-battery position," he concludes, "the meaning of that phrase is both disputed and potentially outcome-determinative." *Id.*

Neither Plaintiffs nor their expert attempt an express definition of "substantially in-battery position." As relevant to the disputed term, Plaintiffs' expert states, "the trigger described in the Asserted Patents and the Rare Breed trigger operate by the trigger being forcibly pushed into the reset position, with the sear engaging the hammer, each time the action cycles (i.e., each time a shot is fired)." [ECF No. 7-17, at 3–4]. He goes on, "[a]nother shot cannot be fired until the bolt returns to the in-battery position and the trigger is pulled again by the user." *Id*.

Plaintiffs essentially refrain from providing a direct rebuttal to the disputed terms and mechanics presented by Defendants. However, depending on how "substantially in-battery" is construed, the timing requirements of the claims change. Because infringement analysis depends on the Court first resolving the disputed claim term ("substantially in-battery position") the Court cannot properly compare the asserted claims to the accused device without first construing the meaning and scope. *See Markman*, 52 F.3d at 976; *O2 Micro*, 521 F.3d at 1362. The Court finds there is insufficient evidence presented to properly make a comparison between the two products. Accordingly, Plaintiffs cannot demonstrate literal infringement or infringement under the doctrine of equivalents, nor a clear likelihood of success on the merits at this stage. *See Markman*, 52 F.3d at 976; *Amazon.com*, *Inc*., 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention."). Nonetheless, the Court will proceed to address the validity of Plaintiffs' patents in demonstrating its likelihood of success on its patent infringement claim.

***2. Validity***

At the preliminary-injunction stage, the Court "does not resolve the validity question," but instead assesses the persuasiveness of the parties' evidence "recognizing that it is doing so without all evidence that may come out at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (quotations omitted) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed. Cir. 1992)). Patents enjoy a statutory presumption of validity. *Id*. If the alleged infringer responds to a preliminary-injunction motion by "launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." *Id*. "The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." *Id*.

Although invalidity ultimately must be proven at trial by clear and convincing evidence, that evidentiary standard does not apply at the preliminary-injunction stage. *Id*. at 1377–79. Thus, if the challenger presents evidence raising a "substantial question" of validity and the patentee cannot demonstrate it "lacks substantial merit," the patentee has not demonstrated a likelihood of success on the merits warranting preliminary relief. *Id*. (quoting *New England Braiding*, 970 F.2d at 883). Here, Plaintiffs have not shown they are likely to withstand Defendants' invalidity challenges. The Court will address (i) Defendants' theory supporting the invalidity of Plaintiffs' patents and (ii) Plaintiffs' burden to overcome that showing.

**i. Defendants' Substantial Question of Validity**

Defendants' principal invalidity theory is tied to obviousness under 35 U.S.C. § 103, which provides:

> A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103.

"[A] patent composed of several elements is not proved obvious by demonstrating that each of its elements was, independently, known in the art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, the appropriate inquiry is "whether the subject matter would have been obvious to a person of ordinary skill in the art at the time of the asserted invention." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). Although an incentive to combine prior-art references may be inferred from the nature of the problem to be solved, there must be "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008).

The Court finds Defendants have raised a substantial question of validity. Defendants' validity challenge rests on a multi-layered obviousness theory grounded in, 35 U.S.C. § 103 and *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 415–16 (2007). [ECF No. 27, at 11]. They contend the '067 Patent and the TacCon 3MR long predate the Asserted Patents and disclose the same core forced-reset architecture embodied in the asserted claims. *Id.* at 11–14. They argue longstanding prior art references the claimed locking and

gating features, and the Asserted Patents merely combine these familiar elements in predictable ways. *Id.* at 13; *see KSR Int'l Co.*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Defendants contend the prosecution histories also reflect limited consideration by the Patent Office of this prior art, including the TacCon 3MR and the '067 Patent. [ECF No. 27, at 8]. Defendants need to only raise a "substantial question" of invalidity at this stage. *Titan Tire*, 566 F.3d at 1377–79. The Court finds Defendants' evidence of the '067 Patent and their prior-art analysis with added support through expert declaration is sufficient to meet this standard. *Amazon.com*, *Inc*., 239 F.3d at 1359 ("Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.").

**ii. Plaintiffs' Burden**

Once Defendants have raised a substantial question of validity, the burden shifts back to Plaintiffs to demonstrate the asserted validity defenses lack substantial merit. *Id*. Plaintiffs have not carried their burden. Plaintiffs raised numerous contentions in their closing statements—including the nonexistence of Defendants' expert's claim charts and alleged proof the '067 Patent was looked at and considered by the Patent Office. [ECF No. 33, at 130–32]. Although these arguments call into question some of Defendants arguments, they fail to demonstrate the Defendants validity challenges, "lack substantial merit." *See Titan Tire* 566 F.3d at 1377–79. Additionally, contrary to Plaintiffs' arguments the Defendants need only raise a substantial question of invalidity at this stage and do not need to prove their invalidity by clear and convincing evidence. *See id*.; *Amazon.com*, *Inc*.,

239 F.3d at 1359 ("The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself."); [ECF No. 33, at 13, 130–31]. Material claim construction disputes preclude a finding of likely infringement, and Defendants have raised substantial questions regarding validity. Collectively, Plaintiffs have failed to meet the burden of demonstrating a likelihood of success on the merits for patent infringement. The Court now turns to Plaintiffs' claim of false advertising.

**B. False Advertising**

Under the Lanham Act, a plaintiff must show the defendant made a false or misleading representation by demonstrating the statement was either facially false or likely to have the effect of misleading consumers. *Zoller Lab'ys*, *LLC*., 111 F. App'x at 982. "Where the advertisement is literally false, a violation may be established without evidence of consumer deception" and, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Id*. (quotations omitted) (quoting *Scotts Co*. *v*. *United Indus*. *Corp*., 315 F.3d 264, 272 (4th Cir.2002), and *C.B*. *Fleet Co*. *v*. *SmithKline Beecham Consumer Healthcare*, *L.P*., 131 F.3d 430, 434 (4th Cir.1997)). "[F]actfinders usually base literal falsity determinations upon the explicit claims made by an advertisement[.]" *Id*.

Plaintiffs assert two bases for their false advertising claim against Defendants. [ECF No. 7, at 25–26]. First, Plaintiffs state Defendants falsely represent the Partisan Disruptor is an "assisted reset trigger" instead of a forced reset trigger. *Id*. at 25. They assert the labels are mutually exclusive and explain, "the two triggers are designed and operate in different

ways: whereas a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger." *Id*. (emphasis in original). Second, Plaintiffs argue, "Partisan incorrectly claims that their Disruptor is covered by the '067, on which Partisan's employee Michael Stakes is a named inventor." *Id*. at 26. They contend this representation is likely to mislead consumers by falsely increasing the perceived legitimacy of the product.

Defendants claim they have not made any false or misleading representations. [ECF No. 27, at 19]. Defendants rely on their expert and Mr. Stakes to assert, "in practice and in the literature, 'assisted reset' and 'forced reset' are used synonymously to describe the same class of mechanisms; the difference is semantics, not mechanics." *Id*. at 20 (citation omitted). Given the context, they conclude no false representation has been made. Defendants rebut Plaintiffs' second contention by stating the Disruptor is in exact compliance with claim 19 of the '067, and claim this conclusion is supported by specific measurements and distances outlined by Mr. Stakes and Mr. Nixon. *Id*. They argue Plaintiffs' expert, "offers only a bare, unsupported assertion to the contrary; he discloses no measurements, photographs, or analysis." *Id*. (citation omitted).

The Court finds Plaintiffs have not demonstrated a likelihood of success on their false advertising claim. The Court holds Defendants have presented adequate counter-analysis to bar an establishment of facial falsity. In considering whether Defendants' representations are misleading, Plaintiffs have not presented any evidence of the actual influence of Defendants' representations on consumers. Such a showing is required absent a demonstration of facial falsity. *Zoller Lab'ys, LLC*, 111 F. App'x at 982; *Wyoming*

*Beverages*, *Inc*., No. 17-CV-116-F, at *13. Accordingly, the Court finds Plaintiffs have not sufficiently demonstrated a likelihood of success on the merits as to false advertising.

### *III. Balancing of Harms*

The balancing of harms element largely entails inventorying the irreparable harms as outlined above. Plaintiffs argue because Defendants' actions in selling an allegedly infringing product are contrary to law, they could not suffer any legally cognizable harm from the requested relief. [ECF No. 7, at 29]. Plaintiffs also assert, "because Partisan Triggers has procured patent insurance, the Defendants are at minimal risk if any of harm from the preliminary injunction." *Id*. (citations omitted). They conclude, "[t]he balance of equities favors injunctive relief." *Id*.

Defendants contend the injunction would force their company out of business. [ECF No. 27, at 27]. They claim, "[a]n injunction would put dozens of employees out of work, and create consequential havoc to the various people who are working in Defendants' business. Even with a sizable bond . . . the damage to Defendants would indeed be extreme and irreparable." *Id*. Conversely, Defendants assert, "in the event Plaintiffs prevail in their claims at trial, they can be made whole by monetary damages. And if Plaintiffs do not prevail at trial, the only hardship to Plaintiffs is *lawful* competition in the marketplace." *Id*. (emphasis in original).

The Court finds the balance of hardships favors Defendants. The Court acknowledges, "[a] record showing that the infringer will be put out of business is a factor . . . but does not control the balance of hardships factor." *Aria Diagnostics*, *Inc*. *v*. *Sequenom*, *Inc*., 726 F.3d 1296, 1305 (Fed. Cir. 2013) (citing *Intel Corp*. *v*. *ULSI Sys*.

*Tech.*, *Inc.*, 995 F.2d 1566, 1568, 1570 (Fed.Cir.1993), and *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997)). Despite this, because the requested remedy is extreme the Court finds the absence of evidence demonstrating irreparable harm lightens Plaintiffs' proverbial scale—shifting the balance in favor of Defendants. The Court additionally notes Plaintiffs' claim related to Defendants' patent insurance could potentially lessen any concerns it has about Defendants' ability to pay a prospective damages award. *See* [ECF No. 33, at 133].

***IV. Public Interest***

The public interest factor, "requires the court to focus on whether 'there exists some critical public interest that would be injured by the grant of preliminary relief.'" *In re BRCA1-, BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 3 F. Supp. 3d 1213, 1275 (D. Utah), *aff'd and remanded sub nom. In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755 (Fed. Cir. 2014) (quoting *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc.*, 849 F.2d at 1458 (footnotes omitted).

Plaintiffs argue, "permitting the Defendants to flood the market with the accused 3-position forced reset triggers at severely reduced prices serves no legitimate public interest, and only contradicts the public interest." [ECF No. 7, at 30]. They state, "the DOJ under President Trump has permitted RBT to market its triggers on condition that RBT (1)

'enforce its patents to prevent infringement that could threaten public safety,' and (2) 'promote the safe and responsible use of its products.'" [ECF No. 7, at 30]; *see* [ECF No. 33, at 14]. Defendants counter, due to the lack of competition in the FRT market, "Plaintiffs have been able to charge the public monopolistic prices for their triggers, and essentially use the additional profits to continue fueling their litigation campaigns." [ECF No. 27, at 28]. They conclude, "[t]he public interest is not served by such tactics and above-market prices but, instead, would be better served by competition." *Id*.

After the hearing, Plaintiffs filed a Supplement to their request attaching the Eastern District of Tennessee's Order granting a preliminary injunction in *ABC IP*, *LLC et al*., *v*. *Hoffman et al*., Case No. 1:25-00389-CKC-CHS. (Dkt. Nos. 45, 46) (E.D. Tenn. Feb. 11, 2026); [ECF No. 37]. The *Hoffman* case involved ABC's Patent No. 12,038,247 (the "'247 Patent"), ABC's Patent No. 12,031,784 (the "'784 Patent"), and ABC's now-expired Patent No. 7,398,723 (the "'723 Patent"). [ECF No. 37-2, at 3]. There, the defendants were accused of infringing the three patents listed, and digitally releasing free firearm-related designs and 3D print files for public download. *Id*. The government filed a statement of interest in the case. *Id*. at 5.

*Hoffman* is factually distinguishable from the present facts. Here, Defendants note the DOJ entered a statement of interest in the *Hoffman* case, but not in the current litigation. [ECF No. 33, at 24]. The *Hoffman* Court also found "Defendants' unrestricted distribution of Super Safety Files resulted in and would continue to result in widespread copying, third-party manufacturing, and uncontrolled downstream infringement." [ECF No. 37-2, at 11]. But, as mentioned, *Hoffman* Defendants posted allegedly infringing firearm designs online

for free public access. *Id*. at 3. Because they freely distributed infringing designs—rather than charging consumers for an allegedly infringing product—this act had the effect of potentially syphoning Plaintiffs' business and also expanding the infringement to potentially countless individuals. The Court correctly concluded the underlying facts presented potentially irreparable public safety and patent infringement concerns. *Id*.

Here, Plaintiffs have failed to demonstrate the current facts present the same public safety and patent infringement concerns. In this case, different patents are at issue, and Defendants have raised a substantial question of validity. *Cf. id*. at 8. Plaintiffs failed to directly and adequately address Defendants' validity and claim construction challenges and Defendants' claims any damages could be resolved through compensatory damages. The Court finds the public interest will not be highly impacted if an injunction is not granted against Defendants. The Court acknowledges the public interest favoring enforcement and protection of patent rights. *See Pfizer*, *Inc*. *v*. *Teva Pharms*. *USA*, *Inc*., 429 F.3d 1364, 1382 (Fed. Cir. 2005); *Syntex (USA) LLC*, No. C 01-02214 MJJ, at *3, *aff'd sub nom*. *Syntex (U.S.A.) LLC*, 221 F. App'x 1002. But Plaintiffs have not demonstrated irreparable harm will result if the requested relief is not granted. Overall, the Court finds the public interest does not weigh in favor of granting injunctive relief.

## CONCLUSION

The Court finds Plaintiffs have failed to carry the burden of showing irreparable harm in the absence of the requested preliminary injunction. The parties shall proceed under the status quo while the case proceeds on the merits. The findings and conclusions

set forth herein do not constitute a determination on the merits but are findings made in light of the requested preliminary injunction order.

**NOW, THEREFORE, IT IS ORDERED** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 6] is **DENIED**.

Dated this 13th day of February, 2026.

Kelly H. Rankin
United States District Judge

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING
3:57 pm, 3/11/26
Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,<br><br>Defendants. | Case No. 26-CV-18-R |

**ORDER DENYING PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY [41]**

ABC IP, LLC, together with Rare Breed Triggers, Inc. ("Plaintiffs") and Peak Tactical, LLC d/b/a Partisan Triggers, and its owner Nicholas Norton ("Defendants") are in the firearms triggers market. [ECF No. 1, at 1, 13]. In January 2026, Plaintiffs sued Defendants asserting patent infringement and false marking and advertising. *Id*. at 3–4. The next day Plaintiffs filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"). [ECF Nos. 6, 7]. The Court denied the Motion. [ECF No. 39]. Plaintiffs now motion the Court for expedited discovery intending to gather relevant evidence to renew their PI request. [ECF Nos. 41, 42]. Defendants oppose the Motion. They claim Plaintiffs have shown neither good cause for expedited discovery nor proper

grounds for reconsideration. [ECF No. 43]. After careful consideration of the briefing and being otherwise fully informed on the matter, the Court denies Plaintiffs' request.

## BACKGROUND

### *I. General Background*

Plaintiffs sued Defendants for patent infringement, false patent marking, and false advertising under the Lanham Act. [ECF No. 1]. Plaintiffs' claims are based on patents they hold related to forced reset triggers ("FRTs"). *Id*. at 3. An FRT is an aftermarket firearms trigger that operates by mechanically resetting the trigger after each shot, allowing the user to make faster follow-up shots without manually releasing pressure on the trigger. ABC owns four patents generally related to FRTs which can be retrofitted into existing semi-automatic rifles. *Id*. The asserted U.S. Patent numbers are: 10,514,223 ("'223 Patent"); 11,724,003 ("'003 Patent"); 12,036,336 ("'336 Patent"); and 12,274,807 ("'807 Patent") (collectively, "Asserted Patents"). ABC exclusively licenses the Asserted Patents to Rare Breed Triggers, who designs, manufactures, and sells aftermarket triggers, including the RBT FRT-15L3 trigger. *Id*. at 4. Plaintiffs allege Defendants have committed willful acts of direct, contributory, and induced patent infringement in violation of 35 U.S.C. § 271.

Defendants manufacture and distribute the Partisan Disrupter, an aftermarket FRT trigger. *Id*. at 6. Except for minor inconsequential cosmetic features in the outer housing Plaintiffs allege, "the Partisan Disruptor is a direct copy of RBT's FRT-15L3 that one of their distributors, Firearm Systems, sells for $299—***$150 (or 33%) cheaper*** than RBT's FRT-15L3." [ECF No. 7, at 13] (emphasis in original). Plaintiffs assert Defendants have

falsely advertised their Disruptor by incorrectly describing it as an "assisted reset trigger." [ECF No. 1, at 71–73]. Plaintiffs maintain Defendants have also falsely advertised their product by telling the public the Disruptor implements and is covered by U.S. Patent No. 9,146,067 ("'067"). *Id*. Patent '067 relates to an assisted reset trigger and was issued to Partisan's employee Michael Stakes before the Asserted Patents were filed.

***II. Plaintiffs' Motion for TRO and PI [6 & 7]***

In January 2026, Plaintiffs requested a TRO and PI enjoining Defendants' business operations and marketing. [ECF Nos. 6, 7]; FED. R. CIV. P. 65. They asked the Court to enjoin Defendants from: "1. making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product; 2. stating publicly . . . the Partisan Disruptor is an assisted reset trigger" and "3. stating publicly . . . the Partisan Disruptor product practices U.S. Patent No. 9,146,067." [ECF No. 6-1, at 2]. Plaintiffs argued all four TRO and PI factors were satisfied.

On February 4, 2026, the Court conducted a hearing on the Motion. Plaintiffs called three witnesses: their corporate representative Lawrence DeMonico, their technical expert Brian Luettke, and their economist Samir Warty. [ECF No. 33, at 4]. Defendants called their employee Michael Stakes, Partisan's spokesperson Ben Woods, and advised at the outset of the hearing their technical expert John Nixon was not present. *Id*. at 5, 12.

After the hearing, the Court denied Plaintiffs' Motion. [ECF No. 39]. In its Order, the Court found all four factors weighed against granting the requested relief. For irreparable harm, the Court found Plaintiffs presented insufficient evidence of price erosion, loss of market share, and reputational damage. *Id*. at 10–17. Specifically, the Court

noted Plaintiffs did not present evidence of their prices before and after Defendants entered the market, existence of their established dealer networks, or losses demonstrating reputational harm. *Id*. at 12–13, 15, 17.

Second, the Court addressed Plaintiffs' likelihood of success for (1) patent infringement and (2) false advertising. First, for patent infringement, the Court began with claim construction. It found material disputes existed about the meaning of claim terms—"substantially in-battery position"—central to the infringement analysis. *Id*. at 23. The Court noted neither Plaintiffs nor their expert attempted to provide a direct interpretation of the disputed terms and mechanics. *Id*. at 25. The Court also found Defendants raised a substantial question rebutting the statutory presumption of validity. *Id*. at 27–28. Plaintiffs failed to demonstrate this challenge lacked substantial merit. *Id*. at 28–29. As to false advertising, the Court established Plaintiffs presented no evidence of the advertisements' consumer impact. Thus, they failed to show facial falsity under the Lanham Act. *Id*. at 30.

Third, the Court found the balance of hardships weighed in Defendants' favor because the requested remedy is extreme and Plaintiffs did not show irreparable harm. *Id*. at 31–32. Fourth, the Court acknowledged public interests favoring protecting patent rights, but again noted Plaintiffs failed to demonstrate irreparable harm or a likelihood of success on the merits. *Id*. at 34.

### ***III. Plaintiffs' Motion for Expedited Discovery [41 & 42]***

Plaintiffs now motion the Court for expedited discovery to renew their PI request. [ECF No. 42, at 3]. They argue, "[t]argetted discovery would allow a renewed preliminary injunction motion to be decided on a complete record." *Id*. at 9. Plaintiffs claim they had

insufficient time to respond to Defendants' arguments, neither of Defendants' experts attended the hearing, and Defendants' technical expert never produced the charts he relied on. *Id*. at 4–5, 9–10. They argue granting their request for expedited discovery and allowing reconsideration is consistent with Tenth Circuit precedent. *Id*. at 2, 5–6.

***IV. Defendants' Opposition to Expedited Discovery [43]***

Defendants contend, "Plaintiffs['] motion for expedited discovery is best understood for what it is: an attempted reconsideration-by-discovery." [ECF No. 43, at 3, 5–8]. They maintain courts treat attempts to renew interlocutory injunctive rulings with caution. *Id*. (citing *Schmeisser GmbH v. AC-Unity d.o.o*., 2021 U.S. Dist. LEXIS 255447, at *8–9 (D. Wyo. Aug. 23, 2021)). And they routinely deny such requests when there is no evidence of a meaningful change in circumstances, evidence, or law. *Id*. at 4 (citing *SEC v. Young*, 121 F.4th 70, 78 (10th Cir. 2024)). They claim even if expedited discovery is permitted "[t]he Court's order was not driven by a lack of information uniquely in Defendants' possession; it was driven by Plaintiffs' failure to carry their burden with their own evidence and arguments." *Id*. at 4, 8–11.

## RELEVANT LAW

***I. Expedited Discovery***

Federal Rule of Civil Procedure 26(d) mandates the typical timing and sequence of discovery. But the court has broad discretion to "alter the timing, sequence and volume of discovery." *Qwest Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc*., 213 F.R.D. 418, 419 (D. Colo. 2003) (citing FED. R. CIV. P. 26(b)(2) and 26(d)); *Washington v. Correia*, 546 F. App'x 786, 787 (10th Cir. 2013) ("It was well within the court's discretion to decline

to authorize expedited discovery."). "However, a party seeking expedited discovery in advance of a Rule 26(f) conference has the burden of showing good cause for the requested departure from usual discovery procedures." *Qwest Commc'ns Int'l*, *Inc.*, 213 F.R.D. at 419 (citing *Pod–Ners*, *LLC v. N. Feed & Bean of Lucerne*, *Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002), and *Yokohama Tire Corp. v. Dealers Tire Supply*, *Inc.*, 202 F.R.D. 612, 614 (D. Ariz. 2001)).

In some cases, "good cause" may be shown where a PI is sought, "or where the moving party has asserted claims of infringement and unfair competition." *Id.* (citations omitted). Still, "early discovery in preliminary injunction circumstances is often limited to jurisdictional issues." *PPEX*, *LLC v. Buttonwood*, *Inc.*, No. 21-CV-53-F, 2021 WL 7210184, at *2 (D. Wyo. July 28, 2021) (citing *Biomin Am.*, *Inc. v. Lesaffre Yeast Corp.*, No. 20-2109-HLT, 2020 WL 1659858, at *1 (D. Kan. Apr. 3, 2020)).

***II. Reconsideration***

"In reviewing an interlocutory motion to reconsider, 'the court may look to the standard used to review a motion made pursuant to Federal Rule of Civil Procedure 59(e).'" *Schmeisser GmbH*, 2021 U.S. Dist. LEXIS 255447, at *3 (quoting *Ankeney v. Zavaras*, 524 Fed. App'x 454, 458 (10th Cir. 2013)). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servante of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995)).

## Ruling of the Court

### *I. Expedited Discovery*

The Court denies Plaintiffs' request for expedited discovery. When ruling on a motion for expedited discovery, courts generally consider "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Smagin v. Yegiazaryan*, No. CV 14-9764-R, 2015 WL 12762270, at *2 (C.D. Cal. Sept. 18, 2015) (citing *Qwest Commc'ns Int'l*, *Inc*., 213 F.R.D. at 419).

#### A. Factor Test

The Court finds each factor weighs against granting expedited discovery and the appropriateness of reconsideration is on a similar, downward slant. The Court finds (1) no PI is pending; (2) Plaintiffs' purpose underlying expedited discovery is to renew their PI motion; (3) the breadth of discovery and burden on Defendants is weighty given the context; and (4) the comparison of expedited and typical discovery timelines favors denial. The Court will address each finding in detail.

##### *1. Whether a Preliminary Injunction is Pending*

A pending PI may support granting an expedited discovery request. *Qwest Commc'ns Int'l*, *Inc*., 213 F.R.D. at 419. But the Court typically considers whether a PI is pending—not whether one has been ruled on or may be reconsidered. *See id*.; *Am. Equip. Sys.*, *LLC v. Chester*, No. 223CV00680DBBDBP, 2023 WL 8261427, at *3 (D. Utah Nov. 29, 2023). Plaintiffs concede no PI motion is pending but state their intent to renew the

request following expedited discovery. [ECF Nos. 42, 44]. They contend "[t]he absence of a currently pending PI motion is not dispositive []—the inquiry is whether a PI is 'at issue.'" [ECF No. 44, at 6] (citation omitted). Defendants argue there is no PI pending and the request for expedited discovery should have been made before the hearing, if at all. [ECF No. 43, at 11]. The Court finds this factor weighs against granting expedited discovery.

Plaintiffs cite *Am. Equip. Sys.* to suggest a PI need only be "at issue." [ECF No. 44, at 6] (citing *Am. Equip. Sys., LLC*, 2023 WL 8261427, at *3). While the court used the words "at issue" when discussing a PI, it also referred to this factor as "whether a preliminary injunction *is pending*." *Am. Equip. Sys., LLC*, 2023 WL 8261427, at *2–3 (emphasis added). More directly, the court found this factor weighed in favor of expedited discovery where the issuance of a PI had been briefed but no hearing had been set, and no order had been issued. *Id.*

Because a PI motion is not currently pending, the Court finds this factor weighs against granting expedited discovery. *See Qwest Commc'ns Int'l, Inc.*, 213 F.R.D. at 419. As reconsideration is central to Plaintiffs' request, the Court will next address whether Plaintiffs' intent to renew their motion is proper.

***2. Purpose for Requesting Expedited Discovery***

Plaintiffs primarily bring this Motion to renew their PI request. Yet they ask the Court to consider this Motion solely as one requesting expedited discovery. [ECF No. 44, at 2–3]. They simply hope the expedited discovery will uncover relevant grounds to renew their motion. *Id.* at 4 ("[T]he discovery Rare Breed requests focuses on information the

Court identified as in dispute and could change the Court's analysis, *depending on what the discovery reveals*.") (emphasis added). This circular reasoning is not proper justification for expedited discovery.

As stated, "[g]rounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servante of Paraclete*, 204 F.3d at 1012 (citing *Brumark Corp.*, 57 F.3d at 948). Plaintiffs do not allege any recognized basis for bringing the renewed motion. The Court will address Plaintiffs' (1) lack of basis, (2) lack of due diligence, and (3) lack of supporting law.

First, because Plaintiffs presented no evidence of an intervening change in controlling law or the need to correct clear error or prevent manifest injustice, their future reconsideration hinges on new, previously unavailable evidence. *See id*. Plaintiffs hope expedited discovery will uncover evidence supporting a compelling PI request. Even so, despite the urgency, Plaintiffs had other procedural options for timing their initial motion. So simply because Plaintiffs did not request expedited discovery earlier does not mean the evidence was "previously unavailable" in the relevant meaning of the phrase. *See United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015) (stating a motion to reconsider should not be used to "advance arguments that could have been raised earlier") (quoting *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014)).

Second, Plaintiffs did not act with due diligence in bringing their original motion. Plaintiffs contend:

> Defendants filed their opposition five days before the hearing, supported by four declarations, including two from retained experts—totaling 325 pages. Plaintiffs had no reply brief, no depositions, no document discovery, and not even an opportunity to cross-examine Partisan's technical and damages experts whose opinions the Court considered. Neither expert appeared at the hearing.

[ECF No. 42, at 3].

Plaintiffs do not acknowledge they initiated the escalated timeline, and Defendants were under a similar resulting burden. Plaintiffs' Complaint, filed January 15, 2026, contained 1,217 pages of attachments. [ECF No. 1]. Their TRO and PI Motion filed the next day included 263 pages of attachments. [ECF Nos. 6, 7]; *see* [ECF No. 42, at 11 n.2]. Altogether, Defendants reviewed 1,480 pages of attachments before filing their response two weeks later. *See* [ECF Nos. 1, 6, 7, 27] (comparing rate-of-review ratios, Plaintiffs proportionately reviewed 65 pages daily for five days while Defendants reviewed around 105 pages daily for two weeks). Regardless, Plaintiffs did not request Defendants' expert witnesses attend the hearing. *See* [ECF No. 43, at 2]. They also did not request a continuance when the witnesses were not present at the hearing. *Id.*; [ECF No. 33, at 5]. Plaintiffs also do not acknowledge the omissions in their evidence and arguments as asserted by the Court and Defendants. Their briefing failures carry greater weight than any discovery issues cited, and increasingly bare on their due diligence omissions. *PPEX*, *LLC*, 2021 WL 7210184, at *2 ("If Plaintiff needed this discovery to support their Motion for Preliminary Injunction, it should have waited to file that motion until after discovery opened.").

Third, Plaintiffs fail to provide relevant law supporting their renewal. The cases they cite are distinguishable from the current facts. *See* [ECF No. 42, at 8–9] (citing *CLEAR Clinic v. Noem*, No. 25-cv-01906, 2025 WL 3033800, at *2 (D. Or. Oct. 29, 2025); *Equity Bank v. McGregor*, No. 22-1081-DDC-GEB, 2022 WL 1102640, at *8 (D. Kan. Apr. 13, 2022); *Phibro Biodigester v. Murphy-Brown, LLC*, No. 4:22-CV-00050-RJS-PK, 2022 WL 17243727, at *3 (D. Utah Nov. 23, 2022), *aff'd sub nom*. *Phibro Biodigester* No. 22-4117, 2024 WL 4541530 (10th Cir. Oct. 22, 2024)).

Plaintiffs claim, "[w]hen the evidentiary record at the TRO or early PI stage is in dispute on key elements, the court has discretion to allow the movant to develop 'a more robust record to litigate the preliminary injunction.'" [ECF No. 42, at 8]. Plaintiffs cite *CLEAR Clinic v. Noem*, stating the court allowed the parties two weeks to brief additional arguments raised at the hearing, and allowed submission of a renewed PI motion. *Id*. (citing *CLEAR Clinic*, 2025 WL 3033800, at *2). There the court noted the plaintiff moved for a mandatory injunction (requiring a party to act) and the parties presented competing evidence. *CLEAR Clinic*, 2025 WL 3033800, at *2. The court explained mandatory injunctions are particularly disfavored, require a clear showing of favorable facts and law, and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Id*. (citations omitted).

Here, Plaintiffs moved for a prohibitory injunction (maintaining the status quo) which requires a less concrete showing than a mandatory injunction. *Id*. ("A mandatory injunction "'goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored.'") (quoting *Stanley v. Univ. of S. Cal*., 13 F.3d 1313, 1320 (9th Cir.

1994)). Yet they failed to carry their initial burden, and rebuttal, as to each of the four TRO and PI factors. [ECF No. 39].

Plaintiffs also cite two cases to support the notion "[c]ourts in this Circuit have also denied TROs, but then granted expedited discovery to develop the record before a preliminary injunction." [ECF No. 42, at 8] (citing *Equity Bank*, 2022 WL 1102640, at *8, and *Phibro Biodigester*, *LLC*, 2022 WL 17243727, at *3).

Both cases cited differ from the current facts. In *Equity Bank*, the plaintiffs filed a single motion in which they requested (1) a TRO, (2) a PI, and (3) expedited discovery to aid their PI request. *Equity Bank*, 2022 WL 1102640, at *8. The court denied the TRO request, "[b]ut, given that plaintiffs [] indicated their desire to proceed with their request for a preliminary injunction" the court allowed expedited discovery related to the PI. *Id*. Like *CLEAR Clinic*, the parties in *Phibro Biodigester* requested a mandatory injunction. *Phibro Biodigester*, *LLC*, 2022 WL 17243727, at *4. After a hearing and an oral ruling specific to the TRO, the court allowed expedited discovery related to the PI. *Id*. at *3. Presently, Plaintiffs failed to demonstrate any TRO or PI factors weighed in their favor under the lesser standard required for a prohibitory injunction and did not request expedited discovery before this ruling. [ECF No. 39].

Overall Plaintiffs ignore the recognized bases supporting reconsideration. They underscore the urgency of renewal by focusing on hypothetical irreparable harm the Court found unpersuasive. [ECF No. 42, at 6–8]. Plaintiffs again fail to acknowledge their briefing deficiencies independent of the requested discovery. This omission indicates—even if it were permitted—any reconsideration may be futile. *See Schmeisser GmbH*, 2021

U.S. Dist. LEXIS 255447, at *3 (stating reconsideration "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.") (quotations omitted) (quoting *Servante of Paraclete*, 204 F.3d at 1012).

***3. Breadth of Discovery Requests and Burden on Defendants***

The Court will jointly consider the breadth of discovery requests and the burden on Defendants to comply. Plaintiffs contend the expedited discovery does not pose an undue burden because the requested scope is limited, Defendants had notice of the underlying claims, and this information would be produced in the normal course of litigation. [ECF No. 42, at 10]. Defendants claim if granted, the request would impose an undue burden because they will undergo another round of front-loaded expedited proceedings and argue the same issues could have been addressed earlier. [ECF No. 43, at 11].

Plaintiffs request "six interrogatories, six requests for production, and five depositions—each targeting issues Partisan itself placed before the Court." [ECF No. 42, at 3]; *see* [ECF Nos. 42-1, 42-2] (detailing proposed discovery requests). Defendants claim the requested discovery is overly broad and Plaintiffs "do not and cannot show [expedited discovery] will alter the multiple independent grounds for denial that the Court identified in its order." [ECF No. 43, at 11] (alteration added). The Court finds the breadth and burden of Plaintiffs' discovery requests favors denial.

The issue with Plaintiffs' proposal is contextual. It seems part of the burden anticipated by Defendants stems from the reconsideration trailing behind Plaintiffs' expedited discovery. [ECF No. 43, at 11]. Reconsideration would necessarily be followed by additional briefing, proceedings, and argument. There would be additional cost in the

preparation and attendance of all parties—including the preparation and attendance of expert and fact witnesses. Plaintiffs chose the timing of their emergency motion on an exceptionally incomplete record. *See* [ECF Nos. 6, 7]. Many issues raised by Plaintiffs could have been addressed before, or during the hearing if proper arrangements were made.

Purportedly related to irreparable harm, Plaintiffs propose taking three depositions. [ECF No. 42-1, at 2] (proposing to depose Ben Woods, Scott Cragun, and Rule 30(b)(6) Designee). Plaintiffs plan to depose Mr. Woods related to Partisan's sales projections, insurance coverage, dealer networks, and pricing strategies. Similarly, they seek to question Defendants' damages expert Mr. Cragun about "[p]rice erosion methodology and calculations; compensability of damages; lost profits analysis; [and] opinions on irreparable harm." *Id*. (alteration added). And they intend to question the Rule 30(b)(6) Designee about insurance coverage, Partisan's financial condition, overall corporate structure, and ability to satisfy a damages judgment. *Id*. Nine of the twelve discovery requests relate to irreparable harm. [ECF No. 42-2, at 2–3]. Five of their discovery requests relate to Defendants' ability to pay a hypothetical judgment. *Id*. at 2.

Defendants argue Plaintiffs' emphasis on collectability "puts the cart before the horse." [ECF No. 43, at 8]; *see* [ECF No. 44, at 4]. Yet Plaintiffs argue Defendants' financial condition must be assessed before money damages may be considered in place of injunctive relief. [ECF No. 44, at 4] (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155–56 (Fed. Cir. 2011)).

While this may be true, Plaintiffs do not acknowledge the crux of the analysis—they must first show irreparable harm requiring compensation. *See Robert Bosch LLC*, 659

F.3d at 1156 ("While competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so."). Plaintiffs failed to provide specific information about how their business operations and reputation have been impacted after Defendants entered the market. [ECF No. 39, at 10–17]. Their current request contains similar flaws. For example, within their collectability argument they present purely hypothetical damages based on Defendants' sales projections for Partisan. [ECF No. 44, at 4 n.2] (stating at their $350 price point, Plaintiffs would yield approximately $86 million more than Defendants "on those same units" projected for Partisan).

Related to likelihood of success, Plaintiffs intend to focus their deposition of John Nixon, Defendant's technical expert, on his "[i]nfringement analysis; claim construction of 'substantially in-battery position'; obviousness theory and prior art analysis; missing claim charts . . .; [and] opinions on '067 Patent and Asserted Patents." [ECF No. 42-1, at 2] (alteration added). Four of their discovery requests relate to the likelihood of success factor. [ECF No. 42-2, at 2]. They argue they should not be required to demonstrate Defendants' validity challenge "lacked substantial merit" "without seeing the charts and questioning the expert who created them." [ECF No. 44, at 6].

At this stage, determining likelihood of success based on an incomplete record poses a predictable challenge. *See*, *e.g.*, *Gillette Co. v. Energizer Holdings*, *Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) ("[T]his court recognizes the difficulty imposed on a trial court to construe claim terms based upon a preliminary 'likelihood' record."); *Jack Guttman, Inc. v. Kopykake Enters.*, *Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (recognizing the need for

"rolling claim construction . . . particularly [] where issues involved are complex, either due to the nature of the technology or because the meaning of the claims is unclear. . . . These difficulties may be even more acute in the preliminary injunction context[.]") (citations omitted).

The Court finds because Plaintiffs selected the timing for filing their suit and emergency motion, granting their request for expedited discovery in support of reconsideration—with no support for the forthcoming reconsideration—would unduly burden Defendants. The Court will now compare the timelines between typical and expedited discovery.

#### *4. Comparison Between Typical and Expedited Discovery Timeframes*

Plaintiffs argue this factor is neutral. [ECF No. 42, at 10–11]. They contend, "the need for the requested discovery crystallized only after the Response . . . and hearing revealed what Defendants would rely on and what the Court found unresolved." [ECF No. 44, at 6]. Defendants do not specifically address this point but argue, as stated above, the requested discovery is front-loaded and would present an undue burden because it could have been addressed earlier. [ECF No. 43, at 11]. The Court finds because Plaintiffs have ultimately chosen the timeline of the emergency motions to this point—and because the discovery is only requested in aid of an unsupported reconsideration—this factor weighs against granting expedited discovery.

### B. Factor Test Conclusion

The listed factors, while non-exhaustive, each weigh against the existence of good cause for Plaintiffs' expedited discovery request. Importantly, Plaintiffs request the

expedited discovery to renew their PI motion. They have no recognized basis for this reconsideration. Thus, the Court finds there is no good cause supporting the request and denies the same.

## CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** Plaintiffs' Motion for Expedited Discovery [ECF No. 41] is **DENIED**.

Dated this 11th day of March, 2026.

Kelly H. Rankin
United States District Judge

US010514223B1

(12) **United States Patent**
**Rounds**

(10) **Patent No.: US 10,514,223 B1**
(45) **Date of Patent: Dec. 24, 2019**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **Wolf Tactical LLC**, Buda, TX (US)

(72) Inventor: **Jeffrey Cooper Rounds**, Buda, TX (US)

(73) Assignee: **Wolf Tactical LLC**, Buda, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/143,624**

(22) Filed: **Sep. 27, 2018**

**Related U.S. Application Data**

(60) Provisional application No. 62/565,247, filed on Sep. 29, 2017.

(51) **Int. Cl.**

| | |
|---|---|
| ***F41A 19/43*** | (2006.01) |
| ***F41A 19/14*** | (2006.01) |
| ***F41A 19/10*** | (2006.01) |
| ***F41A 19/12*** | (2006.01) |
| *F41A 17/82* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***F41A 19/43*** (2013.01); ***F41A 19/10*** (2013.01); ***F41A 19/12*** (2013.01); ***F41A 19/14*** (2013.01); *F41A 17/82* (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/10; F41A 19/12; F41A 19/14; F41A 19/43; F41A 17/82
USPC ............. 89/136, 139; 42/69.01, 69.02, 69.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,704,153 A * 1/1998 Kaminski ............ F41A 17/063 42/117
6,101,918 A 8/2000 Akins
6,722,072 B1 4/2004 McCormick
7,162,824 B1 1/2007 McCormick
7,213,359 B2 5/2007 Beretta
7,293,385 B2 11/2007 McCormick
7,398,723 B1 7/2008 Blakley
(Continued)

FOREIGN PATENT DOCUMENTS

TW 409847 U 10/2000

*Primary Examiner* — Bret Hayes
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism for use in a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. The trigger mechanism includes a hammer, a trigger member, and a locking bar. The hammer has a sear notch and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. The trigger member has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions. The trigger member has a surface positioned to be contacted by hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position. The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the release position, and is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**7 Claims, 4 Drawing Sheets**






(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,127,658 | B1 | 3/2012 | Cottle | |
| 8,820,211 | B1 | 9/2014 | Hawbaker | |
| 9,021,732 | B2 | 5/2015 | Johnson | |
| 9,513,076 | B2 * | 12/2016 | Kolev | F41A 3/12 |
| 9,568,264 | B2 | 2/2017 | Graves | |
| 9,816,772 | B2 | 11/2017 | Graves | |
| 9,939,221 | B2 | 4/2018 | Graves | |
| 2007/0199435 | A1 * | 8/2007 | Hochstrate | F41A 3/66<br>89/191.02 |
| 2016/0010933 | A1 | 1/2016 | Bonner | |
| 2016/0102933 | A1 | 4/2016 | Graves | |
| 2017/0219307 | A1 * | 8/2017 | Foster | F41A 19/06 |
| 2018/0066911 | A1 | 3/2018 | Graves | |
| 2018/0087860 | A1 * | 3/2018 | Sullivan | F41A 17/46 |

* cited by examiner


10
18
42
20
22
44
62
66
64
14
38
12
68
16
26
28
60

FIG. 1


10
18
42
20
44
62
34
66
64
38
24
68
50
70
26
28
32
30
60

FIG. 2


76
40
51
72
58
52
18
42
44
20
24
48
46
36
47
28
30
26
32
62
54
68
64
70
56
66
60
50
49
FWD

FIG. 3


FWD
76
40
51
72
18
24
48
44
46
36
47
52
20
32
30
28
62
26
54
68
64
70
56
49
50
60
66

FIG. 4



52
76
44
42
62
68
72
58
56
54
18
40
51
24
48
46
36
47
28
30
26
32
49
50
60
66
70
64
FWD


FIG. 5

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 62/565,247 filed Sep. 29, 2017, and incorporates the same herein by reference.

## TECHNICAL FIELD

This invention relates to a firearm trigger mechanism. More particularly, it relates to a semiautomatic trigger that is mechanically reset by movement of the hammer when it is reset by the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunitions propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Other devices have been offered that facilitate the bump fire process. One is shown in U.S. Pat. No. 6,101,918, issued Aug. 15, 2000, to William Akins for a Method and Apparatus for Accelerating the Cyclic Firing Rate of a Semiautomatic Firearm. This device, sold for some time as the Akins Accelerator™, allowed the receiver and action of the firearm to move longitudinally relative to the butt stock and used a spring to assist forward return movement. Other devices, such as that shown in U.S. Pat. No. 8,127,658, issued Mar. 6, 2012, and other patents owned by Slide Fire Solutions provide a replacement stock and handgrip assembly that facilitates bump firing, but without spring assistance.



Other solutions to increase the rate of semiautomatic fire include pull/release trigger mechanisms. These devices cause one round to be fired when the trigger is pulled and a second round to be fired when the trigger is released. Such a device is shown in U.S. Pat. No. 8,820,211, issued Sep. 2, 2014, entitled Selectable Dual Mode Trigger for Semiautomatic Firearms. A device like this is offered by FosTecH Outdoors, LLC as the ECHO TRIGGER™. Another device, offered by Digital Trigger Technologies, LLC under the name DigiTrigger™, provides a dual mode trigger in which the pull/release operating function is achieved electronically.

The above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. This invention, however, does not provide a "drop-in" solution for existing popular firearm platforms, like the AR15, AK47 variants, or the Ruger 10/22™. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to be forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures; wherein;

FIG. **1** is an isometric view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention;

FIG. **2** is a partially cut-away view thereof;

FIG. **3** is a longitudinal section view showing the module of the embodiment installed in a typical AR15-pattern lower receiver in a cocked and ready to fire status with the bolt and bolt carrier in an in-battery position;

FIG. **4** is a similar view in which the trigger has been pulled and the hammer has fallen against a firing pin; and

FIG. **5** is a similar view showing the bolt carrier in a retracted position, forcing the hammer and trigger into a reset status.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments.

Referring first to FIGS. **1** and **2**, therein is shown at **10** a "drop-in" trigger module adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatics firearm platforms, such as the Ruger 10/22™ or AK-pattern variants.

The module **10** includes a frame or housing **12** that may be sized and shaped to fit within the internal fire control mechanism pocket of an AR-pattern lower receiver. It includes first and second pairs of aligned openings **14**, **16** that are located to receive transverse pins (**40**, **36**, respectively, shown in FIGS. **3-5**) used in a standard AR-pattern trigger mechanism as pivot axes for the hammer and trigger member, respectively. The housing **12** includes left and right sidewalls **20**, **22**, which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **20**, **22** may be interconnected at the bottom of the housing **12** at the front by a crossmember **24**.

A hammer **18** of ordinary (MIL-SPEC) AR-pattern shape and construction may be used. The illustrated hammer **18** may be standard in all respects and biased by a typical AR-pattern hammer spring (not shown).

A modified trigger member **26** may be sized to fit between the sidewalls **20**, **22** of the housing **12** and may include a trigger blade portion **28** that extends downwardly. The trigger blade portion **28** is the part of the trigger member **26** contacted by a user's finger to actuate the trigger mechanism. The trigger blade portion **28** may be curved (shown) or straight, as desired. The trigger member **26** may pivot on a transverse pin **36** (not shown in FIGS. **1** and **2**) that extends through aligned openings **16** in the sidewalls **20**, **22** of the housing **12**. The same pin **36** is aligned and positioned within aligned openings **47** of a lower receiver **50** to assemble the module **10** into a fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**, for example. The modified trigger member **26** may have integral first and second contact surfaces **30**, **32**. Some part of the trigger member **26** includes contact surfaces for interaction with the hammer **18** and locking bar **62**. For example, the trigger member **26** can include first and second upwardly extended rear contact surfaces **30**, **32**. The first contact surface **30** is positioned to interact, for example, with a tail portion **44** of the hammer **18** that extends rearwardly from a head part **42** of the hammer **18**. The second contact surface **32** is positioned to interact with a locking bar **62**. The contact surfaces may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin **36**, with no lost motion between the parts.



The hammer **18** may include bosses **34** coaxial with a transverse pivot pin opening **38** that receives an assembly/pivot pin **40** (not shown in FIGS. **1** and **2**) through the first set of aligned openings **14** in the housing **12** (and through openings **51** in the firearm receiver, to position the trigger module **10** within the fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**). The bosses **34** may fit between the sidewalls **20**, **22** of the housing **12** to laterally position the hammer **18**, or can be received in the openings **14** (if enlarged) so that the hammer **18** stays assembled with the module **10** when the hammer's pivot pin is removed and/or when the module **10** is not installed in a firearm receiver. The hammer **18** includes a head portion **42** and a tail portion **44**. The hammer **18** also includes a sear catch **46** that engages the sear **48** on the trigger member **26**, when cocked. The trigger and hammer pins **36**, **40** provide pivot axes at locations (openings **47**, **51**, shown in FIGS. **3-5**, for example) standard for an AR-pattern fire control mechanism. Although FIGS. **3-5** are a longitudinal section view and only show one of the aligned openings **47**, **51**, it is understood that a typical AR15-pattern lower receiver **50** includes second, corresponding and aligned openings **47**, **51** in the half of the receiver **50** not shown).

Referring now also to FIG. **3**, the trigger module **10** is shown installed in the fire control mechanism pocket **49** of an AR-pattern lower receiver **50**. Other lower receiver parts not important to the present invention are well-known in the art and are omitted from all figures for clarity. As is well-known in the art, the bolt carrier assembly **52** (or blow-back bolt) would be carried by an upper receiver (not shown) and engage the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The hammer **18** is shown in a cocked position and a bolt carrier assembly **52** is shown in an in-battery position. The sear **48** engages the sear catch **46** of the hammer **18**.

The bolt carrier assembly **52** used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface **54** in a tail portion **56** of the bolt carrier body **58**. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible. The semi-automatic AR-pattern safety selector switch **60** may also be standard (MIL-SPEC) in all respects.

The trigger module of the present invention includes a trigger locking bar **62** carried on a frame **66** for pivotal movement on a transverse pivot pin **68**. The frame **66** may be part of the module housing **12**, if configured as a "drop-in" unit. An upper end of the locking bar **62** extends above the upper edge of the housing **12** and lower receiver **50** to be engaged by the engagement surface **54** of the bolt

carrier body **58** when the bolt carrier assembly **52** is at or near its in-battery position (as shown in FIG. **3**). Contact between the engagement surface **54** and upper end of the locking bar **62** causes the locking bar **62** to pivot into a first position (FIG. **3**) against a biasing spring **70** and allows pivotal movement of the trigger member **26**. If desired, the locking bar **62** may include a rearward extension **64** that serves as a means to limit the extent to which it can pivot toward the blocking position.

Referring now also to FIG. **4**, when the safety selector **60** is in the "fire" position (as shown in all figures), finger pressure pulling rearward against the trigger blade portion **28** causes the trigger member **26** to rotate on the pivot pin **36**, as indicated by arrows. This rotation causes the sear **48** to disengage from the sear catch **46** of the hammer **18**. This release allows the hammer **18** to rotate by spring force (hammer spring omitted for clarity) into contact with the firing pin **72**. Any contact between the rear portion of the trigger member **26** and front surface of the locking bar **62** will simply cause the locking bar **62** to rotate out of the way, as illustrated in FIG. **4**.

Referring now to FIG. **5**, discharging an ammunition cartridge (not shown) causes the action to cycle by moving the bolt carrier assembly **52** rearwardly, as illustrated. The same effect occurs when the action is cycled manually. As in an ordinary AR15-pattern configuration, a lower surface **76** of the bolt carrier body **58** pushes rearwardly against the head portion **42** of the hammer **18**, forcing it to pivot on the hammer pivot/assembly pin **40** against its spring (not shown) toward a reset position. As the rearward movement of the bolt carrier body **58** and pivotal movement of the hammer **18** continues, mechanical interference or contact between a rear surface **74** of the hammer **18** (such as on the tail portion **44**) and a contact surface **30** of the trigger member **26** forces the trigger to pivot (arrows in FIG. **5**) toward and to its reset position. At the same time, as the trigger member **26** is reset, the biasing spring **70** moves the lower end of the locking bar **62** into a second position (FIG. **5**) in which it blocks pivotal movement of the trigger **26**, including by finger pressure applied (or reapplied) to the trigger blade **28**. Thus, as the bolt carrier assembly **52** returns forward, the trigger member **26** is held in its reset position by the locking bar **62** where the hammer sear catch **46** will engage with the sear **48** carried on the trigger member **26** to reset the fire control mechanism. The trigger member **26** cannot be pulled to release the sear/hammer engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **52** and firing pin **72** as the bolt carrier assembly **52** is returning to battery. A trigger return spring (not shown) of the type used in a standard AR-pattern trigger mechanism may be unnecessary in this case, because the trigger member **26** is forced to return by the hammer **18**, but may be used, if desired.

When the bolt carrier assembly **52** has reached (or nearly reached) its closed, in-battery position (shown in FIG. **3**), the engagement surface **54** of the bolt carrier tail portion **56** contacts and forwardly displaces the upper end of the locking bar **62**, disengaging the second contact surface **32** of the trigger member **26**, allowing the trigger **26** to be pulled a second time. The distance of travel during which there is no interference between the locking bar **62** and second contact surface **32** of the trigger member **26**, allowing the trigger member **26** to be manually displaced, may be about from about 0.10 to 0.31 inch. This prevents early release of the hammer **18** and contact of the hammer against the firing pin **72** before the bolt is completely locked and in-battery.



Force applied by the user's trigger finger against the trigger blade portion **28** is incapable of overcoming the mechanical interference and force of the hammer **18** against the contact surface **30** of the trigger member **26**. However, the trigger can immediately be pulled again—only by application of an external force—as soon as the locking bar **62** has been rotated against the spring **70** and out of blocking engagement with the trigger member **26**, as the bolt carrier assembly **52** approaches or reaches its in-battery position. This allows the highest possible standard rate of fire, without risk of hammer-follow, for the semiautomatic action of the firearm.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. For a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a hammer having a sear notch and mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions;

a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in a frame and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**2**. The trigger mechanism of claim **1**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**3**. The trigger mechanism of claim **1**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

**4**. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and

released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

**5**. The trigger mechanism of claim **4**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**6**. The trigger mechanism of claim **4**, wherein the housing's transversely aligned pairs of openings for receiving hammer and trigger assembly pins are aligned with the assembly pin openings in the fire control mechanism pocket of the receiver.

**7**. The trigger mechanism of claim **4**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

* * * * *

US011724003B2

(12) **United States Patent**
**Strbac**

(10) **Patent No.: US 11,724,003 B2**
(45) **Date of Patent: Aug. 15, 2023**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/048,572**

(22) Filed: **Oct. 21, 2022**

(65) **Prior Publication Data**

US 2023/0221087 A1 Jul. 13, 2023

**Related U.S. Application Data**

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**
***F41A 19/24*** (2006.01)
***F41A 19/10*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. ***F41A 19/10*** (2013.01); ***F41A 17/48*** (2013.01); ***F41A 19/15*** (2013.01); ***F41A 19/24*** (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,765,562 | A | 10/1956 | Rober et al. |
| 3,045,555 | A | 7/1962 | Stoner |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 582963 | C | 8/1933 |
| DE | 4008351 | A1 | 9/1991 |

(Continued)

OTHER PUBLICATIONS

Statutory Invention Registration No. H107, Inventor: Bauer, Published Aug. 5, 1986 (8 pages).

*Primary Examiner* — J. Woodrow Eldred
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt

(Continued)



carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**14 Claims, 18 Drawing Sheets**

(51) **Int. Cl.**
***F41A 17/48*** (2006.01)
***F41A 19/15*** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 3,292,492 | A | 12/1966 | Sturtevant |
| 3,301,133 | A | 1/1967 | Sturtevant |
| 3,670,442 | A | 6/1972 | Kennedy et al. |
| 4,023,465 | A | 5/1977 | Inskip |
| 4,057,003 | A | 11/1977 | Atchisson |
| 4,151,670 | A | 5/1979 | Rath |
| 4,276,808 | A | 7/1981 | York |
| 4,433,610 | A | 2/1984 | Tatro |
| 4,463,654 | A | 8/1984 | Barnes et al. |
| 4,516,466 | A | 5/1985 | Jennie |
| 4,580,484 | A | 4/1986 | Moore |
| 4,656,993 | A | 4/1987 | Yuzawa et al. |
| 4,658,702 | A | 4/1987 | Tatro |
| 4,693,170 | A | 9/1987 | Atchisson |
| 4,697,495 | A | 10/1987 | Beretta |
| 4,787,288 | A | 11/1988 | Miller |
| 4,937,964 | A | 7/1990 | Crandall |
| 5,149,898 | A | 9/1992 | Chesnut et al. |
| 5,183,959 | A | 2/1993 | McCoan et al. |
| 5,223,649 | A | 6/1993 | Claridge |
| 5,339,721 | A | 8/1994 | Beretta |
| 5,517,897 | A | 5/1996 | Perrine |
| 5,614,691 | A | 3/1997 | Taylor |
| 5,623,114 | A | 4/1997 | Soper |
| 5,682,699 | A | 11/1997 | Gentry |
| 5,701,698 | A | 12/1997 | Wesp et al. |
| 5,704,153 | A | 1/1998 | Kaminski et al. |
| 5,760,328 | A | 6/1998 | Robbins |
| 5,770,814 | A | 6/1998 | Ealovega |
| 6,101,918 | A | 8/2000 | Akins |
| 6,360,467 | B1 | 3/2002 | Knight |
| 6,601,331 | B2 | 8/2003 | Salvitti |
| 6,718,680 | B2 | 4/2004 | Roca et al. |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 6,851,346 | B1 | 2/2005 | Herring |
| 6,889,459 | B1 | 5/2005 | Salvitti |
| 6,976,416 | B2 | 12/2005 | Ealovega |
| 7,051,638 | B2 | 5/2006 | Thomele |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,337,574 | B2 | 3/2008 | Crandall et al. |
| 7,347,021 | B1 | 3/2008 | Jones |
| 7,398,723 | B1 | 7/2008 | Blakley |
| 7,421,937 | B1 | 9/2008 | Gangl |
| 7,634,959 | B2 | 12/2009 | Frickey |
| 7,661,220 | B2 | 2/2010 | Crandall et al. |
| 7,806,039 | B1 | 10/2010 | Gomez |
| 8,037,805 | B1 | 10/2011 | Neroni |
| 8,112,928 | B2 | 2/2012 | Keough |
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,156,854 | B2 | 4/2012 | Brown |
| 8,443,537 | B2 | 5/2013 | Curry |
| 8,464,454 | B2 | 6/2013 | Martin et al. |
| 8,490,309 | B2 | 7/2013 | Zukowski |
| 8,667,881 | B1 | 3/2014 | Hawbaker |
| 8,695,477 | B2 | 4/2014 | Esch |
| 8,720,096 | B2 | 5/2014 | Siddle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 8,893,607 | B2 | 11/2014 | Audibert et al. |
| 8,925,234 | B1 | 1/2015 | Barrett |
| 8,985,006 | B1 | 3/2015 | Christensen et al. |
| 9,016,187 | B2 | 4/2015 | Findlay |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,021,733 | B1 | 5/2015 | DiChario |
| 9,052,150 | B2 | 6/2015 | Talasco |
| 9,121,661 | B2 | 9/2015 | Calvete |
| 9,146,066 | B1 | 9/2015 | Cason |
| 9,146,067 | B2 | 9/2015 | Stakes |
| 9,182,189 | B2 | 11/2015 | Seigler |
| 9,228,786 | B2 | 1/2016 | Sullivan et al. |
| 9,310,150 | B1 | 4/2016 | Geissele |
| 9,347,726 | B1 | 5/2016 | Thomas |
| 9,448,023 | B2 | 9/2016 | Sheets, Jr. et al. |
| 9,476,660 | B2 | 10/2016 | Potter et al. |
| 9,513,076 | B2 | 12/2016 | Kolev et al. |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,618,288 | B2 | 4/2017 | Wilson |
| 9,618,289 | B1 | 4/2017 | Geissele |
| 9,625,231 | B1 | 4/2017 | Hass |
| 9,631,886 | B2 | 4/2017 | Findlay |
| 9,651,329 | B2 | 5/2017 | Hittmann |
| 9,658,007 | B2 | 5/2017 | Withey |
| 9,683,800 | B2 | 6/2017 | Sewell, Jr. et al. |
| 9,733,031 | B1 | 8/2017 | Sylvester et al. |
| 9,759,504 | B2 | 9/2017 | Geissele |
| 9,777,980 | B2 | 10/2017 | Heizer |
| 9,810,493 | B2 | 11/2017 | Fluhr et al. |
| 9,810,496 | B2 | 11/2017 | Kolev et al. |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,829,263 | B2 | 11/2017 | Bonner |
| 9,835,398 | B2 | 12/2017 | Biegel |
| 9,863,730 | B2 | 1/2018 | Elftmann |
| 9,869,522 | B2 | 1/2018 | Larson, Jr. et al. |
| 9,874,417 | B2 | 1/2018 | Zajk et al. |
| 9,927,197 | B1 | 3/2018 | Geissele |
| 9,939,221 | B2 | 4/2018 | Graves |
| 10,002,500 | B2 | 6/2018 | Hall et al. |
| 10,006,734 | B1 | 6/2018 | Findlay |
| 10,030,924 | B1 | 7/2018 | Smith |
| 10,077,960 | B2 | 9/2018 | Geissele |
| 10,107,580 | B2 | 10/2018 | Fellows et al. |
| 10,254,067 | B2 | 4/2019 | Foster |
| 10,267,584 | B2 | 4/2019 | Kasanjian-King |
| 10,330,413 | B2 | 6/2019 | Williams et al. |
| 10,488,136 | B2 | 11/2019 | Sullivan et al. |
| 10,502,511 | B2 | 12/2019 | Graves |
| 10,514,223 | B1 | 12/2019 | Rounds |
| 10,584,932 | B2 | 3/2020 | Foster |
| 10,816,297 | B1 * | 10/2020 | Williams ................ F41A 19/46 |
| 11,287,205 | B2 | 3/2022 | Biegel |
| 11,293,715 | B1 | 4/2022 | Newsome et al. |
| 11,346,627 | B1 | 5/2022 | DeMonico |
| 2006/0048426 | A1 | 3/2006 | Crandall |
| 2006/0101695 | A1 | 5/2006 | Longueira |
| 2007/0051236 | A1 | 3/2007 | Groves et al. |
| 2007/0199435 | A1 | 8/2007 | Hochstrate et al. |
| 2009/0151213 | A1 | 6/2009 | Bell |
| 2009/0188145 | A1 | 7/2009 | Fluhr et al. |
| 2011/0209607 | A1 | 9/2011 | St. George |
| 2013/0118343 | A1 | 5/2013 | Hirt |
| 2014/0311004 | A1 | 10/2014 | Barrett |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2016/0161202 | A1 | 6/2016 | Larue |
| 2017/0176124 | A1 | 6/2017 | Wilson |
| 2017/0219307 | A1 | 8/2017 | Foster |
| 2017/0276447 | A1 | 9/2017 | Foster |
| 2017/0284761 | A1 | 10/2017 | Lewis et al. |
| 2017/0299309 | A1 | 10/2017 | Fellows et al. |
| 2017/0328663 | A1 | 11/2017 | Fellows et al. |
| 2018/0066911 | A1 | 3/2018 | Graves |
| 2018/0087860 | A1 | 3/2018 | Sullivan et al. |
| 2018/0112944 | A1 | 4/2018 | Underwood et al. |
| 2018/0195823 | A1 | 7/2018 | Schafer et al. |
| 2018/0202740 | A1 | 7/2018 | Elftmann, Jr. |
| 2018/0231342 | A1 | 8/2018 | Martinez |
| 2020/0191513 | A1 * | 6/2020 | Foster ..................... F41A 19/16 |
| 2021/0222974 | A1 | 7/2021 | Graves |
| 2022/0364812 | A1 * | 11/2022 | Fellows .................. F41A 19/24 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1678458 | B1 | 2/2012 |
| EP | 2950033 | B1 | 11/2016 |
| TW | 409847 | U | 10/2000 |
| WO | 2016/028337 | A1 | 2/2016 |
| WO | 2018/058174 | A1 | 4/2018 |

* cited by examiner


10
72
78
84
23
21
50
22
76
74
38
58
36
51
110
60
64
53
16
12
66
26
32
24
30
18
48
46
54
20
38

FIG. 1


10
12
16
36
50
51
53
72
78
38
58
82
84
21
30
46
64
18
60
74
22
110
32
48
20
114
38
66
54
38

FIG. 2


10
36
50
51
53
52
110
111
116
114
112
64
56
60
66
58
56
69
38
67
68
59
54
72
78
82
80
74
21
76
84
76
16
12
24
30
26
46
23
22
20
18
32
48

FIG. 3


46
30
52
20
12
16
56
59
54
64
60
48
53
50
32
68
51
80
67
36
58
74
38
38
72
112
78
66
84
116
114
82
23
10
110

FIG. 4A


10
12
46
30
56
52
36
32
59
64
60
53
48
54
50
51
67
58
20
72
74
116
68
38
78
66
84
112
114
23
110

FIG. 4B


46
30
52
20
12
56
16
59
54
64
60
48
50
53
32
68
51
80
67
36
58
74
38
72
114
78
66
84
116
82
23
10
110

FIG. 5A


10
12
30
46
56
52
36
59
32
64
60
53
48
54
50
51
67
58
20
72
74
116
68
38
66
114
78
84
23
111
116
110

FIG. 5B


46
30
52
20
12
56
16
59
54
50
53
64
60
48
32
68
51
80
67
36
58
74
38
114
72
66
78
116
84
112
82
23
110
111
10

FIG. 6A


10
12
46
30
56
52
36
32
59
54
48
64
60
53
50
51
67
114
58
20
72
74
112
68
38
66
78
84
116
23
110
111

FIG. 6B


14
102
92
42
30
20
12
104
99
46
52
56
59
54
38
50
36
53
60
48
58
51
64
44
32
68
98
72
94
111
67
78
86
84
82
23
114
112
66
96
90
110

FIG. 7


14
102
92
12
104
99
42
30
20
46
52
56
59
50
36
53
60
48
38
58
51
64
44
32
68
54
98
72
94
80
112
67
78
86
84
114
110
66
82
23
96
90

FIG. 8A


14
102
92
104
99
50
51
30
20
46
56
52
59
12
48
38
58
64
60
32
68
54
36
98
72
80
112
94
67
78
66
86
84
114
110
96
82
23
90

FIG. 8B


14
30
20
36
46
52
56
59
50
60
64
99
48
38
54
58
32
68
80
112
66
78
92
72
114
110
82
23
90
102
104
98

FIG. 8C


14
99
102
92
30
20
12
104
46
52
56
59
50
36
53
60
48
38
58
51
64
32
54
68
98
72
112
67
94
78
86
84
114
110
66
96
82
23
90

FIG. 8D



14
102
92
104
99
12
42
30
20
46
52
56
59
50
36
53
60
48
38
54
58
51
64
44
32
68
98
72
94
78
80
114
67
86
84
82
23
111
116
66
96
90


FIG. 9A


14
102
92
30
20
104
50
99
51
46
56
52
59
12
48
38
64
60
58
32
68
54
98
36
72
94
80
114
67
78
66
86
84
116
111
82
23
96
90

FIG. 9B


14
30
20
36
46
52
56
99
50
60
59
38
64
48
58
32
68
54
80
114
66
78
72
116
92
82
23
102
90
104
98

FIG. 9C


14
99
102
92
30
20
12
104
46
52
56
59
50
60
53
58
48
38
36
51
64
32
68
54
98
72
94
80
114
67
78
86
84
116
66
110
82
23
96
90

FIG. 9D

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application claims the priority benefit of US Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, which is hereby incorporated by reference herein as if fully set forth in its entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627, which are hereby incorporated by reference herein as if fully



set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward

movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced



reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position

the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to



the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. **1** is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. **2** is a top rear right perspective view thereof.

FIG. **3** is a top rear right exploded perspective view thereof.

FIG. **4**A is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **4**B is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **5**A is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **5**B is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**A is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**B is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **7** is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. **8**A is a view similar to FIG. **7** but with the safety selector in the standard semi-automatic position.

FIG. **8**B is a view similar to FIG. **8**A but after the trigger has been pulled to drop the hammer.

FIG. **8**C is a view similar to FIG. **8**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **8**D is a view similar to FIG. **8**C but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. **9**A is a view similar to FIG. **7** but with the safety selector in the forced reset semi-automatic position.

FIG. **9**B is a view similar to FIG. **9**A but after the trigger has been pulled to drop the hammer.

FIG. **9**C is a view similar to FIG. **9**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **9**D is a view similar to FIG. **9**C but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. **1**-**6**B, there is illustrated a "drop-in" trigger module **10** adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module **10** includes a frame or housing **12** sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver **14**. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing **12** includes forward left and right sidewalls **16**, **18** which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **16**, **18** may be interconnected by a floor **20**. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls **21**, **22** extend rearward from forward sidewalls **16**, **18** and are interconnected by a rear end wall **23**. The sidewalls **16**, **18** include first and second pairs of aligned openings **24**, **26** for receiving hollow transverse pins **30**, **32** upon which a hammer **36** and trigger member **38** pivot. The openings **24**, **26** are located coaxially with openings **42**, **44** in the lower receiver **14**. Standard AR-pattern hammer and trigger pins **46**, **48** pass through the openings **42**, **44** in the lower receiver **14** and through the hollow transverse pins **30**, **32** to assemble the housing **12** into the lower receiver **14**. Thus, the pins **30**, **32** retain the hammer **36** and trigger member **38** in the housing **12** in modular fashion, whereas the pins **46**, **48** retain the trigger module **10** in the lower receiver **14**.



The hammer **36** has a hammer head **50**, a sear catch **52**, a hammer hook **53**, and a concave contact surface **51**. The hammer **36** is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member **38** has a trigger blade **54** that extends downwardly. The trigger blade **54** is the part of the trigger member **38** contacted by a user's finger to actuate the trigger mechanism. The trigger blade **54** may be curved (as shown) or straight, as desired. The trigger member **38** has a sear **56**. When the sear **56** and the sear catch **52** are engaged, the hammer **36** and trigger member **38** are in their set positions. When the sear **56** and sear catch **52** are not engaged, the hammer **36** and trigger member **38** are in their released positions. The trigger member **38** has a convex contact surface **58** that interacts with concave surface **51** on hammer **36** in a manner described below. The trigger member **38** also has a contact surface **69**. The trigger member **38** is spring biased by a compression spring **59** positioned between a forward end of the trigger member **38** and the floor **20** of the housing **12** so that the trigger blade **54** is spring biased towards a forward position.

A disconnector **60** is pivoted on the hollow transverse pin **32** upon which the trigger member **38** pivots. The disconnector **60** has a disconnector hook **64** and a tail **66**. The tail **66** of the disconnector **60** is spring biased upwardly away from a tail **68** of the trigger member **38** by a compression spring **67**.

A locking or blocking member **72** is movably mounted to the housing **12**. For example, the locking/blocking member **72** can be pivoted on a locking/blocking member pin or screw **74** that is installed in aligned openings **76** in the sidewalls **21**, **22** of the housing **12**. The locking member **72** has a first contact surface **78** that interacts with an engagement surface **94** in a rear portion **96** of a bolt carrier body **98** of a bolt carrier assembly **92**, in a manner to be described below. The locking member **72** has a second contact surface **80** that interacts with surface **69** of trigger member **38** in a manner to be described below. The locking member **72** is spring biased by a torsion spring **82** acting between a pin **84** in the sidewalls **21**, **22** and a lower portion of the locking member **72** such that surface **78** is biased rearward and surface **80** is biased forward. Alternatively, the locking/blocking member **72** can be slidably mounted to the housing **12** and spring biased forward by a compression spring.

An upper receiver **90** houses a bolt carrier assembly **92**. As is well-known in the art, the bolt carrier assembly **92** (or blow-back bolt) slidably reciprocates in the upper receiver **90** and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly **92** used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member **72**, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly **92** has an engagement surface **94** in a rear portion **96** of the bolt carrier body **98**. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly **92** a lower surface **102** in a forward portion **104** of the bolt carrier body **98** contacts the face of the hammer head **50** causing the hammer **36** to pivot rearward. Rearward travel of bolt carrier assembly **92** also moves engagement surface **94** rearward and away from surface **78** of locking member **72**. The action of spring **82** causes locking member **72** to pivot in a first direction from

a first position wherein surface **80** of locking member **72** does not impede upward movement of surface **69** of trigger member **38** to a second position wherein surface **80** of locking member **72** does impede upward movement of surface **69** of trigger member **38** thus preventing the trigger blade **54** from being pulled by the user. During forward travel of the bolt carrier assembly **92** the engagement surface **94** of the bolt carrier body **98** contacts the surface **78** of the locking member **72** to pivot the locking member **72** in a second opposite direction from the second position to the first position.

A three position safety selector **110** has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator **111** pointing forward), a wide semi-circular portion **112** of the safety selector **110** prevents the trigger blade **54** from being pulled (FIGS. **4**A, **4**B, and **7**). When in the standard semi-automatic position (safety selector indicator **111** pointing upward), a flat portion **114** of the safety selector **110** permits the trigger blade **54** to be pulled. The disconnector **60** can pivot with the trigger member **38** and the disconnector hook **64** can catch the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **5**A and **5**B). When in the forced reset semi-automatic position (safety selector indicator **111** pointing rearward), a narrow semi-circular portion **116** permits the trigger blade **54** to be pulled but prevents the disconnector **60** from pivoting with the trigger member **38** thus preventing the disconnector hook **64** from catching the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **6**A and **6**B). In other words, in the forced reset semi-automatic position, the disconnector **60** is "disabled" in that the disconnector hook **64** is unable to catch the hammer hook **53** during cycling of the bolt carrier assembly **92**.

Referring now to FIGS. **8**A-8D, with the safety selector **110** set in the standard semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. Also during pivoting travel of the hammer **36** the disconnector hook **64** catches the hammer hook **53**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise moving surface **80** out of the blocking position. At this point rearward finger pressure on the trigger blade **54** must be released to allow the sear **56** to engage the sear catch **52**, returning the hammer **36** and trigger member **38** to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade **54** to fire another round.

Referring now to FIGS. **9**A-9D, with the safety selector **110** set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. The narrow semi-circular portion **116** of the safety selector **110** prevents the disconnector **60** from rotating with the trigger member **38**, thus "disabling" the disconnector **60**, preventing the disconnector hook **64** from catching the hammer hook **53**. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. The bolt carrier assembly **92** thereby forces the hammer **36** and trigger member **38** to their set positions wherein the sear **56** engages the sear catch **52**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise. At this point the user can reapply rearward finger pressure on the trigger blade **54** to fire another round, without first manually releasing rear finger pressure on the trigger blade **54**.



Thus, as the bolt carrier assembly **92** returns forward, the trigger member **38** is held in its set position by the locking member **72**. The trigger member **38** cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **92** and firing pin **99** as the bolt carrier assembly **92** is returning to battery. When the bolt carrier assembly **92** has reached (or nearly reached) its closed, in-battery position, the engagement surface **94** contacts and forwardly displaces the contact surface **78** of the locking member **72**, disengaging the contact surface **80** of the locking member **72** from the contact surface **69** of the trigger member **38**, allowing the trigger blade **54** to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a

transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**2**. The trigger mechanism of claim **1**, wherein said safety selector has a protuberance thereon which, when said safety selector is in said forced reset semi-automatic position, contacts said disconnector preventing said disconnector hook from catching said hammer hook.

**3**. The trigger mechanism of claim **1** further including a spring which biases said trigger member towards said set position.

**4**. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions,



said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**5**. The trigger mechanism of claim **4**, wherein said safety selector has a protuberance thereon which, when said safety selector is in said forced reset semi-automatic position, contacts said disconnector preventing said disconnector hook from catching said hammer hook.

**6**. The trigger mechanism of claim **4**, wherein said first and second pairs of openings in said housing are adapted to be aligned with first and second pairs of transversely aligned assembly pin openings in the fire control mechanism pocket.

**7**. The trigger mechanism of claim **4** further including a spring which biases said trigger member towards said set position.

**8**. The trigger mechanism of claim **7** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**9**. A firearm comprising:

a receiver having a fire control mechanism pocket therein,

a reciprocating bolt carrier,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, said hammer pivoted rearward by rearward movement of said bolt carrier,

a trigger member having a sear and mounted in said fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member mounted in said fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and moved against said spring bias to said second position by contact from said bolt carrier during forward movement of said bolt carrier as said bolt carrier reaches a substantially in-battery position, and

a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when said bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**10**. The firearm of claim **9** further comprising:

a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough,

said hammer mounted on said hammer pin, said trigger member and disconnector mounted on said trigger member pin.



**11**. The firearm of claim **10** further comprising:

said receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings,

said housing first pair of openings coaxial with said receiver first pair of openings and said housing second pair of openings coaxial with said receiver second pair of openings,

a first assembly pin passing through said receiver first pair of openings and through said housing first pair of openings, and

a second assembly pin passing through said receiver second pair of openings and through said housing second pair of openings.

**12**. The firearm of claim **10** further including a spring which biases said trigger member towards said set position.

**13**. The firearm of claim **12** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**14**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer

and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 11,724,003 B2
APPLICATION NO. : 18/048572
DATED : August 15, 2023
INVENTOR(S) : Mladen Thomas Strbac

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 4, Line 52, delete:
"… and a safety selector adapted mounted in the fire control …";
Insert:
--… and a safety selector adapted to be mounted in the fire control …--.

In the Claims

Column 13, Lines 38-39, Claim 9, delete:
"… a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard …";
Insert:
--… a safety selector adapted to be mounted in said fire control mechanism pocket to pivot between safe, standard …--.

Signed and Sealed this
Fifth Day of December, 2023

Katherine Kelly Vidal

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

US012036336B2

(12) **United States Patent**
**Strbac**

(10) **Patent No.: US 12,036,336 B2**
(45) **Date of Patent: Jul. 16, 2024**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/346,423**

(22) Filed: **Jul. 3, 2023**

(65) **Prior Publication Data**

US 2023/0355830 A1 Nov. 9, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 18/048,572, filed on Oct. 21, 2022, now Pat. No. 11,724,003.

(Continued)

(51) **Int. Cl.**

***F41A 19/24*** (2006.01)
***A61L 24/00*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ....... ***A61L 24/0036*** (2013.01); ***A61L 24/0015*** (2013.01); ***A61L 24/043*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,765,562 A 10/1956 Roper et al.
3,045,555 A 7/1962 Stoner

(Continued)

FOREIGN PATENT DOCUMENTS

DE 582963 C 8/1933
DE 4008351 A1 9/1991

(Continued)

*Primary Examiner* — J. Woodrow Eldred

(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a “three position” safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**12 Claims, 18 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**

| | |
|---|---|
| ***A61L 24/04*** | (2006.01) |
| ***F41A 17/48*** | (2006.01) |
| ***F41A 19/10*** | (2006.01) |
| ***F41A 19/15*** | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***F41A 17/48*** (2013.01); ***F41A 19/10*** (2013.01); ***F41A 19/15*** (2013.01); ***F41A 19/24*** (2013.01); *A61L 2300/252* (2013.01); *A61L 2300/418* (2013.01); *A61L 2400/04* (2013.01); *A61L 2430/36* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 3,292,492 | A | 12/1966 | Sturtevant |
| 3,301,133 | A | 1/1967 | Sturtevant |
| 3,670,442 | A | 6/1972 | Kennedy et al. |
| 4,023,465 | A | 5/1977 | Inskip |
| 4,057,003 | A | 11/1977 | Atchisson |
| 4,151,670 | A | 5/1979 | Rath |
| 4,276,808 | A | 7/1981 | York |
| 4,433,610 | A | 2/1984 | Tatro |
| 4,463,654 | A | 8/1984 | Barnes et al. |
| 4,516,466 | A | 5/1985 | Jennie |
| 4,580,484 | A | 4/1986 | Moore |
| H107 | H | 8/1986 | Bauer |
| 4,656,993 | A | 4/1987 | Yuzawa et al. |
| 4,658,702 | A | 4/1987 | Tatro |
| 4,693,170 | A | 9/1987 | Atchisson |
| 4,697,495 | A | 10/1987 | Beretta |
| 4,787,288 | A | 11/1988 | Miller |
| 4,937,964 | A | 7/1990 | Crandall |
| 5,149,898 | A | 9/1992 | Chesnut et al. |
| 5,183,959 | A | 2/1993 | McCoan et al. |
| 5,223,649 | A | 6/1993 | Claridge |
| 5,339,721 | A | 8/1994 | Beretta |
| 5,517,897 | A | 5/1996 | Perrine |
| 5,614,691 | A | 3/1997 | Taylor |
| 5,623,114 | A | 4/1997 | Soper |
| 5,682,699 | A | 11/1997 | Gentry |
| 5,701,698 | A | 12/1997 | Wesp et al. |
| 5,704,153 | A | 1/1998 | Kaminski et al. |
| 5,760,328 | A | 6/1998 | Robbins |
| 5,770,814 | A | 6/1998 | Ealovega |
| 6,101,918 | A | 8/2000 | Akins |
| 6,360,467 | B1 | 3/2002 | Knight |
| 6,601,331 | B2 | 8/2003 | Salvitti |
| 6,718,680 | B2 | 4/2004 | Roca et al. |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 6,851,346 | B1 | 2/2005 | Herring |
| 6,889,459 | B1 | 5/2005 | Salvitti |
| 6,976,416 | B2 | 12/2005 | Ealovega |
| 7,051,638 | B2 | 5/2006 | Thomele |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,337,574 | B2 | 3/2008 | Crandall et al. |
| 7,347,021 | B1 | 3/2008 | Jones |
| 7,398,723 | B1 | 7/2008 | Blakley |
| 7,421,937 | B1 | 9/2008 | Gangl |
| 7,634,959 | B2 | 12/2009 | Frickey |
| 7,661,220 | B2 | 2/2010 | Crandall et al. |
| 7,806,039 | B1 | 10/2010 | Gomez |
| 8,037,805 | B1 | 10/2011 | Neroni |
| 8,112,928 | B2 | 2/2012 | Keough |
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,156,854 | B2 | 4/2012 | Brown |
| 8,443,537 | B2 | 5/2013 | Curry |
| 8,464,454 | B2 | 6/2013 | Martin et al. |
| 8,490,309 | B2 | 7/2013 | Zukowski |
| 8,667,881 | B1 | 3/2014 | Hawbaker |
| 8,695,477 | B2 | 4/2014 | Esch |
| 8,720,096 | B2 | 5/2014 | Siddle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 8,893,607 | B2 | 11/2014 | Audibert et al. |
| 8,925,234 | B1 | 1/2015 | Barrett |
| 8,985,006 | B1 | 3/2015 | Christensen et al. |
| 9,016,187 | B2 | 4/2015 | Findlay |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,021,733 | B1 | 5/2015 | DiChario |
| 9,052,150 | B2 | 6/2015 | Talasco |
| 9,121,661 | B2 | 9/2015 | Calvete |
| 9,146,066 | B1 | 9/2015 | Cason |
| 9,146,067 | B2 | 9/2015 | Stakes |
| 9,182,189 | B2 | 11/2015 | Seigler |
| 9,228,786 | B2 | 1/2016 | Sullivan et al. |
| 9,310,150 | B1 | 4/2016 | Geissele |
| 9,347,726 | B1 | 5/2016 | Thomas |
| 9,448,023 | B2 | 9/2016 | Sheets, Jr. et al. |
| 9,476,660 | B2 | 10/2016 | Potter et al. |
| 9,513,076 | B2 | 12/2016 | Kolev et al. |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,618,288 | B2 | 4/2017 | Wilson |
| 9,618,289 | B1 | 4/2017 | Geissele |
| 9,625,231 | B1 | 4/2017 | Hass |
| 9,631,886 | B2 | 4/2017 | Findlay |
| 9,651,329 | B2 | 5/2017 | Hittmann |
| 9,658,007 | B2 | 5/2017 | Withey |
| 9,683,800 | B2 | 6/2017 | Sewell, Jr. et al. |
| 9,733,031 | B1 | 8/2017 | Sylvester et al. |
| 9,759,504 | B2 | 9/2017 | Geissele |
| 9,777,980 | B2 | 10/2017 | Heizer |
| 9,810,493 | B2 | 11/2017 | Fluhr et al. |
| 9,810,496 | B2 | 11/2017 | Kolev et al. |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,829,263 | B2 | 11/2017 | Bonner |
| 9,835,398 | B2 | 12/2017 | Biegel |
| 9,863,730 | B2 | 1/2018 | Elftmann |
| 9,869,522 | B2 | 1/2018 | Larson, Jr. et al. |
| 9,874,417 | B2 | 1/2018 | Zajk et al. |
| 9,927,197 | B1 | 3/2018 | Geissele |
| 9,939,221 | B2 | 4/2018 | Graves |
| 10,002,500 | B2 | 6/2018 | Hall et al. |
| 10,006,734 | B1 | 6/2018 | Findlay |
| 10,030,924 | B1 | 7/2018 | Smith |
| 10,077,960 | B2 | 9/2018 | Geissele |
| 10,107,580 | B2 | 10/2018 | Fellows et al. |
| 10,254,067 | B2 | 4/2019 | Foster |
| 10,267,584 | B2 | 4/2019 | Kasanjian-King |
| 10,330,413 | B2 | 6/2019 | Williams et al. |
| 10,488,136 | B2 | 11/2019 | Sullivan et al. |
| 10,502,511 | B2 | 12/2019 | Graves |
| 10,514,223 | B1 | 12/2019 | Rounds |
| 10,584,932 | B2 | 3/2020 | Foster |
| 10,816,297 | B1 | 10/2020 | Williams et al. |
| 11,287,205 | B2 | 3/2022 | Biegel |
| 11,293,715 | B1 | 4/2022 | Newsome et al. |
| 11,346,627 | B1 | 5/2022 | DeMonico |
| 11,724,003 | B2 | 8/2023 | Strbac |
| 2006/0048426 | A1 | 3/2006 | Crandall |
| 2006/0101695 | A1 | 5/2006 | Longueira |
| 2007/0051236 | A1 | 3/2007 | Groves et al. |
| 2007/0199435 | A1 | 8/2007 | Hochstrate et al. |
| 2009/0151213 | A1 | 6/2009 | Bell |
| 2009/0188145 | A1 | 7/2009 | Fluhr et al. |
| 2011/0209607 | A1 | 9/2011 | St. George |
| 2013/0118343 | A1 | 5/2013 | Hirt |
| 2014/0311004 | A1 | 10/2014 | Barrett |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2016/0161202 | A1 | 6/2016 | Larue |
| 2017/0176124 | A1 | 6/2017 | Wilson |
| 2017/0219307 | A1 | 8/2017 | Foster |
| 2017/0276447 | A1 | 9/2017 | Foster |
| 2017/0284761 | A1 | 10/2017 | Lewis et al. |
| 2017/0299309 | A1 | 10/2017 | Fellows et al. |
| 2017/0328663 | A1 | 11/2017 | Fellows et al. |
| 2018/0066911 | A1 | 3/2018 | Graves |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2018/0087860 | A1 | 3/2018 | Sullivan et al. | |
| 2018/0112944 | A1 | 4/2018 | Underwood et al. | |
| 2018/0195823 | A1 | 7/2018 | Schafer et al. | |
| 2018/0202740 | A1 | 7/2018 | Elftmann, Jr. | |
| 2018/0231342 | A1 | 8/2018 | Martinez | |
| 2020/0191513 | A1 | 6/2020 | Foster | |
| 2021/0222974 | A1 | 7/2021 | Graves | |
| 2022/0364812 | A1 | 11/2022 | Fellows | |
| 2023/0097725 | A1* | 3/2023 | Davis | F41A 17/46 42/69.01 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1678458 | B1 | 2/2012 |
| EP | 2950033 | B1 | 11/2016 |
| TW | 409847 | U | 10/2000 |
| WO | 2016/028337 | A1 | 2/2016 |
| WO | 2018/058174 | A1 | 4/2018 |

* cited by examiner


10
72
78
84
23
21
50
22
76
74
38
58
36
51
110
60
64
53
16
12
66
26
32
24
30
18
48
46
54
20
38

FIG. 1


10
12
16
36
50
51
53
30
46
72
78
38
58
82
84
21
64
18
60
74
22
110
32
48
20
114
38
66
54
38

FIG. 2


10
36
50
51
53
52
110
111
116
114
112
64
56
60
66
58
56
69
38
67
68
59
54
72
78
82
80
16
12
74
21
76
84
24
30
76
26
46
23
22
20
18
32
48

FIG. 3



FIG. 4A


10
12
46
30
56
52
36
32
59
54
64
60
53
48
50
51
67
58
20
72
74
116
68
38
66
78
84
112
114
23
110

FIG. 4B


46
30
52
20
12
56
16
59
54
50
53
64
60
48
32
68
51
80
67
36
58
74
38
72
114
78
66
84
116
82
23
10
110

FIG. 5A


10
12
46
30
56
52
36
32
59
54
48
53
64
60
50
51
67
58
20
68
38
66
114
116
74
72
78
84
23
111
116
110

FIG. 5B


46
30
52
20
12
56
16
59
54
50
53
64
60
48
32
68
36
51
80
67
58
74
38
114
72
66
116
78
84
112
82
23
110
111
10

FIG. 6A


10
12
46
30
56
52
36
32
59
64
60
53
48
54
50
51
67
114
58
72
74
112
20
68
38
66
116
78
84
23
111
110

FIG. 6B


14
102
42
30
20
12
46
52
56
59
38
54
48
60
53
50
36
58
51
64
44
32
68
67
111
80
72
94
78
86
84
82
23
114
112
66
110
92
98
104
99
96
90

FIG. 7


14
102
92
104
99
12
42
30
20
46
52
56
59
50
36
53
60
48
38
58
51
64
44
32
68
54
98
72
94
80
112
67
78
86
84
82
23
96
114
110
66
90

FIG. 8A



FIG. 8B


14
30
20
36
46
52
56
59
38
99
50
60
64
48
58
54
32
68
80
112
66
78
72
114
110
92
82
23
90
102
104
98

FIG. 8C


14
99
102
92
30
20
12
104
46
52
56
59
50
36
53
60
48
38
58
51
64
32
68
54
98
72
112
61
94
78
86
84
114
110
66
82
23
96
90

FIG. 8D


14
102
92
104
99
12
42
30
20
46
52
56
59
50
36
53
60
48
38
58
51
64
44
32
68
54
98
72
94
80
114
67
78
86
84
82
23
111
116
66
96
90

FIG. 9A


14
102
92
30
20
104
50
99
46
56
51
52
59
12
38
48
64
60
58
32
68
54
36
98
72
94
80
114
67
78
66
86
84
82
23
111
116
96
90

FIG. 9B


14
30
20
36
46
52
56
59
50
99
60
64
48
38
58
54
32
68
80
114
66
78
92
72
116
82
23
102
90
104
98

FIG. 9C


14
99
102
92
30
20
12
104
46
52
56
59
38
50
53
60
48
36
58
51
64
32
68
54
98
72
94
80
114
67
78
86
84
96
82
23
110
116
66
90

FIG. 9D

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 18/048,572 filed Oct. 21, 2022, which claims the priority benefit of U.S. Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, both of which are hereby incorporated by reference herein as if fully set forth in their entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627,



which are hereby incorporated by reference herein as if fully set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second

position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when

the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. **1** is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. **2** is a top rear right perspective view thereof.

FIG. **3** is a top rear right exploded perspective view thereof.

FIG. **4**A is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **4**B is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **5**A is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **5**B is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**A is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**B is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **7** is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. **8**A is a view similar to FIG. **7** but with the safety selector in the standard semi-automatic position.

FIG. **8**B is a view similar to FIG. **8**A but after the trigger has been pulled to drop the hammer.

FIG. **8**C is a view similar to FIG. **8**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **8**D is a view similar to FIG. **8**C but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. **9**A is a view similar to FIG. **7** but with the safety selector in the forced reset semi-automatic position.

FIG. **9**B is a view similar to FIG. **9**A but after the trigger has been pulled to drop the hammer.

FIG. **9**C is a view similar to FIG. **9**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **9**D is a view similar to FIG. **9**C but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. **1**-**6**B, there is illustrated a "drop-in" trigger module **10** adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module **10** includes a frame or housing **12** sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver **14**. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing **12** includes forward left and right sidewalls **16**, **18** which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **16**, **18** may be interconnected by a floor **20**. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls **21**, **22** extend rearward from forward sidewalls **16**, **18** and are interconnected by a rear end wall **23**. The sidewalls **16**, **18** include first and second pairs of aligned openings **24**, **26** for receiving hollow transverse pins **30**, **32** upon which a hammer **36** and trigger member **38** pivot. The openings **24**, **26** are located coaxially with openings **42**, **44** in the lower receiver **14**. Standard AR-pattern hammer and trigger pins **46**, **48** pass through the openings **42**, **44** in the lower receiver **14** and through the hollow transverse pins **30**, **32** to assemble the housing **12** into the lower receiver **14**. Thus, the pins **30**, **32** retain the hammer **36** and trigger member **38** in the housing **12** in modular fashion, whereas the pins **46**, **48** retain the trigger module **10** in the lower receiver **14**.

The hammer **36** has a hammer head **50**, a sear catch **52**, a hammer hook **53**, and a concave contact surface **51**. The hammer **36** is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member **38** has a trigger blade **54** that extends downwardly. The trigger blade **54** is the part of the trigger member **38** contacted by a user's finger to actuate the trigger mechanism. The trigger blade **54** may be curved (as shown) or straight, as desired. The trigger member **38** has a sear **56**. When the sear **56** and the sear catch **52** are engaged, the hammer **36** and trigger member **38** are in their set positions. When the sear **56** and sear catch **52** are not engaged, the hammer **36** and trigger member **38** are in their released positions. The trigger member **38** has a convex contact surface **58** that interacts with concave surface **51** on hammer **36** in a manner described below. The trigger member **38** also has a contact surface **69**. The trigger member **38** is spring biased by a compression spring **59** positioned between a forward end of the trigger member **38** and the floor **20** of the housing **12** so that the trigger blade **54** is spring biased towards a forward position.

A disconnector **60** is pivoted on the hollow transverse pin **32** upon which the trigger member **38** pivots. The disconnector **60** has a disconnector hook **64** and a tail **66**. The tail **66** of the disconnector **60** is spring biased upwardly away from a tail **68** of the trigger member **38** by a compression spring **67**.

A locking or blocking member **72** is movably mounted to the housing **12**. For example, the locking/blocking member **72** can be pivoted on a locking/blocking member pin or screw **74** that is installed in aligned openings **76** in the sidewalls **21**, **22** of the housing **12**. The locking member **72** has a first contact surface **78** that interacts with an engagement surface **94** in a rear portion **96** of a bolt carrier body **98** of a bolt carrier assembly **92**, in a manner to be described below. The locking member **72** has a second contact surface **80** that interacts with surface **69** of trigger member **38** in a manner to be described below. The locking member **72** is spring biased by a torsion spring **82** acting between a pin **84** in the sidewalls **21**, **22** and a lower portion of the locking member **72** such that surface **78** is biased rearward and surface **80** is biased forward. Alternatively, the locking/blocking member **72** can be slidably mounted to the housing **12** and spring biased forward by a compression spring.

An upper receiver **90** houses a bolt carrier assembly **92**. As is well-known in the art, the bolt carrier assembly **92** (or blow-back bolt) slidably reciprocates in the upper receiver **90** and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly **92** used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member **72**, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly **92** has an engagement surface **94** in a rear portion **96** of the bolt carrier body **98**. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly **92** a lower surface **102** in a forward portion **104** of the bolt carrier body **98** contacts the face of the hammer head **50** causing the hammer **36** to pivot rearward. Rearward travel of bolt carrier assembly **92** also

moves engagement surface **94** rearward and away from surface **78** of locking member **72**. The action of spring **82** causes locking member **72** to pivot in a first direction from a first position wherein surface **80** of locking member **72** does not impede upward movement of surface **69** of trigger member **38** to a second position wherein surface **80** of locking member **72** does impede upward movement of surface **69** of trigger member **38** thus preventing the trigger blade **54** from being pulled by the user. During forward travel of the bolt carrier assembly **92** the engagement surface **94** of the bolt carrier body **98** contacts the surface **78** of the locking member **72** to pivot the locking member **72** in a second opposite direction from the second position to the first position.

A three position safety selector **110** has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator **111** pointing forward), a wide semi-circular portion **112** of the safety selector **110** prevents the trigger blade **54** from being pulled (FIGS. **4**A, **4**B, and **7**). When in the standard semi-automatic position (safety selector indicator **111** pointing upward), a flat portion **114** of the safety selector **110** permits the trigger blade **54** to be pulled. The disconnector **60** can pivot with the trigger member **38** and the disconnector hook **64** can catch the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **5**A and **5**B). When in the forced reset semi-automatic position (safety selector indicator **111** pointing rearward), a narrow semi-circular portion **116** permits the trigger blade **54** to be pulled but prevents the disconnector **60** from pivoting with the trigger member **38** thus preventing the disconnector hook **64** from catching the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **6**A and **6**B). In other words, in the forced reset semi-automatic position, the disconnector **60** is "disabled" in that the disconnector hook **64** is unable to catch the hammer hook **53** during cycling of the bolt carrier assembly **92**.

Referring now to FIGS. **8**A-**8**D, with the safety selector **110** set in the standard semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. Also during pivoting travel of the hammer **36** the disconnector hook **64** catches the hammer hook **53**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise moving surface **80** out of the blocking position. At this point rearward finger pressure on the trigger blade **54** must be released to allow the sear **56** to engage the sear catch **52**, returning the hammer **36** and trigger member **38** to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade **54** to fire another round.

Referring now to FIGS. **9**A-**9**D, with the safety selector **110** set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. The narrow semi-circular portion **116** of the safety selector **110** prevents the disconnector **60** from rotating with the trigger member **38**, thus "disabling" the disconnector **60**, preventing the disconnector hook **64** from catching the hammer hook **53**. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. The bolt carrier assembly **92** thereby forces the hammer **36** and trigger member **38** to their set positions wherein the sear **56** engages the sear catch **52**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise. At this point the user can reapply rearward finger pressure on the trigger blade **54** to fire another round, without first manually releasing rear finger pressure on the trigger blade **54**.

Thus, as the bolt carrier assembly **92** returns forward, the trigger member **38** is held in its set position by the locking member **72**. The trigger member **38** cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **92** and firing pin **99** as the bolt carrier assembly **92** is returning to battery. When the bolt carrier assembly **92** has reached (or nearly reached) its closed, in-battery position, the engagement surface **94** contacts and forwardly displaces the contact surface **78** of the locking member **72**, disengaging the contact surface **80** of the locking member **72** from the contact surface **69** of the trigger member **38**, allowing the trigger blade **54** to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released

positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**2**. The trigger mechanism of claim **1** further including a spring which biases said trigger member towards said set position.

**3**. A firearm trigger mechanism comprising:

a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin,



a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said housing to pivot on said trigger member pin,

a locking member mounted in said housing to pivot on a transverse locking member pin, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**4**. The trigger mechanism of claim **3**, wherein said first and second pairs of openings in said housing are adapted to be aligned with first and second pairs of transversely aligned assembly pin openings in the fire control mechanism pocket.

**5**. The trigger mechanism of claim **3** further including a spring which biases said trigger member towards said set position.

**6**. The trigger mechanism of claim **5** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**7**. A firearm comprising:

a receiver having a fire control mechanism pocket therein,

a reciprocating bolt carrier,

a hammer having a sear catch and a hook for engaging a disconnector and mounted in said fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, said hammer pivoted rearward by rearward movement of said bolt carrier,

a trigger member having a sear and mounted in said fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and mounted in said fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member mounted in said fire control mechanism pocket to pivot on a transverse locking member pivot axis, said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and moved against said spring bias to said second position by contact from said bolt carrier during forward movement of said bolt carrier as said bolt carrier reaches a substantially in-battery position, and

a safety selector adapted mounted in said fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of said bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when said bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**8**. The firearm of claim **7** further comprising:

a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough,

said hammer mounted on said hammer pin, said trigger member and disconnector mounted on said trigger member pin.

**9**. The firearm of claim **8** further comprising:

said receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings,

said housing first pair of openings coaxial with said receiver first pair of openings and said housing second pair of openings coaxial with said receiver second pair of openings,

a first assembly pin passing through said receiver first pair of openings and through said housing first pair of openings, and

a second assembly pin passing through said receiver second pair of openings and through said housing second pair of openings.

**10**. The firearm of claim **7** further including a spring which biases said trigger member towards said set position.

**11**. The firearm of claim **10** wherein said spring is a compression spring positioned between a forward end of said trigger member and a floor of said housing.

**12**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on said transverse trigger member pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic posi-

tions, said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 12,036,336 B2
APPLICATION NO. : 18/346423
DATED : July 16, 2024
INVENTOR(S) : Mladen Thomas Strbac



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 4, Line 53, delete:
“... and a safety selector adapted mounted in the fire control ....”;
Insert:
--... and a safety selector adapted to be mounted in the fire control ....--.

In the Claims

Column 13, Line 41 or Claim 7, Line 38, delete:
“... a safety selector adapted mounted in said fire control ....”;
Insert:
--... a safety selector adapted to be mounted in said fire control ....--.

Signed and Sealed this
Seventeenth Day of September, 2024

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

US012274807B2

(12) **United States Patent**
**Strbac**

(10) **Patent No.: US 12,274,807 B2**
(45) **Date of Patent: *Apr. 15, 2025**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **ABC IP, LLC**, Dover, DE (US)

(72) Inventor: **Mladen Thomas Strbac**, Cleveland, OH (US)

(73) Assignee: **ABC IP, LLC**, Dover, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/665,926**

(22) Filed: **May 16, 2024**

(65) **Prior Publication Data**

US 2024/0299616 A1 Sep. 12, 2024

**Related U.S. Application Data**

(63) Continuation of application No. 18/346,423, filed on Jul. 3, 2023, now Pat. No. 12,036,336, which is a

(Continued)

(51) **Int. Cl.**

***F41A 19/15*** (2006.01)
***A61L 24/00*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ....... ***A61L 24/0036*** (2013.01); ***A61L 24/0015*** (2013.01); ***A61L 24/043*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .......... F41A 19/24; F41A 19/10; F41A 19/15; F41A 19/16; F41A 17/46

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,765,562 | A | 10/1956 | Roper et al. |
| 3,045,555 | A | 7/1962 | Stoner |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 582963 | C | 8/1933 |
| DE | 4008351 | A1 | 9/1991 |

(Continued)

OTHER PUBLICATIONS

Statutory Invention Registration No. H107, Inventor: Bauer, Published Aug. 5, 1986 (8 pages).

*Primary Examiner* — J. Woodrow Eldred
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism that can be used in AR-pattern firearms has a hammer, a trigger member, a disconnector, a locking member, and a "three position" safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member. The locking member is pivotable between a first position at which the locking member mechanically blocks the trigger

(Continued)



member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position. The locking member is spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position.

**8 Claims, 18 Drawing Sheets**

**Related U.S. Application Data**

continuation of application No. 18/048,572, filed on Oct. 21, 2022, now Pat. No. 11,724,003.

(60) Provisional application No. 63/297,884, filed on Jan. 10, 2022.

(51) **Int. Cl.**
***A61L 24/04*** (2006.01)
***F41A 17/48*** (2006.01)
***F41A 19/10*** (2006.01)
***F41A 19/24*** (2006.01)

(52) **U.S. Cl.**
CPC .............. ***F41A 17/48*** (2013.01); ***F41A 19/10*** (2013.01); ***F41A 19/15*** (2013.01); ***F41A 19/24*** (2013.01); *A61L 2300/252* (2013.01); *A61L 2300/418* (2013.01); *A61L 2400/04* (2013.01); *A61L 2430/36* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 3,292,492 | A | 12/1966 | Sturtevant |
| 3,301,133 | A | 1/1967 | Sturtevant |
| 3,670,442 | A | 6/1972 | Kennedy et al. |
| 4,023,465 | A | 5/1977 | Inskip |
| 4,057,003 | A | 11/1977 | Atchisson |
| 4,151,670 | A | 5/1979 | Rath |
| 4,276,808 | A | 7/1981 | York |
| 4,433,610 | A | 2/1984 | Tatro |
| 4,463,654 | A | 8/1984 | Barnes et al. |
| 4,516,466 | A | 5/1985 | Jennie |
| 4,580,484 | A | 4/1986 | Moore |
| 4,656,993 | A | 4/1987 | Yuzawa et al. |
| 4,658,702 | A | 4/1987 | Tatro |
| 4,693,170 | A | 9/1987 | Atchisson |
| 4,697,495 | A | 10/1987 | Beretta |
| 4,787,288 | A | 11/1988 | Miller |
| 4,937,964 | A | 7/1990 | Crandall |
| 5,149,898 | A | 9/1992 | Chesnut et al. |
| 5,183,959 | A | 2/1993 | McCoan et al. |
| 5,223,649 | A | 6/1993 | Claridge |
| 5,339,721 | A | 8/1994 | Beretta |
| 5,517,897 | A | 5/1996 | Perrine |
| 5,614,691 | A | 3/1997 | Taylor |
| 5,623,114 | A | 4/1997 | Soper |
| 5,682,699 | A | 11/1997 | Gentry |
| 5,701,698 | A | 12/1997 | Wesp et al. |
| 5,704,153 | A | 1/1998 | Kaminski et al. |
| 5,760,328 | A | 6/1998 | Robbins |
| 5,770,814 | A | 6/1998 | Ealovega |
| 6,101,918 | A | 8/2000 | Akins |
| 6,360,467 | B1 | 3/2002 | Knight |
| 6,601,331 | B2 | 8/2003 | Salvitti |
| 6,718,680 | B2 | 4/2004 | Roca et al. |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 6,851,346 | B1 | 2/2005 | Herring |
| 6,889,459 | B1 | 5/2005 | Salvitti |
| 6,976,416 | B2 | 12/2005 | Ealovega |
| 7,051,638 | B2 | 5/2006 | Thomele |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,337,574 | B2 | 3/2008 | Crandall et al. |
| 7,347,021 | B1 | 3/2008 | Jones |
| 7,398,723 | B1 | 7/2008 | Blakley |
| 7,421,937 | B1 | 9/2008 | Gangl |
| 7,634,959 | B2 | 12/2009 | Frickey |
| 7,661,220 | B2 | 2/2010 | Crandall et al. |
| 7,806,039 | B1 | 10/2010 | Gomez |
| 8,037,805 | B1 | 10/2011 | Neroni |
| 8,112,928 | B2 | 2/2012 | Keough |
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,156,854 | B2 | 4/2012 | Brown |
| 8,443,537 | B2 | 5/2013 | Curry |
| 8,464,454 | B2 | 6/2013 | Martin et al. |
| 8,490,309 | B2 | 7/2013 | Zukowski |
| 8,667,881 | B1 | 3/2014 | Hawbaker |
| 8,695,477 | B2 | 4/2014 | Esch |
| 8,720,096 | B2 | 5/2014 | Siddle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 8,893,607 | B2 | 11/2014 | Audibert et al. |
| 8,925,234 | B1 | 1/2015 | Barrett |
| 8,985,006 | B1 | 3/2015 | Christensen et al. |
| 9,016,187 | B2 | 4/2015 | Findlay |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,021,733 | B1 | 5/2015 | DiChario |
| 9,052,150 | B2 | 6/2015 | Talasco |
| 9,121,661 | B2 | 9/2015 | Calvete |
| 9,146,066 | B1 | 9/2015 | Cason |
| 9,146,067 | B2 | 9/2015 | Stakes |
| 9,182,189 | B2 | 11/2015 | Seigler |
| 9,228,786 | B2 | 1/2016 | Sullivan et al. |
| 9,310,150 | B1 | 4/2016 | Geissele |
| 9,347,726 | B1 | 5/2016 | Thomas |
| 9,448,023 | B2 | 9/2016 | Sheets, Jr. et al. |
| 9,476,660 | B2 | 10/2016 | Potter et al. |
| 9,513,076 | B2 | 12/2016 | Kolev et al. |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,618,288 | B2 | 4/2017 | Wilson |
| 9,618,289 | B1 | 4/2017 | Geissele |
| 9,625,231 | B1 | 4/2017 | Hass |
| 9,631,886 | B2 | 4/2017 | Findlay |
| 9,651,329 | B2 | 5/2017 | Hittmann |
| 9,658,007 | B2 | 5/2017 | Withey |
| 9,683,800 | B2 | 6/2017 | Sewell, Jr. et al. |
| 9,733,031 | B1 | 8/2017 | Sylvester et al. |
| 9,759,504 | B2 | 9/2017 | Geissele |
| 9,777,980 | B2 | 10/2017 | Heizer |
| 9,810,493 | B2 | 11/2017 | Fluhr et al. |
| 9,810,496 | B2 | 11/2017 | Kolev et al. |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,829,263 | B2 | 11/2017 | Bonner |
| 9,835,398 | B2 | 12/2017 | Biegel |
| 9,863,730 | B2 | 1/2018 | Elftmann |
| 9,869,522 | B2 | 1/2018 | Larson, Jr. et al. |
| 9,874,417 | B2 | 1/2018 | Zajk et al. |
| 9,927,197 | B1 | 3/2018 | Geissele |
| 9,939,221 | B2 | 4/2018 | Graves |
| 10,002,500 | B2 | 6/2018 | Hall et al. |
| 10,006,734 | B1 | 6/2018 | Findlay |
| 10,030,924 | B1 | 7/2018 | Smith |
| 10,077,960 | B2 | 9/2018 | Geissele |
| 10,107,580 | B2 | 10/2018 | Fellows et al. |
| 10,254,067 | B2 | 4/2019 | Foster |
| 10,267,584 | B2 | 4/2019 | Kasanjian-King |
| 10,330,413 | B2 | 6/2019 | Williams et al. |
| 10,488,136 | B2 | 11/2019 | Sullivan et al. |
| 10,502,511 | B2 | 12/2019 | Graves |
| 10,514,223 | B1 | 12/2019 | Rounds |
| 10,584,932 | B2 | 3/2020 | Foster |
| 10,816,297 | B1 | 10/2020 | Williams et al. |
| 11,287,205 | B2 | 3/2022 | Biegel |
| 11,293,715 | B1 | 4/2022 | Newsome et al. |
| 11,346,627 | B1 | 5/2022 | DeMonico |
| 11,724,003 | B2 * | 8/2023 | Strbac ................. A61L 24/0036 42/69.01 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 12,031,784 | B1 * | 7/2024 | DeMonico .............. F41A 17/46 |
| 12,036,336 | B2 * | 7/2024 | Strbac ................. A61L 24/0036 |
| 2006/0048426 | A1 | 3/2006 | Crandall |
| 2006/0101695 | A1 | 5/2006 | Longueira |
| 2007/0051236 | A1 | 3/2007 | Groves et al. |
| 2007/0199435 | A1 | 8/2007 | Hochstrate et al. |
| 2009/0151213 | A1 | 6/2009 | Bell |
| 2009/0188145 | A1 | 7/2009 | Fluhr et al. |
| 2011/0209607 | A1 | 9/2011 | St. George |
| 2013/0118343 | A1 | 5/2013 | Hirt |
| 2014/0311004 | A1 | 10/2014 | Barrett |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2016/0161202 | A1 | 6/2016 | Larue |
| 2017/0176124 | A1 | 6/2017 | Wilson |
| 2017/0219307 | A1 | 8/2017 | Foster |
| 2017/0276447 | A1 | 9/2017 | Foster |
| 2017/0284761 | A1 | 10/2017 | Lewis et al. |
| 2017/0299309 | A1 | 10/2017 | Fellows et al. |
| 2017/0328663 | A1 | 11/2017 | Fellows et al. |
| 2018/0066911 | A1 | 3/2018 | Graves |
| 2018/0087860 | A1 | 3/2018 | Sullivan et al. |
| 2018/0112944 | A1 | 4/2018 | Underwood et al. |
| 2018/0195823 | A1 | 7/2018 | Schafer et al. |
| 2018/0202740 | A1 | 7/2018 | Elftmann, Jr. |
| 2018/0231342 | A1 | 8/2018 | Martinez |
| 2020/0191513 | A1 | 6/2020 | Foster |
| 2021/0222974 | A1 | 7/2021 | Graves |
| 2022/0364812 | A1 | 11/2022 | Fellows |
| 2023/0097725 | A1 | 3/2023 | Davis et al. |
| 2024/0085136 | A1 * | 3/2024 | Blakley ................... F41A 19/45 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1678458 | B1 | 2/2012 |
| EP | 2950033 | B1 | 11/2016 |
| TW | 409847 | U | 10/2000 |
| WO | 2016/028337 | A1 | 2/2016 |
| WO | 2018/058174 | A1 | 4/2018 |

* cited by examiner


10
72
78
84
23
21
50
22
76
74
38
58
36
51
110
60
64
53
16
66
12
26
32
24
30
18
48
46
54
20
38

FIG. 1


10
36
50
16
12
72
38
51
53
58
78
30
82
46
84
64
21
18
60
74
32
110
22
20
48
114
38
66
54
38

FIG. 2


10
36
50
51
53
52
110
111
116
114
112
64
56
60
66
58
56
69
38
67
68
59
54
72
78
82
80
16
12
74
21
76
84
24
30
76
26
46
23
22
20
18
32
48

FIG. 3


46
30
52
20
12
16
56
59
54
50
53
64
60
48
32
68
67
38
51
80
36
58
74
38
72
112
78
66
114
84
116
82
23
10
110

FIG. 4A


10
12
30
46
56
52
36
32
59
54
48
64
60
53
50
51
67
58
20
68
72
74
116
38
66
78
112
84
114
23
110

FIG. 4B


46
30
52
20
12
56
16
59
54
64
48
50
53
60
32
68
51
80
67
36
58
74
38
72
114
78
66
84
116
82
23
10
110

FIG. 5A


10
12
46
30
56
52
36
59
32
54
64
60
53
48
50
51
67
58
20
72
74
116
68
38
66
114
78
84
23
111
116
110

FIG. 5B


46
30
52
20
12
56
16
59
54
64
60
48
50
53
32
68
51
80
67
36
58
74
38
114
72
66
116
78
84
112
82
23
110
111
10

FIG. 6A


10
12
56
52
46
30
36
32
59
54
48
64
60
53
50
51
67
114
58
20
72
74
112
68
38
66
116
78
84
23
111
110

FIG. 6B


14
102
92
104
99
12
42
30
20
46
52
56
59
50
36
53
60
48
54
38
58
51
64
44
32
68
98
72
80
111
67
94
78
86
84
82
23
114
112
66
96
110
90

FIG. 7


14
102
92
104
99
42
30
20
12
46
52
56
59
50
53
60
36
58
48
38
51
64
44
32
68
54
98
72
80
112
67
94
78
86
84
82
23
114
110
66
96
90

FIG. 8A


14
102
92
30
20
104
50
99
46
56
51
52
59
12
64
60
58
48
38
36
32
68
54
98
72
80
112
67
94
78
66
86
84
114
110
82
23
96
90

FIG. 8B


14
30
20
36
46
52
56
59
38
48
54
32
68
66
50
99
60
64
58
80
112
78
72
114
110
92
82
23
102
90
104
98

FIG. 8C


14
99
102
92
30
20
12
104
46
52
56
59
38
60
48
53
50
36
58
51
64
32
54
68
98
72
112
67
94
78
86
84
96
82
23
114
110
66
90

FIG. 8D


14
102
92
104
99
12
42
30
20
46
52
56
59
50
60
53
58
36
51
48
38
54
32
68
44
64
67
98
72
94
80
114
78
86
84
82
23
111
116
66
96
90

FIG. 9A


14
102
92
30
20
104
50
46
56
99
51
52
59
12
38
60
64
48
58
32
68
54
98
36
72
94
80
114
67
78
86
66
84
111
116
82
23
96
90

FIG. 9B


14
30
20
36
46
52
56
59
48
38
54
32
68
66
50
60
64
58
99
80
114
78
92
72
116
82
23
102
90
104
98

FIG. 9C


14
99
102
92
104
12
30
20
46
52
56
59
38
50
60
53
48
36
58
51
64
32
68
54
98
72
80
114
67
94
78
86
84
82
23
110
116
66
96
90

FIG. 9D

# FIREARM TRIGGER MECHANISM

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 18/346,423 filed Jul. 3, 2023, now U.S. Pat. No. 12,036,336 issued Jul. 16, 2024, which is a continuation of U.S. patent application Ser. No. 18/048,572 filed Oct. 21, 2022, now U.S. Pat. No. 11,724,003 issued Aug. 15, 2023, which claims the priority benefit of U.S. Provisional Patent Application No. 63/297,884 filed Jan. 10, 2022, all of which are hereby incorporated by reference herein as if fully set forth in their entirety.

## TECHNICAL FIELD

The present invention relates generally to a firearm trigger mechanism, and more particularly to a semiautomatic trigger that is selectively mechanically reset by movement of the bolt carrier.

## BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunition's propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. To adapt this invention to an AR-pattern



firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

Other devices for increasing the rate of semiautomatic fire are shown in U.S. Pat. Nos. 10,514,223 and 11,346,627, which are hereby incorporated by reference herein as if fully set forth in their entirety. In these devices the hammer forces the trigger to the set position, and a locking bar prevents early hammer release.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. No. 7,398,723, issued to Brian A. Blakley, and is hereby incorporated by reference herein as if fully set forth in its entirety. The device shown in this patent has a pivoting cam which is contacted by the rearwardly traveling bolt carrier, pivoting the cam rearwardly such that the bottom surface of the cam presses downward on the trigger-extension, forcing the rear of the trigger down, and thereby moving forward the surface of the trigger that an operator's finger engages. Another device for increasing the rate of semiautomatic fire employing a pivoting cam arrangement is shown in U.S. Provisional Patent Application No. 63/374,941 filed Sep. 8, 2022, also invented by Brian A. Blakley, and which is hereby incorporated by reference herein as if fully set forth in its entirety. This pivoting cam arrangement incorporates a three-position safety selector and associated structure to provide safe, standard semi-automatic, and forced reset semi-automatic modes.

Further improvement in forced reset triggers is desired.

## SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. Advantageously, the present invention provides a "three position" trigger mechanism having safe, standard semi-automatic, and forced reset semi-automatic positions.

In one aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member

does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The trigger mechanism can further include a spring which biases the trigger member towards the set position.

In another aspect, a firearm trigger mechanism comprises a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the housing to pivot on the hammer pin between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and mounted in the housing to pivot on the trigger member pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the housing to pivot on the trigger member pin, a locking member mounted in the housing to pivot on a transverse locking member pin, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.



The safety selector can have a protuberance thereon which, when the safety selector is in the forced reset semi-automatic position, contacts the disconnector preventing the disconnector hook from catching the hammer hook. The transversely aligned pairs of openings in the housing for receiving the hammer and trigger member pins can be adapted to be aligned with assembly pin openings in the fire control mechanism pocket. The trigger mechanism can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm comprises a receiver having a fire control mechanism pocket therein, a reciprocating bolt carrier, a hammer having a sear catch and a hook for engaging a disconnector and mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer pivoted rearward by rearward movement of the bolt carrier, a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis, the locking member being pivotable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rear-

ward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

The firearm can further comprise a housing having a first pair of transversely aligned openings with a hammer pin therethrough and a second pair of transversely aligned openings with a trigger member pin therethrough, the hammer mounted on the hammer pin, the trigger member and disconnector mounted on the trigger member pin. The firearm can further comprise the receiver having a first pair of transversely aligned assembly pin openings and a second pair of transversely aligned assembly pin openings, the housing first pair of openings coaxial with the receiver first pair of openings and the housing second pair of openings coaxial with the receiver second pair of openings, a first assembly pin passing through the receiver first pair of openings and through the housing first pair of openings, and a second assembly pin passing through the receiver second pair of openings and through the housing second pair of openings. The firearm can further include a spring which biases the trigger member towards the set position. The spring can be a compression spring positioned between a forward end of the trigger member and a floor of the housing.

In another aspect, a firearm trigger mechanism comprises a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, the trigger member having a surface positioned to be contacted by a surface of the hammer during rearward pivoting of the hammer to cause the trigger member to be forced to the set position, wherein the sear and sear catch are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, a disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on the transverse trigger member pivot axis, a locking member adapted to be movably mounted in the fire control mechanism pocket, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position, the locking member spring biased toward the first position and adapted to be moved against the spring bias to the second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and a safety selector adapted to be mounted in the fire control mechanism pocket to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. In the standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually release the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm. In the forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.



Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures, wherein:

FIG. **1** is a top front right perspective view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention.

FIG. **2** is a top rear right perspective view thereof.

FIG. **3** is a top rear right exploded perspective view thereof.

FIG. **4**A is a top rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **4**B is a bottom rear right cross-sectional view thereof with the safety selector in the safe position and with the hammer and trigger member in their set positions.

FIG. **5**A is a top rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **5**B is a bottom rear right cross-sectional view thereof with the safety selector in the standard semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**A is a top rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **6**B is a bottom rear right cross-sectional view thereof with the safety selector in the forced reset semi-automatic position and with the hammer and trigger member in their set positions.

FIG. **7** is a cross-sectional view showing the trigger module installed in a typical AR15-pattern lower receiver, with the hammer and trigger member in their set positions and with the bolt carrier in an in-battery position, and with the safety selector in the safe position.

FIG. **8**A is a view similar to FIG. **7** but with the safety selector in the standard semi-automatic position.

FIG. **8**B is a view similar to FIG. **8**A but after the trigger has been pulled to drop the hammer.

FIG. **8**C is a view similar to FIG. **8**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **8**D is a view similar to FIG. **8**C but with the bolt carrier having returned to battery and the disconnector having caught the hammer.

FIG. **9**A is a view similar to FIG. **7** but with the safety selector in the forced reset semi-automatic position.

FIG. **9**B is a view similar to FIG. **9**A but after the trigger has been pulled to drop the hammer.

FIG. **9**C is a view similar to FIG. **9**B but with the bolt carrier cycling to the rear to pivot the hammer.

FIG. **9**D is a view similar to FIG. **9**C but with the bolt carrier having returned to battery and the hammer and trigger having returned to their set positions.

## DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments. "Forward" will indicate the direction of the muzzle and the direction in which projectiles are fired, while "rearward" will indicate the opposite direction. "Lateral" or "transverse" indicates a side-to-side direction generally perpendicular to the axis of the barrel. Although firearms may be used in any orientation, "left" and "right" will generally indicate the sides according to the user's orientation, "top" or "up" will be the upward direction when the firearm is gripped in the ordinary manner.

Referring first to FIGS. **1**-**6**B, there is illustrated a "drop-in" trigger module **10** adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatic firearm platforms, such as the Ruger 10/22™, AK-pattern firearms, and HK-pattern firearms.

The module **10** includes a frame or housing **12** sized and shaped to fit within the internal fire control pocket of an AR-pattern lower receiver **14**. Lower receiver parts not important to the present invention are well-known in the art and are omitted from the figures for clarity. The housing **12** includes forward left and right sidewalls **16**, **18** which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **16**, **18** may be interconnected by a floor **20**. Shorter, more narrowly spaced apart and substantially vertical and parallel rear sidewalls **21**, **22** extend rearward from forward sidewalls **16**, **18** and are interconnected by a rear end wall **23**. The sidewalls **16**, **18** include first and second pairs of aligned openings **24**, **26** for receiving hollow transverse pins **30**, **32** upon which a hammer **36** and trigger member **38** pivot. The openings **24**, **26** are located coaxially with openings **42**, **44** in the lower receiver **14**. Standard AR-pattern hammer and trigger pins **46**, **48** pass through the openings **42**, **44** in the lower receiver **14** and through the hollow transverse pins **30**, **32** to assemble the housing **12** into the lower receiver **14**. Thus, the pins **30**, **32** retain the hammer **36** and trigger member **38** in the housing **12** in modular fashion, whereas the pins **46**, **48** retain the trigger module **10** in the lower receiver **14**.

The hammer **36** has a hammer head **50**, a sear catch **52**, a hammer hook **53**, and a concave contact surface **51**. The hammer **36** is spring biased towards a forward position by a standard AR-pattern hammer torsion spring (not shown).

The trigger member **38** has a trigger blade **54** that extends downwardly. The trigger blade **54** is the part of the trigger member **38** contacted by a user's finger to actuate the trigger mechanism. The trigger blade **54** may be curved (as shown) or straight, as desired. The trigger member **38** has a sear **56**. When the sear **56** and the sear catch **52** are engaged, the hammer **36** and trigger member **38** are in their set positions. When the sear **56** and sear catch **52** are not engaged, the hammer **36** and trigger member **38** are in their released positions. The trigger member **38** has a convex contact surface **58** that interacts with concave surface **51** on hammer **36** in a manner described below. The trigger member **38** also has a contact surface **69**. The trigger member **38** is spring biased by a compression spring **59** positioned between a forward end of the trigger member **38** and the floor **20** of the housing **12** so that the trigger blade **54** is spring biased towards a forward position.

A disconnector **60** is pivoted on the hollow transverse pin **32** upon which the trigger member **38** pivots. The disconnector **60** has a disconnector hook **64** and a tail **66**. The tail **66** of the disconnector **60** is spring biased upwardly away from a tail **68** of the trigger member **38** by a compression spring **67**.

A locking or blocking member **72** is movably mounted to the housing **12**. For example, the locking/blocking member **72** can be pivoted on a locking/blocking member pin or screw **74** that is installed in aligned openings **76** in the sidewalls **21**, **22** of the housing **12**. The locking member **72** has a first contact surface **78** that interacts with an engagement surface **94** in a rear portion **96** of a bolt carrier body **98** of a bolt carrier assembly **92**, in a manner to be described below. The locking member **72** has a second contact surface **80** that interacts with surface **69** of trigger member **38** in a manner to be described below. The locking member **72** is spring biased by a torsion spring **82** acting between a pin **84** in the sidewalls **21**, **22** and a lower portion of the locking member **72** such that surface **78** is biased rearward and surface **80** is biased forward. Alternatively, the locking/blocking member **72** can be slidably mounted to the housing **12** and spring biased forward by a compression spring.

An upper receiver **90** houses a bolt carrier assembly **92**. As is well-known in the art, the bolt carrier assembly **92** (or blow-back bolt) slidably reciprocates in the upper receiver **90** and engages the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The bolt carrier assembly **92** used with the embodiments of this invention can have either a standard mil-spec M16-pattern bolt carrier, a standard AR15-pattern bolt carrier, or some variation of the two, depending on the design of the locking member **72**, and whether operated by a gas direct impingement system or a gas piston system. The bolt carrier assembly **92** has an engagement surface **94** in a rear portion **96** of the bolt carrier body **98**. As in an ordinary AR15-pattern configuration, during rearward travel of the bolt carrier assembly **92** a lower surface **102** in a forward portion **104** of the bolt carrier body **98** contacts the face of

the hammer head **50** causing the hammer **36** to pivot rearward. Rearward travel of bolt carrier assembly **92** also moves engagement surface **94** rearward and away from surface **78** of locking member **72**. The action of spring **82** causes locking member **72** to pivot in a first direction from a first position wherein surface **80** of locking member **72** does not impede upward movement of surface **69** of trigger member **38** to a second position wherein surface **80** of locking member **72** does impede upward movement of surface **69** of trigger member **38** thus preventing the trigger blade **54** from being pulled by the user. During forward travel of the bolt carrier assembly **92** the engagement surface **94** of the bolt carrier body **98** contacts the surface **78** of the locking member **72** to pivot the locking member **72** in a second opposite direction from the second position to the first position.

A three position safety selector **110** has safe, standard semi-automatic, and forced reset semi-automatic positions. When in the safe position (safety selector indicator **111** pointing forward), a wide semi-circular portion **112** of the safety selector **110** prevents the trigger blade **54** from being pulled (FIGS. **4**A, **4**B, and **7**). When in the standard semi-automatic position (safety selector indicator **111** pointing upward), a flat portion **114** of the safety selector **110** permits the trigger blade **54** to be pulled. The disconnector **60** can pivot with the trigger member **38** and the disconnector hook **64** can catch the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **5**A and **5**B). When in the forced reset semi-automatic position (safety selector indicator **111** pointing rearward), a narrow semi-circular portion **116** permits the trigger blade **54** to be pulled but prevents the disconnector **60** from pivoting with the trigger member **38** thus preventing the disconnector hook **64** from catching the hammer hook **53** during rearward pivoting travel of the hammer head **50**. (FIGS. **6**A and **6**B). In other words, in the forced reset semi-automatic position, the disconnector **60** is “disabled” in that the disconnector hook **64** is unable to catch the hammer hook **53** during cycling of the bolt carrier assembly **92**.

Referring now to FIGS. **8**A-**8**D, with the safety selector **110** set in the standard semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge (not shown), and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. Also during pivoting travel of the hammer **36** the disconnector hook **64** catches the hammer hook **53**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise moving surface **80** out of the blocking position. At this point rearward finger pressure on the trigger blade **54** must be released to allow the sear **56** to engage the sear catch **52**, returning the hammer **36** and trigger member **38** to their set positions. Thereafter the user can reapply rearward finger pressure on the trigger blade **54** to fire another round.



Referring now to FIGS. **9**A-**9**D, with the safety selector **110** set in the forced reset semi-automatic position, rearward finger pressure on the trigger blade **54** causes the trigger member **38** to rotate clockwise. The narrow semi-circular portion **116** of the safety selector **110** prevents the disconnector **60** from rotating with the trigger member **38**, thus “disabling” the disconnector **60**, preventing the disconnector hook **64** from catching the hammer hook **53**. Rotation of the trigger member **38** causes the sear **56** to disengage from the sear catch **52** of the hammer **36**. This allows the hammer **36** to drop by spring force onto the firing pin **99** of the bolt carrier assembly **92**, discharging an ammunition cartridge, and causing the action to cycle by moving the bolt carrier assembly **92** rearward. Rearward travel of the bolt carrier assembly **92** frees the locking member **72** to pivot such that surface **80** is moved into a blocking position. Rearward travel of the bolt carrier assembly **92** also causes the lower surface **102** to contact the face of the hammer head **50** and pivot the hammer **36** counter-clockwise. During pivoting travel of the hammer **36** surface **51** contacts surface **58** of trigger member **38** forcing trigger member **38** to pivot counter-clockwise. The bolt carrier assembly **92** thereby forces the hammer **36** and trigger member **38** to their set positions wherein the sear **56** engages the sear catch **52**. Forward travel of the bolt carrier assembly **92** returning to battery causes the surface **94** to contact the surface **78** of the locking member **72** to pivot the locking member **72** clockwise. At this point the user can reapply rearward finger pressure on the trigger blade **54** to fire another round, without first manually releasing rear finger pressure on the trigger blade **54**.

Thus, as the bolt carrier assembly **92** returns forward, the trigger member **38** is held in its set position by the locking member **72**. The trigger member **38** cannot be pulled to release the sear/sear catch engagement, thus precluding early hammer release or “hammer follow” against the bolt carrier assembly **92** and firing pin **99** as the bolt carrier assembly **92** is returning to battery. When the bolt carrier assembly **92** has reached (or nearly reached) its closed, in-battery position, the engagement surface **94** contacts and forwardly displaces the contact surface **78** of the locking member **72**, disengaging the contact surface **80** of the locking member **72** from the contact surface **69** of the trigger member **38**, allowing the trigger blade **54** to be pulled. Again, this prevents early hammer release and contact of the hammer against the firing pin before the bolt is completely locked and in-battery.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. The invention resides in each individual feature described herein, alone, and in any and all combinations and subcombinations of any and all of those features. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. A firearm trigger mechanism comprising:

a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis

between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,

a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, said trigger member having a surface positioned to be contacted by a surface of said hammer during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,

wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,

a disconnector having a hook for engaging said hammer hook and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis,

a locking member adapted to be movably mounted in the fire control mechanism pocket, said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and

a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi-automatic, and forced reset semi-automatic positions,

whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, at which time a user must manually release said trigger member to free said



hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and

whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, said safety selector preventing said disconnector hook from catching said hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.

**2**. The trigger mechanism of claim **1**, wherein said safety selector is configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector contacts said disconnector preventing said disconnector hook from catching said hammer hook.

**3**. The trigger mechanism of claim **1**, further comprising a spring which biases said trigger member towards said set position.

**4**. The trigger mechanism of claim **1**, wherein said trigger member pivot axis and said disconnector pivot axis are the same axis.

**5**. The trigger mechanism of claim **1**, wherein said safety selector is adapted to be pivotably mounted in the fire control mechanism pocket to pivot on a transverse safety selector pivot axis.

**6**. The trigger mechanism of claim **1**, wherein said locking member is adapted to be pivotably mounted in the fire control mechanism pocket to pivot on a transverse locking member pivot axis.

**7**. The trigger mechanism of claim **1**, further comprising a housing having a first pair of transversely aligned openings for receiving a hammer pivot pin and a second pair of transversely aligned openings for receiving a trigger member pivot pin.

**8**. The trigger mechanism of claim **7**, wherein said housing has a third pair of transversely aligned openings for receiving a locking member pivot pin or screw.

* * * * *

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

Margaret Botkins
Clerk of Court

Jon Bastian
Chief Deputy Clerk

March 12, 2026

Chris Wolpert, Clerk of Court
United States Court of Appeals for the 10th Circuit
Byron R. White Courthouse
1823 Stout Street
Denver, CO 80257

Re: ABC IP LLC et al v. Peak Tactical LLC et al
District Court Case Number: 26-cv-18-KHR
Notice of Appeal Filed: 3/12/2026
$600 fee was not paid; $5 fee was not paid.

Dear Mr. Wolpert:

Attached are documents filed in connection with the Notice of Appeal in this case, which will constitute the preliminary record on appeal:

- Copy of District Court docket entries
- Copy of Notice of Appeal
- Copy of the District Court's final judgment or order(s) from which the appeal is taken, as follows:

[45] Order Denying Plaintiffs' Motion for Expedited Discovery

If anything further is required, please let me know.

Sincerely,

Margaret Botkins
Clerk of Court

By:______________________
MiYon Bowden

Attachment(s)

APPEAL

# U.S. District Court
# District of Wyoming (Cheyenne)
# CIVIL DOCKET FOR CASE #: 2:26−cv−00018−KHR
## *Internal Use Only*

| | |
|---|---|
| ABC IP LLC et al v. Peak Tactical LLC et al | Date Filed: 01/15/2026 |
| Assigned to: Chief District Judge Kelly H Rankin | Jury Demand: Plaintiff |
| Referred to: US Magistrate Judge Scott P Klosterman | Nature of Suit: 830 Patent |
| Cause: 35:271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**ABC IP LLC**
*a Delaware limited liability company*

represented by

**Glenn D Bellamy**
Wood, Herron & Evans LLP
600 Vine Street
Suite 2800
Cincinnati, OH 45202
513−241−2324
Fax: 513−241−6234
Email: gbellamy@whe−law.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan A Nicholas**
Koch Law, P.C.
121 West Carlson
Ste 3
Cheyenne, WY 82009
307−426−5010
Email: nnicholas@kochlawpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Christoff**
Fish & Richardson
1000 Maine Ave. SW
Washington, DC 20024
202−626−7724
Email: christoff@fr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl Bruce**
Fish & Richardson − Carl Bruce
1 Marina Park Drive
Boston, MA 02210
617−542−5070
Email: bruce@fr.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Matt Colvin**
Fish & Richardson − Matt Colvin
1717 Main Street
Ste 5000
Dallas, TX 75201
214−747−5070
Fax: 214−747−2091
Email: colvin@fr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Travis W Koch**
KOCH LAW PC
Wyoming
P.O. Box 2660
Cheyenne, WY 82003
307−426−5010
Fax: 307−426−4927
Email: tkoch@kochlawpc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rare Breed Triggers Inc**
*a Texas corporation*

represented by

**Glenn D Bellamy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan A Nicholas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Christoff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carl Bruce**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matt Colvin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Travis W Koch**
(See above for address)

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Peak Tactical LLC**
*a Wyoming limited liability company*
*doing business as*
Partisan Triggers

represented by

**Andrew C Orr**
HOLLAND & HART LLP
Wyoming
645 South Cache Street
Suite 100
Jackson, WY 83001
307−739−9741
Email: acorr@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Pope**
HOLLAND & HART LLP
2020 Carey Avenue
Suite 800
Cheyenne, WY 82001
307−778−4200
Fax: 307−778−8175
Email: jspope@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Randall Roeser**
Holland & Hart LLP
1800 Broadway
Ste. 300
Boulder, CO 80302
303−473−2700
Email: jrroeser@hollandhart.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy P Getzoff**
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
303−473−2734
Email: tgetzoff@hollandhart.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul Douglas Swanson**
Holland & Hart LLP
555 Seventeenth Street

Ste 3200
Denver, CO 80202
303−295−8578
Fax: 303−416−8814
Email: pdswanson@hollandhart.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nicholas Norton** represented by

**Andrew C Orr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Pope**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Randall Roeser**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy P Getzoff**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul Douglas Swanson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/15/2026 | 1 | COMPLAINT against All Defendants with Jury Demand. (Filing fee $405 Receipt Number AWYDC−2724915) Attorney Travis W Koch added to party ABC IP LLC(pty:pla), Attorney Travis W Koch added to party Rare Breed Triggers, Inc.(pty:pla), filed by ABC IP LLC, Rare Breed Triggers Inc (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E − Part 1, # 6 Exhibit Ex. E − Part 2, # 7 Exhibit Ex. F, # 8 Exhibit Ex. G, # 9 Exhibit Ex. H, # 10 Exhibit Ex. I − Part 1, # 11 Exhibit Ex. I − Part 2, # 12 Exhibit Ex. J, # 13 Civil Cover Sheet, # 14 Summons − Peak Tactical, LLC, # 15 Summons − N. Norton) (Koch, Travis) Modified text on 1/16/2026 (Court Staff, stmo). (Entered: 01/15/2026) |
| 01/15/2026 | 2 | CORPORATE DISCLOSURE filed by ABC IP LLC (no corporate parent) (Koch, Travis) Modified text on 1/16/2026 (Court Staff, stmo). (Entered: 01/15/2026) |
| 01/15/2026 | 3 | |

| | | |
|---|---|---|
| | | CORPORATE DISCLOSURE filed by Rare Breed Triggers Inc (no corporate parent) (Koch, Travis) Modified text on 1/16/2026 (Court Staff, stmo). (Entered: 01/15/2026) |
| 01/16/2026 | 4 | Notice of Judge Assignment and Consent to Proceed before a Magistrate Judge. The case has been assigned to the Honorable Kelly H. Rankin as Presiding Judge and the Honorable Scott P. Klosterman as Referral Judge. (Court Staff, stmo) (Entered: 01/16/2026) |
| 01/16/2026 | 5 | Summonses Issued (Court Staff, stmo) (Entered: 01/16/2026) |
| 01/16/2026 | 6 | MOTION for Preliminary Injunction , MOTION for Temporary Restraining Order filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Proposed Order)(Koch, Travis) (Entered: 01/16/2026) |
| 01/16/2026 | 7 | MEMORANDUM in Support of 6 Motion for Preliminary Injunction, Motion for Temporary Restraining Order filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E, # 6 Exhibit Ex. F, # 7 Exhibit Ex. G, # 8 Exhibit Ex. H, # 9 Exhibit Ex. I, # 10 Exhibit Ex. J, # 11 Exhibit Ex. K, # 12 Exhibit Ex. L, # 13 Exhibit Ex. M, # 14 Exhibit Ex. N, # 15 Exhibit Ex. O, # 16 Exhibit Ex. P, # 17 Exhibit Ex. Q, # 18 Exhibit Ex. R, # 19 Exhibit Ex. S, # 20 Exhibit Ex. T, # 21 Exhibit Ex. U, # 22 Exhibit Ex. V, # 23 Exhibit Ex. W, # 24 Exhibit Ex. X, # 25 Exhibit Ex. Y, # 26 Exhibit Ex. Z, # 27 Exhibit Ex. AA) (Koch, Travis) (Entered: 01/17/2026) |
| 01/20/2026 | 8 | NOTICE of Attorney Appearance by Jeffrey Scott Pope on behalf of Nicholas Norton, Peak Tactical LLC (Pope, Jeffrey) (Entered: 01/20/2026) |
| 01/20/2026 | 9 | ORDER Setting Hearing and Briefing Schedule by the Chief District Judge Kelly H Rankin, re 6 MOTION for Preliminary Injunction and MOTION for Temporary Restraining Order. Plaintiffs to serve Defendants with the Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on or before January 23, 2026. Defendants to file a written response to the Motion no later than January 30, 2026. The Response shall comply with Local Rule 7.1(b)(2). **IN−PERSON Motion Hearing set for 2/4/2026 at 10:00 AM in Cheyenne Courtroom No. 1 (Room No. 2132) before Chief District Judge Kelly H Rankin.** (Court Staff, smxb) (Entered: 01/20/2026) |
| 01/20/2026 | 10 | NOTICE of Attorney Appearance by Andrew C Orr on behalf of Nicholas Norton, Peak Tactical LLC (Orr, Andrew) (Entered: 01/20/2026) |
| 01/22/2026 | 11 | NOTICE by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc *Report on the filing or determination of an action regarding patent or trademark* (Attachments: # 1 A0 120) (Nicholas, Nathan) (Entered: 01/22/2026) |
| 01/24/2026 | 12 | WAIVER OF SERVICE Returned Executed by ABC IP LLC, Rare Breed Triggers Inc. Nicholas Norton 1/23/2026, answer due 3/23/2026 (Nicholas, Nathan) Modified date on 2/2/2026 (Court Staff, smxb). (Entered: 01/24/2026) |
| 01/24/2026 | 13 | WAIVER OF SERVICE Returned Executed by ABC IP LLC, Rare Breed Triggers Inc. Peak Tactical LLC 1/23/2026, answer due 3/23/2026 (Nicholas, Nathan) Modified date on 2/2/2026 (Court Staff, smxb). (Entered: 01/24/2026) |
| 01/24/2026 | 14 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Carl Bruce to appear pro hac vice; Check not tendered; filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Exhibit Declaration of Carl Bruce)(Nicholas, Nathan) (Entered: 01/24/2026) |

| | | |
|---|---|---|
| 01/24/2026 | 15 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Ben Christoff to appear pro hac vice; Check not tendered; filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Exhibit Declaration of Ben Christoff)(Nicholas, Nathan) (Entered: 01/24/2026) |
| 01/24/2026 | 16 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Matthew Colvin to appear pro hac vice; Check not tendered; filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Exhibit Declaration of Matthew Colvin)(Nicholas, Nathan) (Entered: 01/24/2026) |
| 01/27/2026 | 17 | (TEXT−ONLY) NOTICE Resetting Hearing on 6 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order IN−PERSON. **Motion Hearing reset for 2/4/2026 at 09:00 AM in Cheyenne Courtroom No. 1 (Room No. 2132) before Chief District Judge Kelly H Rankin.** (Court Staff, smxb) (Entered: 01/27/2026) |
| 01/27/2026 | 18 | ORDER by the US Magistrate Judge Scott P Klosterman granting 14 MOTION to appear pro hac vice admitting Carl Bruce, 15 MOTION to appear pro hac vice admitting Ben Christoff, 16 MOTION to appear pro hac vice admitting Matthew Colvin for Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. Emailed counsel on this date.(Court Staff, smxb) (Entered: 01/27/2026) |
| 01/27/2026 | 19 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Timothy P. Getzoff to appear pro hac vice; Check not tendered; filed by Defendants Nicholas Norton, Peak Tactical LLC. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Pope, Jeffrey) (Entered: 01/27/2026) |
| 01/28/2026 | 20 | ORDER by Judge Scott P Klosterman granting 19 MOTION to appear pro hac vice admitting Timothy P. Getzoff for defendants Peak Tactical LLC, Nicholas Norton. Emailed counsel on this date. (Court Staff, smxb) Modified judge on 1/28/2026 (Court Staff, smxb). (Main Document 20 replaced on 1/28/2026) (Court Staff, smxb). (Entered: 01/28/2026) |
| 01/28/2026 | 21 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Paul Swanson to appear pro hac vice; Check not tendered; filed by Defendants Nicholas Norton, Peak Tactical LLC. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Pope, Jeffrey) (Entered: 01/28/2026) |
| 01/28/2026 | 22 | ORDER by the US Magistrate Judge Scott P Klosterman granting 21 MOTION to appear pro hac vice admitting Paul Swanson for defendants Peak Tactical LLC, Nicholas Norton. Emailed counsel on this date. (Court Staff, smxb) (Entered: 01/28/2026) |
| 01/29/2026 | | FINANCIAL ENTRY: $100 Pro Hac Vice Fee Paid (Receipt #2−5659 for the total amount of $200 received) On Behalf of Timothy P Getzoff and Paul Swanson. (Court Staff, smek) (Entered: 01/29/2026) |
| 01/29/2026 | 23 | Notice of Pro Hac Vice Attorney Appearance by Timothy P Getzoff on behalf of Nicholas Norton, Peak Tactical LLC (Getzoff, Timothy) (Entered: 01/29/2026) |
| 01/30/2026 | 24 | Notice of Pro Hac Vice Attorney Appearance by Carl Bruce on behalf of ABC IP LLC, Rare Breed Triggers Inc (Bruce, Carl) (Entered: 01/30/2026) |
| 01/30/2026 | 25 | Notice of Pro Hac Vice Attorney Appearance by Benjamin Christoff on behalf of ABC IP LLC, Rare Breed Triggers Inc (Christoff, Benjamin) (Entered: 01/30/2026) |

| | | |
|---|---|---|
| 01/30/2026 | 26 | Notice of Pro Hac Vice Attorney Appearance by Matt Colvin on behalf of ABC IP LLC, Rare Breed Triggers Inc (Colvin, Matt) (Entered: 01/30/2026) |
| 01/30/2026 | 27 | RESPONSE in Opposition re 6 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order filed by Defendants Nicholas Norton, Peak Tactical LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Thumb drive of Exhibits 9 and 10 received and retained in Clerk's Office on 2/4/26) (Orr, Andrew) Modified text on 2/4/2026 (Court Staff, smxb). (Attachment 2 replaced to fix page orientation on 2/18/2026) (Court Staff, szf). (Entered: 01/30/2026) |
| 02/02/2026 | 28 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Glen Bellamy to appear pro hac vice; Check not tendered; filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Exhibit Declaration of Glen Bellamy, # 2 Proposed Order Proposed Order)(Nicholas, Nathan) (Entered: 02/02/2026) |
| 02/02/2026 | | FINANCIAL ENTRY: PAYMENT OF $100 RECEIVED FOR PRO HAC VICE FEE FOR CARL BRUCE. RECEIPT 2−5678. (Court Staff, smek) (Entered: 02/02/2026) |
| 02/02/2026 | | FINANCIAL ENTRY: $200 Pro Hac Vice Fee Paid (Receipt #2−5679 for the total amount of $200 received) On Behalf of Ben Christoff and Matthew Colvin. (Court Staff, smek) (Entered: 02/02/2026) |
| 02/02/2026 | 29 | Notice of Pro Hac Vice Attorney Appearance by Paul Douglas Swanson on behalf of Nicholas Norton, Peak Tactical LLC (Swanson, Paul) (Entered: 02/02/2026) |
| 02/03/2026 | 30 | ORDER by the US Magistrate Judge Scott P Klosterman granting 28 MOTION to appear pro hac vice admitting Glen Bellamy for plaintiffs ABC IP LLC, Rare Breed Triggers Inc. Emailed counsel on this date. (Court Staff, smxb) (Entered: 02/03/2026) |
| 02/04/2026 | | FINANCIAL ENTRY: PAYMENT OF $100 RECEIVED FOR PRO HAC VICE FEE FOR GLEN BELLAMY. RECEIPT 2−5686. (Court Staff, smek) (Entered: 02/04/2026) |
| 02/04/2026 | 31 | MINUTES for proceedings held before Chief District Judge Kelly H Rankin: Motion Hearing held on 2/4/2026. Motions taken under advisement. (Court Reporter Jan Davis.) (Attachments: # 1 Exhibit 1, # 2 Exhibit 3) (Thumb drive containing Exhibits A and B received and retained in Clerk's Office on 2/6/26). (Court Staff, smxb) Modified text on 2/10/2026 (Court Staff, smxb). (Entered: 02/04/2026) |
| 02/05/2026 | 32 | Notice of Pro Hac Vice Attorney Appearance by Glenn D Bellamy on behalf of ABC IP LLC, Rare Breed Triggers Inc ~~Filing fee $ 100, receipt number AWYDC−2733256.~~ (Bellamy, Glenn) Modified on 2/5/2026 (Court Staff, smek). (Entered: 02/05/2026) |
| 02/06/2026 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion for Temporary Restraining Order held on 2/4/2026 before Judge Kelly H. Rankin. To purchase a copy of this transcript, please contact Court Reporter Jan Davis, phone (307) 433−2154 or email jbd.davis@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction.**THIS TRANSCRIPT MUST NOT BE ATTACHED AS AN EXHIBIT OR MADE PART OF AN APPENDIX.** . Notice of Intent to Redact due 2/13/2026. Notice of Redaction Request due 2/27/2026. Redacted Transcript Deadline set for 3/9/2026. Release of Transcript Restriction set for 5/7/2026. (Davis, Jan) (Entered: 02/06/2026) |
| 02/06/2026 | 34 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for Jeffrey R. Roeser to appear pro hac vice; Check not tendered; filed by Defendants Nicholas Norton, Peak |

| | | |
|---|---|---|
| | | Tactical LLC. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Pope, Jeffrey) (Entered: 02/06/2026) |
| 02/06/2026 | 35 | ORDER by the US Magistrate Judge Scott P. Klosterman granting 34 MOTION for Jeffrey R. Roeser to appear pro hac vice on behalf of Defendants Peak Tactical LLC, Nicholas Norton (order emailed to phv counsel on this date) (Court Staff, sbh) (Entered: 02/06/2026) |
| 02/09/2026 | 36 | Notice of Pro Hac Vice Attorney Appearance by Jeffrey Randall Roeser on behalf of Nicholas Norton, Peak Tactical LLC Filing fee $ 100, receipt number AWYDC−2734602. (Roeser, Jeffrey) (Entered: 02/09/2026) |
| 02/11/2026 | 37 | NOTICE by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc *OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF [Dkt. No. 6 ] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Order Granting Preliminary Injunction in ABC IP, LLC v. Hoffman, Case No. 1:25−cv−00389−CKC−CHS)* (Attachments: # 1 Exhibit A to Not of Supplemental Authority − Preliminary Injunction, # 2 Exhibit B to Not of Supplemental Authority − Memorandum Granting Preliminary Injunction) (Colvin, Matt) Modified text on 2/19/2026 (Court Staff, sjlg). (Entered: 02/11/2026) |
| 02/13/2026 | 38 | CORPORATE DISCLOSURE filed by Nicholas Norton, Peak Tactical LLC identifying Corporate Parent QOX Consulting, LLC for Nicholas Norton, Peak Tactical LLC.. (Pope, Jeffrey) (Entered: 02/13/2026) |
| 02/13/2026 | 39 | ORDER by the Chief District Judge Kelly H. Rankin denying 6 Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Court Staff, sesh) (Entered: 02/13/2026) |
| 02/14/2026 | 40 | NOTICE by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc *RE MULTIDISTRICT LITIGATION FILING* (Attachments: # 1 Attachment − Part 1 − Mot to Transfer and Resp, # 2 Attachment − Part 2 − Mot to Transfer and Resp, # 3 Attachment − Part 3 − Mot to Transfer and Resp, # 4 Attachment − Part 4 − Partisan Resp, # 5 Attachment − Part 5 − Not of Potential Tag−Alongs, # 6 Exhibit 1 to Attachment − Part 5, # 7 Exhibit 2 to Attachment − Part 5, # 8 Exhibit 3 to Attachment − Part 5, # 9 Exhibit 4 to Attachment − Part 5, # 10 Exhibit 5 to Attachment − Part 5, # 11 Exhibit 6 to Attachment − Part 5, # 12 Exhibit 7 to Attachment − Part 5, # 13 Exhibit 8 to Attachment − Part 5, # 14 Exhibit 9 to Attachment − Part 5) (Colvin, Matt) (Entered: 02/14/2026) |
| 02/20/2026 | 41 | MOTION for Order to Expedite Discovery filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Proposed Order Granting for Expedited Discovery)(Colvin, Matt) Modified event on 2/24/2026 (Court Staff, sjlg). (Entered: 02/20/2026) |
| 02/20/2026 | 42 | MEMORANDUM in Support of 41 Motion to Expedite filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Attachments: # 1 Appendix A to Memo in Support of Motion for Expedited Discovery, # 2 Appendix B to Memo in Support of Motion for Expedited Discovery, # 3 Exhibit 1 to Memo in Support of Motion for Expedited Discovery, # 4 Exhibit 2 to Memo in Support of Motion for Expedited Discovery, # 5 Exhibit 3 to Memo in Support of Motion for Expedited Discovery, # 6 Exhibit 4 to Memo in Support of Motion for Expedited Discovery) (Colvin, Matt) (Entered: 02/20/2026) |
| 02/27/2026 | 43 | RESPONSE in Opposition re 41 MOTION for Order to Expedite Discovery filed by Defendants Nicholas Norton, Peak Tactical LLC. (Attachments: # 1 Exhibit Exhibit A |

| | | |
|---|---|---|
| | | to Response, # 2 Exhibit Exhibit B to Response) (Getzoff, Timothy) (Entered: 02/27/2026) |
| 03/05/2026 | 44 | REPLY to 43 Response in Opposition to Motion filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Colvin, Matt) (Entered: 03/05/2026) |
| 03/11/2026 | 45 | ORDER by the Chief District Judge Kelly H. Rankin denying 41 Plaintiffs' Motion for Expedited Discovery. (Court Staff, sesh) (Entered: 03/11/2026) |
| 03/12/2026 | 46 | NOTICE OF APPEAL as to 45 Order on Motion for Order, 39 Order on Motion for Preliminary Injunction, Order on Motion for TRO filed by Plaintiffs ABC IP LLC, Rare Breed Triggers Inc. (Colvin, Matt) (Entered: 03/12/2026) |

Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar # 7-5418
Koch Law, P.C.
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation, | ) | Case No. |
| *Plaintiffs*, | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, | ) | |
| and | ) | |
| NICHOLAS NORTON, an individual, | | |
| *Defendants*. | | |

---

**COMPLAINT FOR PATENT INFRINGEMENT, FALSE PATENT MARKING, AND FALSE ADVERTISING**

---

This is an action for patent infringement and false patent marking in which Rare Breed Triggers, Inc. (“Rare Breed”) and ABC IP LLC (“ABC”) (collectively, “Plaintiffs”) accuse Peak Tactical, LLC d/b/a Partisan Triggers and its owner, Nicholas Norton (collectively, “Defendants”), of infringing U.S. Patent No. 10,514,223 (“the ’223 Patent”); U.S. Patent No. 11,724,003 (“the ’003 Patent”), 12,036,336 (“the ’336 Patent”), and 12,274,807 (“the ’807 Patent) (collectively,

"the Asserted Patents") and marking products with a false patent number for the purpose of deceiving the public, as follows:

## THE PARTIES

1. Rare Breed is a corporation organized under the laws of the State of Texas with an address at 2710 Central Fwy, Suite. 150-151, Wichita Falls, TX 76306.

2. ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

3. Upon information and belief, Peak Tactical, LLC d/b/a Partisan Triggers ("Peak"), is a Wyoming company that lists a principal office at 131 Franklin Plaza, Ste. 257, Franklin, N.C. 28734. Partisan Triggers is a d/b/a by Peak Tactical LLC in Wyoming.

4. Upon information and belief, Nicholas Norton is an individual residing in Wyoming or North Carolina, and working in Wyoming, and is the owner of Peak Tactical, LLC.

## JURISDICTION AND VENUE

5. This is an action for patent infringement arising under 35 U.S.C. §§ 271(a)-(b), 281, and 283-85.

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338, which directs that United States District Courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents and pursuant to 28 U.S.C. § 1331, which pertains to civil actions arising under the laws of the United States.

7. Personal jurisdiction and venue over Defendants is proper in this District because Defendants reside in and/or have a place of business this district. Nicholas Norton has availed himself of Wyoming's laws by owning a business in Wyoming with a principal address in

Wyoming. Additionally, on information and belief Mr. Norton commits and directs infringing activities from Peak Tactical, LLC's principal place of business in Wyoming.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1400. Defendants reside in this district and/or have a regular and established place of business in this District.

## BACKGROUND

9. This lawsuit asserts direct infringement of the '223 Patent, the '003 Patent, the '336 Patent, and the '807 Patent ("the Asserted Patents"). True copies of the '223 Patent, the '003 Patent, the '336 Patent, and the '807 Patent are attached hereto as Exhibits A, B, C, and D, respectively.

10. The '223 Patent was lawfully and properly issued by the United States Patent and Trademark Office on December 24, 2019. Each and every claim of the '223 Patent is valid and enforceable.

11. The '003 Patent was lawfully and properly issued by the United States Patent and Trademark Office on August 15, 2023. Each and every claim of the '003 Patent is valid and enforceable.

12. The '336 Patent was lawfully and properly issued by the United States Patent and Trademark Office on July 16, 2024. Each and every claim of the '336 Patent is valid and enforceable.

13. The '807 Patent was lawfully and properly issued by the United States Patent and Trademark Office on April 15, 2025. Each and every claim of the '807 Patent is valid and enforceable.

14. ABC is the owner by assignment of all right, title and interest in and to the Asserted Patents. These assignments have been recorded at the United States Patent and Trademark Office ("USPTO").

15. Rare Breed is the exclusive licensee of the Asserted Patents. Plaintiffs have complied with the requirements of 35 U.S.C. § 287 either because the Asserted Patents are not practiced by ABC or any licensee and/or because any licensee has been required to mark its product.

16. Upon information and belief, Defendants have committed acts of direct, contributory, and induced patent infringement, which will be described in more detail below. These acts are in violation of 35 U.S.C. § 271 and should be considered willful.

17. Upon information and belief, Defendants were aware that their acts were infringing and were, therefore, willful.

## THE INVENTIONS

18. A typical AR15-pattern firearm, for example, is considered a semiautomatic firearm. The operation of a standard disconnector AR-pattern trigger mechanism is commenced by the trigger member being pulled by the user. The trigger member releases the hammer from the trigger sear and allows the hammer to strike the firing pin. A portion of the propellant gas is used to begin the process of sending the bolt carrier to the rear of the firearm. The rearward movement of the bolt carrier cocks the hammer on the disconnector and then the bolt is allowed to return forward into battery with a new round inserted into the chamber. While this is happening, in the standard AR-pattern semiautomatic trigger, the user can either continue to hold the trigger member in a pulled (i.e., fired) state or allow the trigger to return to its reset state, in which the sear, rather than the disconnector, engages and holds the hammer in a cocked position. When the user reduces

pressure on the trigger member to allow the trigger spring to reset the trigger member, the disconnector releases the hammer to engage the trigger sear.

19. In the standard AR-pattern trigger assembly, the purpose of the disconnector is to hold the hammer in a cocked position until the trigger member is reset by a trigger spring when the user allows the trigger to reset. The disconnector allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to manually reset the trigger rapidly enough so that the sear engages with the hammer before the bolt carrier or bolt returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer to simply "follow" the bolt carrier as it returns to battery without firing a second round, leaving the hammer uncocked.

20. In contrast, in a forced reset trigger mechanism, cycling of the bolt carrier or bolt causes the trigger member to be forced to the reset position and hold the trigger member in a locked state until the bolt or bolt carrier is back in battery, when it is safe for the user to pull the trigger again, without the need for a disconnector.

21. The '223 Patent describes and claims a device in which the cycling of the action displaces the hammer which causes the trigger member to forcefully reset the trigger member. A locking bar prevents the trigger member from being pulled again by the user until the bolt carrier has returned to the in-battery position.

22. The '003 Patent, the '336 Patent, and the '807 Patent describe and claim a similarly operating device with the additional feature that allows it to be selected to operate in either of two distinct modes: 1) standard disconnector semiautomatic mode and 2) forced reset semiautomatic mode.

23. The claims of the patents define the scope of the patented invention(s).

## THE INFRINGEMENT

24. On information and belief, Defendants are currently making, using, selling, offering for sale, and/or importing a forced reset trigger assembly, which includes a three-position safety selector, known as the "Disruptor" ("the Infringing Device"), which embodies the technology claimed in the Asserted Patents.

25. On information and belief, Defendants are making, using, selling, offering for sale, and/or importing the Infringing Device. In a thread on the forum AR15.com formed September 15, 2025, Defendants, *inter alia*, stated the following:

- "A large number of sales and reviewer samples have already gone out, including to a pretty well known guy who has posted in this thread."
- "Our full release is set to occur in time for the holidays, and in such quantities that you won't have to worry about back orders or whether you can find and receive a trigger in short order."
- "There will be a substantial number of units available on release day. Enough that we don't need to worry about throttling sales so that everyone can get one."
- "How many units are we getting ready to ship? A lot of them [showing picture depicting cards corresponding to the number of infringing products]."
- "Everything is set for [December 15, 2025]. Most of the retailers launching Monday are regional brick and mortar locations. There will be a major online retailer selling and shipping Monday, as well as several more major retailers as they receive their shipments throughout the week. We will post the online retailer shipping Monday at 0900 EST. You can also expect a number of review videos to go live Monday."
- "We are doing spot testing of our first full production run this week and early next."
- "More testing yesterday and today with Sig SPEAR-MCX and Light versions."
- "There are people unrelated to the project who have attested in this very thread to getting the opportunity to test fire the trigger that is being released at various events, and we haven't heard a complaint from a single tester."

*See* Ex. E.

26. On information and belief, Defendants sell, offer for sale, and/or offered for sale the Infringing Device via the website https://partisantriggers.com/the-disruptor. Exemplary photographs of the Infringing Device (in Green) are shown below:




Ex. F

27. On information and belief, Defendants promotes the sale of the Infringing Device via the website: https://partisantriggers.com, which includes hyperlink buttons "Where To Find" and "Where can I buy one?," as well as direct hyperlinks to websites for "Available Now" sellers and "Coming Soon" sellers, as reproduced below.




Ex. G

28. On information and belief, Defendants promote the sale of the Infringing Device via the forum AR15.com. In a thread formed September 15, 2025, Defendants, *inter alia*, stated the following:

- "Target price is $200 or just a little north of there."
- "This trigger is going to be a very good trigger, and great value for your dollars."
- "It would be shocking if you find a better quality FRT at a comparable price. We are confident that you will find it to be the gold standard."
- "There is a 1 year manufacturers warranty."
- "Our focus is now on finalizing production, marketing and websites. As we ramp up, we have videos to shoot, samples to get out to your favorite reviewers, contracts to sign and Purchase Orders to fulfill."
- "Many of your favorite big time retailers/distributors will have our product."
- "@PartisanTriggers are these going to be available at brick and mortar retailers?" "Yes."
- "Appreciate those who are keeping the thread bumped daily."
- "We fully agree that the more FRTs in circulation, the better."

*See* Ex. E.

29. The Infringing Device can operate in a "disconnector mode," which is much like that of a standard AR-15 trigger. The user can switch between safe, standard semiautomatic with disconnector, and forced reset semiautomatic modes by moving the safety selector between positions.

30. When the Infringing Device operates in the forced reset mode, the cycling of the action causes hammer contact with the trigger member to forcefully reset the hammer and trigger member. A locking bar/member prevents the trigger member from being pulled again by the user until the bolt carrier has returned to the in-battery position.

31. When in the standard semi-automatic mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm again.

32. When in the forced reset semi-automatic mode, rearward movement of the bolt carrier causes rearward pivoting of the hammer causing the trigger member to be forced to the set position, the safety selector preventing the disconnector hook from catching the hammer hook, and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull the trigger member to fire the firearm without manually releasing the trigger member.

33. Defendants' website includes a page titled "FRT Legal Library" at https://partisantriggers.com/library, attached as Ex. H. This web page links to copies of several documents, including the '223 Patent, the '003 Patent, and the '336 Patent, showing that Defendants are aware of Plaintiffs' patent rights and that they are relevant to the product it is

making, using, selling, offering for sale, and/or importing. This provides notice of Plaintiffs' patent rights to reseller customers of the Disruptor.

34. On information and belief, Defendants, formed a forum thread on AR15.com on September 13, 2025. In this thread, Defendants, *inter alia*, demonstrated their knowledge of Plaintiffs' ownership of and willingness to defend its patent rights. Specifically, Defendants stated the following:

- "It is a three position cassette style trigger, and better than the RB trigger across the board."
- "After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments."
- "The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent."
- "It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble."
- "Get plenty of popcorn ready – it's likely to be highly entertaining."
- "Our (not mine, our) words were chosen carefully and vetted with our legal team prior to the OP."
- "[E]very part of this project has been preplanned."
- "[W]e won't be posting any of the brick and mortar locations unless they ask us to, as none of them want a bogus C&D letter from someone suing everyone and their mother. It is a hassle, and they know our trigger will sell regardless."

- "Shroud with deception everything you do."

*See* Ex. E.

35. On information and belief, Defendants formed a forum thread on AR15.com on January 7, 2026. In this thread, Defendants, *inter alia*, demonstrated their knowledge of Plaintiffs' ownership of and willingness to defend its patent rights. Specifically, Defendants stated the following:

- "In [a September 2025 forum post], we detailed our preparations for the inevitable lawsuit from Rare Breed Triggers/ABC IP (RBT)."
- "Dealers are indemnified under our substantial patent insurance policy—covering the Disruptor alongside our upcoming releases, and worth multiples of RBT's claimed millions in litigation costs from their prior lawsuits."
- "After some discussions with our legal team, we have decided to make a few things clear, out here in public. . . ."
- "As many know, RBT [Rare Breed] named us as a John Doe d/b/a Partisan Triggers in an Arizona suit filed December 23, 2025."
- "Do your homework and sue us in the right venue boys, you're just...so disappointing right now."
- "We don't believe we've violated any valid patent."

*See* Ex. I.

36. In January 7, 2026 thread, Defendants, *inter alia*, demonstrated their intent to continue to infringe the Asserted Patents by making, using, selling, offering for sale, and/or importing the Accused Product. Specifically, Defendants stated the following:

- This week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end."
- "RBT excels at bullying small companies, often run by young men who have barely gotten their feet under them in life, through aggressive lawfare to bankrupt and break them. It's easy to feel invincible when facing under-resourced opponents while relying on powerful allies. Rest assured, this won't work against us."

- "You and our dealers can trust we won't be bullied or back down. . . . We are here for the long haul, so strap in, folks—this may turn into a wild ride. Thumbs up, let's do this."

- "We have no plans or need for donations; support us by spreading the word or buying our triggers."

- "We would like to ask you to do something. If you have useful information on RBT (or related parties) for this lawsuit, PM us on ARFCOM to share it. We feel very confident in our preparations, but we are aware that there is always the possibility someone may know something we've missed. We hope they see this and want to help."

*See* Ex. I.

37. In view of the Defendants' knowledge of the Plaintiffs' patent rights as evidenced by the "Legal Library" on the Partisan Triggers website and its knowledge of the allegations made against Defendants in the case *Rare Breed Triggers Incorporated et al v. Firearm Systems LLC et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025), the infringement is willful.

38. On information and belief, Nicholas Norton is and/or has been and is working in concert with Douglas Rios ("Rios") on the development, manufacture, and/or import of the Infringing Device.

39. Rios is a named party in prior litigation relating to the '223 Patent, i.e., *Rare Breed Triggers, LLC, et al. v. Big Daddy Enterprises, Inc., et al.*, Case No. 1:21-cv-149, N.D Florida ("Prior Litigation"). In that prior litigation, Rios is a party expressly bound by a permanent injunction entered October 19, 2022. That injunction provides:

> The issues of infringement, validity, and enforceability are hereby finally concluded and disposed of and this CONSENT JUDGMENT AND PERMANENT INJUNCTION bars each and any of the Defendants from contending in this action or any other proceeding that the claims of the '223 Patent are invalid, unenforceable or not infringed.

40. Pursuant to Federal Rule of Civil Procedure 65, an injunction binds persons who receive actual notice of the injunction by personal service or otherwise, to include the parties and other persons who are in active concert or participation with any of them.

41. Rios is a named Defendant who was represented by counsel in the Prior Litigation and is, thus is presumed to have received actual notice of the injunction.

42. Existence of the injunction was well known among those who manufacture rate enhancing devices for firearms, including assisted reset and forced reset triggers, including, on information and belief, Nicholas Norton.

43. On information and belief, Rios gave actual notice of the injunction for the Prior Litigation to Nicholas Norton. In any event, Nicholas Norton has actual notice of the injunction no later than the service of this Complaint. Because Nicholas Norton is acting in active concert or participation with Rios with respect to the Infringing Device, he is bound by the injunction's terms.

## FALSE MARKING AND ADVERTISING

44. The claims of U.S, Patent No. 9,146,067 do not cover a forced reset trigger.

45. On information and belief, Defendants know that the Disruptor is a forced reset trigger and that the claims of U.S, Patent No. 9,146,067 do not cover that product.

46. Defendants falsely promote the Disruptor as not being a forced reset trigger. The Partisan Triggers website sates at https://partisantriggers.com/the-disruptor: "The Disruptor (US Patent 9146067) is an assisted reset trigger descended from the original TacCon 3MR trigger . . .." and presents the banner reproduced below, falsely asserting that it is an "assisted reset trigger" and that it is covered by claims of U.S, Patent No. 9,146,067.




Ex. F

47. This assertion is false, is for the purpose of deceiving the public, causes competitive injury to Plaintiffs, and is in violation of 35 U.S.C. § 292.

**COUNT I – INFRINGEMENT OF THE ’223 PATENT**

48. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

49. In violation of 35 U.S.C. § 271, Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the ’223 patent, including but not limited to Claim 4, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the ’223 patent. Such unlicensed products include the Infringing Device.

50. On information and belief, Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the ’223 patent, including but not limited to Claim 4, literally and/or under the doctrine of equivalents.

51. An exemplary comparison of the Infringing Device with Claim 4 of the ’223 patent, when assembled and used as intended, is illustrated in the chart below:

| Claim Language | Infringing Device (Disruptor) |
|---|---|
| 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, | The Infringing Device is for an AR-pattern firearm, which has a lower receiver with a fire control pocket and assembly pin openings in side walls of the pocket.   |
| and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising: | An AR-pattern firearm has a bolt carrier that reciprocates and pivotally displaces a hammer when cycled.   |
| a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins; | The Infringing Device includes a housing with transversely aligned pairs of openings for receiving hammer and trigger assembly pins. |

| | |
|---|---|
| | <br><br>**(Plaintiff–generated renderings of the Partisan Disruptor here and below)** |
| a hammer having a sear notch and mounted in the housing to pivot on a transverse axis<br><br>between set and | The Infringing Device includes a hammer **(Blue)** with a sear notch and is mounted in the housing to pivot on a transverse axis.<br> |

| | |
|---|---|
| released positions; | <br>**(Set position)**<br><br>**(Released position)** |
| a trigger member having a sear and mounted in the housing to pivot on a transverse axis<br><br>between set | The infringing device has a trigger member **(Green)** that has a sear and is mounted in a housing to pivot on a transverse axis. |

| | |
|---|---|
| and released positions, |  **(Set position)**  **(Released position)** |
| the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)** |
| the contact causing the trigger member to be forced to the set position; | |




The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position.





| | |
|---|---|
| a locking bar pivotally mounted in the housing | The Infringing Device includes a locking bar **(Red)** that is pivotally mounted in the housing.<br><br> |
| and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, | The locking bar has spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position.<br><br>**(First position mechanically blocked)** |
| and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position | The locking bar is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position. |

| | |
|---|---|
| in which the trigger member can be moved by an external force to the released position. | In this position, the trigger member can be moved by an external force (pull by the trigger finger) to the released position.  |

52. On information and belief, in addition to direct infringement, Defendants take active steps to induce others, including their customers, to directly infringe the '223 patent. Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, encouraging, advertising, promoting, and instructing others to use and/or how to use the Accused Products. One example of this is the instructional steps and videos found on Defendants' website (https://partisantriggers.com/the-disruptor/):


Partisan Triggers - The Disruptor - Forced Reset Trigger
Partisan Triggers
00:04
vimeo


How To Install The Partisan Triggers Disruptor FRT
Partisan Triggers
Partisan Trigger Install demonstration
Partisan Trigger Cartridge
Small Hammer
Screw Driver
Safety Switch
Trigger Pins
Torx bits
Torx bits
03:48
vimeo

## Installation Steps - The Disruptor

**Follow these steps for proper installation:**

1. Remove any magazine and ensure the rifle and workspace are clear of ammunition.
2. Press pivot and takedown pins; separate upper and lower receivers.
3. Loosen the pistol grip screw. In most cases, it is not necessary to completely remove the pistol grip.
4. Remove the installed safety.
5. Remove hammer pin. Remove the hammer and hammer spring assembly.
6. Remove the trigger pin. Remove the trigger, sear and trigger spring assembly.
7. Insert the Partisan Trigger cartridge assembly.
8. Install your Partisan Trigger 3-position safety. Partisan Trigger safeties must be used in conjunction with the trigger. It may be necessary to use a small tool to depress the safety detent to get the safety installed fully.
9. Tighten pistol grip screw.
10. Install anti-rotation pins and apply thread locker.
11. Place the rear lug of the upper receiver into the lower, and slightly pull back on the charging handle to enable the rear of the bolt carrier group to clear the out of battery safety sear.
12. Reinsert pivot and takedown pins.
13. Installation complete.

*See* Ex. J

53. On information and belief, Defendants know or should know that such activities induce others to directly infringe one or more of at least Claim 4 of the ’223 Patent by virtue of their statements in the forum thread formed on September 15, 2025, their statements in the forum thread formed on January 7, 2026, their inclusion of the ’223 Patent on their webpage titled “FRT Legal Library,” and the allegations made against Defendants in the case *Rare Breed Triggers Incorporated et al v. Firearm Systems LLC et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025).

54. On information and belief, Defendants also contribute to the infringement of the ’223 patent by others, including their customers. Acts by Defendants that contributes to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by Defendants of the components of Infringing Device, such as the trigger assembly. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the ’223 Patent.

55. Defendants have engaged in egregious infringement behavior with knowledge of the ’223 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’223 Patent and that the ’223 Patent is valid at least through the service and filing of this complaint and the Arizona case. Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’223 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that his actions constitute infringement, Defendants have continued their infringing activities. As such, Defendants willfully infringe the ’223 Patent.

56. By their actions, Defendants have injured Plaintiffs and are liable to Plaintiffs for infringement of the ’223 Patent pursuant to 35 U.S.C. § 271.

57. By their actions, Defendants’ infringement of the ’223 Patent has irreparably injured Plaintiffs. Unless such infringing acts are enjoined by this Court, Plaintiffs will continue to suffer additional irreparable injury.

58. By their actions, Defendants’ infringement of the ’223 Patent has damaged and continues to damage Plaintiffs in an amount yet to be determined.

59. Defendants’ infringement of the ’223 patent is exceptional and entitles Plaintiffs to attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

60. Defendants’ acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs’ business, sales, reputation, and good-will.

61. Plaintiffs have been substantially harmed by Defendants’ infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction,

damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

## COUNT II – DIRECT INFRINGEMENT OF THE '003 PATENT

62. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

63. In violation of 35 U.S.C. § 271, Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '003 patent, including but not limited to Claim 4, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '003 patent. Such unlicensed products include the Infringing Device.

64. On information and belief, Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the '003 patent, including but not limited to Claim 4, literally and/or under the doctrine of equivalents.

65. An exemplary comparison of the Infringing Device with claim 4 of the '003 patent, when assembled and used as intended, is illustrated in the chart below:

| Claim Language | Infringing Device (Disruptor) |
|---|---|
| 4. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. Peak describes the "Disruptor" as "an assisted reset trigger . . . designed for fast and hassle-free installation on the AR-15 platform" on its website. (https://partisantriggers.com/the-disruptor). |
| a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, | The Infringing Device includes a housing (Black) that has a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin. |

| | |
|---|---|
| | <br>The Infringing Device is sold with hammer and trigger pins.<br> |
| a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the housing to pivot on the hammer pin between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier.<br><br>**(Plaintiff-generated renderings of the Partisan Disruptor here and below)** |

| | |
|---|---|
| between set and<br><br>released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, | <br>**(Set position)**<br><br>**(Released position)** |
| a trigger member having a sear and mounted in said housing to pivot on said trigger member pin<br><br>between set | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the housing to pivot on the trigger member pin |

| | |
|---|---|
| and released positions, |  **(Set position)**  **(Released position)** |
| said trigger member having a surface positioned to be contacted by a surface of said hammer | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)** |

| | |
|---|---|
| |  |
| during rearward pivoting of said hammer to cause said trigger member to be forced to said set position, | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position.<br><br> |

| | |
|---|---|
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear and sear catch are engaged in the set position  **(Set position)** |
| and are out of engagement in said released positions of said hammer and trigger member, | The sear and sear catch are out of engagement in the released position  **(Released position)** |
| a disconnector having a hook for engaging said hammer | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook |

| | |
|---|---|
| and mounted in said housing to pivot on said trigger member pin, | <br>The disconnect is mounted in the housing to pivot on the trigger **(Green)** member pin<br> |
| a locking member mounted in said housing to pivot on a transverse locking member pin, | The infringing device has a locking member **(Red)** that is mounted in the housing and it pivots on a transverse locking member pin<br> |

| | |
|---|---|
| said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position | When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled<br><br>**(First position mechanically blocked)** |
| and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, | When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled<br><br>**(Second position not mechanically blocked)**<br>The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the |

| | |
|---|---|
| said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and | bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position. |
| a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions.<br><br><br><br>The Disruptor<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook |

| | |
|---|---|
| at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and |  **(Standard semi-automatic position)** |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position.  **(Trigger pulled to the rear, hammer first touches the trigger)** |

| | |
|---|---|
| | <br>**(Hammer has now caused the trigger to move to the reset position)** |
| said safety selector preventing said disconnector hook from catching said hammer hook,<br><br>and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member. | The safety selector prevents the disconnector **(Orange)** hook from catching the hammer **(Blue)** hook<br><br>**(Set position)**<br><br>When the bolt carrier reaches a substantially in-battery position the user can pull the trigger **(Green)** without manually releasing pressure off the trigger |

| | |
|---|---|
| |  |

66. On information and belief, in addition to direct infringement, Defendants take active steps to induce others, including their customers, to directly infringe the '003 patent. Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, encouraging, advertising, promoting, and instructing others to use and/or how to use the Accused Products. One example of this is the instructional steps and videos found on Defendants' website (https://partisantriggers.com/the-disruptor/):


Partisan Triggers - The Disruptor - Forced Reset Trigger
Partisan Triggers
00:04
vimeo


How To Install The Partisan Triggers Disruptor FRT
Partisan Triggers
Partisan Trigger Install demonstration
Partisan Trigger Cartridge
Small Hammer
Screw Driver
Safety Switch
Trigger Pins
Torx bits
Torx bits
03:48
vimeo

## Installation Steps - The Disruptor

**Follow these steps for proper installation:**

1. Remove any magazine and ensure the rifle and workspace are clear of ammunition.
2. Press pivot and takedown pins; separate upper and lower receivers.
3. Loosen the pistol grip screw. In most cases, it is not necessary to completely remove the pistol grip.
4. Remove the installed safety.
5. Remove hammer pin. Remove the hammer and hammer spring assembly.
6. Remove the trigger pin. Remove the trigger, sear and trigger spring assembly.
7. Insert the Partisan Trigger cartridge assembly.
8. Install your Partisan Trigger 3-position safety. Partisan Trigger safeties must be used in conjunction with the trigger. It may be necessary to use a small tool to depress the safety detent to get the safety installed fully.
9. Tighten pistol grip screw.
10. Install anti-rotation pins and apply thread locker.
11. Place the rear lug of the upper receiver into the lower, and slightly pull back on the charging handle to enable the rear of the bolt carrier group to clear the out of battery safety sear.
12. Reinsert pivot and takedown pins.
13. Installation complete.

Ex. J

67. On information and belief, Defendants know or should know that such activities induce others to directly infringe one or more of at least Claim 4 of the '003 Patent by virtue of their statements in the forum thread formed on September 15, 2025, their statements in the forum thread formed on January 7, 2026, their inclusion of the '003 Patent on their webpage titled "FRT Legal Library," and the allegations made against Defendants in the case *Rare Breed Triggers Incorporated et al v. Firearm Systems LLC et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025).

68. On information and belief, Defendants also contribute to the infringement of the '003 patent by others, including their customers. Acts by Defendants that contributes to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by Defendants of the components of Infringing Device, such as the trigger assembly. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the '003 Patent.

69. Defendants have engaged in egregious infringement behavior with knowledge of the ’003 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’003 Patent and that the ’003 Patent is valid at least through the service and filing of this complaint and the Arizona case. Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’003 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that his actions constitute infringement, Defendants have continued their infringing activities. As such, Defendants willfully infringe the ’003 Patent.

70. By their actions, Defendants have injured Plaintiffs and are liable to Plaintiffs for infringement of the ’003 Patent pursuant to 35 U.S.C. § 271.

71. By their actions, Defendants’ infringement of the ’003 Patent has irreparably injured Plaintiffs. Unless such infringing acts are enjoined by this Court, Plaintiffs will continue to suffer additional irreparable injury.

72. By their actions, Defendants’ infringement of the ’003 Patent has damaged and continues to damage Plaintiffs in an amount yet to be determined.

73. Defendants’ infringement of the ’003 patent is exceptional and entitles Plaintiffs to attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

74. Defendants’ acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs’ business, sales, reputation, and good-will.

75. Plaintiffs have been substantially harmed by Defendants’ infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction,

damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNT III – DIRECT INFRINGEMENT OF THE '336 PATENT**

76. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

77. In violation of 35 U.S.C. § 271, Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '336 patent, including but not limited to Claim 3, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '336 patent. Such unlicensed products include the Infringing Device.

78. On information and belief, Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the '336 patent, including but not limited to Claim 3, literally and/or under the doctrine of equivalents.

79. An exemplary comparison of the Infringing Device with Claim 3 of the '336 patent, when assembled and used as intended, is illustrated in the chart below:

| Claim Language | Infringing Device (Disruptor) |
|---|---|
| 3. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. Peak describes the "Disruptor" as "an assisted reset trigger . . . designed for fast and hassle-free installation on the AR-15 platform" on its website. (https://partisantriggers.com/the-disruptor). |
| a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, | The Infringing Device includes a housing that has a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin. |

| | |
|---|---|
| | <br>The Infringing Devise is sold with hammer and trigger pins.<br><br>. |
| a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the housing to pivot on the hammer pin between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier.<br><br>**(Plaintiff-generated renderings of the Partisan Disruptor here and below)** |

| | |
|---|---|
| between set and<br><br>released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, | <br>**(Set position)**<br><br>**(Released position)** |
| a trigger member having a sear and mounted in said housing to pivot on said trigger member pin<br><br>between set | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the housing to pivot on the trigger member pin |

| | |
|---|---|
| and released positions, | <br>**(Set position)**<br><br>**(Released position)** |
| said trigger member having a surface positioned to be contacted by a surface of said hammer | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)**<br><br> |

| | |
|---|---|
| | |
| during rearward pivoting of said hammer to cause said trigger member to be forced to said set position, | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position   |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear and sear catch are engaged in the set position |

| | |
|---|---|
| and are out of engagement in said released positions of said hammer and trigger member, |  **(Set position)** The sear and sear catch are out of engagement in the released position  **(Released position)** |
| a disconnector having a hook for engaging said hammer | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook |

| | |
|---|---|
| and mounted in said housing to pivot on said trigger member pin, |   The disconnect is mounted in the housing to pivot on the trigger **(Green)** member pin  |
| a locking member mounted in said housing to pivot on a transverse locking member pin, | The infringing device has a locking member **(Red)** that is mounted in the housing and it pivots on a transverse locking member pin.   |

| | |
|---|---|
| said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position | When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled  **(First position mechanically blocked)** |
| and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, | When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled. |

| | |
|---|---|
| said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and |  **(Second position not mechanically blocked)** The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position. |
| a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions..   |

| | |
|---|---|
| | **The Disruptor**<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook, | While in the forced reset semi-automatic position the disconnect **(Orange)** moves to a position that does not allow the disconnector hook to catch the hammer **(Blue)** hook<br><br>**(Forced reset semi-automatic position)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook |

| | |
|---|---|
| at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and |  **(Standard semi-automatic position)** |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position.  **(Trigger pulled to the rear, hammer first touches the trigger)** |

| | |
|---|---|
| |  **(Hammer has now caused the trigger to move to the reset position)** |
| said safety selector preventing said disconnector hook from catching said hammer hook, | The safety selector prevents the disconnector **(Orange)** hook from catching the hammer **(Blue)** hook  **(Set position)** |
| and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member. | When the bolt carrier reaches a substantially in-battery position the user can pull the trigger **(Green)** without manually releasing pressure off the trigger |

80. On information and belief, in addition to direct infringement, Defendants take active steps to induce others, including their customers, to directly infringe the ’336 patent. Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, encouraging, advertising, promoting,

and instructing others to use and/or how to use the Accused Products. One example of this is the instructional steps and videos found on Defendants' website (https://partisantriggers.com/the-disruptor/):






## Installation Steps - The Disruptor

**Follow these steps for proper installation:**

1. Remove any magazine and ensure the rifle and workspace are clear of ammunition.
2. Press pivot and takedown pins; separate upper and lower receivers.
3. Loosen the pistol grip screw. In most cases, it is not necessary to completely remove the pistol grip.
4. Remove the installed safety.
5. Remove hammer pin. Remove the hammer and hammer spring assembly.
6. Remove the trigger pin. Remove the trigger, sear and trigger spring assembly.
7. Insert the Partisan Trigger cartridge assembly.
8. Install your Partisan Trigger 3-position safety. Partisan Trigger safeties must be used in conjunction with the trigger. It may be necessary to use a small tool to depress the safety detent to get the safety installed fully.
9. Tighten pistol grip screw.
10. Install anti-rotation pins and apply thread locker.
11. Place the rear lug of the upper receiver into the lower, and slightly pull back on the charging handle to enable the rear of the bolt carrier group to clear the out of battery safety sear.
12. Reinsert pivot and takedown pins.
13. Installation complete.

Ex. J

81. On information and belief, Defendants know or should know that such activities induce others to directly infringe one or more of at least Claim 3 of the ’336 Patent by virtue of their statements in the forum thread formed on September 15, 2025, their statements in the forum thread formed on January 7, 2026, their inclusion of the ’336 Patent on their webpage titled “FRT Legal Library,” and the allegations made against Defendants in the case *Rare Breed Triggers Incorporated et al v. Firearm Systems LLC et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025).

82. On information and belief, Defendants also contribute to the infringement of the ’336 patent by others, including their customers. Acts by Defendants that contributes to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by Defendants of the components of Infringing Device, such as the trigger assembly. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the ’336 Patent.

83. Defendants have engaged in egregious infringement behavior with knowledge of the ’336 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’336 Patent and that the ’336 Patent is valid at least through the service and filing of this complaint and the Arizona case. Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’336 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that his actions constitute infringement, Defendants have continued their infringing activities. As such, Defendants willfully infringe the ’336 Patent.

84. By their actions, Defendants have injured Plaintiffs and are liable to Plaintiffs for infringement of the ’336 Patent pursuant to 35 U.S.C. § 271.

85. By their actions, Defendants’ infringement of the ’336 Patent has irreparably injured Plaintiffs. Unless such infringing acts are enjoined by this Court, Plaintiffs will continue to suffer additional irreparable injury.

86. By their actions, Defendants’ infringement of the ’336 Patent has damaged and continues to damage Plaintiffs in an amount yet to be determined.

87. Defendants’ infringement of the ’336 patent is exceptional and entitles Plaintiffs to attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

88. Defendants’ acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs’ business, sales, reputation, and good-will.

89. Plaintiffs have been substantially harmed by Defendants’ infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction,

damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNT IV – DIRECT INFRINGEMENT OF THE '807 PATENT**

90. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

91. In violation of 35 U.S.C. § 271, Defendants have infringed, induced others to infringe, and/or contributed to the infringement of one or more claims of the '807 patent, including but not limited to Claim 1, literally and/or under the doctrine of equivalents, by among other things, making, using, offering for sale, selling, and/or importing into the United States unlicensed products in a manner that infringes the '807 patent. Such unlicensed products include the Infringing Device.

92. On information and belief, Defendants have and continue to willfully infringe, induce others to infringe, and/or contribute to the infringement of one or more claims of the '807 patent, including but not limited to Claim 1, literally and/or under the doctrine of equivalents.

93. An exemplary comparison of the Infringing Device with Claim 1 of the '807 patent, when assembled and used as intended, is illustrated in the chart below:

| Claim Language | The infringing Device (Disruptor) |
|---|---|
| 1. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. Peak describes the "Disruptor" as "an assisted reset trigger . . . designed for fast and hassle-free installation on the AR-15 platform" on its website. (https://partisantriggers.com/the-disruptor). |
| a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier. |

| | |
|---|---|
| between set and |   **(Plaintiff-generated renderings of the Partisan Disruptor here and below)**  **(Set position)** |
| released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, |  **(Released position)** |

| | |
|---|---|
| a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis<br><br>between set<br><br>and released positions, | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis<br><br>**(Set position)**<br><br>**(Released position)**<br><br>The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)** |

<table>
<tr>
<td>said trigger member having a surface positioned to be contacted by a surface of said hammer</td>
<td>
</td>
</tr>
<tr>
<td>during rearward pivoting of said hammer to cause said trigger member to be forced to said set position,</td>
<td>The hammer (Blue) pivots rearward causing the trigger (Green) to be forced to the set position<br></td>
</tr>
</table>

| | |
|---|---|
| |  |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member<br><br>and are out of engagement in said released positions of said hammer and trigger member, | The sear and sear catch are engaged in the set position<br><br>**(Set position)**<br><br>The sear and sear catch are out of engagement in the released position |

| | |
|---|---|
| |  **(Released position)** |
| a disconnector having a hook for engaging said hammer hook | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook   |
| and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, | The disconnect is mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis |

| | |
|---|---|
| |  |
| a locking member adapted to be movably mounted in the fire control mechanism pocket, | The infringing device has a locking member **(Red)** that is movably mounted in the fire control mechanism pocket and it is movable between a first position and a second position.   |
| said locking member being movable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position | When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled |

| | |
|---|---|
| and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, |  **(First position mechanically blocked)** When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled |
| said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and |  **(Second position not mechanically blocked)** |

| | |
|---|---|
| | The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position |
| a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi-automatic, and forced reset semi-automatic positions, | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions.<br><br><br><br>The Disruptor<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook,<br><br>at which time a user must manually release said trigger member to free | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook |

| | |
|---|---|
| said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and |  **(Standard semi-automatic position)** |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position.  **(Trigger pulled to the rear, hammer first touches the trigger)** |

<table>
<tr><td></td><td><br>(Hammer has now caused the trigger to move to the reset position)</td></tr>
<tr><td>said safety selector preventing said disconnector hook from catching said hammer hook,</td><td>The safety selector prevents the disconnector (Orange) hook from catching the hammer (Blue) hook.<br><br>(Set position)</td></tr>
<tr><td>and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member.</td><td>When the bolt carrier reaches a substantially in-battery position the user can pull the trigger (Green) without manually releasing pressure off the trigger.</td></tr>
</table>

| | |
|---|---|
| |  |

94. On information and belief, in addition to direct infringement, Defendants take active steps to induce others, including their customers, to directly infringe the ’807 patent. Defendants take such active steps knowing that those steps will induce, encourage, and facilitate direct infringement by others. Such active steps include, but are not limited to, encouraging, advertising, promoting, and instructing others to use and/or how to use the Accused Products. One example of this is the instructional steps and videos found on Defendants’ website (https://partisantriggers.com/the-disruptor/):


Partisan Triggers - The Disruptor - Forced Reset Trigger
Partisan Triggers
00:04
vimeo


How To Install The Partisan Triggers Disruptor FRT
Partisan Triggers
Partisan Trigger Install demonstration
Partisan Trigger Cartridge
Small Hammer
Screw Driver
Safety Switch
Trigger Pins
Torx bits
Torx bits
03:48
vimeo

**Installation Steps - The Disruptor**

**Follow these steps for proper installation:**

1. Remove any magazine and ensure the rifle and workspace are clear of ammunition.
2. Press pivot and takedown pins; separate upper and lower receivers.
3. Loosen the pistol grip screw. In most cases, it is not necessary to completely remove the pistol grip.
4. Remove the installed safety.
5. Remove hammer pin. Remove the hammer and hammer spring assembly.
6. Remove the trigger pin. Remove the trigger, sear and trigger spring assembly.
7. Insert the Partisan Trigger cartridge assembly.
8. Install your Partisan Trigger 3-position safety. Partisan Trigger safeties must be used in conjunction with the trigger. It may be necessary to use a small tool to depress the safety detent to get the safety installed fully.
9. Tighten pistol grip screw.
10. Install anti-rotation pins and apply thread locker.
11. Place the rear lug of the upper receiver into the lower, and slightly pull back on the charging handle to enable the rear of the bolt carrier group to clear the out of battery safety sear.
12. Reinsert pivot and takedown pins.
13. Installation complete.

Ex. J

95. On information and belief, Defendants know or should know that such activities induce others to directly infringe one or more of at least Claim 1 of the ’807 Patent by virtue of their statements in the forum thread formed on September 15, 2025, their statements in the forum thread formed on January 7, 2026, and the allegations made against Defendants in the case *Rare Breed Triggers Incorporated et al v. Firearm Systems LLC et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025).

96. On information and belief, Defendants also contribute to the infringement of the ’807 patent by others, including their customers. Acts by Defendants that contributes to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by Defendants of the components of Infringing Device, such as the trigger assembly. The components are not suitable for substantial noninfringing use as they are specially designed and adapted to be used in a fire control unit to forcibly reset a trigger mechanism and infringe the ’807 Patent.

97. Defendants have engaged in egregious infringement behavior with knowledge of the ’807 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Defendants have known or should have known that their actions constituted and continue to constitute infringement of the ’807 Patent and that the ’807 Patent is valid at least through the service and filing of this complaint and the Arizona case. Defendants could not reasonably or subjectively believe that their actions do not constitute infringement of the ’807 Patent, nor could they reasonably or subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that his actions constitute infringement, Defendants have continued their infringing activities. As such, Defendants willfully infringe the ’807 Patent.

98. By their actions, Defendants have injured Plaintiffs and are liable to Plaintiffs for infringement of the ’807 Patent pursuant to 35 U.S.C. § 271.

99. By their actions, Defendants’ infringement of the ’807 Patent has irreparably injured Plaintiffs. Unless such infringing acts are enjoined by this Court, Plaintiffs will continue to suffer additional irreparable injury.

100. By their actions, Defendants’ infringement of the ’807 Patent has damaged and continues to damage Plaintiffs in an amount yet to be determined.

101. Defendants’ infringement of the ’807 patent is exceptional and entitles Plaintiffs to attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

102. Defendants’ acts of infringement are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs’ business, sales, reputation, and good-will.

103. Plaintiffs have been substantially harmed by Defendants’ infringing activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction,

damages adequate to compensate for the infringement, being lost profits or no less than a reasonable royalty, treble damages, and attorneys' fees.

**COUNT V – FALSE PATENT MARKETING**

104. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

105. The claims of U.S. Patent No. 9,146,067 (the "'067 Patent") do not cover a forced reset trigger.

106. On information and belief, Defendants know that the Disruptor is a forced reset trigger and that the claims of the '067 Patent do not cover that product.

107. Additionally, claims of the '067 Patent require, as one example, a "reset lever" that is struck by a hammer. The Disruptor does not have such a component and therefore is not covered by the '067 patent.

108. Further, claims of the '067 Patent require the trigger to be reset less that the full travel of the trigger. Such a limitation is not present in the Disruptor and therefore is not covered by the '067 Patent.

109. Defendants falsely promote the Disruptor as not being a forced reset trigger and that it is covered by claims of U.S. Patent No. 9,146,067. This falsely suggests to reseller customers and end user customers that the Disruptor is not covered by Plaintiffs' patent(s) deceiving those customers to believe they are not exposed to infringement liability.

110. This assertion is false and is for the purpose of deceiving the public,

111. Plaintiffs have suffered competitive injury as a result of these false and deceptive statements and are entitled under 35 U.S.C. § 292 to recover damages adequate to compensate for the injury.

**COUNT VI – FALSE ADVERTISING UNDER THE LANHAM ACT**

112. Plaintiffs re-allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

113. Defendants have violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by making false or misleading statements of fact in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of the Disruptor product.

114. Specifically, on information and belief, Defendants falsely advertise and promote the Disruptor on their website and in other commercial materials as an "assisted reset trigger" that is covered by U.S. Patent No. 9,146,067 (the "'067 Patent"). For example, the Partisan Triggers website states: "The Disruptor (US Patent 9146067) is an assisted reset trigger descended from the original TacCon 3MR trigger . . . ." and includes a banner asserting that it is an "assisted reset trigger" covered by the '067 Patent.

115. These statements are false or misleading because:

a. The Disruptor is, in fact, a forced reset trigger, not an assisted reset trigger as claimed. Defendants know this and elsewhere identify the Disruptor as a "FRT" and "Forced Reset Trigger." See Ex. J.

b. The claims of the '067 Patent do not cover a forced reset trigger like the Disruptor. Among other deficiencies, the claims of the '067 Patent require a "reset lever" that is struck by a hammer, which the Disruptor lacks. Further, the claims of the '067 Patent require the trigger to be reset less than the full travel of the trigger, a limitation not present in the Disruptor.

c. On information and belief, Defendants know or should know that the Disruptor is not covered by the '067 Patent, yet they continue to make these false representations.

116. Defendants' false or misleading statements are made in commercial advertising or promotion, including on their website, which promotes the sale of the Disruptor and includes hyperlinks to sellers under "Where To Find," "Where can I buy one?," "Available Now," and "Coming Soon." These statements are disseminated in interstate commerce and are directed to consumers, resellers, and the public in the firearms industry.

117. The false or misleading statements are material and have a tendency to deceive a substantial portion of the intended audience, including reseller customers and end-user customers. By falsely claiming that the Disruptor is covered by the '067 Patent and is an "assisted reset trigger," Defendants mislead consumers into believing that the Disruptor possesses certain patented qualities, features, or legitimacy that it does not have, such as implying that it operates in a manner distinct from forced reset triggers (like those covered by Plaintiffs' Asserted Patents), thereby suggesting reduced risk of patent infringement liability for purchasers. This misrepresentation ties directly to the product's nature, characteristics, and qualities, including its mechanical operation, exclusivity, and legal status in the market.

118. Plaintiffs have suffered, and are likely to continue suffering, injury as a direct result of Defendants' false advertising, including but not limited to competitive harm, lost sales, diverted business, damage to reputation and goodwill, and erosion of market share in the forced reset trigger market.

119. Defendants' false advertising is willful, as evidenced by their knowledge of Plaintiffs' Asserted Patents (demonstrated through the "FRT Legal Library" on their website, which links to the '223 Patent, '003 Patent, and '336 Patent), their forum posts on AR15.com acknowledging Plaintiffs' patent rights and litigation activities (e.g., threads from September 15, 2025, and January 7, 2026), and their continued promotion of the Disruptor despite awareness of

the allegations in *Rare Breed Triggers Incorporated, et al v. Firearm Systems LLC, et al*, 2:25-cv-04938 (D. Ariz. Dec. 23, 2025).

120. By their actions, Defendants have injured Plaintiffs and are liable to Plaintiffs for false advertising under the Lanham Act pursuant to 15 U.S.C. § 1125(a).

121. By their actions, Defendants' false advertising has irreparably injured Plaintiffs. Unless such false advertising is enjoined by this Court, Plaintiffs will continue to suffer additional irreparable injury.

122. By their actions, Defendants' false advertising has damaged and continues to damage Plaintiffs in an amount yet to be determined.

123. Defendants' acts of false advertising are willful and for no other purpose than to deliberately and irreparably harm Plaintiffs' business, sales, reputation, and goodwill.

124. Plaintiffs have been substantially harmed by Defendants' false advertising activities and are entitled to relief including but not limited to a preliminary injunction, a permanent injunction, actual damages, disgorgement of Defendants' profits, treble damages for willful conduct, costs of the action, and reasonable attorneys' fees in this exceptional case.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgement against Defendants as follows:

a. Each of the Asserted Patents has been and continues to be infringed by Defendants;

b. Defendants' infringement of each of the Asserted Patents has been, and continues to be, willful;

c. Each of the Asserted Patents is enforceable and not invalid;

d. A preliminary injunction enjoining Defendants and their principals, agents, successors, assigns, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of each of the Asserted Patents during the pendency of this case, or other such equitable relief as the Court determines is warranted;

e. A permanent injunction enjoining Defendants and their principals, agents, successors, assigns, attorneys, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert therewith from infringement or contributing to the infringement of each of the Asserted Patents, or other such equitable relief as the Court determines is warranted;

f. An award of damages adequate to compensate Plaintiffs for the infringement of each of the Asserted Patents that has occurred, together with pre-judgment interests and costs, post-judgment interests and costs, and an accounting;

g. An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

h. A finding that this action is an exceptional case under 35 U.S.C. § 285 and an award to Plaintiffs of their costs and attorneys' fees incurred in this action;

i. An award of damages to compensate Plaintiffs for the competitive injury it suffered under 35 U.S.C. § 292(b);

j. An award of all relief available under the Lanham Act, 15 U.S.C. § 1125(a), including a preliminary and permanent injunction enjoining Defendants from continuing their false advertising and misrepresentations regarding the Disruptor and U.S. Patent No. 9,146,067, actual damages, disgorgement of Defendants' ill-gotten profits attributable to such false

advertising, treble damages for willful conduct, costs of the action, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) in this exceptional case.

k. Any and all other relief, at law or equity, to which Plaintiffs may show themselves to be entitled or which this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues so triable by right.

Dated: January 15, 2026

Respectfully Submitted,

By: */s/ Travis W. Koch*

Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar # 7-5418
Koch Law, P.C.
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

Matthew A. Colvin
Texas Bar No. 24087331
Carl E. Bruce
Texas Bar No. 24036278
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
Tel: (214) 747-5070
Facsimile: (214) 747-2091
E-mail: colvin@fr.com
bruce@fr.com

Ben Christoff
FISH & RICHARDSON P.C.
(D.C. Bar No. )
1001 Maine Avenue SW, Suite 1000
Washington, DC
E-mail: christoff@fr.com
Tel: (202) 783-5070
Fax: (202) 783-2331

Glenn D. Bellamy
Wood Herron & Evans LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-707-0243
Emails:gbellamy@whe-law.com

***Counsel for Plaintiffs ABC IP, LLC, and Rare Breed Triggers, Inc.***

# EXHIBIT E
# Part 1

(/)

Home (/) / General (/forums/b/1_General.html) / General Discussion (/forums/f_1/5_General-Discussion.html)

Modern

**Shortest and Lightest 1-10x LPVO | Vortex AMG (https://youtu.be/QuJmcxLMuZM)**

## It is time for an introduction. Edit: Nominate charities now! (/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-)

**(Page 1 of 26)**

Previous Page 1 / 26 Next Page (/forums/General/It-is-time-for-an-introduction-Edit-Nominate-charities-now-/5-2813452/?page=2)



**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**

Freedom Accelerated

Joined: **Jun 2025** Posts: **6**
EE: **0% (0)** USA

**9/13/2025 2:09:27 PM EST** [Last Edit: PartisanTriggers]

(/)

Let's introduce ourselves with a backstory.

The P-51 Mustang was an incredible piece of machinery. From signing the contract to first flight, that magnificent bird took 149 days. Five months - with massive brainpower and the production power of a nation at war behind it. That was fast, incredibly fast, when necessity was the mother of invention. But the truth is that everything worth doing always takes longer and costs way more than you first imagine.

Partisan Triggers is a new company configured to incubate the development of innovative triggers and access high quality, high volume manufacturing in order to bring the best possible value for money to the end user. Triggers for all and one for every gun.

Several months ago, Partisan Triggers was shown a new trigger design by @Ben and his weapons company. It promised to be a unique match grade FRT with a light, clean trigger pull and superb reliability over thousands of rounds on a given unit. A deal was done to bring this trigger to market, and Ben was asked to take on the role of public relations spokesman for the company. Amazing what he'll do for a box crayons.

After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments. Their track record is all the evidence required to support this opinion. We cannot allow this to happen and are, therefore, adopting a quite different approach.

The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent. It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble.

Our focus is now on finalizing production, marketing and websites. As we ramp up, we have videos to shoot, samples to get out to your favorite reviewers, contracts to sign and Purchase Orders to fulfill. It's going to take us a few more weeks before we go mainstream.

Finally, we intend to regularly contribute support to 2A charities and

(/)

causes. To that end, we will begin holding monthly [illegible] threads for nominations and voting on which charities should receive our monthly donations. Once any potential legal issues are settled, we intend to divert even more money towards supporting 2A causes.

Please bear with us and stay tuned here for updates, exclusive behind the scenes peeks and ARFCOM only specials.  Get plenty of popcorn ready - it's likely to be highly entertaining.

Cheers,

The Partisan Triggers Team

Edit 15 December 2025

You can buy a Partisan Disruptor right now at

**Battlehawk Armory. (https://www.avantlink.com/click.php?tt=cl&mi=10048&pw=234121&ctc=608514&url=https%3A%2F%2Fbattlehawkarmory.com%2Fproduct-search-results%3Fsearch_text%3Dpartisan%26from_form%3Dtrue)**

Or

**Cloak Industries. (https://cloak-industries.com/)**



**bkpkr (https://ar15.com/member/user.html?id=125849)**

★

#6packclub

Joined: **May 2007** Posts: **33697**
EE: **100% (334)** TN, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707745)
**9/13/2025 2:14:05 PM EST**
[#1]

In.

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707786)
**9/13/2025 2:17:43 PM EST**
[#2]

(/)

The last guy was as pleasant as a root canal. Let's see what these guys do.




**whiskerz (https://ar15.com/member/user.html?id=5137)**

Member

Joined: **Mar 2001** Posts: **140566**
EE: **100% (34)** AL, USA

RIP Jeff Reed. Tennessee Squire, Ga. Carry member, NRA,Non-puking 72 ounce drinker 2 of 6 Norcal call sign, Forgotten.

ROCK ISLAND AUCTION COMPANY
ROCK ISLAND AUCTION COMPANY



**EFB16ACRX (https://ar15.com/member/user.html?id=131707)**

Member

Joined: **Aug 2007** Posts: **17099**
EE: **100% (9)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707800)
**9/13/2025 2:19:28 PM EST**
[#3]

Pretty good intro id say



(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707926)
**9/13/2025 2:32:50 PM EST**
[#4]

**Sub_Arctic_Sun (https://ar15.com/member/user.html?id=567339)**

Member

Joined: **Feb 2022** Posts: **1438**
EE: **0% (0)** AK, USA

Welcome, fellow aircraft enthusiast!

Eight stars of gold, on a field of blue. A white bar of separation... The North Star stands alone!




**_Matt_ (https://ar15.com/member/user.html?id=168129)**

Joined: **Aug 2008** Posts: **23825**
EE: **100% (1)** SC, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707953)
**9/13/2025 2:36:03 PM EST**
[#5]




**HDSledge (https://ar15.com/member/user.html?id=374164)**

Knuckle dragging boomer rube, patriot, Navy vet.

Joined: **Nov 2013** Posts: **4856**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114707990)
**9/13/2025 2:41:13 PM EST**
[#6]

in...

My own view is that left-wing positions largely come about from resentment, I agree with Nietzsche, a resentment about the surrounding social order. They have privileges, I don't. Or, I have them and I can't live up to them. Roger Scruton

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708001)

(/)

[#7]



**Ciraxis (https://ar15.com/member/user.html?id=184584)**

Member

Joined: **Dec 2008** Posts: **34616**
EE: **100% (1)** NY, USA

I'm not reading all that shit



**mad_mardigan (https://ar15.com/member/user.html?id=175932)**

Member

Joined: **Nov 2008** Posts: **8806**
EE: **100% (69)** IN, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708011)
**9/13/2025 2:45:14 PM EST**

[#8]

885



**Koolpenguin89 (https://ar15.com/member/user.html?**

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708012)
**9/13/2025 2:45:20 PM EST**

[#9]

id=60[illegible])

(/)

Member

Joined: **Jan 2025** Posts: **287**
EE: **0% (0)** GA, USA

Quote History

Originally Posted By whiskerz:

The last guy was as pleasant as a root canal. Let's see what these guys do.

I mean, they appear to have at least a semi-functional grasp of the English language, so that's a good start!




**Gingerbreadman (https://ar15.com/member/user.html?id=145837)**

Just some guy.

Joined: **Jan 2008** Posts: **17129**
EE: **100% (1)** MN, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708016)
**9/13/2025 2:45:34 PM EST**
[#10]

The government is just a corporation with a monopoly on violence.



**tonysoprano150 (https://ar15.com/member/user.html?id=64548)**

Team Member

Joined: **Dec 2004** Posts: **10137**
EE: **100% (168)** KY, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708031)
**9/13/2025 2:47:20 PM EST**
[#11]

Welcome fellow trigger enthusiast

"I see dumb people... they're everywhere. They walk around like everyone



**RobertL (https://ar15.com/member/user.html?id=67156)**

NorCal Call Sign Moss

Joined: **Jan 2005** Posts: **21860**
EE: **100% (229)** MO, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708043)
**9/13/2025 2:49:44 PM EST**
[#12]

So, you're not releasing Ben's trigger but you are releasing another FRT that was formerly produced by someone else?

I'm assuming a design that predates the patents in question?

SAF Life Member-GOA Life Member-JPFO Charter Member-MSF Life Member
FPC Member-VCDL Member-BFA Member-NRA Benefactor Life Member

Sir RobertL, Charter Member of the Knights of Wonder



**bravo5two (https://ar15.com/member/user.html?id=27381)**

Member

Joined: **Oct 2002** Posts: **4331**
EE: **100% (65)** NV, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708064)
**9/13/2025 2:53:05 PM EST**
[#13]

Okay I'm listening PTT. Show us your hardwares.



**WhatsGnu (https://ar15.com/member/user.html?**

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708076)
**9/13/2025 2:54:34 PM EST**
[#14]

id=464777)
(/)
General gNuisance

Joined: **Mar 2017** Posts: **38837**
EE: **0% (0)** AR, USA




**(/media/mediaFiles/464777/97a8ry-3353554.jpg)**

Gnu User, Clumsy Migratory Off-topic Herd Ungulate




**GMTECH9 (https://ar15.com/member/user.html?id=154216)**

Shooter

Joined: **Apr 2008** Posts: **678**
EE: **0% (0)** ID, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708081)
**9/13/2025 2:55:01 PM EST**
[#15]

In for the Fun Running Trigger info.

NRA ISAA GOA
3 Gun Fun
Lets Make America Great Again
0% EE, 0 likes, no Condo, no MBA, no BMW

(/)



**MNRidesHonda (https://ar15.com/member/user.html?id=187453)**

★

IG @callsignninja

Joined: **Dec 2008** Posts: **4514**
EE: **100% (459)** VA, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708082)
**9/13/2025 2:55:05 PM EST**
[#16]

**Quote History**

> Originally Posted By whiskerz:
>
> The last guy was as pleasant as a root canal. Let's see what these guys do.

I don't particularly like the old man but his products work wonderfully and are my favorites unlike OP's who's giving us the blue balls..

2nd Battalion 9th Marines Echo Company

3rd Battalion 8th Marines India Company

2ND 28TH INFANTRY

**11boomboom (https://ar15.com/member/user.html?id=523928)**

★

25mm Aficionado

Joined: **Oct 2020** Posts: **13716**
EE: **100% (7)** TX, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708087)
**9/13/2025 2:55:40 PM EST**
[Last Edit: 11boomboom] [#17]

(/)

Quote History

> Originally Posted By Ciraxis:
>
> I'm not reading all that shit

This.

OP is too professional.

> Originally Posted By MNRidesHonda:
>
> > Originally Posted By whiskerz:
> >
> > The last guy was as pleasant as a root canal. Let's see what these guys do.
>
> I don't particularly like the old man but his products work wonderfully and are my favorites unlike OP's who's giving us the blue balls..

**Attached File (/media/mediafiles/sharedAlbum/giphy-359.gif)**

ETA: subbed. I'll probably buy one since Ben is involved. He's been pretty successful at giving the FBATFE a black eye.

Why is the sky blue?
What makes the green grass grow?




**Need4Guns (https://ar15.com/member/user.html?id=524356)**

Member

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708090)

**9/13/2025 2:56:26 PM EST**

[#18]

Joined: Nov 2020 Posts: 2730
EE: 0% (0)
(/)
VA, USA

Quote History

Originally Posted By whiskerz:

The last guy was as pleasant as a root canal. Let's see what these guys do.




(/media/mediaFiles/sharedAlbum/giphy-359.gif)




**SouthernSaratoga (https://ar15.com/member/user.html?id=603174)**

★

Joined: **Dec 2024** Posts: **1918**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708103)

**9/13/2025 2:57:46 PM EST**

[#19]

Right on! 👍




**SouthernSaratoga (https://ar15.com/member/user.html?id=603174)**

Joined: **Dec 2024** Posts: **1919**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708124)
**9/13/2025 3:00:35 PM EST**
[#20]

So the Ben trigger is not going to be released? And instead different one is? What differences are there between the two? And I'm assuming it's not as good as the Ben trigger?



**scuba_steve (https://ar15.com/member/user.html?id=375298)**

These are not my pants.

Joined: **Nov 2013** Posts: **30918**
EE: **100% (20)** VA, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708127)
**9/13/2025 3:01:23 PM EST**
[Last Edit: scuba_steve] [#21]

**Quote History**

Originally Posted By whiskerz:

The last guy was as pleasant as a root canal. Let's see what these guys do.

Well, these folks signed up for a dealer account, so at least they ramped up on the rules and are trying to respect them. But yeah, wow, that's a wall of text to just announce nothing.




**SIASL (https://ar15.com/member/user.html?id=384478)**

Joined: **Jan 2014** Posts: **30810**

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708134)
**9/13/2025 3:02:11 PM EST**
[#22]

Nice

IN




**NAM (https://ar15.com/member/user.html?id=24416)**

★

Joined: **Jul 2002** Posts: **34982**
EE: **100% (57)** WI, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708160)
**9/13/2025 3:06:49 PM EST**
[#23]




**(https://c.tenor.com/3buaA9Yt_vwAAAAd/tenor.gif)**



**Hill_monkey (https://ar15.com/member/user.html?id=337739)**

★

Uncultured swine

Joined: **Jan 2013** Posts: **111234**
EE: **100% (30)** PA, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708171)
**9/13/2025 3:08:22 PM EST**
[#24]




**(https://s33.postimg.cc/l4j8qmkxr/IN_duck.gif)**

(/)




**hammer1995 (https://ar15.com/member/user.html?id=99132)**

Member

Joined: **May 2006** Posts: **2416**
EE: **100% (43)** LA, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708180)
**9/13/2025 3:09:49 PM EST**
[#25]

**Quote History**

Originally Posted By Koolpenguin89:

I mean, they appear to have at least a semi-functional grasp of the English language, so that's a good start!

**Attached File (/media/mediafiles/sharedAlbum/mourning-nod-1006.gif)**



**johngalt9mm (https://ar15.com/member/user.html?id=599199)**

Member

Joined: **Aug 2024** Posts: **177**
EE: **0% (0)** KY, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708247)
**9/13/2025 3:16:40 PM EST**
[#26]

Tea riggered.

In

**Attached File (/media/mediafiles/599199/triggers_jpg-3623632.JPG)**



**SquatchAv8 (https://ar15.com/member/user.html?**

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708280)
**9/13/2025 3:20:44 PM EST**
[#27]

Appx251

id=13...)
★ (/)
Member

Joined: **Aug 2001** Posts: **7059**
EE: **100% (31)** TX, USA

Quote History

Originally Posted By Ciraxis:

I'm not reading all that shit

And no one cares




**Glocked (https://ar15.com/member/user.html?id=483179)**
★
Armed Autist

Joined: **May 2018** Posts: **20995**
EE: **100% (35)** MS, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708281)
**9/13/2025 3:20:57 PM EST**
[#28]

Very cool!

Not everyone gets to be an astronaut, the world needs pole dancers too.
~Observer



**Cardplayer (https://ar15.com/member/user.html?id=422646)**
★
Black Labs Matter

Joined: **Jan 2015** Posts: **50925**
EE: **100% (87)** ID, USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708286)
**9/13/2025 3:21:43 PM EST**
[#29]

(/)




**(https://media1.giphy.com/media/v1.Y2lkPTZjMDliOTUyNmRhYXkxa2Q2MHVqMWdzNGQ0MWhqOHBvMXFzOTZicDZ4aTQzdWEzcCZlcD12MV9naWZzX3NlYXJjaCZjdD1n/82DaAxknlvBovGGPj5/giphy.gif)**

AMERICA IS BACK!

Selling dime bags of primers.




**Jambalaya (https://ar15.com/member/user.html?id=80518)**

Slow Cooked

Joined: **Sep 2005** Posts: **53940**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-#i114708383)

**9/13/2025 3:35:17 PM EST**

[#30]

Interested in seeing if it will be a cartridge trigger and/or what design considerations were taken to ensure it stays clear of having any M16 compatible parts. Also whether it works well with .22lr conversions.

Quote History

(/)

> Originally Posted By HappyCamel:
>
>> Originally Posted By Andrapos:
>>
>>> Originally Posted By HappyCamel:
>>>
>>> Will you be shipping to 50 states?
>>
>> Reading the wording of the CT bumpstock/binary ban on its face it doesn't appear to ban FRTs although nobody wants to ship anything here if it's close. If true, and they are legal, I'll buy a bunch.
>
> That's my whole issue with all these FRT outfits. For instance Mr. No-Meds Extra Coffee FRT (not OP), he writes a whole dissertation on why he thinks his device is legal federally (even pre ruling), meanwhile our state law bans devices that increase RATE OF FIRE. Rate of fire is limited by the weight of the parts, springs, ECT (and as such, it's a retarded law). The potential ROF of two identical guns where the only difference is one has an FRT...is identical.

For reasons that should be obvious, we can't speak publicly yet as to all our plans and intrigues. Hopefully you understand.

As Sun Tzu put it;

"Let your plans be dark and impenetrable as night, and when you move, fall like a thunderbolt."



**ConcernedCitizen (https://ar15.com/member/user.html?**

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=4#i114755619)

**9/18/2025 11:00:01 PM EST**

[#27]




(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=5#i114815010)
**9/25/2025 7:49:39 PM EST**

[#22]

**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**

Freedom Accelerated

Joined: **Jun 2025** Posts: **12**
EE: **0% (0)** USA

**(/forums/topic.html?b=1&f=5&t=2813452&r=114786284&qte=1#i114786284)** **Quote History**

Originally Posted By Hill_monkey:

**https://media1.giphy.com/media/v1.Y2lkPTZjMDliOTUyemt5Z2Q0YTFqd3I0NXhzYXltbG1uYTU4ZWljOGtsaXkyOTBucmVndCZlcD12MV9naWZzX3NlYXJjaCZjdD1n/76dXlFZZEqNH2/giphy.gif (https://media1.giphy.com/media/v1.Y2lkPTZjMDliOTUyemt5Z2Q0YTFqd3I0NXhzYXltbG1uYTU4ZWljOGtsaXkyOTBucmVndCZlcD12MV9naWZzX3NlYXJjaCZjdD1n/76dXlFZZEqNH2/giphy.gif)**

It won't last much longer at all.



(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=5#i114815414)
**9/25/2025 8:36:33 PM EST**

[#23]

**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**

Freedom Accelerated

Joined: **Jun 2025** Posts: **13**
EE: **0% (0)** USA

Appx369

(/)

[(/forums/topic.html?b=1&f=5&t=2813452&r=114787606&qte=1#i114787606)]

**Quote History**

Originally Posted By EagleArmsHBAR:

> Per the original post, you will be releasing an old trigger that has an expired patent (if I read that correctly). If that is the case, what trigger is it? Is it selectable, or auto reset only? Is it for the AR-15 only, or something else too?

This is Ben logged in as PartisanTriggers.

Our (not mine, our) words were chosen carefully and vetted with our legal team prior to the OP. The trigger is a three position.

You'll have a lot more clarity shortly. We have a media company flying out less than a week from now to shoot commercials and assist with other preparations for our website launch.

The consternation and frustration over this seemingly taking so long is understood and appreciated- but those same people outwardly complaining should reread the OP.

We don't like this taking so long either, but this is a *very* litigious world we live in, and people can try and goad us into providing information we aren't ready to share all they want- but every part of this project has been preplanned. Including the timeline for press releases.

There is a method to the madness, and any given individual desiring a trigger or a photo is secondary to the bigger picture. Some things are being allowed to ferment for a reason. Be patient. You can be assured we will keep to our timeline as stated previously...you'll have plenty of time to order and receive as many triggers as your heart desires well ahead of the holiday season, and you aren't going to need to worry about whether you need to add express shipping.

Every step in this process takes time if you want to do it right and ultimately be able to present a solid product at a reasonable price from the get go. There are people unrelated to the project who have attested in this very thread to getting the opportunity to test fire the trigger that is being released at various events, and we haven't heard a complaint from a single tester.

This trigger is going to be a very good trigger, and great value for your dollars. Honestly, my trigger design, that people have referenced as the "Ben trigger," is nicer, it is true. But it is also going to be quite a bit more expensive because it is much more complex to manufacture.

(/)

We are doing spot testing of our first full production run this week and early next. By next weekend we will be posting the official release date. We will also give those of you salivating in this thread some video of the triggers in action, and some photos.

Cheers,
Ben



**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**

Freedom Accelerated

Joined: **Jun 2025** Posts: **14**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=5#i114815428)

**9/25/2025 8:37:50 PM EST**

[#24]

**Quote History**

Originally Posted By Kuraki:

Question OP: You say initially why you won't be releasing Ben's design, with good reasoning, then say you're going to release a different design that you believe is less likely to get caught in the web of patent lawsuits (and I'd guess, less injurious to lose the design of should it happen). Is the plan to release Ben's design after something definitive has been decided regarding current suits? Or particular suits? Or when that other company runs out of money to sue people?

What's the trigger to release Ben's design?

Expect the Ben trigger when we have removed the threat.



(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=5#i114815469)

**9/25/2025 8:44:45 PM EST**

[#25]

(/)

Discuss one tactical task appropriate for assignment to partisan forces. Explain why it is an appropriate tactical task for partisan forces, and if possible give an example of when such a task was used.

Each poster can only choose one task, additionally listed tasks from the same poster don't count.

There may be a prize for this challenge. 😎

Pro tip:

"Tactical task" has a very specific meaning. This is supposed to be educational. Look up what the tactical tasks are if you don't know.



**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**

Freedom Accelerated

Joined: **Jun 2025** Posts: **68**
EE: **0% (0)** USA

(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=19#i115460630)
**12/12/2025 9:15:54 PM EST**

[#37]

**Quote History**

Originally Posted By JellyJugz:

Opsec on this has been about as secure as Hilary's email server.

Shroud with deception everything you do.

"Let your plans be dark and impenetrable as the night, and when you move, fall like a thunderbolt."



(/forums/topic.html?b=1&f=5&t=2813452&tl=It-is-time-for-an-introduction-Edit-Nominate-charities-now-&page=19#i115460835)
**12/12/2025 9:29:19 PM EST**

[#38]

# EXHIBIT I
# Part 1

(/)

Home (/) / General (/forums/b/1_General.html) /
General Discussion (/forums/f_1/5_General-Discussion.html)

Modern

Shortest and Lightest 1-10x LPVO | Vortex AMG (https://youtu.be/QuJmcxLMuZM)

**Rare Breed Triggers v Partisan Triggers legal battle (/forums/topic.html?b=1&f=5&t=2828908&tl=Rare-Breed-Triggers-v-Partisan-Triggers-legal-battle)** (Page 1 of 3)

Previous Page | 1 / 3 | Next Page (/forums/General/Rare-Breed-Triggers-v-Partisan-Triggers-legal-battle/5-2828908/?page=2)



**PartisanTriggers (https://ar15.com/member/user.html?id=608514)**
Freedom Accelerated
Joined: **Jun 2025** Posts: **88**
EE: **0% (0)** USA

**1/7/2026 12:36:11 AM EST** [Last Edit: PartisanTriggers]

Partisan Triggers previously introduced ourselves **here. (https://www.ar15.com/forums/general/It-is-time-for-an-introduction-Edit-Nominate-charities-now-/5-2813452/)** In it, we detailed our preparations for the inevitable lawsuit from Rare Breed Triggers/ABC IP (RBT). As many know, RBT named us as a John Doe d/b/a Partisan Triggers in an Arizona suit filed December 23, 2025. They've also sued Cloak Industries in Idaho, and we expect more suits against our dealers.

As stated on our website, we oppose public/private partnerships that exist only to your detriment.

RBT excels at bullying small companies, often run by young men who have barely gotten their feet under them in life, through aggressive lawfare to bankrupt and break them. It's easy to feel invincible when facing under-resourced opponents while relying on powerful allies. Rest assured, this won't work against us.

This week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end. Dealers are indemnified under our substantial patent insurance policy—covering the Disruptor alongside our upcoming releases, and worth multiples of RBT's claimed millions in litigation costs from their prior lawsuits. You and our dealers can trust we won't be bullied or back down.

We don't believe we've violated any valid patent. When we respond to RBTs suit, we'll post the documents here for those interested. We have no plans or need for donations; support us by spreading the word or buying our triggers.

A certain famous former naval officer[1] once said:

"The wrong thing to do about any given circumstance or situation is to do nothing."

We would like to ask you to do something. If you have useful information on RBT (or related parties) for this lawsuit, PM us on ARFCOM to share it. We feel very confident in our preparations, but we are aware that there is always the possibility someone may know something we've missed. We hope they see this and want to help.

We have new products coming out phased over the next weeks, including maintenance kits, the Clone Lower Appropriate Pins (the CLAP), military style one piece selectors, and the LAT. We also have several more triggers that are past the drawing board and into pre-production prototyping.

We are here for the long haul, so strap in, folks—this may turn into a wild ride.

Thumbs up, let's do this.

(/)

(/forums/topic.html?b=1&f=5&t=2828908&r=115677513&qte=1#i115677513) Quote History

Originally Posted By Ackrite:

What role did Partisan Triggers play in the current legal status of FRT triggers in general? How deep in the trenches were you guys and how much of your personal wealth and potential freedom was put on the line to ensure the masses can use FRT's without the boogeyman looking over their shoulder?

I'm sure it's easy to hate on RBT after the fact when the settlement ended up being what it was.

I have no relation to RBT, but it's funny to see all the love they received during the fight they put up turn to hate after some legal compromises to finally end the saga.

Flame away.

A man saving a bunch of women and children from a burning building is, on its face, commendable.

It ceases to be commendable when it is discovered later that he did so only in order to chain those women and children up in his basement and rape them until someone stops him.

Rare Breed is not, and has never been, the good guys. There is a lot more going on here than any of you are aware of. We look forward to providing further details in court.

Twitter/Instagram: benunsuppressed

**https://americanpioneercorps.org (https://americanpioneercorps.org)**



**Cobra-Commander (https://ar15.com/member/user.html?**

(/forums/topic.html?b=1&f=5&t=2828908&tl=Rare-Breed-Triggers-v-Partisan-Triggers-legal-battle&page=2#i115689352)

**Yesterday 11:23:09 AM EST**

[#16]

# EXHIBIT J

**Partisan Triggers**

Home | Triggers ▾ | Where To Find | Troubleshooting | Menu ▾

Michael Stakes, inventor of the modern assisted reset trigger, joins Partisan Triggers! Learn more about our team here






# The Disruptor

**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.

## Technical Specifications

- Tool steel and 4140 chromoly used on all wear surfaces for superior strength, durability, and long service life
- Trigger Pull Weight: 3.75 – 4.1lbs
- Compatible with most lowers; anti-walk pins recommended
- Requires a minimum H2 (recommend H3) carbine buffer weight for firearms with carbine extensions and 16" or shorter barrels, or a standard rifle buffer for 20" A2 stocks.
- Tested beyond 6,000 rounds under a course of fire derived from the USMC M27 IAR evaluation criteria

Legal in all 30+ Free American States (Sales prohibited to – CA, CT, CO (Boulder County and Broomfield), DE, FL, HI, IL, MA, MD, MN, NJ, NV, NY, RI, WA, Washington DC, Puerto Rico).

Your order will be canceled if you are ordering from one of these states.



Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar #7-5418
**KOCH LAW, P.C.**
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,<br><br>*Defendants*. | Case No. 2:26-cv-00018<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs ABC IP, LLC ("ABC") and Rare Breed Triggers, Inc. ("RBT") (collectively, "Plaintiffs"), through undersigned counsel, hereby move this Court pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 for entry of a Temporary Restraining Order and Preliminary Injunction enjoining Defendants Peak Tactical, LLC ("Peak") and Nicholas Norton and their officers, agents, servants, employees, and attorneys, and any other person(s) in concert or participation with any of the foregoing people or entities, from (A) making, using, offering to sell, selling, or importing the accused Partisan Disruptor product, or any substantially identical product, and (B) stating publicly in commercial advertising that (i) the accused Partisan Disruptor practices U.S. Patent No. 9,146,067, and/or that (ii) the accused Partisan Disruptor is an assisted reset trigger.

This Motion is based on the Complaint (Dkt. 1), the Memorandum in Support filed concurrently herewith, the declarations and exhibits attached thereto, any additional materials that Plaintiffs may file in support of this Motion before or at any hearing on the Motion, and any oral argument requested by this Court.

Dated: January 16, 2026

Respectfully submitted,

By: *<u>/s/ Travis W. Koch</u>*

Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar #7-5418
**KOCH LAW, P.C.**
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

Ben Christoff (DC Bar 1025635)
**FISH & RICHARDSON P.C.**
1000 Maine Avenue SW, Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

christoff@fr.com

Matthew A. Colvin (TX Bar 24087331)
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
colvin@fr.com

***Attorneys for Plaintiffs***
***Rare Breed Triggers and***
***ABC IP, LLC***

Nathan Nicholson Wyo. Bar #7-5078
Travis W. Koch Wyo. Bar #7-5418
**KOCH LAW, P.C.**
P.O. Box 2660
Cheyenne, WY 82004
(307) 426-5010
(307)426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

ABC IP, LLC, a Delaware limited liability company, and RARE BREED TRIGGERS, INC., a Texas corporation,

*Plaintiffs*,

v.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and NICHOLAS NORTON, an individual,

*Defendants*.

Case No. 2:26-cv-00018

**JURY TRIAL DEMANDED**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

I. Forced Reset Triggers ..... 2

II. Patent Owner ABC and Exclusive Licensee RBT ..... 3

A. The Asserted Patents ..... 3

B. RBT's FRT-15 Forced Reset Trigger Products ..... 5

III. The Defendants' Public Campaign to Flood the Market with Infringing Copies of RBT's FRT-15L3 ..... 7

A. Defendants Manufacture and Distribute the Copycat Partisan Disruptor Products ..... 7

B. In Recent Days, Partisan Necessitates This Motion by Publicly Detailing Its Widespread, Deliberate Infringement Campaign ..... 8

C. The Defendants Falsely Advertise Their Accused Disruptor Product ..... 12

ARGUMENT ..... 14

I. Legal Standards ..... 15

II. The Plaintiffs Are Likely to Succeed on the Merits ..... 15

A. The Plaintiffs Are Likely to Succeed on Their Patent Infringement Claims ..... 16

1. The Plaintiffs Own All Substantial Rights in the Asserted Patents ..... 16

2. The Asserted Patents Are Valid and Enforceable ..... 16

3. The Defendants' Accused Disruptor Product Likely Infringes the Asserted Patents ..... 17

B. The Plaintiffs Are Likely to Succeed on Their False Advertising Claim ..... 19

III. The Plaintiffs Will Suffer Irreparable Harm Without the Requested Injunctive Relief .......... 20

IV. The Balance of Equities Tips in RBT's Favor .......... 22

V. The Public Interest Favors the Requested Relief .......... 23

VI. The Court Should Require No Security, or Alternatively, Nominal Security .......... 24

CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
473 F.3d 1196 (Fed. Cir. 2007)....................16

*Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*,
604 F.3d 1354 (Fed. Cir. 2010)....................16

*AMVAC Chem. Corp. v. Aceto Agric. Chems. Corp.*,
No. 1:08-CV-1617-CC, 2008 WL 2456076 (N.D. Ga. May 8, 2008)....................17, 21, 23

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015)....................23

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
678 F.3d 1314 (Fed. Cir. 2012)....................22

*Avvo Inc. v. Liang*,
No. 16-CV-892, 2016 WL 8738247 (D. Ariz. Apr. 4, 2016)....................22

*Biles v. Schneider*,
No. 19-CV-48, 2019 WL 13222745 (D. Wyo. Mar. 26, 2019)....................15

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
825 F.2d 1461 (10th Cir. 1987)....................24

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001)....................21

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
796 F.3d 1312 (Fed. Cir. 2015)....................16

*Fred Hutchinson Cancer Rsch. Ctr. v. BioPet Vet Lab, Inc.*,
No. 2:10CV616, 2011 WL 1119565 (E.D. Va. Mar. 1, 2011)....................16, 21

*Hybritech Inc. v. Abbot Lab'ys*,
849 F.2d 1446 (Fed. Cir. 1988)....................22

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)....................17

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017)....................22

*Miche Bag, LLC v. Thirty One Gifts LLC*,
No. 2:10-CV-781 TS, 2010 WL 3629686 (D. Utah Sept. 13, 2010) ....17, 18, 20, 23

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
106 F.4th 1369 (Fed. Cir. 2024) ....15

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003)....17

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005)....18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)....18

*Rare Breed Triggers, Inc. et al. v. Firearm Systems LL et al.*,
No. 2:25-cv-04938-SMB (D. Ariz.)....8

*Resolution Trust Corp. v. Cruce*,
972 F.2d 1195 (10th Cir. 1992) ....15

*Revision Military, Inc. v. Balboa Mfg. Co.*,
700 F.3d 524 (Fed. Cir. 2012)....15

*Speight v. Gordon*,
582 F. Supp. 3d 897 (D. Wyo. 2022)....15

*Syntex (USA) LLC v. Apotex Inc.*,
Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435 (N.D. Cal. May 18, 2006) ....23

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....18

*Tinnus Enters., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017)....21

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014)....22

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
805 F.2d 351 (10th Cir. 1986) ....22

*Windsurfing Int'l v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)....23

*Winnebago Tribe of Nebraska v. Stovall*,
341 F.3d 1202 (10th Cir. 2003) ....................24

*Wyoming Beverages, Inc. v. Core-Mark Int'l, Inc.*,
No. 17-CV-116-F, 2018 WL 8221068 (D. Wyo. Jan. 4, 2018) ....................19

**Statutes**

15 U.S.C. § 1125(a)(1)(B) ....................19

35 U.S.C. § 112(d) ....................14

35 U.S.C. § 271(a) ....................17

35 U.S.C. § 283 ....................15

**Other Authorities**

Fed. R. Civ. P. 65(a) ....................15

Fed. R. Civ. P. 65(c) ....................24

## INTRODUCTION

Defendants' brazen, widespread, and publicly-acknowledged infringement campaign must stop. Their strategy of flooding the market with the Partisan Disruptor trigger—a cheap knockoff of Rare Breed's patented trigger—stands to immediately inflict irreparable damage to Plaintiffs.



**Partisan Disruptor**



**Rare Breed FRT-15L3**



**Partisan Disruptor**



**Rare Breed FRT-15L3**

This Motion, triggered by Partisan's recent public boasts detailing its deliberate infringement spree, asks for immediate action to halt the irreparable damage. All applicable TRO and preliminary injunction factors are met. The Court should preserve the status quo and enjoin the infringing triggers.

***First***, success on the merits is clear. On patent infringement, ABC owns four asserted patents exclusively licensed to RBT. Expert analysis confirms the Defendants' Partisan Disruptor infringes every patent—it's a blatant copy, with only superficial cosmetic tweaks to its housing.

Defendants, fully aware of these patents and the impending suit, have mounted no challenge to validity or enforceability. On false advertising, Partisan makes two false statements designed to manufacture the Disruptor's legitimacy: (1) the Disruptor is an assisted reset trigger rather than a forced reset trigger, and (2) the Disruptor is covered by, and implements, the '067 Patent issued to its engineer, Michael Stakes. Both statements are wrong and mislead consumers.

***Second***, irreparable harm is unfolding now. These durable triggers mean every infringing sale robs RBT of a lifelong customer. Price erosion and Partisan's public smears tarnish Plaintiffs' reputation and goodwill. Money damages and an injunction at the end of a protracted litigation will not suffice. Partisan is a startup and serious doubts plague Defendants' ability to make Plaintiffs whole.

***Third***, equities demand relief. Plaintiffs are bearing losses while Defendants are flooding the market with apparent impunity, shielded by their self-proclaimed patent insurance and lacking any right to profit from their continued theft of Plaintiff's intellectual property.

***Fourth***, the public interest strongly favors injunctive relief. The DOJ has already acknowledged publicly that, for public safety and IP protection reasons, the public interest favors the enforcement of the Plaintiffs' patents. The public interest cannot favor flooding the market with cheap knockoff triggers that greatly increase the rate of firing a rifle.

## STATEMENT OF FACTS

### I. Forced Reset Triggers

This case involves forced reset triggers ("FRTs") made for semi-automatic rifles. The federal government has previously regulated and closely monitors FRTs because they are designed to increase a rifle's rate of fire. *See* Ex. A. An FRT operates by mechanically resetting the trigger after each shot, allowing the user to take faster follow-up shots without manually releasing pressure on the trigger. Ex. A.

FRTs are distinct from other categories of trigger mechanisms. For example, in a traditional semi-automatic trigger mechanism, for each shot, a user manually pulls the trigger and releases the trigger to reset it. Ex. A. As another example, in a fully automatic mechanism, a user can fire at a fast rate without resetting the trigger between each shot. Ex. A. As yet another example, an assisted reset trigger is one that only partially—rather than fully—resets the trigger.

## II. Patent Owner ABC and Exclusive Licensee RBT

### A. The Asserted Patents

ABC owns the four asserted patents, U.S. Patent Nos. 10,514,223 ("'223 Patent"), 11,724,003 ("'003 Patent"), 12,036,336 ("'336 Patent"), and 12,274,807 ("'807 Patent") (collectively, "asserted patents"),[1] generally directed to FRTs that can be retrofitted into existing semi-automatic rifles. *See infra* Statement of Facts ("SOF") § II.B; Dkt. 1, Exs. A–D. All four asserted patents are titled "Firearm Trigger Mechanism," and all asserted claims are drawn to a firearm "trigger mechanism."[2] ABC exclusively licenses the asserted patents to RBT, who designs, makes and sells implementing products (discussed further below). Exs. B, C.

The '223 Patent is the earliest asserted patent, filed in 2018 and issued in 2019, and is unrelated to the other asserted patents. '223 Patent, Cover Page. The '223 Patent describes and claims a semi-automatic rifle trigger mechanism involving a hammer, a trigger member, and a locking bar. '223 Patent, Abstract, cl. 4. As shown in Figures 3 and 4, when the trigger is pulled, the hammer contacts the firing pin, thereby causing the ammunition cartridge to discharge. '223 Patent, Figs. 3–4, 2:59–64, 4:35–5:22. This discharge causes the bolt carrier (52) to move rearward,

[1] The '223, '003, '336, and '807 Patents are attached to the Complaint (Dkt. 1) as Exhibits A–D, respectively.

[2] The "asserted claims" for purposes of this brief are '223 Patent claim 4, '003 Patent claim 4, '336 Patent claim 3, and '807 Patent claim 1. Plaintiffs reserve the right to assert additional claims in this case to the extent permissible under the law and rules.

and a lower surface of the bolt carrier pushes against the hammer (18), which in turn forces the trigger (via trigger member 26) to return to its reset position. '223 Patent, Figs. 4–5, 5:23–54. A locking bar (62) prevents the trigger member from being pulled again by the user until the bolt carrier (52) has returned to the original or "in-battery" position. '223 Patent, Figs. 4–5, 5:23–54.




FIG. 5

'233 Patent, Fig. 5 (showing the bolt carrier 52 forcing the hammer 18 and trigger 26 back into its reset position).

The '003, '336, and '807 Patents are related and share a common specification, as the '336 and '807 Patents are continuations of the '003 Patent. Dkt. 1, Exs. B–D ('003, '336, and '807 Patents, respectively). These three patents were filed and issued between 2022 and 2025. *See id.* These patents all describe and claim a device similar to that of the '223 Patent, but with the additional feature that it "provides a 'three position' trigger mechanism having safe, standard semi-

automatic, and forced reset semi-automatic positions." '003 Patent, 2:34–37, Figs. 7 (safe), 8A-8D (standard semi-automatic), and 9A-9D (forced reset semi-automatic).

### B. RBT's FRT-15 Forced Reset Trigger Products

RBT markets an "FRT-15" product line (shown below) made up of three high-durability forced reset triggers implementing the asserted patents. The FRT-15 and FRT-15L2 both have two operating modes—(1) safe, and (2) forced reset—and thus implement the '223 Patent. Ex. D. The FRT-15 and FRT-15L2 triggers do not allow the user the option of a traditional (i.e., non-forced reset) operating mode. RBT also markets the FRT-15L3, which adds a third, selectable option for the traditional operating mode. This trigger is more expensive than the other two models, reflecting the value customers place on being able to select between the traditional and forced reset operating modes. Ex. A. The FRT-15L3 can also be retrofitted into existing AR-15 style rifles.

| RBT Product | Image | Positions | Patent(s) | Price |
|---|---|---|---|---|
| FRT-15 |  | 2 | '223 | $275 |

| RBT Product | Image | Positions | Patent(s) | Price |
|---|---|---|---|---|
| FRT-15L2 |  | 2 | ’223 | $285 |
| FRT-15L3 |  | 3 | ’223, ’003, ’336, and ’807 | $450 |

In May 2025, RBT settled litigation with the U.S. Department of Justice (“DOJ”) over whether the use of an FRT qualifies a rifle as a “machinegun.” *See* Ex. E (Office of the Attorney General, *Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers* (May 16, 2025), https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed (last visited Jan. 10, 2026)). The settlement was reached on condition that Rare Breed will (1) “significantly advance public safety with respect to FRTs” by, *inter alia*, “enforc[ing] its patents to prevent infringement that could threaten public safety,” and (2) “promote the safe and responsible use of its products.” *Id.*

## III. The Defendants' Public Campaign to Flood the Market with Infringing Copies of RBT's FRT-15L3

### A. Defendants Manufacture and Distribute the Copycat Partisan Disruptor Products

Defendants manufacture and distribute the accused Partisan Disruptors. Except for cosmetic features in the outer housing that are irrelevant to the claimed inventions, the Partisan Disruptor is a direct copy of RBT's FRT-15L3 (see below) that one of their distributors, Firearm Systems, sells for $299—***$150 (or 33%) cheaper*** than RBT's FRT-15L3. Ex. F.




**RBT FRT-15L3**



**Accused Partisan Disrupter**

Defendants are the source of these copycat products. Ex. G. Partisan clearly knows about RBT's asserted patents because Partisan has posted ***three out of four—the '223, '003, and '336 Patents—on its own website*** in a so-called "FRT Legal Library." Ex. H. Partisan was apparently formed in mid-2025, as it created its website in April 2025 around the time RBT settled with the DOJ. Ex. I.

### B. In Recent Days, Partisan Necessitates This Motion by Publicly Detailing Its Widespread, Deliberate Infringement Campaign

Partisan necessitated the instant motion by posting openly, just days ago, about its ongoing, widespread, and deliberate infringement campaign in a popular online firearm forum called AR15.com. Ex. J. Although Partisan had also posted in fall 2025 (discussed below), it did not reveal until its recent online statements that its Disruptor product is a copycat of ***RBT's FRT-15L3*** product.

On January 7, 2026, Partisan posted (forming a forum thread) on AR15.com, where Partisan (1) ties its infringement campaign to RBT's product and RBT's lawsuit against Firearm Systems LLC (one of Partisan's Disruptor dealers), *see Rare Breed Triggers, Inc. et al. v. Firearm Systems LL et al.*, No. 2:25-cv-04938-SMB (D. Ariz.)), and (2) and reveals it has begun flooding the market with infringing products. More specifically, Partisan

- states it is presently in the process of shipping thousands of accused triggers to dealers throughout the United States: "This week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end."
- acknowledges the complaint filed in Arizona linking Partisan with the John Doe defendant:
    - "As many know, RBT named us as a John Doe d/b/a Partisan Triggers in an Arizona suit filed December 23, 2025."
- states it expected, and was preparing for, a lawsuit initiated by RBT since at least September 2025: "Partisan Triggers previously introduced ourselves here. In it, we detailed our preparations for the inevitable lawsuit from Rare Breed Triggers/ABC IP (RBT)."
- states its belief that RBT is a "public/private partnership" it "opposes": "As stated on our website, we oppose public/private partnerships that exist only to your detriment."
- states its refusal to cease making and distributing the accused Disruptor products even despite litigation:
    - "RBT excels at bullying small companies, often run by young men who have barely gotten their feet under them in life, through aggressive lawfare

to bankrupt and break them. It's easy to feel invincible when facing under-resourced opponents while relying on powerful allies. Rest assured, this won't work against us."

  - "You and our dealers can trust we won't be bullied or back down. . . . We are here for the long haul, so strap in, folks—this may turn into a wild ride. Thumbs up, let's do this."

- states it has a substantial patent insurance policy to indemnify its dealers: "Dealers are indemnified under our substantial patent insurance policy—covering the Disruptor alongside our upcoming releases, and worth multiples of RBT's claimed millions in litigation costs from their prior lawsuits."

- asks readers for support in the litigation:

  - "We have no plans or need for donations; support us by spreading the word or buying our triggers."

  - "We would like to ask you to do something. If you have useful information on RBT (or related parties) for this lawsuit, PM us on ARFCOM to share it. We feel very confident in our preparations, but we are aware that there is always the possibility someone may know something we've missed. We hope they see this and want to help."

Ex. K.

In the ensuing thread, Partisan later

- summarizes its discussions with its counsel about its positions on issues in the case: "After some discussions with our legal team, we have decided to make a few things clear, out here in public. . . ."

- shows flippancy towards its infringement campaign and invites a lawsuit: "Do your homework and sue us in the right venue boys, you're just...so disappointing right now."

Ex. K.

This recent thread is a follow-up from Partisan's separate AR15.com thread started in September 2025. There, Partisan did not specifically say that it was using RBT's FRT15-L3 design, but did convey it was mimicking an existing design, sought an IP lawyer's advice, and procured intellectual property-related insurance. Partisan specifically

- states it is a new company formed to sell triggers: "Partisan Triggers is a new company configured to incubate the development of innovative triggers and access high quality, high volume manufacturing in order to bring the best possible value for money to the end user."

- states it is copying an existing trigger design that it learned about several months earlier: "Several months ago, Partisan Triggers was shown a new trigger design by @Ben and his weapons company. It promised to be a unique match grade FRT with a light, clean trigger pull and superb reliability over thousands of rounds on a given unit. A deal was done to bring this trigger to market, and Ben was asked to take on the role of public relations spokesman for the company."

- states it decided ***not*** to release the product at that time because of risk of patent infringement: "After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments. Their track record is all the evidence required to support this opinion."

- describes its lawyer's advice and states that Partisan procured intellectual property-related insurance: "The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent."

- reassures its customers and dealers that they will not face liability for purchasing or distributing Partisan's trigger product: "It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble."

- again demonstrates flippancy toward its infringement campaign: "Get plenty of popcorn ready – it's likely to be highly entertaining."

- repeatedly states its plans to distribute a massive number of infringing products by the holidays in 2025 in order to fully satisfy market demand:

    - "Our full release is set to occur in time for the holidays, and in such quantities that you won't have to worry about back orders or whether you can find and receive a trigger in short order."

- "You can be assured we will keep to our timeline as stated previously...you'll have plenty of time to order and receive as many triggers as your heart desires well ahead of the holiday season, and you aren't going to need to worry about whether you need to add express shipping."
- "There will be a substantial number of units available on release day. Enough that we don't need to worry about throttling sales so that everyone can get one."
- "That said, we must sadly inform you that we are pushing back the release a month to ensure sufficient supply is available to meet demand. This is the sort of delay inherent in the beast that is gearing up and manufacturing on a mass scale."
- "Many of your favorite big time retailers/distributors will have our product."
- "How many units are we getting ready to ship? A lot of them [showing picture depicting cards corresponding to the number of infringing products]."
- "Those cards don't even fully represent the initial release."
- "Relatively small scale cottage industry production is a lot easier and straightforward than large scale mass production. The wait will be worth it."
- "@PartisanTriggers are these going to be available at brick and mortar retailers?" "Yes."
- "We fully agree that the more FRTs in circulation, the better."
- "Everything is set for Monday[, December 15, 2025]. Most of the retailers launching Monday are regional brick and mortar locations. There will be a major online retailer selling and shipping Monday, as well as several more major retailers as they receive their shipments throughout the week. We will post the online retailer shipping Monday at 0900 EST. You can also expect a number of review videos to go live Monday."

- states that a large number of infringing products have already been sold and distributed: "A large number of sales and reviewer samples have already gone out, including to a pretty well known guy who has posted in this thread."
- states its infringement campaign has been carefully planned:
  - "Our (not mine, our) words were chosen carefully and vetted with our legal team prior to the OP."
  - "[E]very part of this project has been preplanned."

- states the intention to conceal its business dealings from an intellectual property owner:
    - "[W]e won't be posting any of the brick and mortar locations unless they ask us to, as none of them want a bogus C&D letter from someone suing everyone and their mother. It is a hassle, and they know our trigger will sell regardless."
    - "Shroud with deception everything you do."
- advertises its infringing product's price, quality, and features:
    - "It is a three position cassette style trigger, and better than the RB trigger across the board."
    - "Target price is $200 or just a little north of there."
    - "This trigger is going to be a very good trigger, and great value for your dollars."
    - "It would be shocking if you find a better quality FRT at a comparable price. We are confident that you will find it to be the gold standard."
- thanks viewers for ample promotion the post has received: "Appreciate those who are keeping the thread bumped daily."

Ex. J.

Based on its own website and forum posts, Partisan has made clear that it has already intentionally flooded the market with its infringing Disruptor products. *See* Exs. F, K. The Defendants are therefore engaged in a widespread and ongoing campaign of deliberate infringement.

**C. The Defendants Falsely Advertise Their Accused Disruptor Product**

Partisan robustly and widely markets its Disruptor product, including on various pages on its website. *See, e.g.*, Ex. L (Partisan Triggers, https://partisantriggers.com/ (last visited Jan. 16, 2026), advertising the Disruptor); Ex. M (The Disruptor, https://partisantriggers.com/the-disruptor/ (last visited Jan. 16, 2026)). There, Partisan provides links on its website to nine separate firearm dealers, Ex. F (Partisan Triggers Disruptor FRT, https://firearmsystems.net/ (last visited

Jan. 10, 2026)), and even invites anyone to become a dealer: "Interested in becoming of a dealer of Partisan Triggers? Email us at Sales@PartisanTriggers.com," Ex. N. A consumer can go to these dealers' websites from anywhere in the country and purchase a Disruptor. *See, e.g.*, Ex. O (Partisan Disruptor AR-15 FRT, https://firearmsystems.net/product/partisan-disruptor-ar-15-frt/ (last visited Jan. 16, 2026), showing button to "Add to cart"); Ex. P (The Partisan Disruptor AR15 Forced Reset Trigger, https://cloak-industries.com/product/partisan-disruptor-frt/ (last visited Jan. 16, 2026) ("ADD TO CART")).

Even though Partisan's Disruptor is a copy of RBT's FRT-15L3 forced reset trigger, Partisan incorrectly describes the Disruptor on its website as an "***assisted*** reset trigger," Ex. M—which is a different type of trigger altogether. Ex. Q, ¶ 16. In particular, where a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger. As Mr. Luettke explains in his declaration, both RBT's FRT-15L3 and Partisan's accused Disruptor are ***forced*** reset triggers because (1) the Partisan is a copy of the FRT-15L3, and (2) and their mechanisms fully return the trigger to the reset state. Ex. Q, ¶¶ 11, 16. Notably, Partisan's dealers' websites, and some portions of Partisan's own website, correctly describe the Disruptor as a forced reset trigger. *See, e.g.*, Dkt. 1, Ex. J; Ex. O, (Partisan Disruptor AR-15 FRT, https://firearmsystems.net/product/partisan-disruptor-ar-15-frt/ (last visited Jan. 16, 2026) ("3 Position Drop-In Forced Reset Trigger")); Ex. P (The Partisan Disruptor AR15 Forced Reset Trigger, https://cloak-industries.com/product/partisan-disruptor-frt/ (last visited Jan. 16, 2026)). Partisan's advertisement of the Disruptor as an ***assisted*** reset trigger is therefore false and misleads consumers about the nature, design, and operation of the Disruptor product.

Partisan also tells the public that its Disruptor implements, and is covered by, U.S. Patent No. 9,146,067 ("'067 Patent"), which issued to Partisan's employee Michael Stakes. Ex. M ("The

Disruptor (US Patent 9146067) is an assisted reset trigger . . . ."); Ex. G (stating Michael Stakes is "Group Engineer" at Partisan); Ex. R, Cover Page (listing Michael Stakes as Applicant and Inventor). However, as Mr. Luettke explains, that too is incorrect, and the FRT-15L3 and Disruptor ***do not practice*** any claim of the '067 Patent. Ex. Q, ¶ 46. The '067 Patent's independent claims 1, 4, 8, 11, and 15—and thus all their dependent claims, 35 U.S.C. § 112(d)—all require a "reset lever" that is struck by a hammer. *See* Ex. R, 19:11-12, 19:27-40 (independent cl. 1);[3] 19:53-54, 20:4-17 (independent cl. 4); 20:35-36, 20:50-62 (independent cl. 8); 21:9-10, 21:25-37 (independent cl. 11); 21:55-56, 22:5-17 (independent cl. 15); Ex. Q, ¶ 42. The FRT15-L3 and Disruptor products do not have any such component. Ex. Q, ¶ 43. Claim 19 (the only remaining claim) requires a selector that permits different amount of trigger travel for different selected operating modes, Ex. R, 22:41-64 (independent cl. 19); Ex. Q, ¶ 44, and neither the FRT-15L3 nor the Disruptor feature any such differences. Ex. Q, ¶ 45. Therefore, Partisan's advertisement that its Disruptor product practices the '067 Patent is false and misleads consumers.

Given that Partisan copied the FRT-15L3, and that its own employee is the named inventor on the '067 Patent, Partisan can hardly be unaware of what it is doing—i.e., making incorrect public statements about the nature and legitimacy of its product to attract and syphon RBT's customers.

## ARGUMENT

The Court should grant a TRO and a preliminary injunction to preserve the status quo throughout this litigation because all applicable factors are satisfied.

---

[3] Claims that depend from an independent claim include all the requirements of the independent claim. 35 U.S.C. § 112(d).

## I. Legal Standards

The patent statue authorizes this Court to grant injunctive relief "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction." *Speight v. Gordon*, 582 F. Supp. 3d 897, 902–03 (D. Wyo. 2022) (internal quotation marks omitted) (quoting *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018)). Such relief may be granted to preserve the status quo pending a determination of the action on the merits. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); Fed. R. Civ. P. 65(a).

"[A] preliminary injunction enjoining patent infringement pursuant to 35 U.S.C. § 283 'involves substantive matters unique to patent law and, therefore, is governed by the law of [the Federal Circuit].'" *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012) (quoting *Hybritech Inc. v. Abbot Lab'ys*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988)). To obtain a preliminary injunction, the moving party must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024). The purpose of a TRO is to maintain the status quo until a preliminary injunction hearing can be held. *Biles v. Schneider*, No. 19-CV-48, 2019 WL 13222745, at *1 (D. Wyo. Mar. 26, 2019).

## II. The Plaintiffs Are Likely to Succeed on the Merits

The Plaintiffs are likely to succeed on the merits. As for Plaintiffs' patent infringement claims, the evidence establishes that ABC owns the asserted patents and RBT is their exclusive licensee, that the accused Disruptor meets all the asserted claims and is a copycat of RBT's FRT-15L3 patent-implementing product, and that the Defendants have never raised a substantial

question of invalidity or unenforceability despite being aware of the asserted patents. *E.g.*, *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007). As for Plaintiffs' false advertising claims, the evidence establishes that Partisan willfully makes public false statements about the design and legitimacy of the Disruptor to syphon RBT's would-be FRT-15L3 customers.

### A. The Plaintiffs Are Likely to Succeed on Their Patent Infringement Claims

#### 1. The Plaintiffs Own All Substantial Rights in the Asserted Patents

An assignee and exclusive licensee have standing to sue for patent infringement. *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1358–59 (Fed. Cir. 2010). Here, ABC has standing because it owns all substantial rights to the asserted patents based on the following assignments:

| Execution Date | Assignments of the '223 Patent | Exhibit |
|---|---|---|
| Sept. 26, 2018 | Named inventor Jeffrey Cooper Rounds to Wolf Tactical LLC | Ex. S (Reel/Frame 46989/0991) |
| May 7, 2020 | Wolf Tactical, LLC to Rare Breed Triggers, LLC | Ex. T (Reel/Frame 52893/0732) |
| Dec. 8, 2020 | Rare Breed Triggers, LLC to ABC IP, LLC | Ex. U (Reel/Frame 71006/0717) |

| Execution Date | Assignments of the '003, 336, and '807 Patents | Exhibit |
|---|---|---|
| Oct. 21, 2022 | Inventor Mladen Thomas Strbac to ABC IP, LLC | Ex. V (Reel/Frame 61499/0329) |

RBT also has standing as the exclusive licensee of the asserted patents. Ex. B; Ex. C.

#### 2. The Asserted Patents Are Valid and Enforceable

The asserted patents are also valid and enforceable. The asserted patents are presumed valid at every stage of litigation. *E.g.*, *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015). To avoid a TRO and/or preliminary injunction, the Defendants must raise a "substantial question of invalidity," and if they do, then "the burden shifts back to the patentee to present contrary evidence that they are likely to succeed at trial on the validity issue." *Fred*

*Hutchinson Cancer Rsch. Ctr. v. BioPet Vet Lab, Inc.*, No. 2:10CV616, 2011 WL 1119565, at *2 (E.D. Va. Mar. 1, 2011) (citing *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009)) (cleaned up).

To date, the Defendants have not challenged any of the asserted patents' validity, despite being aware of the asserted patents and knowing that this case was forthcoming. As mentioned above, Partisan's website expressly lists the '223, '003, and '336 Patents as part of a "FRT Legal Library." *See supra* SOF, § III.A. Fully aware of the patents and their application to Defendants' FRT products, the Defendants have had the opportunity to challenge the asserted patents but have not done so. The asserted patents' presumption of validity, combined with the lack of any showing of a meritorious invalidity or enforceability defense, is sufficient to establish a reasonable likelihood that the patents are valid and enforceable. *AMVAC Chem. Corp. v. Aceto Agric. Chems. Corp.*, No. 1:08-CV-1617-CC, 2008 WL 2456076, at *1 (N.D. Ga. May 8, 2008); *Miche Bag, LLC v. Thirty One Gifts LLC*, No. 2:10-CV-781 TS, 2010 WL 3629686, at *3 (D. Utah Sept. 13, 2010).

### 3. The Defendants' Accused Disruptor Product Likely Infringes the Asserted Patents

Determining the likelihood of infringement involves a two-step analysis:[4] first, a court construes the patent claims; second, the court compares the construed claims to the accused product. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

***First***, claim construction is a question of law for the Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit has "frequently stated that the words of a claim are generally given their ordinary

---

[4] Infringement also requires a lack of authorization for the accused conduct. 35 U.S.C. § 271(a) ("[W]hoever ***without authority*** makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." (emphasis added)). Here, this requirement is met because neither ABC nor RBT has ever authorized the Defendants' infringing conduct.

and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (quotation omitted). Since *Phillips*, that court has explained that the plain meaning of claim language should govern absent certain limited circumstances, namely: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Here, the asserted claim language should carry its plain and ordinary meaning. The asserted patents contain no lexicography or disavowal that would require assigning any different meaning. *See generally* '223 Patent; '003 Patent.[5] Moreover, because the claims "use language in its ordinary, rather than technical, sense," construing the claims should involve "the application of the widely accepted meaning of commonly understood words." *Miche*, 2010 WL 3629686, at *2 (quoting *Phillips*, 415 F.3d at 1314); Ex. Q (showing claim language met by the Defendants' accused Partisan Disrupter product).

***Second***, technical expert Brian Luettke's declaration comparing the claim language to the Defendants' accused Partisan Disrupter product shows infringement. Ex. Q, ¶¶ 26–38; *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005); *Miche*, 2010 WL 3629686, at *2–3 (granting a temporary restraining order after the court compared the asserted claims—read in light of definitions supplied by the plaintiff—to the accused products). Mr. Luettke's expert declaration shows infringement by mapping each claim limitation of at least one claim of each asserted patent onto the corresponding aspects and features of the Defendants' accused Partisan Disrupter product. *See* Ex. W (mapping each limitation of claim 4 of the '223 Patent onto the

[5] The '003, '336, and '807 Patents share a common specification.

corresponding features of the Defendants' accused Partisan Disrupter product); Ex. X (same for claim 4 of the '003 Patent); Ex. Y (same for claim 3 of the '336 Patent); Ex. Z (same for claim 1 of the '807 Patent). The Plaintiffs' comparison is more than sufficient to show a likelihood of success on the merits of infringement.

### B. The Plaintiffs Are Likely to Succeed on Their False Advertising Claim

False advertising under 15 U.S.C. § 1125(a)(1)(B) "requires the plaintiff to allege the false or misleading statements were made in commercial advertising or promotion." *Wyoming Beverages, Inc. v. Core-Mark Int'l, Inc.*, No. 17-CV-116-F, 2018 WL 8221068, at *13 (D. Wyo. Jan. 4, 2018); 15 U.S.C. § 1125(a)(1)(B). Section 1125(a)(1)(B) provides in relevant part:

> Any person who, on or in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods . . . or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

Partisan falsely describes its Disruptor product in at least two respects in its website's widely-available public advertisements. ***First***, Partisan repeatedly incorrectly calls the Disruptor an "assisted reset trigger" on its website. *See supra* SOF, § III.C. As Mr. Luettke explains, this is wrong, and instead the Disruptor is a forced reset trigger. Ex. Q, ¶ 16. The difference is not academic, because the two triggers are designed and operate in different ways: whereas a forced reset trigger uses a mechanism to ***fully*** reset the trigger, an assisted reset trigger's mechanism only ***partially*** resets the trigger. *Id.* Certain parts of Partisan's own website, and its dealers' websites, confirm that the Disruptor is actually a forced reset trigger. *See supra* SOF, § III.C. It cannot be both types.

***Second***, Partisan incorrectly claims that the Disruptor is covered by the ’067, on which Partisan’s employee Michael Stakes is a named inventor. *See supra* SOF, § III.C; Ex. Q, ¶¶ 46–47. This public assertion tends to increase the legitimacy of the product from a consumer’s perspective, Ex. AA, ¶ 20, and therefore serves as a marketing statement designed to attract customers to buy Partisan’s accused Disruptor.

These statements in Partisan’s public commercial advertising harm RBT. For the reasons discussed further below and in Dr. Warty’s declaration, Partisan’s syphoning of RBT’s FRT15-L3 customers is likely to cause RBT irreparable harm. *See infra* § III. For these reasons, the Plaintiffs are likely to succeed on their claim for false advertising.

## III. The Plaintiffs Will Suffer Irreparable Harm Without the Requested Injunctive Relief

The Plaintiffs have already suffered and, absent the requested relief, will suffer more irreparable harm from “price erosion, loss of market share, harm to its reputation, and a loss of business opportunities”—factors which “[t]he Federal Circuit has held . . . can constitute irreparable harm.” *Miche*, 2010 WL 3629686, at *3 & n.27 (collecting cases). This is especially so here since Defendants’ product appears to be nothing more than a cheap knockoff of Plaintiffs’ product and since Defendants have begun flooding the market with thousands of additional units in response to this lawsuit, as discussed above. *See supra* SOF, § III.B.

As economic expert Dr. Samir Warty’s declaration explains, the risk of irreparable harm to RBT is acute given the durable, long-lasting nature of the products in question. Ex. AA, ¶¶ 4, 8, 12. A rifle owner likely only needs to buy one trigger product for the life of his or her rifle—which can survive generations. Ex. Q, ¶ 12, Ex. AA, ¶ 8. Moreover, because the triggers can be retrofitted onto any existing AR-15 style rifle, a customer can buy one trigger and use it across multiple rifles already in his or her possession—albeit not simultaneously. Ex. Q, ¶¶ 13–15, Ex.

AA, ¶ 9. For these reasons, the Defendants' sales of infringing triggers likely translate directly into permanently lost sales, customers, and business opportunities for RBT, and RBT is unlikely to ever make up those losses. Ex. AA, ¶¶ 8–15. Courts have recognized the irreparable harm in such circumstances. *E.g.*, *BioPet Vet Lab, Inc.*, 2011 WL 1119565, at *4.

Further, because its accused Disrupters are sold at prices such as $300, the Defendants are eroding RBT's $450 price by a sizable margin of 33% (or $150). Ex. AA, ¶¶ 16–18. The Defendants' pricing has already diverted and will continue to divert a significant number of RBT's customers. *See* Ex. AA, ¶¶ 5 (price factors play a role in competitive position), 16. As explained above, RBT is unlikely to ever regain those diverted customers and sales. Ex. AA, ¶¶ 8, 10–12.

The Plaintiffs have also already suffered and will continue to suffer reputational harm and loss of goodwill. The Defendants' undercutting of RBT's price by itself harms RBT's reputation by incorrectly suggesting to customers that RBT's pricing is uncompetitive. Ex. AA, ¶ 26. The Defendants have also popularized labeling RBT as a "bully" and "Rare Greed" instead of "Rare Breed" in key public forums such as AR15.com. *See* Ex. AA, ¶¶ 16, 26 (harm resulting from perceived unreasonable pricing). Courts have recognized reputational damage as irreparable harm favoring injunctive relief. *See, e.g.*, *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156–57 (10th Cir. 2001); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1208 (Fed. Cir. 2017); *AMVAC*, 2008 WL 2456076, at *1.

Irreparable harm to RBT is immediate and ongoing. Distributors are currently selling the infringing Disruptor product. Ex. AA, ¶¶ 12 ("The risk of permanent displacement is not hypothetical: Defendants advertise the Partisan Disruptor Trigger as being available now through distributors currently selling the product."), 28–29, 36. RBT has established "a likelihood of substantial and immediate irreparable injury," and preliminary injunctive relief is an appropriate

remedy. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (internal quotation marks omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

Moreover, a money damages award will not adequately compensate RBT. There is no sound reason to believe that the Defendants would be able to satisfy a money judgment; Defendants may well seek to evade efforts to stop infringement and simply migrate infringing conduct to a separate business or location. *See Avvo Inc. v. Liang*, No. 16-CV-892, 2016 WL 8738247, at *2 (D. Ariz. Apr. 4, 2016); Ex. J ("Shroud with deception everything you do . . . ."). This circuit has found irreparable harm where, as here, there is reason to believe damages may be difficult to collect. *See, e.g.*, *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury.").

## IV. The Balance of Equities Tips in RBT's Favor

The Court must weigh the "harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017). Generally, this factor will be dispositive only if the balance tips heavily in favor of the accused infringer. *Hybritech Inc.*, 849 F.2d at 1457–58 (affirming grant of preliminary injunction and explaining "we never have required, as a prerequisite to awarding preliminary injunctive relief, that the district court expressly find the existence of this factor").

The Plaintiffs' harms detailed above are severe and threaten the long-term viability of their business. Beyond reputational damage, the Plaintiffs have lost and will continue to lose customers and revenue because of the Defendants' campaign to undercut RBT with infringing copies. *See, e.g.*, *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) (noting loss

of business to a "new entrant selling a likely-infringing product" was a relevant consideration under balance of equities factor).

In contrast, "light weight" should be accorded to the Defendants' "desire to continue distribution of an infringing product." *AMVAC*, 2008 WL 2456076, at *2; *see also Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Defendants would not suffer any legally cognizable harm in light of the fact that their actions sought to be restrained are contrary to law and would maintain the status quo. Moreover, because Partisan Triggers has procured patent insurance, the Defendants are at minimal if any risk of harm from the preliminary injunction. *See supra* SOF, § III.B. The balance of equities favors injunctive relief.

**V. The Public Interest Favors the Requested Relief**

The public interest strongly favors enjoining the Defendants' conduct. "[T]he public interest strongly favors enforcement and protection of patent rights." *Syntex (USA) LLC v. Apotex Inc.*, Nos. C 01-02214 MJJ, C 05-02116 MJJ, 2006 WL 1390435, at *3 (N.D. Cal. May 18, 2006); *see also AMVAC*, 2008 WL 2456076, at *2 ("[P]ublic policy favors protection of the rights secured by the valid patents" (citation and quotation marks omitted)). This is even more true when the patent owner practices its own patents, as the Plaintiffs do here. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."). In a typical patent case, absent "some critical public interest that would be injured by the grant[] of preliminary relief," the public interest favors granting TRO and preliminary injunctive relief. *Miche*, 2010 WL 3629686, at *3 (citing *Hybritech Inc.*, 849 F.2d at

1458). No critical public interest would be injured by preliminarily enjoining the Defendants' infringing conduct during this case.

To the contrary, permitting the Defendants to flood the market with the accused 3-position forced reset triggers at severely reduced prices serves no legitimate public interest, and only contradicts the public interest. The DOJ under President Biden restricted the use of these trigger products, and similarly the DOJ under President Trump has permitted RBT to market its triggers ***on condition that*** RBT (1) "enforce its patents to prevent infringement that could threaten public safety," and (2) "promote the safe and responsible use of its products." Ex. E. In other words, the government has already recognized that enforcement of Plaintiffs' patents is in the public interest.

### VI. The Court Should Require No Security, or Alternatively, Nominal Security

Under Rule 65(c), the movant is required to give security only "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A bond may not be required if there is no evidence the party will suffer damages from the injunction. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). The Defendants have not shown and cannot show it would suffer damage if the Court were to grant the requested relief and thus maintain the status quo in this case. Defendants only began marketing their infringing products in late 2025, so the status quo is a market without their low-priced knockoff.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the Plaintiffs' Motion for a TRO and preliminary injunction on the terms described in the Motion and proposed order.

Dated: January 16, 2026

Respectfully submitted,

By: */s/ Travis W. Koch*

Nathan Nicholas, Wyo. Bar #7-5078
Travis W. Koch, Wyo. Bar #7-5418
**KOCH LAW, P.C.**
P.O. Box 2660
Cheyenne, WY 82003
(307) 426-5010
(307) 426-4927 (fax)
tkoch@kochlawpc.com
nnicholas@kochlawpc.com

Ben Christoff (DC Bar 1025635)
**FISH & RICHARDSON P.C.**
1000 Maine Avenue SW, Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070
christoff@fr.com

Matthew A. Colvin (TX Bar 24087331)
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
colvin@fr.com

***Attorneys for Plaintiffs***
***Rare Breed Triggers and***
***ABC IP, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, a copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record.

*/s/ Travis W. Koch*
Travis W. Koch

.

# EXHIBIT A

FRT Trigger For Sale | RareBreed Triggers | Rare Breed FRT-15- Rare Breed Triggers Official https://rarebreedtriggerofficial.com/

Innovation in Firearm Technology

Home Triggers Cart Contact About

RARE BREED TRIGGERS




## Rare Breed Triggers: The Revolutionary Forced Reset Trigger — FRT-15 Triggers

The Rare Breed Trigger offers easy installation, enhancing semi-automatic firearm performance. Our FRT-15, FRT-15E3, FRT-15L2, and FRT-15L3 are drop-in forced reset triggers that fit your AR-15 without requiring gunsmithing.

BUY NOW

### What is an FRT Trigger?

The rarebreed FRT is a patented trigger mechanism designed to maximize firing speed while maintaining control and reliability.

Unlike traditional binary or bump-fire triggers, the FRT-15 uses a forced reset system that automatically resets the trigger after each shot, allowing for near-instantaneous follow-up shots without fully releasing the trigger.

### How Does the FRT Trigger Work?

FRT-15 trigger operates on a unique forced-reset principle:

1. Trigger Pull – The shooter pulls the trigger, firing the first round.
2. Forced Reset – Instead of manually releasing the trigger for a reset, the firearm's recoil and gas system force the trigger forward, resetting it instantly.

Captured by FireShot Pro: 01-15-2026, 14:59:58

This innovative design mimics the firing speed of automatic firearms while remaining compliant with semi-automatic regulations—at least until recent legal scrutiny. The rarebreed triggers quickly gained a cult following for its smooth operation and rapid-fire capabilities, making it one of the most sought-after aftermarket triggers on the market.

3. Rapid Succession – By maintaining slight rearward pressure, the shooter can fire again as soon as the trigger resets, achieving an incredibly fast rate of fire.

This mechanism of rarebreed frt15 trigger allows for firing speeds approaching 600 rounds per minute—comparable to some automatic firearms—while still functioning as a semi-automatic trigger.




## Where to Buy Rare Breed Triggers

Engineering excellence is at the core of RareBreed Triggers. Our patented Forced Reset Trigger (FRT) technology reflects years of dedicated research, advanced design, and rigorous testing to achieve superior mechanical performance.

Our engineering team integrates cutting-edge design, state-of-the-art manufacturing, and strict quality control at every stage of production. The FRT-15 set a new benchmark for speed, reliability, and ingenuity. Successive designs continue to build on that legacy—offering enhanced performance while remaining firmly within the boundaries of federal law.

At RareBreed Trigger, we innovate with purpose. Our goal is simple: to provide law-abiding gun owners with best-in-class Forced Reset Triggers that deliver an exceptional shooting experience with absolute confidence in both performance and legality.

RareBreed Triggers has faced intense legal and regulatory challenges—driven by agencies seeking to restrict innovation through questionable interpretations of existing law. From the moment the FRT-15® was introduced, our products have been scrutinized and targeted—not because they break the law, but because they threaten the status quo. Rare Breed Triggers remains vigilant.

We will continue to defend our intellectual property, protect our customers, and stand as a bulwark against regulatory overreach and government abuse.

Captured by FireShot Pro: 01-15-2026, 14:59:58




**FRT-15**
**$275.00**



**Rare Breed Triggers Wholesale**
**$700.00 – $2,000.00**




**FRT-15L3 – Precision Enhanced Trigger**
**$450.00 – $900.00**



**FRT-15L2**
**$285.00**

# FRT-15L3 Forced Reset Trigger for the AR-15

Take your AR-15 to the next level with the official RareBreed Triggers FRT-15L3. This drop-in, duty-grade 3-position Forced Reset Trigger (Safe/Semi/FRT) is 100% manufactured and assembled in the USA. The FRT-15L3 includes a 3-position ambidextrous safety selector and anti-walk pins for a secure, hassle-free installation.

**Performance on the Range**
Enhance your shooting experience with the FRT-15 L3 Forced Reset Trigger. Designed to accelerate follow-up shots while remaining within legal parameters, the innovative Forced Reset system resets the trigger after each shot, enabling faster, more consistent firing. Each trigger pull fires one round, ensuring full legal compliance while delivering improved speed and performance. Perfect for competitive shooting, tactical training, or maximizing your AR-15's potential.

**Innovative Design and Features**

- **3-Position Functionality**: The FRT-15L3 features Safe, Semi, and Forced Reset modes, controlled via a 3-position, ambidextrous safety selector. Whether you're focused on precision shooting or rapid-fire drills, this system adapts to your needs, offering versatility for both left- and right-handed shooters.
- **Effortless Installation**: Designed for easy installation on MIL-SPEC AR-15 lowers, the FRT-15 L3 includes anti-walk trigger pins, providing secure attachment and preventing unwanted movement during extended use. The ambidextrous safety selector seamlessly integrates into any MIL-SPEC lower receiver.

**Durable Construction for Long-Lasting Performance**
Crafted from high-quality materials, including 7075 anodized aluminum and heat-treated 4140 steel, the FRT-15 L3 is built to endure heavy use. This robust construction ensures reliability and longevity, allowing you to push your AR-15 to its limits with confidence.

**AR-15 Compatibility**
The FRT-15L3 is compatible with MIL-SPEC AR-15 lowers and requires a full-auto-compatible bolt carrier group for proper functionality. For optimal performance, we also recommend using an H2 or H3 buffer, or alternatively, an A5 buffer system.

**Unmatched Speed and Control**

The rare breed triggers FRT-15 L3 is ideal for shooters seeking speed and precision. By mechanically resetting the trigger after each shot and then locking the trigger from being pulled until the BCG returns to battery, this system allows for faster follow-up shots without needing advanced techniques. The forced reset mechanism ensures the trigger returns to the non-firing position after each round, requiring the shooter to pull the trigger again, offering full control over each shot.

**Why Choose the FRT-15 L3 Forced Reset Trigger?**

If you're looking to boost your AR-15's performance, the FRT-15L3 Forced Reset Trigger is the ultimate upgrade. With its rapid-fire capability, secure anti-rotation design, and seamless compatibility with the AR-15 platform, this trigger provides a superior shooting experience for competition, tactical use, or range drills. Unlock the full potential of your AR-15 with the FRT-15 L3.

## Is the FRT Trigger For Sale?

In the world of firearm enhancements, few innovations have sparked as much interest—and controversy—as the Rare Breed Trigger (FRT-15). This forced reset trigger system has redefined rapid-fire capabilities for AR-15 platforms, offering shooters an unprecedented level of performance. But what makes the Rare Breed Triggers so unique, and why has it become a must-have for firearms enthusiasts?




Our Rarebreed Triggers revolutionized the aftermarket trigger industry with its forced-reset technology, offering an unrivaled shooting experience. While our legal status is still uncertain as of now, our impact on firearm innovation is undeniable. For those who value cutting-edge performance, RareBreed Triggers remains a legendary piece of engineering—whether as a functional tool or a collector's item.




# FRT TRIGGE R AR15

Despite its popularity, the Rare Breed Trigger has faced significant legal hurdles. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has classified the FRT-15 as a "machine gun conversion device," making its sale and possession illegal without proper licensing. We have contested this ruling, arguing that the FRT-15 does not meet the legal definition of a machine gun. However, as of now, the ATF's stance has led to seizures and legal battles, leaving many gun owners uncertain about the future of forced reset triggers.

ORDER HERE

## Why Firearms Enthusiasts and Veterans Prefer the Rare Breed FRT-15

The rare breed FRT-15 internal geometry creates rapid, efficient cycling without requiring modifications to the firearm's gas system or bolt carrier group. For many shooters, this makes the FRT-15 an attractive upgrade for AR-15 platforms. The FRT-15 stands out in the crowded market of aftermarket triggers for several reasons:

**1. Enhanced Speed Without Sacrificing Accuracy**

The defining advantage of an FRT trigger is speed. Unlike binary triggers or lightweight competition triggers, the FRT design supports extremely rapid follow-up shots while keeping the rifle stable. Many shooters report more consistent groupings during fast shooting sessions because the forced reset encourages proper trigger discipline.

## 2. Durable, High-Quality Construction

Rare Breed engineered the FRT-15L3 to withstand the demands of rapid cycling. Its components are machined from high-strength materials designed for longevity. This durability appeals to shooters who want a long-term upgrade rather than a novelty trigger.

## 3. Plug-and-Play Installation

For most AR-15 owners, installing an FRT-15 trigger is straightforward. It drops into standard lower receivers without requiring specialized tools or gunsmithing. This ease of installation has contributed to its popularity among DIY firearm enthusiasts.

**60 DAYS RETURN**
With our hassle-free Easy Returns, changing your mind has never been more convenient.

**FREE SHIPPING**
Shopping with no extra charges – savor the liberty of complimentary shipping on every wholesale order.

**Newsletter Sign Up**

Your email please

SUBSCRIBE

The Rare Breed Triggers (FRT-15) distinguishes out for its ease of installation, which improves the performance of semi-automatic rifles.

**Information**

Home
Shop
Checkout
Legal Policy
Privacy Policy

**Quick Links**

FRT-15
FRT-15L2
FRT-15L3 – Precision Enhanced Trigger

**Locate Us**

Witchita Falls, TX 76311, United States
sales@rarebreedtriggerofficial.com

© 2026 Rare Breed FRT-15 Triggers | Powered by Rare Breed Triggers Official

# EXHIBIT B

# EXCLUSIVE PATENT LICENSE AGREEMENT

This **EXCLUSIVE PATENT LICENSE AGREEMENT** (hereinafter, the "Agreement"), made and effective as of the 20th day of October, 2022 ("Effective Date"), by and between ABC IP, LLC (hereinafter called "Licensor"), a Delaware limited liability company having an address of 8 The Green, Suite A, Dover, Delaware 19901, and Rare Breed Triggers LLC (hereinafter called "Licensee"), a North Dakota limited liability company having an address of 3523 45th Street South, Suite 100, Fargo, North Dakota 58104. Licensor and Licensee may hereinafter collectively be referred to as the Parties.

**WHEREAS**, Licensor is the owner of all right, title, and interest in and to United States Patent Nos. 10,514,223 (Firearm Trigger Mechanism); 11,346,627 (Forced Reset Semiautomatic Trigger with Sliding Blocking Bar); and 7,398,723 (Trigger Forward Displacement System and Method);

**WHEREAS**, Licensor represents that it has filed a pending U.S. Provisional Patent Application, Serial No. 63/297,884 (hereinafter "the '884 Application") covering Three-Position Forced Reset Triggers;

**WHEREAS**, Licensor represents that it has the right to grant the herein-contained rights and license under the Licensed Patents to Licensee; and

**WHEREAS**, Licensee wishes to obtain, and Licensor is willing to grant, the herein-contained worldwide right and license respecting the Licensed Patents, and the '884 Application to replace and supersede any and all prior patent licensing agreements between the Parties.

**NOW, THEREFORE**, the Parties hereto agree as follows:

I. Definitions.

As used in this Agreement:

1) The term "Licensed Patents" shall mean United States Patent Nos. 10,514,223 ("the '223 Patent"); 11,346,627 ("the '627 Patent"); and 7,398,723 ("the '423 Patent").

2) Any patent issuing with priority claimed to the '884 Application.

3) The term "Future Patents" shall mean any United States Patent, United States patent application, foreign patent, or foreign patent application that is filed by or on behalf of ABC IP, LLC, after the Effective Date, including but not limited to any other application which has been, or which at any time while this Agreement is in effect shall be, filed as a substitute for, or a division, or a continuation relating to any firearm or firearm trigger technology. Future Patents owned by Licensor may be added under the terns of this Agreement by one or more separately executed Addendum.

4) The term "Valid Claim" shall mean:

a) In the case of an application for Letters Patent (during the time such application is pending as an application), a claim or part which shall not have been finally rejected by an unappealed or unappealable decision of the Patent Office of the country in which such application is filed; and
b) In the case of an issued and unexpired Letters Patent, a claim or part which shall not have been held invalid in an unappealed or unappealable decision of a court of competent jurisdiction.

5) The term "Forced Reset Trigger" shall mean any trigger and/or trigger device wherein the trigger is forcibly returned to the in-battery position after firing through a mechanical interaction between at least the hammer or bolt-carrier and the trigger member.

6) The term "Royalty Period" shall mean the present calendar quarter and each succeeding calendar quarter thereafter.

7) Licensor does not provide any technical data or design information with respect to the Licensed Patent or Licensed Products. Licensee is solely responsible for the design, manufacture, promotion, and distribution of the Licensed Products and Licensee has no control over the same.

II. <u>License.</u>

1) Subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee the exclusive right and license to make, use, sell, offer for sale, and import for use, any Forced Reset Trigger or colorably equivalent product under the Licensed Patents and/or the '884 Application.

2) Such license shall include the right on the part of Licensee (on notice to and approval by Licensor) to sublicense the exclusive patent rights under the Licensed Patents and/or the '884 Application.

III. <u>Royalty.</u>

1) As royalty for the license hereby granted to it, Licensee shall, at the times and in the manner hereinafter set forth or otherwise mutually agreed by the Parties, pay or have paid on its behalf to Licensor a per unit fee on a sliding scale ranging from US$200.00 to $300.00 of all forced reset triggers, hereunder sold by Licensee and/or its sublicensees, the sale of which forced reset triggers is, at the time of such sale, covered by a valid claim of the Licensed Patents and/or the '884 Application. The royalty rate may be set or changed within this range from time to time, as necessary, by agreement between the Licensor and Licensee.

2) Forced Reset Triggers shall be deemed to have been sold when billed or when shipped to a wholesale or retail consumer, whichever shall first occur.

IV. Reports and payments.

1) At least quarterly and before the end of the month following the end of each calendar quarter year up to and including the calendar quarter following the termination or expiration of this Agreement, Licensee shall render or have rendered on its behalf a report to Licensor setting forth for the preceding calendar quarter:

a) the quantity of Forced Reset Triggers sold in respect of which royalty is payable hereunder,; and
b) the amount of royalty payable with respect thereto; and
c) such other information (if any) as may be necessary to show the basis on which the amount of royalty has been computed.

2) In case no payment is due hereunder for any calendar quarter year, Licensee shall so report. Royalty payable by Licensee to Licensor hereunder shall accompany each such report.

3) All amounts payable hereunder by Licensee to Licensor shall be payable in United States funds. In the event any Forced Reset Triggers shall be sold by Licensee and/or its sublicensees for funds other than United States funds, the net sales value of such forced reset triggers so sold shall first be determined in the funds of the currency for which the forced reset triggers were sold and then converted into its equivalent in United States funds at:
a) the rate applicable to the transfer of funds arising from royalty payments as established by the exchange rate for the last business day of the accounting period for which payment is thus made; or
b) if there is no applicable rate so established, then the selling rate for United States funds as published by leading commercial banks in the major city of the country of which such currency, for the last business day of such accounting period.

V. Examination of books and records.

1) Licensee shall keep, and shall cause its sublicensees to keep, full and true books of account and other records in sufficient detail so that the royalty payable to Licensor hereunder can be properly ascertained.

2) Upon no less than thirty days advance written notice, and within one year following the applicable annual sales period (the "Audit Period"), Licensor, at its expense, may appoint an independent certified public accountant to audit directly applicable sales records of Licensee at Licensee's principal place of business for the sole purpose of verifying Royalties due Licensor. An audit shall take place during regular business hours and shall not occur more than once during any twelve-month period. The certified public accountant should not be engaged in any other audit of Licensor or licensee, or on a contingency-fee basis, and must provide to Licensee a confidentiality agreement that protects Licensee's confidential information no less than the terms of this Agreement or as Licensee protects its own similar information. Licensor may audit a royalty period only once, and no audit

Case: 26-1527 Document: 43-1 Page: 315 Filed: 06/12/2026

shall be conducted for a period spanning less than six months. A copy of any audit report shall be provided to Licensee but shall not by itself be conclusive or binding as to any reported finding.

3) In the event the audit reveals an overpayment by Licensee, the excess shall be credited to the next License Term. In the event the audit reveals underpayment of royalties, the deficiency must be paid by Licensee to Licensor within thirty days after the audit report. If the audit report reveals an underpayment by 10% or more, the cost of the audit shall be borne by Licensee.

VI. <u>Prosecution and Maintenance of Licensed Patents.</u> To the extent it has not done so:

1) Licensor, through its own attorneys and at its own expense and cost, shall cause to be filed and/or prosecuted any patent applications pertaining to and/or covering any and all Future Patents.

2) It shall be the obligation of Licensor to pay ongoing patent maintenance fees for the Licensed Patents as well as the '884 Application and its progeny, but in the event Licensor is unable or unwilling to pay such patent maintenance fees, Licensee may pay such patent maintenance fees, at which time any sum paid as patent maintenance fee will be offset from any owed royalty amount pursuant to Section II or IV of this Agreement.

VII. <u>Duration and termination.</u>

3) This Agreement shall, unless sooner terminated as hereinafter provided, remain in full force and effect until the expiration of the last of the Licensed Patents to expire or patent based on the '884 Application and its progeny, whichever occurs later.

4) In the event that one of either the Licensed Patents or patent based on the '884 Application and its progeny expires but not both, Licensee's obligation to pay a royalty to Licensor during the term of this Agreement shall terminate only with respect to that instrument which has expired.

5) Licensee may terminate this Agreement at any time upon not less than ninety (90) days' prior written notice to that effect to Licensor.

6) In the event that Licensee shall at any time fail to make payments, render reports, or otherwise abide by the conditions herein provided, Licensor shall have the right to notify Licensee of such default and that Licensor intends to terminate this Agreement unless such default is corrected within thirty (30) days.

7) Licensor, at its discretion, may terminate this Agreement in the event the ownership of Licensee changes. Licensor may terminate this Agreement in whole or with respect to one or more specific Licensed Patent(s), with or without cause, by unanimous vote of the members of Licensor who are not also members of Licensee.

8) The termination of this Agreement for any reason shall be without prejudice to Licensor's right to receive any payments accrued and unpaid at the effective date of such termination, to the provisions of Section III or VII hereof as to periods prior to termination, and to the remedy of either party hereto in respect of any previous breach of any of the covenants herein contained.

9) The termination of this Agreement for any reason shall terminate any sublicenses granted by Licensee and Licensee shall, upon termination of this Agreement, assign to Licensor all of Licensee's rights and obligations in and under such sublicenses and Licensor shall assume the same.

VIII. Enforcement. In the event any of the Licensed Patents need to be enforced against an infringer, Licensor may, but is not required to, include Licensee as a plaintiff and, if so joined, the Parties shall mutually participate in any legal action against such an infringer to resolve the dispute, whether by civil action or otherwise.

IX. Law to govern. This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to principles of conflicts of law. The Parties to this Agreement will submit all disputes arising under this Agreement to binding arbitration in Orlando, Florida, before a single arbitrator using the Commercial Rules of the American Arbitration Association ("AAA"), whether the arbitrator is independent or with another arbitration organization. The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the Parties, except that such arbitrator must be an attorney admitted to practice law in Florida. No Party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent a Party from seeking an injunction for equitable relief.

X. General.

1) All prior agreements, representations and understandings, oral or written, between the Parties and/or their representatives, if any exist, are hereby terminated, replaced, and superseded by this Agreement.

2) This Agreement shall be interpreted as if jointly written by both Parties and cannot be modified at any time except by a writing, signed by an officer of each Party.

3) The Parties acknowledge, represent and warrant that, in entering this Agreement, each Party has made an independent investigation of the facts and is not relying upon any statements or representations, other than those contained herein, made by the other Party, its agents or representatives, and that no one, including any of the Parties' agents, employees, attorneys or representatives, has made any promise, representation or warranty relating to, or offered any inducement to enter into this Agreement, except as recited herein.

4) If any part, term or provision of this Agreement is declared or determined by any court to be illegal or invalid, such illegal or invalid part, term or provision shall be deemed not a

part of this Agreement, and the validity of the remaining parts, terms, or provisions shall not be affected or impaired thereby and shall remain in full force and effect.

5) Neither party shall have the right to assign this Agreement or any rights or obligations hereunder without the consent of the other Party; provided, however, that this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of each Party, and their respective successors and assigns.

6) This agreement is for the benefit of and enforcement by only the Licensor and Licensee and does not create or provide any rights to third parties.

7) The undersigned corporate representatives represent and warrant that they have full authority to execute this Agreement on behalf of the respective corporations to bind such corporations to the terms hereof, and that all necessary action has been taken to authorize the same.

8) This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates indicated below.

**ABC IP, LLC**

By: [signature]
Cole Leleux, Managing Member

Date: 10/20/2022

**RARE BREED TRIGGERS, LLC**

By: [signature]
Lawrence DeMonico, President

Date: 10-20-2022

# EXHIBIT C

# ADDENDUM TO EXCLUSIVE PATENT LICENSE AGREEMENT

This Addendum, made an effective as of the 19th day of May, 2025, is entered into by consent of the Parties to an Exclusive Patent License Agreement ("Prior License Agreement") dated October 20, 2022, between ABC IP, LLC (hereinafter called "Licensor"), and Rare Breed Triggers LLC (hereinafter called "Licensee"),

**WHEREAS**, as of August 7, 2023, Licensee has re-established its corporate entity as Rare Breed Triggers, Inc., a Texas corporation having an address of 2710 Central Freeway, Suite 150, Wichita Falls, TX 76306;

**WHEREAS**, patents claiming priority to U.S. provisional patent application, Serial No. 63/297,884 referenced in the Prior License Agreement have issued; and

WHEREAS, Licensor has acquired additional patents to be expressly included as Licensed Patents.

**NOW, THEREFORE**, the Parties hereto agree as follows:

1) The term "Licensed Patents" shall additionally include those listed in **Schedule A** hereto and any related patent application (continuation, divisional, continuation-in-part), foreign patent, or foreign patent application, including but not limited to any other application which has been, or which at any time while this Agreement is in effect that is filed as a substitute for, reissue, division, continuation, or continuation-in-part thereof.

2) Licensee shall mean the Texas corporation Rare Breed Triggers, Inc.

3) All other terms of the Prior License Agreement remain unchanged.

4) The undersigned corporate representatives represent and warrant that they have full authority to execute this Agreement on behalf of the respective corporations to bind such corporations to the terms hereof, and that all necessary action has been taken to authorize the same.

5) This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on the dates indicated below.

| | |
|---|---|
| **ABC IP, LLC** | **RARE BREED TRIGGERS, INC.** |
| By: Cole Leleux | By: |
| Cole Leleux, Managing Member | Lawrence DeMonico, President |
| Date: 05/19/2025 | Date: 05-19-2025 |

Case: 26-1527 Document: 43-1 Page: 320 Filed: 06/12/2026

## SCHEDULE A

| US Patent No. | Title | Inventor | Issue Date |
|---|---|---|---|
| 7,398,723 | Trigger Forward Displacement System and Method | Blakley | July 15,2008 |
| 11,724,003 | Firearm Trigger Mechanism | Strbac | August 15, 2023 |
| 12,031,784 | Adapted Forced Reset Trigger | DeMonico | July 9, 2024 |
| 12,038,247 | Firearm Trigger Mechanism | Blakley | July 16, 2024 |
| 12,036,336 | Firearm Trigger Mechanism | Strbac | July 16, 2024 |
| 12169105 | Firearm Semiautomatic Trigger Mechanism | Barry | December 17, 2024 |
| 9568264 | Flex-Fire Technology | Graves | February 14, 2017 |
| 9816772 | Flex-Fire Technology | Graves | November 14, 2017 |
| 9939221 | Flex-Fire G2 Technology | Graves | April 10, 2018 |

# EXHIBIT D

Innovation in Firearm Technology

Home Triggers Cart Contact About

RARE BREED TRIGGERS



Rare Breed Triggers

**$285.00**

1 ADD TO CART

Category: Rare Breed Triggers

Description Reviews (0)

## FRT-15L2 AR-15 Forced Reset Trigger, 2 Position (Safe/Forced Reset), Drop-In Compatible w/ Anti-Walk Pins

Gain the advantage on the range with this FRT 15L2 (Forced Reset) Trigger! Designed to speed up your follow-up shots while adhering to legal regulations, the Forced Reset Triggers FRT-15 L2 trigger will truly take your AR up a notch!

The FRT Triggers FRT 15L2 AR-15 Forced Reset Trigger is designed to revolutionize your shooting experience by allowing for quicker, more consistent trigger pulls. The innovative Forced Reset Trigger (FRT) system resets the trigger after each shot, giving you rapid follow-up shots while maintaining safety and control. With each pull of the trigger, you'll fire one round, adhering to legal standards while enjoying the enhanced speed and performance. This makes it ideal for competitive shooting, training, or simply getting the most out of your AR-15 platform. Take your AR to the next level and get every ounce

of performance you can out of it with this incredible FRT-15L2 Trigger!

## Durable Construction and Easy Installation

Constructed for durability and ease of use, the FRT-15 L2 comes equipped with anti-rotation pins. Ensuring secure installation on your AR-15 lower and gives you a good-looking set of trigger pins. These pins prevent unwanted movement, ensuring consistent performance during extended use. Additionally, this trigger is constructed out of high-quality aluminum (7075 & Anodized) and steel parts (4140 heat treated steel). Ensuring longevity and long-lasting reliable performance that can only further shine forth the awesome trigger you get with the FRT-15L2

## AR-15 Compatibility

The FRT-15L2 trigger is compatible with mil-spec AR-15 lowers and requires a full-auto-compatible bolt carrier group to function properly. Without this, the trigger will not function as intended. We also highly recommend using a H2 or H3 buffer weight to ensure functionality.

## Unmatched Speed and Control

The FRT-15L2 is perfect for shooters who demand speed without compromising safety or precision. By mechanically resetting the trigger, you can achieve faster follow-up shots without the need for special techniques or modifications. This is further enhanced with the FRT-15L2 by forcing the trigger into the non-firing position, requiring the shooter to pull the trigger additionally.

## Why Buy the FRT-15L2 AR-15 Forced Reset Trigger?

If you're seeking to elevate your AR-15's performance, the FRT Triggers FRT-15L2 is a must-have upgrade. With its ability to reset the trigger for rapid shooting, secure anti-rotation pins for dependable installation, and compatibility with the AR-15 platform, this trigger will take your shooting experience to the next level. Whether for competition or tactical use, this innovative trigger system ensures both speed and reliability.

# Related products








**FRT-15E3 Enhanced Reset Trigger**
$325.00

**FRT-15**
$275.00

**FRT-15L3 – Precision Enhanced Trigger**
$450.00 – $900.00

**60 DAYS RETURN**
With our hassle-free Easy Returns, changing your mind has never been more convenient.

**FREE SHIPPING**
Shopping with no extra charges – savor the liberty of complimentary shipping on every wholesale order.

**Newsletter Sign Up**

Your email please | SUBSCRIBE

The Rare Breed Triggers (FRT-15) distinguishes out for its ease of installation, which improves the performance of semi-automatic rifles.

**Information**
Home
Shop
Checkout
Legal Policy
Privacy Policy

**Quick Links**
FRT-15
FRT-15L2
FRT-15L3 – Precision Enhanced Trigger

**Locate Us**
Witchita Falls, TX 76311, United States
sales@rarebreedtriggerofficial.com

© 2026 Rare Breed FRT-15 Triggers | Powered by Rare Breed Triggers Official

# EXHIBIT E

An official website of the United States government Here's how you know

DOJ Menu

Office of Public Affairs
U.S. Department of Justice

Our Offices | Find Help | Contact Us

Search

About News Documents Internships FOIA Contact Information for Journalists

Justice.gov > Office of Public Affairs > News > Press Releases > Department of Justice Announces Settlement of Litigation Between The Federal Government and Rare Breed Triggers

News
- All News
- Blogs
- Photo Galleries
- Podcasts
- Press Releases
- Speeches
- Videos

Archived News

PRESS RELEASE

# Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers

Friday, May 16, 2025

Share

**For Immediate Release**
Office of Public Affairs

Today, in accordance with President Trump's Executive Order *Protecting Second Amendment Rights*, as well as the Attorney General's Second Amendment Enforcement Task Force, the Department of Justice announced the settlement of litigation between the federal government and Rare Breed Triggers.

"This Department of Justice believes that the 2nd Amendment is not a second-class right," said Attorney General Pamela Bondi. "And we are glad to end a needless cycle of litigation with a settlement that will enhance public safety."

In June 2024, in *Cargill v. Garland*, the Supreme Court held that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) exceeded its statutory authority by issuing a rule classifying a bump stock as a "machinegun." In July 2024, the Northern District of Texas applied *Cargill v. Garland* to a device called a "forced-reset trigger" (FRT) and concluded that FRTs also cannot be classified as a "machinegun."

The Department's agreement with Rare Breed Triggers avoids the need for continued appeals in *United States v. Rare Breed Triggers* and continued litigation in other, related cases concerning the same issue. The settlement includes agreed-upon conditions that significantly advance public safety with respect to FRTs, including that Rare Breed will not develop or design FRTs for use in any pistol and will enforce its patents to prevent infringement that could threaten public safety. Rare Breed also agrees to promote the safe and responsible use of its products.

The cases that will be resolved under the settlement agreement are:

- *NAGR v. Garland*, 23-cv-830-O (N.D. Tex.), on appeal 24-10707 (5th Cir.).
- *United States v. Rare Breed Triggers LLC*, No. 23-cv-369 (E.D.N.Y), on appeal 23-7276 (2d Cir.).
- *United States v. Miscellaneous Firearms and Related Parts and Equipment Listed in Exhibit A*, 23-cv-17 (D. Utah).

*Updated May 16, 2025*

**Topic**

FIREARMS OFFENSES

**Component**

Office of the Attorney General

Press Release Number: 25-520

## Related Content

PRESS RELEASE
**Justice Department Publishes Proposed Rule to Grant Relief to Certain Individuals Precluded from Possessing Firearms**
WASHINGTON — President Trump directed the Department of Justice to address the ongoing infringements of the Second Amendment rights of our citizens — all of them. Federal law disables the firearms rights...
July 18, 2025

PRESS RELEASE
**27 Members or Associates of Tren de Aragua Charged with Racketeering, Narcotics, Sex Trafficking, Robbery and Firearms offenses**
April 21, 2025

PRESS RELEASE
**Notorious Violent Mexican Cartel Leader Sentenced to Life Plus 30 Years in Prison for International Drug Trafficking and Firearms Offenses**
A U.S.-Mexican dual national and co-founder of the Cartel de Jalisco Nueva Generación (CJNG) — an international drug trafficking organization — was sentenced today in the District of Columbia to...
March 7, 2025

**Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

Signup for Email Updates
Social Media

U.S. Department of JUSTICE

About
Budget & Performance
Archives
FOIA
Accessibility
Legal Policies & Disclaimers
Privacy
For Employees
Office of the Inspector General
No FEAR Act Data
Vulnerability Disclosure
Multilingual
Vote.gov
Have a question about Government Services?
Contact USA.gov

Captured by FireShot Pro: 01-15-2026, 16:46:52

# EXHIBIT F

# Premium AR-15 & Reset Trigger Systems

Engineered for speed, precision and reliability – made in the USA.

Shop Now

## Delta Velocity Gen1 3MR

Assisted-reset, 3-mode drop-in trigger with Safe, Semi and Positive 3rd Mode. 4.5-lb pull weight, zero overtravel and made in America.

View Gen1 3MR

## Delta Velocity Gen2 3MR

Next-gen 3-mode trigger for AR-15/AR-10 with lightning-fast resets, NP3-coated components, ambidextrous selector and ATF-approved design.

View Gen2 3MR

## Partisan Disruptor FRT

Drop-in forced reset trigger featuring Safe/Semi/FRT positions, heat-treated 4140 & S7 steel, and rapid reset for faster follow-up shots.

View Disruptor

## Why Choose Firearm Systems?

### Precision Engineering

Meticulously machined components with NP3 and nickel-Teflon coatings for long-lasting performance and smooth pulls.

### Fast Resets

Assisted and forced reset technology delivers positive resets, zero overtravel and faster split times for competitive edge.

ATF Compliance

Our triggers are non-NFA and include compliance letters, ensuring legal peace of mind for shooters across the U.S.

## Latest from the Blog

### Ultimate Partisan Disruptor Legal Guide 2025-2026 (Federal vs. State)

Partisan Disruptor Legal FRTs? If you've spent more than five minutes in the gun world online, you already ...

Read More

### Ultimate Guide to Tuning the Delta Velocity Gen2 3MR Trigger

Fine-tuning the Delta Velocity Gen2 3MR trigger can significantly enhance your shooting experience, offering smoother pulls and more ...

Read More

### Delta Velocity Gen2 3MR: The Ultimate Installation Guide

If you are looking to upgrade your AR-15 or AR-10 with the Delta Velocity Gen2 3MR trigger, you ...

Read More

## Join Our Affiliate Program

Refer customers, share our high-performance triggers and earn 10% commission on every sale. It's quick to sign up and perfect for content creators, trainers and firearm enthusiasts.

Become an Affiliate

## Customer Reviews

"The Disruptor installed in minutes and completely transformed my AR-15. Smooth and lightning fast!"

**– J. Stevens**

"Firearm Systems' customer service is top-notch. The FRT exceeded my expectations."

**– A. Ramirez**

"Finally a drop-in trigger that delivers on performance without breaking the bank."

**– M. Johnson**

Firearm Systems

**ADDRESS**

4742 North 24th Street

Suite 300

Phoenix, AZ 85016

**PHONE NUMBER**

(623) 252-9593

**EMAIL ADDRESS**

Info@FirearmSystems.net

**Partisan Triggers Disruptor FRT**

**Products**

**Calendar**

**Affiliate Area**

**About**

**Blog**

© 2026 Firearm Systems. All Rights Reserved.

GODADDY DESIGN SERVICES

# EXHIBIT G

Michael Stakes, inventor of the modern assisted reset trigger, joins Partisan Triggers! Learn more about our team here

# Team Partisan

Partisan forces have always been David in the struggle with Goliath. A nasty, supposedly superior occupying enemy, notionally in control and tied to a puppet government, being dealt significant damage by much smaller bands of highly motivated, plucky and laser focused indigenous fighters. Force multipliers are the key: terrain knowledge and deep intelligence sources; sympathetic support within the general population; and often external support too from powerful allies. Sometimes, significant damage becomes terminal and the Goliath falls.

Partisan Triggers leans on this heritage to bring a similar approach to the world of firearms. Founded in 2025 to shake it all up. Old technology gets new life to provide shooters with incredible experiences reserved previously only to the wealthy, those who serve or trips to Vegas. Not everyone has access to a machine gun rental range or can afford what they charge for ammo. Assisted Reset Triggers are not machine guns. Enhanced rates of fire at the range put smiles on every faces we've ever seen. Together it's a winning combination and the mission is to make the devices widely available, extremely affordable and the new standard for many platforms straight from the factory.

The team, both public facing and behind the curtain, is world class. Quiet professionals from diverse disciplines who have fought many battles across war and business. Minesweepers for the legal minefields, body armor for cheap shots and a solid understanding of Sun Tzu. Success opens up the market for all to continual innovation and production, puts a trigger in every gun and provides the riches with which to militantly support 2A causes. No more public private partnerships that screw the consumer. And, for Partisan Triggers, a full line of amazing products each of which commemorates that heritage by bringing the stories of true heroes to a new generation of shooters.

## Ben Woods - Spokesman

Ben served enlisted as a US Army Fire Support Specialist, and as an artillery officer in the US Marine Corps. Ben left active duty as a captain to accept an appointment as a Special Agent with the Bureau of Diplomatic Security, continuing his Marine Corps service as a reservist. After leaving government service Ben was brought on as a spokesman for Partisan Triggers. Ben has been a firearms instructor for numerous US government agencies, and has served operationally in South America, Africa, Europe, and Asia. He has been a competitive shooter for nearly two decades, and is heavily involved in gun rights activism. He was a key player in organizing the largest ever gun rights rally that occurred January 2020 in Richmond, VA.

## Michael Stakes - Group Engineer

Michael founded Tactical Fire Control (TacCon) with the mission of engineering excellence, unparalleled product performance and earning the loyalty of every customer. The company specialized in precision firearm triggers for shooters who demand consistency, safety, and exceptional feel.

Drawing on deep industry experience and a hands-on approach to product development, Michael oversaw every stage of the manufacturing process—from conceptual design and materials selection to machining tolerances, quality control, and end-user testing. His focus has always been on combining innovative engineering with rugged durability to produce triggers that enhance accuracy and elevate the shooting experience. Mission Accomplished then and mission accepted now to take precision triggers to a whole new level in partnership with Partisan Triggers. Michael looks forward to many years of collaboration, innovation and serving many, many more customers.

## Nick Norton - Sales & Marketing

Nick's expertise stem from the worlds of sales and marketing. He's spent the last decade in the firearms and outdoor industry. Where he's scaled quite a few brands to a national level, through a large network he's compiled in big-box store, wholesale distribution, e-commerce channels, and brick and mortar shops. His background spans national account development, retailer outreach, product launches, and building practical sales and marketing systems that drive long-term growth in competitive categories. He's been very successful at every tier and rung in the sales arena. He's also has significant experience brokering components and materials, helping manufacturers source what they need to keep their doors open.

## Jon Groff - Field Engineer - The "Helpful Gorilla"

Jon graduated the United States Naval Academy with a degree in engineering and commissioned as a Marine officer. He led a varied career with experiences ranging from aviation logistics to foreign force advising. He deployed to Iraq as a member of a Police Transition Team and spent several years instructing at the School of Infantry. After leaving the Marine Corps, he worked in the oil and gas industry. He had previously worked as a LTCF instructor in Texas and has been involved in collecting and shooting rifles for the past twenty years.

### Subscribe to Our Newsletter

**Stay up to date on Partisan Triggers! Everything from our latest product developments, releases, promotions and more.**

Your Email:

Submit

Proudly Insured Through IPISC




Captured by FireShot Pro: 01-15-2026, 16:40:11

# EXHIBIT H

Partisan Triggers

Home | Triggers ▾ | Where To Find | Troubleshooting | Menu ▾

Michael Stakes, inventor of the modern assisted reset trigger, joins Partisan Triggers! Learn more about our team here

# FRT Legal Library

Explore primary documents — patents, filings, memoranda, and settlement materials — in one searchable archive.

Search by title, number, or keyword... | Newest → Oldest | 21 items

All | Patents | Litigation | Enforcement | History | Settlement

Settlement — 2025
**Settlement Agreement — Federal Handling (May 13, 2025)**
Defines post-settlement federal handling of FRTs and procedures for previously seized property.
View Document →

Enforcement / C&D — 2025
**C&D Notice — Super Safety (Apr 1, 2025)**
Notice demanding cessation of sales for parts alleged to enable infringing use.
View Document →

Patent — 2024
**US 12,031,784 — Trigger Mechanism**
Continuation of FRT-related mechanical refinements.
View Patent →

Patent — 2024
**US 12,036,336 — Trigger Assembly**
Further follow-on in modern FRT mechanism evolution.
View Patent →

Litigation — 2023
**ATF Memorandum (EDNY Matter)**
Government filing used to justify early seizure efforts and machine-gun assertions.
View Document →

Patent — 2023
**US 11,724,003 — Trigger Mechanism**
Successor filing refining forced-reset principles.
View Patent →

Patent — 2022
**US 11,346,627 — DeMonico (Rare Breed)**
Sliding blocking-bar mechanism central to the FRT-15.
View Patent →

Patent — 2019
**US 10,514,223 — Rounds (Wolf Tactical)**
Carrier-driven trigger reset timing influencing FRT operation.
View Patent →

Patent — 2018
**US 9,939,221 — Graves Follow-Up**
Further refinement of assisted-reset fire control systems.
View Patent →

Patent 2017
**US 9,816,772 — Graves (Flex-Fire)**
Early rapid-reset concept that informs current FRT designs.
View Patent →

Patent 2017
**US 9,829,263 — Bonner (Rapid Reset)**
Redirected spring force to drive the trigger forward into a fast reset.
View Patent →

Patent 2016
**US 9,518,793 — Stakes (Tac-Con)**
Commercial assisted-reset trigger often referenced as prior art.
View Patent →

Patent 2016
**US 9,267,751 — Trigger Mechanism**
Related mechanical improvements in semiautomatic fire control.
View Patent →

US Patent 2015
**US 9,146,067 B2 — Trigger Mechanism**
Trigger/disconnector system using a reset lever that moves from open to closed when struck by the hammer to reset the mechanism.
View Patent →

Patent 2015
**US 9,021,732 — Johnson**
Cited as a direct forerunner to modern forced-reset concepts.
View Patent →

Patent 2008
**US 7,398,723 — Trigger Assembly**
Carrier-influenced reset behavior later seen in FRT lineage.
View Patent →

Prior Art 1938
**US 2,139,691 — Multi-Stage Fire Control**
Early multi-position selector logic.
View Patent →

Prior Art 1936
**US 2,056,975 — Early Semiauto Sear System**
Foundational sear/hammer control concepts.
View Patent →

History —
**Dealer Legal Brief (Overview)**
Quick reference: federal posture, restricted states, and IP context.
View Document →

Prior Art —
**BG66145B1 — Bauer Patent**
Referenced prior-art document included in prosecution records.
View Document →

History —
**H000107 — Bauer Reference**
Historical supporting material cited in filings.
View Document →

## Subscribe to Our Newsletter

Stay up to date on Partisan Triggers! Everything from our latest product developments, releases, promotions and more.

Your Email: | Submit


US PATENT 9146067
THE PARTISAN DISRUPTOR 3 POSITION AR15 TRIGGER
Safe, Standard Semi Auto, Enhanced Semi Auto
M16 BCG and H3 dead blow buffer required. For Optimal performance, keep your AR clean and well lubed.

# EXHIBIT I

INTERNET ARCHIVE WEB TEXTS VIDEO AUDIO SOFTWARE IMAGES SIGN UP | LOG IN UPLOAD Search

ABOUT BLOG EVENTS PROJECTS HELP DONATE CONTACT JOBS VOLUNTEER

DONATE INTERNET ARCHIVE WaybackMachine

Explore more than 1 trillion web pages saved over time

https:/partisantriggers.com/

Calendar · Collections · Changes · Summary · Site Map · URLs

Saved **2 times** between April 16, 2025 and January 12, 2026.

003 2004 2005 2006 2007 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 2020 2021 2022 2023 2024 2025 **2026**

JAN

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

FEB

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |

MAR

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

APR

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

MAY

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

JUN

| | | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

JUL

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

AUG

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

SEP

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

OCT

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

NOV

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

DEC

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

Note

This calendar view maps the number of times **https:/partisantriggers.com/** was crawled by the Wayback Machine, *not* how many times the site was actually updated. More info in the FAQ.

FAQ | Contact Us | Terms of Service (Dec 31, 2014)

The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

# EXHIBIT J

The ALL NEW NX6 Line from Nightforce | ARFCOM Reviews
Canada Buy Back Fail | Stranger Things | EOTech & NF Product Launch | Dragons Breath IRL







## It is time for an introduction. Edit: Nominate charities now! (Page 1 of 26)

Previous Page 1 / 26 Next Page



**PartisanTriggers**
Freedom Accelerated
Joined: Jun 2025 Posts: 6
EE: 0% (0) USA

**Posted: 9/13/2025 2:09:27 PM EST** [Last Edit: PartisanTriggers]

Let's introduce ourselves with a backstory.

The P-51 Mustang was an incredible piece of machinery. From signing the contract to first flight, that magnificent bird took 149 days. Five months - with massive brainpower and the production power of a nation at war behind it. That was fast, incredibly fast, when necessity was the mother of invention. But the truth is that everything worth doing always takes longer and costs way more than you first imagine.

Partisan Triggers is a new company configured to incubate the development of innovative triggers and access high quality, high volume manufacturing in order to bring the best possible value for money to the end user. Triggers for all and one for every gun.

Several months ago, Partisan Triggers was shown a new trigger design by @Ben and his weapons company. It promised to be a unique match grade FRT with a light, clean trigger pull and superb reliability over thousands of rounds on a given unit. A deal was done to bring this trigger to market, and Ben was asked to take on the role of public relations spokesman for the company. Amazing what he'll do for a box crayons.

After much consideration, however, we have decided not to release his particular trigger for the time being. Due to the legal actions being taken by a certain FRT company and their Axis of partners, we are deeply concerned about losing control of the design. We don't believe anyone can patent a concept that was developed nearly a century ago, but others do and think they already have. They also think their patents are actually valid and we are damn sure they will try to claim Ben's design falls within their IP rights, steal it and attempt to incorporate it into their open patent applications through amendments. Their track record is all the evidence required to support this opinion. We cannot allow this to happen and are, therefore, adopting a quite different approach.

The new approach has required several long months of intensive work with IP attorneys and insurance companies. It involved hiring special Counsel who have a history of winning billion dollar IP suits. The result is robust insurance coverage and an official Advice Of Counsel Letter that painstakingly covers every detail of concern in the current FRT IP landscape. This Letter, longer than most printed copies of a dictionary, details the legality of releasing our own version of an older trigger which we believe is not protected by any valid patent. It has taken a while and cost a lot of money but we finally have everything needed on the legal side in place. Our distributors and dealers are financially covered for frivolous lawsuits. Even our customers are protected. We are ready to rumble.

Our focus is now on finalizing production, marketing and websites. As we ramp up, we have videos to shoot, samples to get out to your favorite reviewers, contracts to sign and Purchase Orders to fulfill. It's going to take us a few more weeks before we go mainstream.

Finally, we intend to regularly contribute support to 2A charities and causes. To that end, we will begin holding monthly GD threads for nominations and voting on which charities should receive our monthly donations. Once any potential legal issues are settled, we intend to divert even more money towards supporting 2A causes.

Please bear with us and stay tuned here for updates, exclusive behind the scenes peeks and ARFCOM only specials. Get plenty of popcorn ready - it's likely to be highly entertaining.

Cheers,

The Partisan Triggers Team

Edit 15 December 2025

You can buy a Partisan Disruptor right now at

Battlehawk Armory.

Or

Cloak Industries.



**bkpkr**
#6packclub
Joined: May 2007 Posts: 33697
EE: 100% (334) TN, USA

**Posted: 9/13/2025 2:14:05 PM EST** [#1]

In.



**whiskerz**
Member
Joined: Mar 2001 Posts: 140566
EE: 100% (34) AL, USA

**Posted: 9/13/2025 2:17:43 PM EST** [#2]

The last guy was as pleasant as a root canal. Let's see what these guys do.

RIP Jeff Reed. Tennessee Squire, Ga. Carry member, NRA,Non-puking 72 ounce drinker 2 of 6 Norcal call sign, Forgotten.





**EFB16ACRX**
Member
Joined: Aug 2007 Posts: 17099
EE: 100% (9) USA

Posted: 9/13/2025 2:19:28 PM EST [#3]

Pretty good intro id say



**Sub_Arctic_Son**
Member
Joined: Feb 2022 Posts: 1438
EE: 0% (0) AK, USA

Posted: 9/13/2025 2:32:50 PM EST [#4]

TLDR

Welcome, fellow aircraft enthusiast!

Eight stars of gold, on a field of blue. A white bar of separation... The North Star stands alone!




**_Matt_**
Joined: Aug 2008 Posts: 23825
EE: 100% (1) SC, USA

Posted: 9/13/2025 2:36:03 PM EST [#5]



**HDSledge**
Knuckle dragging boomer rube, patriot, Navy vet.
Joined: Nov 2013 Posts: 4856
EE: 0% (0) USA

Posted: 9/13/2025 2:41:13 PM EST [#6]

in...

My own view is that left-wing positions largely come about from resentment, I agree with Nietzsche, a resentment about the surrounding social order. They have privileges, I don't. Or, I have them and I can't live up to them. Roger Scruton



**Ciraxis**
Member
Joined: Dec 2008 Posts: 34616
EE: 100% (1) NY, USA

Posted: 9/13/2025 2:43:57 PM EST [#7]

I'm not reading all that shit




**mad_mardigan**
Member
Joined: Nov 2008 Posts: 8806
EE: 100% (69) IN, USA

Posted: 9/13/2025 2:45:14 PM EST [#8]

885



**Koolpenguin89**
Member
Joined: Jan 2025 Posts: 287
EE: 0% (0) GA, USA

Posted: 9/13/2025 2:45:20 PM EST [#9]

Quote History

> Originally Posted By whiskerz:
> The last guy was as pleasant as a root canal. Let's see what these guys do.

I mean, they appear to have at least a semi-functional grasp of the English language, so that's a good start!



**Gingerbreadman**
Just some guy.
Joined: Jan 2008 Posts: 17129
EE: 100% (1) MN, USA

Posted: 9/13/2025 2:45:34 PM EST [#10]

The government is just a corporation with a monopoly on violence.



**tonysoprano150**
Team Member
Joined: Dec 2004 Posts: 10137
EE: 100% (169) KY, USA

Posted: 9/13/2025 2:47:20 PM EST [#11]

Welcome fellow trigger enthusiast

"I see dumb people... they're everywhere. They walk around like everyone else. They don't even know that they're dumb."



**RobertL**
NorCal Call Sign Moss
Joined: Jan 2005 Posts: 21860
EE: 100% (229) MO, USA

Posted: 9/13/2025 2:49:44 PM EST [#12]

So, you're not releasing Ben's trigger but you are releasing another FRT that was formerly produced by someone else?

I'm assuming a design that predates the patents in question?

SAF Life Member-GOA Life Member-JPFO Charter Member-MSF Life Member
FPC Member-VCDL Member-BFA Member-NRA Benefactor Life Member
Sir RobertL, Charter Member of the Knights of Wonder



**bravo5two**
Member
Joined: Oct 2002 Posts: 4331
EE: 100% (65) NV, USA

Posted: 9/13/2025 2:53:05 PM EST [#13]

Okay I'm listening PTT. Show us your hardwares.



**WhatsGnu**
General gNuisance
Joined: Mar 2017 Posts: 38837
EE: 0% (0) AR, USA

Posted: 9/13/2025 2:54:34 PM EST [#14]




Gnu User, Clumsy Migratory Off-topic Herd Ungulate




**GMTECH9**
Shooter
Joined: Apr 2008 Posts: 678
EE: 0% (0) ID, USA

Posted: 9/13/2025 2:55:01 PM EST [#15]

In for the Fun Running Trigger info.

NRA ISAA GOA
3 Gun Fun
Lets Make America Great Again
0% EE, 0 likes, no Condo, no MBA, no BMW



**MNRidesHonda**
IG @callsignninja
Joined: Dec 2008 Posts: 4514
EE: 100% (459) VA, USA

Posted: 9/13/2025 2:55:05 PM EST [#16]

Quote History

> Originally Posted By whiskerz:
> The last guy was as pleasant as a root canal. Let's see what these guys do.

I don't particularly like the old man but his products work wonderfully and are my favorites unlike OP's who's giving us the blue balls..

2nd Battalion 9th Marines Echo Company
3rd Battalion 8th Marines India Company




**11boomboom**
25mm Aficionado
Joined: Oct 2020 Posts: 13716
EE: 100% (7) TX, USA

Posted: 9/13/2025 2:55:40 PM EST [Last Edit: 11boomboom] [#17]

Quote History

> Originally Posted By Ciraxis:
> I'm not reading all that shit

View All Quotes

This.

OP is too professional.

> Originally Posted By MNRidesHonda:
>> Originally Posted By whiskerz:
>> The last guy was as pleasant as a root canal. Let's see what these guys do.
>
> I don't particularly like the old man but his products work wonderfully and are my favorites unlike OP's who's giving us the blue balls..

Attached File

ETA: subbed. I'll probably buy one since Ben is involved. He's been pretty successful at giving the FBATFE a black eye.

Why is the sky blue?
What makes the green grass grow?




**Need4Guns**
Member
Joined: Nov 2020 Posts: 8730
EE: 0% (0) VA, USA

Posted: 9/13/2025 2:56:28 PM EST [#18]

Quote History

> Originally Posted By whiskerz:
> The last guy was as pleasant as a root canal. Let's see what these guys do.







**SouthernSaratoga**
Joined: Dec 2024 Posts: 1918
EE: 0% (0) USA

Posted: 9/13/2025 2:57:46 PM EST [#19]

Right on! 👍




**SouthernSaratoga**
Joined: Dec 2024 Posts: 1919
EE: 0% (0) USA

Posted: 9/13/2025 3:00:35 PM EST [#20]

So the Ben trigger is not going to be released? And instead different one is? What differences are there between the two? And I'm assuming it's not as good as the Ben trigger?

**scuba_steve**
These are not my pants.
Joined: Nov 2013 Posts: 30918
EE: 100% (20) VA, USA

Posted: 9/13/2025 3:01:23 PM EST [Last Edit: scuba_steve] [#21]

Quote History
Originally Posted By whiskerz:
The last guy was as pleasant as a root canal. Let's see what these guys do.

Well, these folks signed up for a dealer account, so at least they ramped up on the rules and are trying to respect them. But yeah, wow, that's a wall of text to just announce nothing.

---

**SIASL**
Joined: Jan 2014 Posts: 30810
EE: 100% (34) SC, USA

Posted: 9/13/2025 3:02:11 PM EST [#22]

Nice

IN

---

**NAM**
Joined: Jul 2002 Posts: 34982
EE: 100% (57) WI, USA

Posted: 9/13/2025 3:06:49 PM EST [#23]




---

**Hill_monkey**
Uncultured swine
Joined: Jan 2013 Posts: 111234
EE: 100% (30) PA, USA

Posted: 9/13/2025 3:08:22 PM EST [#24]




---

**hammer1995**
Member
Joined: May 2006 Posts: 2416
EE: 100% (43) LA, USA

Posted: 9/13/2025 3:09:49 PM EST [#25]

Quote History
Originally Posted By Koolpenguin89:
I mean, they appear to have at least a semi-functional grasp of the English language, so that's a good start!

Attached File

---

**johngalt9mm**
Member
Joined: Aug 2024 Posts: 177
EE: 0% (0) KY, USA

Posted: 9/13/2025 3:16:40 PM EST [#26]

Tea riggered.

In

Attached File

---

**SquatchAv8**
Member
Joined: Aug 2001 Posts: 7059
EE: 100% (31) TX, USA

Posted: 9/13/2025 3:20:44 PM EST [#27]

Quote History
Originally Posted By Ciraxis:
I'm not reading all that shit

And no one cares



**Glocked**
Armed Autist
Joined: May 2018 Posts: 20995
EE: 100% (35) MS, USA

Posted: 9/13/2025 3:20:57 PM EST [#28]

Very cool!

Not everyone gets to be an astronaut, the world needs pole dancers too. ~Observer



**Cardplayer**
Black Labs Matter
Joined: Jan 2015 Posts: 50925
EE: 100% (87) ID, USA

Posted: 9/13/2025 3:21:43 PM EST [#29]




AMERICA IS BACK!

Selling dime bags of primers.




**Jambalaya**
Slow Cooked
Joined: Sep 2005 Posts: 53940
EE: 0% (0) USA

Posted: 9/13/2025 3:35:17 PM EST [#30]

Interested in seeing if it will be a cartridge trigger and/or what design considerations were taken to ensure it stays clear of having any M16 compatible parts. Also whether it works well with .22lr conversions.



**czechsix**
why, oh why GOD WAS I BORN IN CALIFORNIA..
Joined: Apr 2005 Posts: 20266
EE: 100% (28) AK, USA

Posted: 9/13/2025 3:36:31 PM EST [#31]




RIP Tamurand a damn fine Rhodesian Ridgeback 02-09-14
RIP Kaya, an equally fine Yellow Lab 06-08-2015
RIP Millie the Destroyer, AKA ShitTrumpet, WCCorgi 12-21-2015
NORCAL CALLSIGN: YODEL
Happy to be in ALASKA!



**Ohio_Bill**
NorCal callsign "Bipod"
Joined: Apr 2009 Posts: 21926
EE: 100% (2) OH, USA

Posted: 9/13/2025 3:41:24 PM EST [#32]

Quote History

> Originally Posted By mad_mardigan:
> 885

"My irritability keeps me alive and kicking" --Howard Devoto

"Didn't watch it. You don't rack up 100k posts by reading the articles before commenting on them, slow poke." --Aimless




**Bellows1**
Who me?
Joined: Mar 2015 Posts: 16392
EE: 100% (16) VT, USA

Posted: 9/13/2025 3:42:10 PM EST [#33]

Quote History

> Originally Posted By Jambalaya:
> Interested in seeing if it will be a cartridge trigger and/or what design considerations were taken to ensure it stays clear of having any M16 compatible parts. Also whether it works well with .22lr conversions.

22 conversions would be nice.

Please help St Jude children's hospital.




**dropdbombnow**
Member
Joined: Nov 2001 Posts: 81785
EE: 100% (16) TX, USA

Posted: 9/13/2025 3:50:18 PM EST [#34]

Quote History

> Originally Posted By Ciraxis:
>
> I'm not reading all that shit




*"The essence of tyranny is not iron law, it is capricious law."*
Christopher Hitchens



**scuba_steve**
These are not my pants.
Joined: Nov 2013 Posts: 30922
EE: 100% (20) VA, USA

Posted: 9/13/2025 3:52:39 PM EST [#35]

Quote History

> Originally Posted By dropdbombnow:
>
> https://i.imgur.com/MwCYxRt.jpg

Thanks. I needed a laugh this week. 🙂



**FMJ0311**
Member
Joined: Dec 2013 Posts: 7667
EE: 100% (6) TX, USA

Posted: 9/13/2025 3:55:02 PM EST [#36]

Link?



**KILROD73**
observational anthropologist
Joined: Aug 2012 Posts: 1338
EE: 0% (0) TN, USA

Posted: 9/13/2025 3:58:07 PM EST [#37]

Attached File

We don't go there anymore




**thesquidliest**
Member
Joined: Apr 2016 Posts: 5655
EE: 100% (3) TX, USA

Posted: 9/13/2025 3:58:46 PM EST [#38]

In. Let's see where this goes.

If you can't dazzle them with brilliance, baffle them with bullshit.



**HDLS**
Member
Joined: Sep 2013 Posts: 44439
EE: 100% (33) CA, USA

Posted: 9/13/2025 4:00:46 PM EST [#39]



---



**BB**
Neo-Maxi Zoomdweebie
Joined: Feb 2001 Posts: 42968
EE: 100% (55) FL, USA

Posted: 9/13/2025 4:02:55 PM EST [#40]

I miss Larue vs Geissele threads. These FRT threads are lame.

-Women should always wear tight clothes and men should carry powerful handguns

---




**Jeff_1**
Joined: Aug 2004 Posts: 7217
EE: 100% (13) OK, USA

Posted: 9/13/2025 4:03:46 PM EST [#41]

To many words. Not enough pictures.

---



**mudholestomper**
2020 is money, sonny.
Joined: May 2020 Posts: 18348
EE: 100% (59) TX, USA

Posted: 9/13/2025 4:06:30 PM EST [#42]

Quote History

> Originally Posted By whiskerz:
> The last guy was as pleasant as a root canal. Let's see what these guys do.

What last guy? The guy who was representing Ben's design before these guys? Or some other design? A different manufacturer's rep?

"Now none of the frightened soldiers moved, for they saw that cowardice and valor purchased equal plots in the sniper's killing field."

"Not interested in a lecture by either side"
- isaidme

---

**DevilDog0402**
Retiree
Joined: Sep 2008 Posts: 11322
EE: 100% (3) MI, USA

Posted: 9/13/2025 4:09:38 PM EST [#43]

Quote History

> Originally Posted By whiskerz:
> The last guy was as pleasant as a root canal. Let's see what these guys do.

It's an acquired taste

Originally Posted By CplRick:
The line of credit on the Race Card is maxed out, sorry.
Originally Posted By refurb:
Your life isn't actually longer if you don't drink. It just feels like it is.

---



**HunterFisher**
Member
Joined: Sep 2024 Posts: 2157
EE: 0% (0) MD, USA

Posted: 9/13/2025 4:10:49 PM EST [#44]

... Please allow me to introduce myself
I'm a man of wealth and taste...

Sic Semper Tyrannis

---



**TonyRumore**
Member
Joined: Feb 2001 Posts: 4728
EE: 100% (61) OK, USA

Posted: 9/13/2025 4:12:01 PM EST [Last Edit: TonyRumore] [#45]

If I could give the OP just one piece of advice.

You really need to sign that wall of text with a first and last name. Don't worry about a title, because in this industry, a five person company only has presidents, VP's, CEO's etc on the payroll.

Tony Rumore
Tromix

Captured by FireShot Pro: 01-15-2026, 16:51:17



**PeepEater**
Member
Joined: Dec 2009 Posts: 60664
EE: 100% (2) USA

**Posted: 9/13/2025 4:17:36 PM EST** [#46]

So are you guys selling a trigger anytime soon or not?



**bjkb1f**
Member
Joined: Mar 2010 Posts: 19478
EE: 100% (27) MO, USA

**Posted: 9/13/2025 4:20:52 PM EST** [#47]

Nice to meet you and welcome to the site. Here's a little about me - My father was a relentlessly self-improving boulangerie owner from Belgium with low grade narcolepsy and a penchant for buggery. My mother was a fifteen year old French prostitute named Chloe with webbed feet. My father would womanize, he would drink, he would make outrageous claims like he invented the question mark. Some times he would accuse chestnuts of being lazy, the sort of general malaise that only the genius possess and the insane lament. My childhood was typical, summers in Rangoon, luge lessons. In the spring we'd make meat helmets. When I was insolent I was placed in a burlap bag and beaten with reeds, pretty standard really. At the age of 12 I received my first scribe. At the age of fourteen, a Zoroastrian named Vilma ritualistically shaved my testicles. There really is nothing like a shorn scrotum, it's breathtaking, I suggest you try it.

Find around and fuck out.



**Posted: 9/13/2025 4:21:02 PM EST** [#48]



# EXHIBIT K

The ALL NEW NX6 Line from Nightforce | ARFCOM Reviews
Canada Buy Back Fail | Stranger Things | EOTech & NF Product Launch | Dragons Breath IRL







## Rare Breed Triggers v Partisan Triggers legal battle (Page 1 of 3)

Previous Page 1 / 3 Next Page



**PartisanTriggers**
Freedom Accelerated
Joined: Jun 2025 Posts: 88
EE: 0% (0) USA

**Posted: 1/7/2026 12:36:11 AM EST** [Last Edit: PartisanTriggers]

Partisan Triggers previously introduced ourselves here. In it, we detailed our preparations for the inevitable lawsuit from Rare Breed Triggers/ABC IP (RBT). As many know, RBT named us as a John Doe d/b/a Partisan Triggers in an Arizona suit filed December 23, 2025. They've also sued Cloak Industries in Idaho, and we expect more suits against our dealers.

As stated on our website, we oppose public/private partnerships that exist only to your detriment.

RBT excels at bullying small companies, often run by young men who have barely gotten their feet under them in life, through aggressive lawfare to bankrupt and break them. It's easy to feel invincible when facing under-resourced opponents while relying on powerful allies. Rest assured, this won't work against us.

This week, we've shipped thousands of triggers to dealers, with thousands more going out by week's end. Dealers are indemnified under our substantial patent insurance policy—covering the Disruptor alongside our upcoming releases, and worth multiples of RBT's claimed millions in litigation costs from their prior lawsuits. You and our dealers can trust we won't be bullied or back down.

We don't believe we've violated any valid patent. When we respond to RBTs suit, we'll post the documents here for those interested. We have no plans or need for donations; support us by spreading the word or buying our triggers.

A certain famous former naval officer[1] once said:

"The wrong thing to do about any given circumstance or situation is to do nothing."

We would like to ask you to do something. If you have useful information on RBT (or related parties) for this lawsuit, PM us on ARFCOM to share it. We feel very confident in our preparations, but we are aware that there is always the possibility someone may know something we've missed. We hope they see this and want to help.

We have new products coming out phased over the next weeks, including maintenance kits, the Clone Lower Appropriate Pins (the CLAP), military style one piece selectors, and the LAT. We also have several more triggers that are past the drawing board and into pre-production prototyping.

We are here for the long haul, so strap in, folks—this may turn into a wild ride.

Thumbs up, let's do this.



–
–
–
–
–

[1]L. Ron Hubbard, maybe better known for other works

**01/09/2026**

People, and by extension groups of people, tend to project themselves and their ideas on others. Projection, a well known phenomenon, is easily observed if you're paying attention. Thieves tend to assume other people are also thieves. Cheaters are often suspicious that their spouse or partner is also a cheater. Conspirators tend to assume that anything inconvenient that happens to them grew from some other conspiracy. Incompetent people tend to assume others are also incompetent.

After some discussions with our legal team, we have decided to make a few things clear, out here in public. Let's talk about the high level of effort and professionalism that Rare Breed put into the Arizona lawsuit that they filed.

Rare Breed Triggers v Partisan Triggers legal battle > General Discussion > AR15.COM https://www.ar15.com/forums/General/Rare-Breed-Triggers-v-Partisan-Triggers-legal-battle/5-2828908/

Glenn D. Bellamy (OH Bar 0070321)
Wood Herron & Evans, LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel: 513-707-0243
Email: gbellamy@whe-law.com
For Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **RARE BREED TRIGGERS, Inc., a Texas corporation,** | CASE NO. ___________ |
| **and** | **JURY TRIAL DEMANDED** |
| **ABC IP, LLC, a Delaware limited liability company,** | **COMPLAINT FOR PATENT INFRINGEMENT AND FALSE PATENT MARKING** |
| **Plaintiffs,** | |
| **v.** | |
| **Firearm Systems LLC d/b/a Firearm Systems, an Arizona limited liability company,** | |
| **and** | |
| **Brandon Donatto, an individual,** | |
| **and** | |
| **Michael Stakes, an individual,** | |
| **and** | |
| **John Doe, an entity of unknown type,** | |
| **Defendants.** | |

See Michael Stakes? Yeah- he is an engineer for Partisan Triggers. John Doe? He is Partisan Triggers, whoever we may be.

**PARTIES**

1. Rare Breed is a corporation organized under the laws of the State of Texas with an address at 2710 Central Fwy, Suite. 150-151, Wichita Falls, TX 76306.

2. ABC is a limited liability company organized under the laws of the State of Delaware with an address at 8 The Green, Suite A, Dover, DE 19901.

3. Upon information and belief, Firearm Systems is a limited liability company existing under the laws of the state of Arizona and has a place of business at 4742 N. 24th Street, Suite 300, Phoenix, AZ 85016.

4. Upon information and belief, Brandon Donatto is an individual residing in Arizona, who is an owner and directs the operations of Firearm Systems, LLC.

5. Upon information and belief, defendant John Doe, the identity of which will be determined in discovery, is the business of Partisan Triggers, manufacturer of products that

Captured by FireShot Pro: 01-15-2026, 17:37:46

infringe the Asserted Patents, whether a sole proprietorship, partnership, corporation, or limited liability company, that is believed to have a business location in Arizona.

6. Upon information and belief, Michael Stakes is an individual residing in Arizona, who directs the operations of Partisan Triggers and is an owner of U.S. Patent No. 9,146,067.

Demonico and Friends really failed to do any sort of homework on this lawsuit. They have launched themselves on a complete fools errand. We'd be very curious to know what sloppy assessment of their available "information and belief" led them to conclude Michael Stakes, an engineer with no ownership or managing interest in Partisan Triggers, directs the operations of our company. He doesn't have any role whatsoever in directing the company or our operations. Michael Stakes is an engineer who we hired *after* we had already begun production of the Partisan Disruptor. In fact, *our very first contact* of any kind with Stakes was not until after we were already in production for the Disruptor. At no point has Stakes been involved with the Disruptor project. The whole of the complaint against Stakes is so laughably off that Bellamy ought to not only feel bad, but he deserves all the ridicule he gets for it.

Furthermore, Partisan Triggers is not located in Arizona, nor do we have any facilities in Arizona. Rare Breed are attempting to sue John Doe in the wrong venue. To make matters worse for our Texas based friends, it would have been very easy to reach out via our website and we'd have helped them along to find us. We aren't hiding. Quite the opposite. We have a contact form on our website. Rare Breed can continue pursuing their lawsuit in Arizona, and it is going to go very sideways fast for them. Do your homework boys, you're just...so disappointing right now.




**Southernman077**
Oh, I'm a Good Ol' Rebel
Joined: Mar 2006 Posts: 36042
EE: 0% (0) TN, USA

Posted: 1/7/2026 12:38:49 AM EST [#1]




"America is a whorehouse where the revolutionary ideals of your forefathers are corrupted and sold in alleys by vendors of capitalism."

BATTLE HAWK ARMORY

Where can I buy right now?

OPTICS PLANET.COM

CLOAK INDUSTRIES

AMMOTRUCKS GET LOADED

Scottsdale Gun Club

Copyright © 2022 Scottsdale Gun Club. All Rights Reserved.

## The Partisan Disruptor

**Assisted Reset Trigger**

3 Position Safety | Drop-In Cassette

Learn More





## The Legal Library

At Partisan Triggers, we've assembled an unbiased, neutral legal and patent library on forced-reset triggers, covering material from the 1930s to the present day. In one organized hub, you'll find legal rulings, enforcement actions, patents, and settlements, giving any interested party the ability to study the history and legal landscape of forced-reset triggers for themselves.

Explore Library

Michael Stakes, inventor of the modern assisted reset trigger, joins Partisan Triggers! Learn more about our team here






# The Disruptor

**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.

## Technical Specifications

- Tool steel and 4140 chromoly used on all wear surfaces for superior strength, durability, and long service life
- Trigger Pull Weight: 3.75 – 4.1lbs
- Compatible with most lowers; anti-walk pins recommended
- Requires a minimum H2 (recommend H3) carbine buffer weight for firearms with carbine extensions and 16" or shorter barrels, or a standard rifle buffer for 20" A2 stocks.
- Tested beyond 6,000 rounds under a course of fire derived from the USMC M27 IAR evaluation criteria

Legal in all 30+ Free American States (Sales prohibited to – CA, CT, CO (Boulder County and Broomfield), DE, FL, HI, IL, MA, MD, MN, NJ, NV, NY, RI, WA, Washington DC, Puerto Rico).

Your order will be canceled if you are ordering from one of these states.

Partisan Triggers

Home Triggers ▾ Where To Find Troubleshooting Menu ▾

Michael Stakes, inventor of the modern assisted reset trigger, joins Partisan Triggers! Learn more about our team here

# Where To Find

**Available Now**

BATTLE HAWK ARMORY

CLOAK INDUSTRIES

OPTICS PLANET.COM

AMMOTRUCKS GET LOADED

Scottsdale Gun Club
Copyright © 2022 Scottsdale Gun Club. All Rights Reserved.

TAKEDOWN TOOLS

FIREARMSYSTEMS.NET

PERFORMANCE TRIGGERS

INOCULUM

**Coming Soon**




# Partisan Disruptor AR-15 FRT

$299.99

## Partisan Triggers Disruptor AR-15 FRT

### 3 Position Drop-In Forced Reset Trigger

**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original Tac-Con 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.

## Technical Specifications

- Tool steel and 4140 chromoly used on all wear surfaces for superior strength, durability, and long service life
- Trigger Pull Weight: 3.75 – 4.1lbs
- Compatible with most lowers; anti-walk pins recommended
- Requires a minimum H2 (recommend H3) carbine buffer weight for firearms with carbine extensions and 16" or shorter barrels, or a standard rifle buffer for 20" A2 stocks.
- Tested beyond 6,000 rounds under a course of fire derived from the USMC M27 IAR evaluation criteria

Legal in all 35 Free American States (Sales prohibited to – CA, CT, CO, DE, FL, HI, IL, MA, MD, MN, NJ, NV, NY, RI, WA, Washington DC, Puerto Rico).

**Your order will be canceled if you are ordering from one of these states.**

Check out the blog on legality Federal vs State

Install Guide: How to install + Troubleshoot

In stock

1 Add to cart

Category: Uncategorized Tags: 3 Position Trigger, Anti-Walk Pins, AR-15 Trigger, AR-15 Upgrade, Assisted Reset, Cassette Trigger, Drop In Trigger, Forced Reset Trigger, FRT Trigger, Michael Stakes, Partisan Disruptor, Rapid Fire Trigger, Tactical Trigger

Description | Additional information

## Description

**Partisan Triggers Disruptor AR-15 FRT 3 Position Drop-In Forced Reset Trigger**

*The Partisan Disruptor* **Forced Reset Trigger — Now Available at FirearmSystems.net!**

The **Partisan Disruptor** is a forced reset trigger engineered for shooters who demand speed, precision, and reliability without complicated installation. **Unlike a Super Safety, the Partisan Disruptor is a true, direct drop-in replacement trigger**, requiring **no modification, gunsmithing, or fitting**. Installation is fast, straightforward, and hassle-free.

Designed with performance and control in mind, the Partisan Disruptor features a **three-position safety selector** with **Safe**, **Semi-Automatic**, and **Enhanced Semi-Automatic** modes. This allows shooters to tailor their shooting experience while maintaining consistent operation and dependable safety.

Whether you're building a duty-grade rifle or upgrading an existing platform, the Partisan Disruptor delivers a responsive, confident trigger feel backed by extensive durability testing.

### Why Buy the Partisan Disruptor from Firearm Systems

Firearm Systems has been committed to offering **ALL** cutting-edge firearm components **designed by Michael Stakes since 2013**, fast shipping, and knowledgeable support. The Partisan Disruptor FRT delivers enhanced trigger performance in a true drop-in format—making it one of the most straightforward forced reset trigger upgrades available today.

**Package Contains**

- **Partisan Drop-In Cassette Forced Reset Trigger**
- **Replacement Safety**
- **Anti Walk Trigger Pins**

### Technical Specifications

- Constructed with **tool steel and 4140 chromoly** on all wear surfaces for superior strength, durability, and extended service life
- **Trigger Pull Weight – 3.75-4.1 lbs**
- Compatible with most AR-pattern lowers
  - **Anti-walk pins recommended**
- Buffer requirements:
  - **Minimum H2 buffer (H3 recommended)** for firearms with carbine extensions and **16" or shorter barrels**
  - **Standard rifle buffer** for **20" A2 stocks**
- Tested beyond **6,000 rounds** under a course of fire derived from **USMC M27 IAR evaluation criteria**

Install Guide: Partisan Triggers Disruptor: How to install + Troubleshoot

Patent Info: Trigger mechanism

### Legal Information

The Partisan Disruptor is **legal in 35 Free American States**.

**Sales are prohibited to the following locations:**
CA, CT, CO, DE, FL, HI, IL, MA, MD, MN, NJ, NY, RI, WA, Washington D.C., and Puerto Rico.

It is the buyer's responsibility to ensure compliance with all federal, state, and local laws prior to purchase.

## Firearm Systems – Legal Disclaimer

## Waiver, Release of Liability, and Final Sale Policy

By purchasing, possessing, installing, or using this product, you acknowledge and agree to the following terms and conditions:

This product is designed for installation in a firearm. Firearms are inherently dangerous and are intended to function as such. Improper handling, installation, use, or misuse of firearms or firearm components may result in property damage, serious bodily injury, or death. It is solely your responsibility to obtain proper training and knowledge regarding the safe, lawful installation and use of this product and any firearm into which it is installed, including strict adherence to all firearm safety rules and applicable laws.

If you are not fully confident in your ability to safely and legally install or use this product, you must seek qualified professional assistance, obtain appropriate instruction, or refrain from use altogether. By purchasing, installing, or using this product, you voluntarily assume all risks associated with its use and accept full personal responsibility for those risks.

You hereby waive, release, and hold harmless **Firearm Systems**, its owners, officers, employees, affiliates, contractors, and agents from any and all claims, liabilities, damages, losses, costs, fines, penalties, legal actions, or prosecutions arising out of or related to the purchase, possession, installation, transfer, or use of this product, whether caused by negligence or otherwise, to the fullest extent permitted by law.

You are solely responsible for ensuring that this product is legal to purchase, possess, install, and use under all applicable federal, state, and local laws and regulations. While this product may be legal under federal law, certain states or local jurisdictions may prohibit or restrict its use. Compliance with all applicable laws is entirely the responsibility of the buyer.

You agree to inform any other person who may use or possess this product of the contents of this disclaimer, including in the event of a temporary or permanent transfer. Failure to do so does not relieve you of responsibility as the original purchaser.

This Waiver and Release is binding upon you and your heirs, assigns, representatives, and beneficiaries.

All Partisan Triggers are Sold under the Agreement HERE

## Final Sale – No Returns Policy

**All sales of the Partisan Trigger through Firearm Systems are final.**
**Firearm Systems does not accept returns or exchanges for any reason. By completing your purchase, you acknowledge and accept this final sale policy.**

**DO NOT purchase this product if you do not agree with any portion of this disclaimer, waiver, or final sale policy.**

## Related products




Delta Velocity Gen1 3MR

~~$329.99~~ $260.00

Add to cart

Firearm Systems

**ADDRESS**

4742 North 24th Street

Suite 300

Phoenix, AZ 85016

**PHONE NUMBER**

(623) 252-9593

**EMAIL ADDRESS**

Info@FirearmSystems.net

**Partisan Triggers Disruptor FRT**

**Products**

**Calendar**

**Affiliate Area**

**About**

**Blog**

© 2026 Firearm Systems. All Rights Reserved.

GODADDY DESIGN SERVICES

# EXHIBIT P






CLK-PT-DSPTR-FRT-GRN Triggers

# THE PARTISAN DISRUPTOR AR15 FORCED RESET TRIGGER

By purchasing this product you agree to this LEGAL DISCLAIMER.

**Great news! All back orders have been fulfilled, and triggers are back in stock and ready to ship. Place your order today, and it will ship the next business day. We truly appreciate your patience-our priority is ensuring every customer is completely satisfied. Thank you for your continued support!**
**– The Cloak Team**

This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.

Legal in all 30+ Free American States
(Sales prohibited to – CA, CT, CO (Boulder County and Broomfield), DE, FL, HI, IL, MA, MD, MN, NJ, NY, OR, RI, VT, WA, Washington DC, Puerto Rico). Your order will be canceled if you are ordering from one of these states.

$299.00

Color: Green

In stock

1 ADD TO CART

# EXHIBIT Q

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

RARE BREED TRIGGERS, INC., a Texas corporation, and
ABC IP, LLC, a Delaware limited liability company,

*Plaintiffs*,

v.

PEAK TACTICAL, LLC d/b/a PARTISAN TRIGGERS, a Wyoming limited liability company, and
NICHOLAS NORTON, an individual,

*Defendants*.

Case No. 26-cv-00018

**DECLARATION OF BRIAN LUETTKE**

I, Brian Luettke, declare and state as follows:

**I. Qualifications and Assignment**

1. I am over eighteen years of age, and I am an employee of Luettke Firearms Consulting, Inc., located in Grand Rapids, Michigan, and am competent to make these statements.

2. I have been retained as an expert for Plaintiffs in the case, Rare Breed Triggers, LLC ("Rare Breed") and ABC IP, LLC to examine the Partisan Disruptor Trigger and FRT-15L3™ Trigger and compare them to U.S. Patent Nos. 10,514,223 ("the '223 Patent"); 11,724,003 ("the '003 Patent"); 12,036,336 ("the '336 Patent"); and 12,274,807 ("the '807 Patent") (collectively, "the Asserted Patents"). I have also been asked to compare the Partisan Disruptor Trigger and FRT-15L3™ Trigger to U.S. Patent No. 9,146,067 ("the '067 Patent").

3. The content of my testimony or payment of my consulting fee is not dependent in any way on the outcome of this matter. I have no financial interest in any party to this case.

4. I have more than twenty-five years of experience in firearms identification, investigation, and classification.

5. I hold a Bachelor of Arts degree in Criminal Justice from the University of Michigan – Flint and a Master's Degree in Security and Safety Leadership from The George Washington University.

6. I have been employed as a firearm consultant and trainer for at least the last five years, working as a firearm expert and trainer in firearm identification.

7. I am a person of at least ordinary skill in the field of firearm trigger designs and function.

**II. The Rare Breed FRT-15L3™ and Partisan Disruptor Products**

8. I am familiar with the construction and operation of the Rare Breed FRT-15L3™ semiautomatic trigger, shown below. Unlike standard semiautomatic triggers or other firing-rate-enhancing devices, the trigger described in the Asserted Patents and the Rare Breed trigger operate

by the trigger being forcibly pushed into the reset position, with the sear engaging the hammer, each time the action cycles (i.e., each time a shot is fired). Another shot cannot be fired until the bolt returns to the in-battery position and the trigger is pulled again by the user.



9. I have reviewed publicly available information on the Partisan Disruptor trigger, including technical specifications and images of the product.

10. From publicly available information and from a physical examination, I can see the mechanisms of the Partisan Disruptor trigger and how it operates.

11. Comparing the Partisan Disruptor and Rare Breed FRT-15L3™ triggers, it is my opinion that the products are functionally identical and therefore that the Disruptor can serve as a direct substitute for the FRT-15L3™ trigger. The only visible difference between the triggers is the shape of the housing, which does not affect trigger functionality. Once installed into a firearm, the products are virtually indistinguishable.



Partisan Disruptor



Rarebreed FRT-15L3



Partisan Disruptor



Rarebreed FRT-15L3

12. Both the Partisan Disruptor and Rare Breed FRT-15L3™ products are manufactured of durable steel and are intended to be long-lasting products.

13. Both the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are readily installed out of the box into firearms without requiring modification or gunsmithing.

14. Both the Partisan Disruptor and Rare Breed FRT-15L3™ triggers advertise "hassle-free installation." In order to install the Partisan Disruptor or Rare Breed FRT-15L3™ triggers into an AR-15 receiver, a person simply inserts the trigger into the receiver's fire control mechanism pocket, inserts the two (supplied) trigger pins to hold the trigger in place, and installs the (supplied) safety selector or safety switch.

15. Both the Partisan Disruptor and Rare Breed FRT-15L3™ triggers can be retrofitted to any existing MIL-SPEC AR-15 lower receiver and can be easily transferred from one rifle to another.

16. Forced reset triggers are a type of semi-automatic trigger mechanism that fully reset the trigger after each shot, forcing the trigger back into the forward position and allowing the user to take faster follow-up shots without fully releasing the trigger. In contrast, assisted reset triggers reset the trigger only partially. Both the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are forced reset triggers, not assisted reset triggers, because in both products the trigger is forced back into its reset position with each shot.

17. In particular, both products, the Partisan Disruptor and Rare Breed FRT-15L3™, incorporate a locking bar as a safety and legal compliance feature to prevent runaway fire of the weapon. The locking bar is necessary in an FRT design but has no relevance in an assisted reset trigger.

18. Forced reset triggers such as the Partisan Disruptor and Rare Breed FRT-15L3™ also have a different firing rate than assisted reset triggers.

**III. Infringement of the Asserted Patents**

19. I have been provided copies of and have studied the Asserted Patents. The ’223 Patent relates to a forced reset trigger that allows more rapid reset and semiautomatic firing of a firearm, firing once each time the trigger is pulled by the user. The ’003 Patent, the ’336 Patent, and the ’807 Patent describe and claim a similarly operating device with the additional feature that allows the device to be selectively operated in one of two distinct modes: (1) standard disconnector semiautomatic mode, and (2) forced reset semiautomatic mode.

20. I have been asked to compare the structure and operation of the Partisan Disruptor and Rare Breed FRT-15L3™ triggers to the elements specified in claim 4 of the ’223 Patent, claim 4 of the ’003 Patent, claim 3 of the ’336 Patent, and claim 1 of the ’807 Patent.

21. I am not a patent attorney, nor have I independently researched the law on patent validity. Rare Breed's counsel explained certain legal principles to me, set forth below, that I have relied on and followed in forming my opinions set forth in this declaration.

22. I have been instructed that a determination of patent infringement requires a two-step analysis: first, the patent claims must be properly construed; and second, a determination must be made as to whether the claims "read on" the accused product.

23. To determine the meaning of the patent terms (construing claim terms), I looked primarily to the claim language and the specifications of the Asserted Patents.

24. For purposes of my evaluation, I applied the plain and ordinary meaning of the terms of the asserted claim as they would be understood by a person of ordinary skill in this field in the context of the patent document as a whole. The Asserted Patents sufficiently describe the limitations of the claims such that their meanings are clear.

25. For the second step of the inquiry, I compared the language of the claim to the accused product.

**A. Claim 4 of the '223 Patent**

26. Below is a chart that compares each element and limitation of claim 4 of the '223 Patent to the Partisan Disruptor:

| Claim Language | Infringing Device (Partisan Disruptor) |
|---|---|
| 4. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, | The Infringing Device is for an AR-pattern firearm, which has a lower receiver with a fire control pocket and assembly pin openings in side walls of the pocket. |

| | |
|---|---|
| and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising: | <br><br>An AR-pattern firearm has a bolt carrier that reciprocates and pivotally displaces a hammer when cycled.<br><br> |
| a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins; | The Infringing Device includes a housing with transversely aligned pairs of openings for receiving hammer and trigger assembly pins.<br><br> |

| | |
|---|---|
| | <br>**(Plaintiff–generated renderings of the Partisan Disruptor here and below)** |
| a hammer having a sear notch and mounted in the housing to pivot on a transverse axis<br><br>between set and | The Infringing Device includes a hammer **(Blue)** with a sear notch and is mounted in the housing to pivot on a transverse axis.<br><br><br>**(Set position)** |

| | |
|---|---|
| released positions; | <br>**(Released position)** |
| a trigger member having a sear and mounted in the housing to pivot on a transverse axis<br><br>between set<br><br>and released positions, | The infringing device has a trigger member **(Green)** that has a sear and is mounted in a housing to pivot on a transverse axis.<br><br>**(Set position)**<br><br>**(Released position)** |

| | |
|---|---|
| the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)**   |
| the contact causing the trigger member to be forced to the set position; | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position. |

| | |
|---|---|
| |  |
| a locking bar pivotally mounted in the housing | The Infringing Device includes a locking bar (Red) that is pivotally mounted in the housing.<br><br> |
| and spring biased toward a first position | The locking bar is spring biased toward a first position in which the locking bar mechanically |

| | |
|---|---|
| in which the locking bar mechanically blocks the trigger member from moving to the released position, | blocks the trigger member from moving to the released position.<br><br>**(First position mechanically blocked)** |
| and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position | The locking bar is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position. |
| in which the trigger member can be moved by an external force to the released position. | In this position, the trigger member can be moved by an external force (pull by the trigger finger) to the released position.<br> |

27. It is my opinion, for the reasons stated above, that the Partisan Disruptor includes each and every limitation of claim 4 and, therefore, literally infringes at least claim 4 of the '223 Patent.

28. As explained above, it is my opinion that the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are functionally identical. Because the products are functionally identical and the claim language is silent regarding the only distinction between the products (the shape of the housing), it is my opinion the Rare Breed FRT-15L3™ trigger is also covered by at least claim 4 of the '223 Patent.

**B. Claim 4 of the '003 Patent**

29. Below is a chart that compares each element and limitation of claim 4 of the '003 Patent to the Partisan Disruptor:

| Claim Language | Infringing Device (Partisan Disruptor) |
|---|---|
| 4. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. |
| a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, | The Infringing Device includes a housing **(Black)** that has a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin.   The Infringing Device is sold with hammer and trigger pins. |

| | |
|---|---|
| |  |
| a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin<br><br>between set and | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the housing to pivot on the hammer pin between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier.<br><br>**(Plaintiff-generated renderings of the Partisan Disruptor here and below)**<br><br>**(Set position)** |

| | |
|---|---|
| released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, |  **(Released position)** |
| a trigger member having a sear and mounted in said housing to pivot on said trigger member pin between set and released positions, | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the housing to pivot on the trigger member pin  **(Set position)** |

| | |
|---|---|
| said trigger member having a surface positioned to be contacted by a surface of said hammer |  **(Released position)** The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)**   |
| during rearward pivoting of said hammer to cause said trigger member to be forced to said set position, | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position. |

| | |
|---|---|
| |   |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear and sear catch are engaged in the set position  **(Set position)** The sear and sear catch are out of engagement in the released position |

| | |
|---|---|
| and are out of engagement in said released positions of said hammer and trigger member, | <br>**(Released position)** |
| a disconnector having a hook for engaging said hammer | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook<br><br><br>The disconnect is mounted in the housing to pivot on the trigger **(Green)** member pin |

| | |
|---|---|
| and mounted in said housing to pivot on said trigger member pin, |  |
| a locking member mounted in said housing to pivot on a transverse locking member pin, | The infringing device has a locking member **(Red)** that is mounted in the housing and it pivots on a transverse locking member pin<br><br> |
| said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position | When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled<br><br>**(First position mechanically blocked)** |
| and a second position at which said locking member does not mechanically | When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled |

| | |
|---|---|
| block said trigger member allowing said trigger member to be moved to said released position, | <br>**(Second position not mechanically blocked)** |
| said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and | The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position. |
| a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions.<br><br> |

| | |
|---|---|
| | **The Disruptor**<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook,<br><br>at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook<br><br>**(Standard semi-automatic position)** |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position. |

| | |
|---|---|
| |  **(Trigger pulled to the rear, hammer first touches the trigger)**  **(Hammer has now caused the trigger to move to the reset position)** |
| said safety selector preventing said disconnector hook from catching said hammer hook, | The safety selector prevents the disconnector **(Orange)** hook from catching the hammer **(Blue)** hook by pivoting the disconnector back out of the way of the hammer hook.  **(Set position)** |

| | |
|---|---|
| and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member. | When the bolt carrier reaches a substantially in-battery position the user can pull the trigger **(Green)** without manually releasing pressure off the trigger  |

30. It is my opinion, for the reasons stated above, that the Partisan Disruptor includes each and every limitation of claim 4 and, therefore, literally infringes at least claim 4 of the '003 Patent.

31. As explained above, it is my opinion that the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are functionally identical. Because the products are functionally identical and the claim language is silent regarding the only distinction between the products (the shape of the housing), it is my opinion that the Rare Breed FRT-15L3™ trigger is also covered by at least claim 4 of the '003 Patent.

### C. Claim 3 of the '336 Patent

32. Below is a chart that compares each element and limitation of claim 3 of the '336 Patent to the Partisan Disruptor:

| Claim Language | Infringing Device (Partisan Disruptor) |
|---|---|
| 3. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. |

| | |
|---|---|
| a housing having a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin, | The Infringing Device includes a housing that has a first pair of transversely aligned openings for receiving a hammer pin and a second pair of transversely aligned openings for receiving a trigger member pin.   The Infringing Devise is sold with hammer and trigger pins.   |
| a hammer having a sear catch and a hook for engaging a disconnector and mounted in said housing to pivot on said hammer pin | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the housing to pivot on the hammer pin between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier. |

| | |
|---|---|
| between set and<br><br>released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, | <br><br>**(Plaintiff-generated renderings of the Partisan Disruptor here and below)**<br><br>**(Set position)** |

| | |
|---|---|
| |  **(Released position)** |
| a trigger member having a sear and mounted in said housing to pivot on said trigger member pin<br><br>between set | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the housing to pivot on the trigger member pin<br><br> **(Set position)** |

| | |
|---|---|
| and released positions, | <br>**(Released position)** |
| said trigger member having a surface positioned to be contacted by a surface of said hammer | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)**<br><br> |
| during rearward pivoting of said hammer to cause said trigger member to be forced to said set position, | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position |

| | |
|---|---|
| |   |
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear and sear catch are engaged in the set position  **(Set position)** |
| and are out of engagement in said released positions of said hammer and trigger member, | The sear and sear catch are out of engagement in the released position |

| | |
|---|---|
| |  **(Released position)** |
| a disconnector having a hook for engaging said hammer | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook   |
| and mounted in said housing to pivot on said trigger member pin, | The disconnect is mounted in the housing to pivot on the trigger **(Green)** member pin |

| | |
|---|---|
| |  |
| a locking member mounted in said housing to pivot on a transverse locking member pin, | The infringing device has a locking member **(Red)** that is mounted in the housing and it pivots on a transverse locking member pin.   |
| said locking member being pivotable between a first position at which said locking member mechanically blocks said trigger member from moving to said released position | When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled  **(First position mechanically blocked)** |

| | |
|---|---|
| and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position, | When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled.<br><br>**(Second position not mechanically blocked)** |
| said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and | The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position. |
| a safety selector adapted to be mounted in a fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions, | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions.<br><br> |

| | |
|---|---|
| | <br>**The Disruptor**<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| said safety selector configured such that, when said safety selector is in said forced reset semi-automatic position, said safety selector causes said disconnector to be repositioned and in doing so prevents said disconnector hook from catching said hammer hook, | While in the forced reset semi-automatic position the disconnect **(Orange)** moves to a position that does not allow the disconnector hook to catch the hammer **(Blue)** hook<br><br>**(Forced reset semi-automatic position)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook |

| | |
|---|---|
| at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and |  **(Standard semi-automatic position)** |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position.  **(Trigger pulled to the rear, hammer first touches the trigger)**  **(Hammer has now caused the trigger to move to the reset position)** |

| | |
|---|---|
| said safety selector preventing said disconnector hook from catching said hammer hook, | The safety selector prevents the disconnector **(Orange)** hook from catching the hammer **(Blue)** hook  **(Set position)** |
| and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member. | When the bolt carrier reaches a substantially in-battery position the user can pull the trigger **(Green)** without manually releasing pressure off the trigger |

33. It is my opinion, for the reasons stated above, that the Partisan Disruptor includes each and every limitation of claim 4 and, therefore, literally infringes at least claim 3 of the ’336 Patent.

34. As explained above, it is my opinion that the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are functionally identical. Because the products are functionally identical and the claim language is silent regarding the only distinction between the products (the shape of the housing), it is my opinion that the Rare Breed FRT-15L3™ trigger is also covered by at least claim 3 of the ’336 Patent.

### D. Claim 1 of the ’807 Patent

35. Below is a chart that compares each element and limitation of claim 1 of the ’807 Patent to the Partisan Disruptor:

| Claim Language | The infringing Device (Partisan Disruptor) |
|---|---|
| 1. A firearm trigger mechanism comprising: | The Infringing Device is a firearm trigger mechanism. |

| | |
|---|---|
| a hammer having a sear catch and a hook and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis | The Infringing Device includes a hammer **(Blue)** that has a sear catch and a hook for engaging a disconnector. It is mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions. The hammer is pivoted rearward by rearward movement of a bolt carrier.   **(Plaintiff-generated renderings of the Partisan Disruptor here and below)**  **(Set position)** |
| between set and | |

| | |
|---|---|
| released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, | <br>**(Released position)** |
| a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis<br><br>between set<br><br>and released positions, | The Infringing Device includes a trigger member **(Green)** that has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis<br><br>**(Set position)**<br><br>**(Released position)** |

| | |
|---|---|
| said trigger member having a surface positioned to be contacted by a surface of said hammer | The trigger member **(Green)** has a surface positioned to be contacted by a surface of the hammer **(Blue)**   |
| during rearward pivoting of said hammer to cause said trigger member to be forced to said set position, | The hammer **(Blue)** pivots rearward causing the trigger **(Green)** to be forced to the set position   |

| | |
|---|---|
| wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member | The sear and sear catch are engaged in the set position  **(Set position)** |
| and are out of engagement in said released positions of said hammer and trigger member, | The sear and sear catch are out of engagement in the released position  **(Released position)** |
| a disconnector having a hook for engaging said hammer hook | The infringing device has a disconnector **(Orange)** that has a hook for engaging the hammer **(Blue)** hook |

| | |
|---|---|
| and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, | <br><br>The disconnect is mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis<br> |
| a locking member adapted to be movably mounted in the fire control mechanism pocket,<br><br>said locking member being movable between a first position at which said locking member | The infringing device has a locking member **(Red)** that is movably mounted in the fire control mechanism pocket and it is movable between a first position and a second position.<br><br><br>When the locking bar **(Red)** is in the first position, the locking member blocks the trigger **(Green)** from being pulled |

| | |
|---|---|
| mechanically blocks said trigger member from moving to said released position<br><br>and a second position at which said locking member does not mechanically block said trigger member allowing said trigger member to be moved to said released position,<br><br>said locking member spring biased toward said first position and adapted to be moved against said spring bias to said second position by contact from the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position, and | <br>**(First position mechanically blocked)**<br>When the locking bar **(Red)** is in the second position, it does not prevent the trigger **(Green)** from being pulled<br><br>**(Second position not mechanically blocked)**<br><br>The locking member **(Red)** is spring biased toward the first position and is moved against the spring bias to the second position by contact of the bolt carrier during forward movement of the bolt carrier as the bolt carrier reaches a substantially in-battery position |
| a safety selector adapted to be movably mounted in the fire control mechanism pocket to move between safe, standard semi- | The Infringing Device includes a safety selector that is mounted in the fire control mechanism pocket of a receiver to pivot between safe, standard semi-automatic, and forced reset semi-automatic positions. |

| | |
|---|---|
| automatic, and forced reset semi-automatic positions, | <br><br>**The Disruptor**<br>**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.<br>**(https://partisantriggers.com/the-disruptor/)** |
| whereupon in said standard semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook,<br><br>at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and | While in the standard semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot and the disconnect **(Orange)** hook catches the hammer hook<br><br>**(Standard semi-automatic position)** |

| | |
|---|---|
| | |
| whereupon in said forced reset semi-automatic position, rearward movement of the bolt carrier causes rearward pivoting of said hammer causing said trigger member to be forced to said set position, | When the infringing device is in the forced reset semi-automatic position rearward movement of the bolt carrier causes the hammer **(Blue)** to pivot which causes the trigger **(Green)** to be forced to the set position.  **(Trigger pulled to the rear, hammer first touches the trigger)**  **(Hammer has now caused the trigger to move to the reset position)** |

| | |
|---|---|
| said safety selector preventing said disconnector hook from catching said hammer hook, | The safety selector prevents the disconnector **(Orange)** hook from catching the hammer **(Blue)** hook.<br><br>**(Set position)** |
| and thereafter when the bolt carrier reaches the substantially in-battery position the user can pull said trigger member to fire the firearm without manually releasing said trigger member. | When the bolt carrier reaches a substantially in-battery position the user can pull the trigger **(Green)** without manually releasing pressure off the trigger.<br> |

36. It is my opinion, for the reasons stated above, that the Partisan Disruptor includes each and every limitation of claim 4 and, therefore, literally infringes at least claim 1 of the ’807 Patent.

37. It is my opinion that the asserted claims relate to the core functionality of the Partisan Disruptor and therefore that designing around the asserted claims would require material technical changes. For example, Partisan highlights the three-position safety selector, claimed in claim 4 of the ’003 Patent, claim 3 of the ’336 Patent, and claim 1 of the ’807 Patent, as a key feature of the Disruptor.

**The Disruptor**

**The Disruptor (US Patent 9146067)** is an assisted reset trigger descended from the original TacCon 3MR trigger, designed for fast and hassle-free installation on the AR-15 platform. It requires no modification, gunsmithing, or fitting. Built for shooters who value precision and control, it features a three-position safety selector with Safe, Semi- Automatic, and Enhanced Semi-Automatic modes. This versatile trigger delivers a responsive and confident shooting experience while maintaining reliability and safety for users.

(https://partisantriggers.com/the-disruptor/)

38. As explained above, it is my opinion that the Partisan Disruptor and Rare Breed FRT-15L3™ triggers are functionally identical. Because the products are functionally identical and the claim language is silent regarding the only distinction between the products (the shape of the housing), it is my opinion that the Rare Breed FRT-15L3™ trigger is also covered by at least claim 1 of the ’807 Patent.

## IV. Non-Infringing Alternatives

39. I am not aware of any alternatives that provide the same functionality, durability, and ease of installation as the Partisan Disruptor and Rare Breed FRT-15L3™ triggers without infringing the asserted claims.

## V. The Partisan Disruptor and FRT-15L3 Do Not Practice the ’067 Patent

40. I have reviewed the ’067 patent and am familiar with the patent and its recited claims.

41. In my opinion, neither the RBT FRT-15L3™ nor the Partisan Disruptor practice any claim of the ’067 patent.

42. The ’067 Patent’s independent claims 1, 4, 8, 11, and 15 all, and therefore all the dependent claims that depend from them, require a “reset lever” that is struck by a hammer. In my opinion, a person of ordinary skill in the art would understand that the following claim limitations (emphasized below) create such a requirement:

> 1. A trigger mechanism, comprising:
>
> a trigger disconnector assembly having a trigger nose, and a disconnector having a disconnector hook;
>
> ***a reset lever mounted for pivotal movement between open and closed positions;***
>
> the trigger disconnector assembly mounted for pivotal movement between charged and discharged orientations, the charged orientation comprises a set position of the trigger nose and a disengaged position of the disconnector hook, and the discharged orientation comprises a released position of the trigger nose and an engaged position of the disconnector hook;
>
> a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and
>
> the trigger disconnector assembly is in mechanical communication with the reset lever, ***the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the trigger disconnector assembly to pivot the trigger disconnector assembly from the discharged orientation to the charged orientation when the reset lever moves from the open position to the closed position, to position*** the trigger nose in the set position in preparation to be received by the trigger notch in the cocked position of the hammer and to position the disconnector in the disengaged position of the disconnector hook relative to the hammer disconnect notch.
>
> 4. A trigger mechanism, comprising:
>
> a trigger disconnector assembly having a trigger nose, and a disconnector having a disconnector hook and a cam surface;
>
> ***a reset lever mounted for pivotal movement between open and closed positions;***

the trigger disconnector assembly mounted for pivotal movement between charged and discharged orientations, the charged orientation comprises a set position of the trigger nose and a disengaged position of the disconnector hook, and the discharged orientation comprises a released position of the trigger nose and an engaged position of the disconnector hook;

a hammer includes a striking end including a striking surface and an opposed hammer tail, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a forward position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the set position of the trigger nose and the cocked position of the hammer; and

***the cam surface of the trigger disconnector assembly is in mechanical communication with the reset lever, the hammer tail of the striking end of the hammer strikes the reset lever in the past-cocked position the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the cam surface to pivot the trigger disconnector assembly from the discharged orientation to the charged orientation when the reset lever moves from the open position to the closed position, to position*** the trigger nose in the set position in preparation to be received by the trigger notch in the cocked position of the hammer and to position the disconnector in the disengaged position of the disconnector hook relative to the hammer disconnect notch.

8. A trigger mechanism, comprising:

a trigger body having a trigger nose and a trigger pivot for pivotally coupling the trigger body to a firearm for movement of the trigger nose between set and released positions;

***a reset lever mounted for pivotal movement between open and closed positions;***

a disconnector having a disconnector hook, and a disconnector pivot pivotally coupling the disconnector to the trigger pivot for movement of the disconnector hook between disengaged and engaged positions in response to pivotal movement of the trigger body between the set and released positions of the trigger nose, respectively;

a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and

***the disconnector is in mechanical communication with the reset lever, the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the disconnector to concurrently pivot the disconnector***

***from the engaged position of the disconnector hook to the disengaged position of the disconnector hook*** and the trigger body from the released position of the trigger nose to the set position of the trigger nose in preparation to be received by the trigger notch in the cocked position of the hammer when the reset lever moves from the open position to the closed position.

11. A trigger mechanism, comprising:

a trigger body having a trigger nose and a trigger pivot for pivotally coupling the trigger body to a firearm for movement of the trigger nose between set and released positions;

***a reset lever mounted for pivotal movement between open and closed positions;***

a disconnector having a disconnector lever, a disconnector hook, and a disconnector pivot pivotally coupling the disconnector to the trigger pivot for movement of the disconnector hook between disengaged and engaged positions in response to pivotal movement of the trigger body between the set and released positions of the trigger nose, respectively;

a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and

***the disconnector lever of the disconnector is in mechanical communication with the reset lever, the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the disconnector lever to concurrently pivot the disconnector from the engaged position of the disconnector hook to the disengaged position of the disconnector hook and the trigger body from the released position of the trigger nose to the set position of the trigger nose*** in preparation to be received by the trigger notch in the cocked position of the hammer when the reset lever moves from the open position to the closed position.

15. A trigger mechanism, comprising:

a trigger body having a trigger nose and a trigger pivot for pivotally coupling the trigger body to a firearm for movement of the trigger nose between set and released positions;

***a reset lever mounted for pivotal movement between open and closed positions;***

a disconnector having a disconnector hook, a cam surface, and a disconnector pivot pivotally coupling the disconnector to the trigger pivot for movement of the disconnector hook between disengaged and engaged positions in response to

> pivotal movement of the trigger body between the set and released positions of the trigger nose, respectively;
>
> a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and
>
> ***the cam surface of the disconnector is in mechanical communication with the reset lever, the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the cam surface to concurrently pivot the disconnector from the engaged position of the disconnector hook to the disengaged position of the disconnector hook and the trigger body from the released position of the trigger nose to the set position of the trigger nose*** in preparation to be received by the trigger notch in the cocked position of the hammer when the reset lever moves from the open position to the closed position.

43. I have analyzed the designs of both the FRT-15L3™ and Partisan Disruptor and, in my opinion, the FRT-15L3™ and Partisan Disruptor do not have any features that satisfy the above requirement as recited by the above limitations.

44. The only remaining claim in the ’067 patent is claim 19. This claim requires a selector that permits different amount of trigger travel for different selected operating modes. In my opinion, a person of ordinary skill in the art would understand that the following claim limitations (emphasized below) create such a requirement:

> 19. A trigger mechanism, comprising:
>
> a trigger assembly with a hammer having a trigger notch, a trigger body has a trigger nose, a trigger tail, and a trigger, the trigger nose for receiving the trigger notch in a cocked position of the hammer and a set position of the trigger body and for releasing the trigger nose when the trigger body is moved a travel distance from the set position to a fired position, a disconnector coupled between the hammer and the trigger body, and a selector movable between a first position and a second position for adjusting the travel distance of the trigger body;
>
> ***the selector has a first stop aligned with the tail of the trigger body in the first position, and a second stop aligned with the tail of the trigger body in the second position;***

***the first stop is separated from tail of the trigger body a first distance in the set position of the trigger body in the first position of the selector, and the second stop is separated from tail of the trigger body a second distance in the set position of the trigger body in the second position of the selector;***

***in the first position of the selector and the fired position of the trigger body the first distance between the first stop and the tail of the trigger body is closed and the tail contacts the first stop, and movement of the trigger body is arrested by the tail contacting the first stop;***

***in the second position of the selector and the fired position of the trigger body the second distance between the second stop and the tail of the trigger body is closed and the tail contacts the second stop, and movement of the trigger body is arrested by the tail contacting the second stop; and***

***the second distance is less than the first distance, wherein the travel distance of the trigger body in the second position of the selector is less than the travel distance of the trigger body in the first position of the selector.***

45. Based on my analysis of the RBT's FRT-15L3™ and Partisan Disruptor, in my opinion, the RBT's FRT-15L3™ and Partisan Disruptor do not have any features that meet the above claim requirements.

46. Therefore, in my opinion the Partisan Disruptor and FRT-15L3™ do not practice any claims of the '067 patent.

47. For this reason, in my opinion, any statement by Partisan that the Disruptor practices, or is covered by, the '067 patent, is incorrect and misleading.

Under penalty of perjury, I declare that the foregoing statements and facts stated herein are true and correct to the best of my knowledge and belief.

Date: January 16, 2026

Respectfully submitted,

Brian Luettke

the disconnector, preventing the hammer from striking the trigger body and the disconnector in the past cocked position of the hammer.

**11**. A trigger mechanism, comprising:

a trigger body having a trigger nose and a trigger pivot for pivotally coupling the trigger body to a firearm for movement of the trigger nose between set and released positions;

a reset lever mounted for pivotal movement between open and closed positions;

a disconnector having a disconnector lever, a disconnector hook, and a disconnector pivot pivotally coupling the disconnector to the trigger pivot for movement of the disconnector hook between disengaged and engaged positions in response to pivotal movement of the trigger body between the set and released positions of the trigger nose, respectively;

a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and

the disconnector lever of the disconnector is in mechanical communication with the reset lever, the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the disconnector lever to concurrently pivot the disconnector from the engaged position of the disconnector hook to the disengaged position of the disconnector hook and the trigger body from the released position of the trigger nose to the set position of the trigger nose in preparation to be received by the trigger notch in the cocked position of the hammer when the reset lever moves from the open position to the closed position.

**12**. The trigger mechanism according to claim **11**, a spring that keeps tension on the reset lever urging the reset lever toward the closed position.

**13**. The trigger mechanism according to claim **12**, wherein the reset lever isolates the hammer from the trigger body and the disconnector, preventing the hammer from striking the trigger body and the disconnector in the past cocked position of the hammer.

**14**. The trigger mechanism according to claim **6**, wherein the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer at a location between the disconnector lever and the disconnector hook.

**15**. A trigger mechanism, comprising:

a trigger body having a trigger nose and a trigger pivot for pivotally coupling the trigger body to a firearm for movement of the trigger nose between set and released positions;

a reset lever mounted for pivotal movement between open and closed positions;

a disconnector having a disconnector hook, a cam surface, and a disconnector pivot pivotally coupling the disconnector to the trigger pivot for movement of the disconnector hook between disengaged and engaged positions in response to pivotal movement of the trigger body between the set and released positions of the trigger nose, respectively;

a hammer includes a striking end, a hammer disconnect notch, a pivot end pivotable about a hammer pivot between a firing position of the striking end, a cocked



position of the striking end, and a past-cocked position of the striking end, and a trigger notch formed in the pivot end for receiving the trigger nose in the cocked position of the hammer; and

the cam surface of the disconnector is in mechanical communication with the reset lever, the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer pivoting the reset lever from the open position to the closed position, the reset lever acting on the cam surface to concurrently pivot the disconnector from the engaged position of the disconnector hook to the disengaged position of the disconnector hook and the trigger body from the released position of the trigger nose to the set position of the trigger nose in preparation to be received by the trigger notch in the cocked position of the hammer when the reset lever moves from the open position to the closed position.

**16**. The trigger mechanism according to claim **15**, a spring that keeps tension on the reset lever urging the reset lever toward the closed position.

**17**. The trigger mechanism according to claim **16**, wherein the reset lever isolates the hammer from the trigger body and the disconnector, preventing the hammer from striking the trigger body and the disconnector in the past cocked position of the hammer.

**18**. The trigger mechanism according to claim **6**, wherein the striking end of the hammer strikes the reset lever in the past-cocked position of the hammer at a location between the cam surface and the disconnector hook.

**19**. A trigger mechanism, comprising:

a trigger assembly with a hammer having a trigger notch, a trigger body has a trigger nose, a trigger tail, and a trigger, the trigger nose for receiving the trigger notch in a cocked position of the hammer and a set position of the trigger body and for releasing the trigger nose when the trigger body is moved a travel distance from the set position to a fired position, a disconnector coupled between the hammer and the trigger body, and a selector movable between a first position and a second position for adjusting the travel distance of the trigger body;

the selector has a first stop aligned with the tail of the trigger body in the first position, and a second stop aligned with the tail of the trigger body in the second position;

the first stop is separated from tail of the trigger body a first distance in the set position of the trigger body in the first position of the selector, and the second stop is separated from tail of the trigger body a second distance in the set position of the trigger body in the second position of the selector;

in the first position of the selector and the fired position of the trigger body the first distance between the first stop and the tail of the trigger body is closed and the tail contacts the first stop, and movement of the trigger body is arrested by the tail contacting the first stop;

in the second position of the selector and the fired position of the trigger body the second distance between the second stop and the tail of the trigger body is closed and the tail contacts the second stop, and movement of the trigger body is arrested by the tail contacting the second stop; and

the second distance is less than the first distance, wherein the travel distance of the trigger body in the second position of the selector is less than the travel distance of the trigger body in the first position of the selector.

* * * * *

# EXHIBIT S

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT5161257

| | |
|---|---|
| **SUBMISSION TYPE:** | NEW ASSIGNMENT |
| **NATURE OF CONVEYANCE:** | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| JEFFREY COOPER ROUNDS | 09/26/2018 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| **Name:** | WOLF TACTICAL LLC |
| **Street Address:** | 1955 FM 2001 #600 |
| **City:** | BUDA |
| **State/Country:** | TEXAS |
| **Postal Code:** | 78610 |

**PROPERTY NUMBERS Total: 1**

| Property Type | Number |
|---|---|
| **Application Number:** | 16143624 |

**CORRESPONDENCE DATA**

**Fax Number:** (513)241-6234

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:** 513-241-2324
**Email:** pschreiber@whe-law.com
**Correspondent Name:** WOOD, HERRON & EVANS, LLP
**Address Line 1:** 2700 CAREW TOWER
**Address Line 2:** 441 VINE STREET
**Address Line 4:** CINCINNATI, OHIO 45202

| | |
|---|---|
| **ATTORNEY DOCKET NUMBER:** | WOLFTAC-03US |
| **NAME OF SUBMITTER:** | GLENN D. BELLAMY |
| **SIGNATURE:** | /Glenn D. Bellamy/ |
| **DATE SIGNED:** | 09/27/2018 |

**Total Attachments: 2**
source=Declaration_Assignment#page1.tif
source=Declaration_Assignment#page2.tif

Attorney Docket: WOLFTAC-03US

**DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN PATENT APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76) AND ASSIGNMENT**

Title of Invention:

**Firearm Trigger Mechanism**

As the below named inventor, I hereby declare that:

This Declaration is directed to:

☐ The attached application

OR

☐ United States Application Number or PCT International Application Number ________________ filed on ________________ .

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the above-identified application.

I have reviewed and understand the contents of the above-identified application, including the claims.

I am aware of the duty to disclose to the United States Patent and Trademark Office all information known to me to be material to patentability as defined in 37 C.F.R. § 1.56.

Whereas, the undersigned inventor(s) has/have made certain inventions, improvements and discoveries (herein referred to as the "Invention") disclosed in the above-identified patent application;

Whereas, Wolf Tactical LLC, a Texas Limited Liability Company of United States of America, having a place of business at 1955 FM 2001 #600, Buda, Texas 78610 (herein referred to as the "ASSIGNEE"), desires to acquire, and each undersigned inventor desires to grant to the ASSIGNEE, the entire worldwide right, title, and interest in and to the Invention and in and to any and all patent applications and patents directed thereto;

Now, therefore, for good and valuable consideration, the receipt and sufficiency thereof being hereby acknowledged, each undersigned inventor ("ASSIGNOR") hereby sells or has sold, assigns or has assigned, and otherwise transfers or has transferred to the ASSIGNEE, its successors, legal representatives, and assigns, the entire worldwide right, title, and interest in and to the Invention, the above-identified United States patent application, and any and all other patent applications and patents for the Invention which may be applied for or granted therefor in the United States and in all foreign countries and jurisdictions, including all divisions, continuations, reissues, reexaminations, renewals, extensions, counterparts, substitutes, and extensions thereof, and all rights of priority resulting from the filing of such applications and

granting of such patents. In addition, each undersigned inventor hereby authorizes and requests the Director of the United States Patent and Trademark Office to issue any United States Patent, and foreign patent authorities to issue any foreign patent, granted for the Invention, to the ASSIGNEE, its successors, legal representatives, and assigns, the entire worldwide right, title, and interest in and to the same to be held and enjoyed by the ASSIGNEE, its successors, legal representatives, and assigns to the full end of the terms for which any and all such patents may be granted, as fully and entirely as would have been held and enjoyed by the undersigned had this Assignment not been made; and each undersigned inventor agrees to execute any and all documents and instruments and perform all lawful acts reasonably related to recording this Assignment or perfecting title to the Invention and all related patents and applications, in the ASSIGNEE, its successors, legal representatives, and assigns, whenever requested by the ASSIGNEE, its successors, legal representatives, or assigns.

Each undersigned inventor acknowledges their prior and ongoing obligations to sell, assign, and transfer the rights under this Assignment to the ASSIGNEE and is unaware of any reason why they may not have the full and unencumbered right to sell, assign, and transfer the rights hereby sold, assigned, and transferred, and has not executed, and will not execute, any document or instrument in conflict herewith. Each undersigned inventor also hereby grants the ASSIGNEE, its successors, legal representatives, and assigns, the right to insert in this Assignment any further identification (including, but not limited to, patent Application Number) which may be necessary or desirable for recordation of this Assignment. This Assignment is governed by the substantive laws of United States of America, and any disputes will be resolved in a court sited in United States of America.

In the event that the filing date and/or Application No. are not entered above at the time I execute this document, and if such information is deemed necessary, I hereby authorize and request the attorneys/agent(s) at Wood Herron & Evans LLP, 2700 Carew Tower, 441 Vine Street, Cincinnati, Ohio 45202-2917, to insert the filing date and/ or Application No. of said application into this document.

I hereby acknowledge that any willful false statement made in this Declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

**Legal name of Inventor**: Jeffrey Cooper Rounds

Inventor's Signature: Jeffrey Cooper Rounds Date: 26 September 2018

Residence City/State/Country: Buda, Texas, United States of America

Mailing Address: 1250 Robert S. Light Drive
Apartment 7101
Buda, TX 78610

Citizenship: US

# EXHIBIT T

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT6146769

| | |
|---|---|
| **SUBMISSION TYPE:** | NEW ASSIGNMENT |
| **NATURE OF CONVEYANCE:** | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| WOLF TACTICAL, LLC | 05/07/2020 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| **Name:** | RARE BREED TRIGGERS, LLC |
| **Street Address:** | 733 WEST COLONIAL DRIVE |
| **City:** | ORLANDO |
| **State/Country:** | FLORIDA |
| **Postal Code:** | 32804 |

**PROPERTY NUMBERS Total: 1**

| Property Type | Number |
|---|---|
| **Patent Number:** | 10514223 |

**CORRESPONDENCE DATA**

**Fax Number:**

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:** 5127409472
**Email:** cooper@atxwolf.com
**Correspondent Name:** JEFFREY COOPER ROUNDS
**Address Line 1:** 1955 FM 2001 STE 600
**Address Line 4:** BUDA, TEXAS 78610

| | |
|---|---|
| **NAME OF SUBMITTER:** | JEFFREY COOPER ROUNDS |
| **SIGNATURE:** | /Jeffrey Cooper Rounds/ |
| **DATE SIGNED:** | 06/10/2020 |
| | This document serves as an Oath/Declaration (37 CFR 1.63). |

**Total Attachments: 1**
source=HRT Assignment B&W#page1.tif

# INTELLECTUAL PROPERTY ASSIGNMENT OF RIGHTS

Wolf Tactical, LLC, a Texas Limited Liability Company of United States of America, having place of business at 1955 FM 2001 #600, Buda, Texas 78610 (herein referred to as the "Assignor"), is owner of U.S. Patent Number 10514223, dated December 24, 2019, titled Firearm Trigger Mechanism (herein referred to as the "Patent"). Rare Breed Triggers, LLC, a Florida Limited Liability Company of United States of America (herein referred to as the "Assignee") desires to acquire rights in and to the Patent.

Therefore, for good and valuable consideration, the receipt and sufficiency thereof being hereby acknowledged, Assignor hereby sells or has sold, assigns or has assigned, and otherwise transfers or has transferred 100% (One Hundred Percent) of its right, title, and interest in the invention and Patent to Assignee for the entire term of the Patent and any reissues or extensions and for the entire terms of any patents, reissues, or extensions that may issue from foreign applications, divisions, continuations in whole or part, or substitute applications filed claiming the benefit of the Patent. This assignment also includes any past, present, and future claims for infringement.

The right, title, and interest conveyed in this Assignment is to be held and enjoyed by Assignee and Assignee's successors as fully and exclusively as it would have been held and enjoyed by Assignor had this assignment not been made.

Assignor further agrees to: (a) execute, verify, acknowledge and deliver all such papers, including patent applications and instruments of transfer; and (b) perform such other acts as Assignee lawfully may request to obtain or maintain the Patent and any and all applications and registrations for the invention in any and all countries.

Assignor:

Jeffrey Cooper Rounds

______________________________

Jeffrey Cooper Rounds
Managing Member for Wolf Tactical LLC

Date: May 7, 2020

On this 4th day of June 2020, before me, Trinity Tristan, the undersigned Notary Public, personally appeared Jeffrey Cooper Rounds, ASSIGNOR, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he or she executed the same.

WITNESS my hand and official seal in Hays County of Texas on the date set forth in this certificate.

______________________________

Notary Public

TRINITY TRISTAN
NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID 12672553-3
01/10/2021



PATENT
RECORDED: 06/10/2020 REEL: 052893 FRAME: 0733

# EXHIBIT U